1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  TAMAR PACHTER, State Bar No. 146083
   Supervising Deputy Attorney General
3  NELSON R. RICHARDS, State Bar No. 246996
   EMMANUELLE S. SOICHET, State Bar No. 290754
4  Deputy Attorneys General
   2550 Mariposa Mall, Room 5090
5  Fresno, CA  93721
   Telephone:  (559) 477-1688
6  Fax:  (559) 445-5106
   E-mail:  Nelson.Richards@doj.ca.gov
7  *Attorneys for Defendants*
   *Kamala D. Harris and*
8  *Stephen J. Lindley*

9                 IN THE UNITED STATES DISTRICT COURT

10               FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13
   **TRACY RIFLE AND PISTOL LLC;**          2:14-cv-02626-TLN-DAD
14 **MICHAEL BARYLA; TEN PERCENT**
   **FIREARMS; WESLEY MORRIS;**
15 **SACRAMENTO BLACK RIFLE, INC.;**
   **ROBERT ADAMS; PRK ARMS, INC.; and**   **DEFENDANTS' OPPOSITION TO**
16 **JEFFREY MULLEN,**                      **PLAINTIFFS' MOTION FOR**
                                            **PRELIMINARY INJUNCTION**
17                        Plaintiffs,
                                            Date:          March 12, 2015
18        v.                                Time:          2:00 p.m.
                                            Judge:         Hon. Troy L. Nunley
19                                          Action Filed:  Nov. 10, 2014
   **KAMALA D. HARRIS, in her official**
20 **capacity as Attorney General of California;**
   **and STEPHEN J. LINDLEY, in his official**
21 **capacity as Chief of the California**
   **Department of Justice Bureau of Firearms,**
22
                          Defendants.
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Table of Authorities ....................................................................................................................ii

Introduction .............................................................................................................................. 1

Background ............................................................................................................................... 1

    I.     California's regulation of handgun advertisements visible from the outside of licensed firearms retailers. ................................................................................ 1

    II.    Several plaintiffs violate section 26820. .................................................................. 4

Argument .................................................................................................................................. 5

    I.     Legal standard .......................................................................................................... 5

    II.    Plaintiffs are not likely to succeed on the merits because section 26820 is a constitutionally permissible commercial speech regulation. ..................................... 5

          A.    California has a substantial public health and safety interest in reducing handgun-related crime and violence. ............................................ 7

          B.    Section 26820 directly advances California's interests by decreasing the likelihood of emotion-driven impulse purchases of handguns. ......................................................................................................... 8

               1.    Courts have found that advertising regulations can directly advance a substantial state interest by dampening demand. ........... 9

               2.    Common sense and public health research both support the conclusion that section 26820 directly advances California's interest in decreasing handgun violence. ..................................... 10

               3.    Plaintiffs' arguments that section 26820 does not directly advance California's interests are misguided ............................. 12

          C.    Section 26820 limits commercial speech no more than necessary to advance California's interest in public health and safety. ....................... 14

          D.    No special heightened scrutiny applies to regulation of advertisements. .................................................................................... 15

    III.   Because section 26820 does not violate the First Amendment, plaintiffs cannot establish that they are likely to suffer irreparable harm. .......................... 16

    IV.   The balance of equities tips in California's favor. ................................................. 17

Conclusion ............................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page**

CASES

1-800-411-Pain Referral Serv. LLC v. Otto
    744 F.3d 1045 (8th Cir. 2014) ............................................................................ 16

Actmedia, Inc. v. Stroh
    830 F.2d 957 (9th Cir. 1986) ..................................................................... passim

Ass'n of Nat'l Advertisers v. Lungren
    44 F.3d 726, 728 (9th Cir. 1994) ............................................................. 9, 10, 13

Bd. of Tr. of State Univ. of N.Y. v. Fox
    492 U.S. 469 (1989) ............................................................................ 5, 6, 8, 14

Bolger v. Youngs Drug Prods. Corp.
    463 U.S. 60 (1983) ............................................................................................ 6, 7

Ctr. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n
    447 U.S. 557 (1980) ......................................................................... 6, 14, 15, 16

Charles v. City of L.A.
    697 F.3d 1146 (9th Cir. 2012) ............................................................................ 6

Coal. for Econ. Equity v. Wilson
    122 F.3d 718 (9th Cir. 1997) ............................................................................ 17

Coyote Publ'g Inc. v. Miller
    598 F.3d 592 (9th Cir. 2010) ..................................................................... passim

District of Columbia v. Heller
    554 U.S. 570 (2008) ........................................................................................... 7

Eller Media Co. v. City of Oakland
    No. C98–2237 FMS, 1998 WL 549494 (N.D. Cal. Aug. 28, 1998) .................... 17

Fla. Bar v. Went For It, Inc.
    515 U.S. 618 (1995) ................................................................................. 5, 10, 15

G & G Fremont LLC v. City of Las Vegas
    No. 2:14–CV–1006 JCM (PAL), 2014 WL 5062548 (D. Nev. Oct. 9, 2014) ....... 10, 16

Jackson v. City & Cnty. of S.F.
    746 F.3d 953 (9th Cir. 2014) ..................................................................... 8, 10, 13, 15

Kachalsky v. Cnty. of Westchester
    701 F.3d 81 (2d Cir. 2012) ................................................................................. 2

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*King v. Gen. Info. Servs., Inc.*

4
   903 F. Supp. 2d 303 (E.D. Pa. 2012) ................................................................. 16

5
*Maryland v. King*
   133 S. Ct. 1 (2012) .............................................................................................. 17

6

7
*Metro Lights, LLC v. City of L.A.*
   551 F.3d 898 (9th Cir. 2009) ......................................................................... 8, 16

8
*Minority Television Project, Inc. v. FCC*
   736 F.3d 1192 (9th Cir. 2013) (en banc) ............................................................ 16

9

10
*Ohralik v. Ohio State Bar Ass'n*
   436 U.S. 447 ...................................................................................................... 7, 8

11
*Preminger v. Principi*

12
   422 F.3d 815 (9th Cir.2005) ......................................................................... 16, 17

13
*Retail Digital Network, LLC v. Appelsmith*
   945 F. Supp. 2d 1119 (C.D. Cal. 2013) .............................................................. 16

14

15
*Sorrell v. IMS Health Inc.*
   131 S. Ct. 2653 (2011) ............................................................................12, 15, 16

16
*United States v. Edge Broad.*

17
   509 U.S. 418 (1993).......................................................................................... 9, 13

18
*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)............................................................................................ 13

19

20
*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)................................................................................................. 5

21
**STATUTES**

22
1917 California Statute

23
   Chapter 145 ........................................................................................................... 2

24
1923 California Statute
   Chapter 339 ........................................................................................................... 2

25
   Chapter 339, § 11(4) ............................................................................................. 3

26
1935 California Statute .......................................................................................... 9

27
California Penal Code

28
   § 26820.......................................................................................................... passim

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

§ 26920.............................................................................................................3

4

Ala. Code § 13A-11-79....................................................................................4

5

D.C. Code § 22-4510(a)(6)..............................................................................4

6

R.I. General Laws § 11-47-40..........................................................................4

7

S. 4012, 67th Cong. (1922)..............................................................................3

8

**CONSTITUTIONAL PROVISIONS**

9

United States Constitution

10

First Amendment .......................................................................................... passim

11

Second Amendment ................................................................................. 6, 8, 13

12

**OTHER AUTHORITIES**

13

14

Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767, 767 (1926)..............................2

15

Garen J. Wintemute et al., *Mortality Among Recent Purchasers of Handguns*, 341 New
Eng. J. Med. 1583 (1999)...................................................... 11

16

17

*Handbook of the National Conference of Commissioners on
Uniform State Laws* (1924) ........................................................ 2, 3

18

John Henry Sloan et al., *Handgun Regulations, Crime, Assaults, and Homicide: A Tale of
Two Cities*, 318 New Eng. J. Med. 913, 922 (1988)............................. 11

19

20

Bureau of Justice Statistics, U.S. Department of Justice, *Firearm
Violence, 1993-2011* (2013) ...................................................... 7, 14

21

22

K.M. Grassel et al., *Association Between Handgun Purchase and Mortality from Firearm
Injury* .................................................................................... 11, 12

23

24

Kamala D. Harris, Attorney General, *2013 Firearms Used in the
Commission of Crimes* (2013) ........................................................ 7

25

Kamala D. Harris, Attorney General, *Homicide in California, 2013* (2013) ............... 7

26

Law Enforcement, *For a Better Enforcement of the Law*, 8 A.B.A. J. 588 (1922)...........3

27

Lee Kennett & James LaVerne Anderson, *The Gun in America* (1975) .......................... 1, 2, 4

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

Mathew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New

4

Eng. J. Med. 898 (2008).................................................................................................... 12

Michael Siegel et al., *The Relationship Between Gun Ownership and Firearm Homicide*

5

*Rates in the United States, 1981-2010* .................................................................................. 11

6

Peter Cummings et al., *The Association Between the Purchase of a Handgun and*

7

*Homicide or Suicide*............................................................................................................... 11

8

*Proceedings of the Thirty-Fourth Annual Meeting of the National Conference of*

*Commissioners on Uniform State Laws* 47 Ann. Rep. A.B.A. 522 (1924)............................ 2

9

*Report of the California Crime Commission* (1929) ................................................................ 3, 4

10

Report of the Standing Committee on Uniform State Laws, *Report of the Forty-Ninth*

11

*Annual Meeting of the American Bar Association* (1926) ........................................................ 4

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2       Plaintiffs' motion for a preliminary injunction lacks merit.  California's 90-year-old law

3  regulating handgun advertising on the outside of firearms retailers is a permissible regulation of

4  commercial speech, and does not violate their First Amendment rights.  In California, like the rest

5  of the country, handgun-related violence is a significant public health and safety concern.  The

6  link between handguns and violent death emerged in the early twentieth century, prompting

7  California to regulate firearms dealers and to restrict outdoor handgun advertising.  Those

8  advertising restrictions are now codified in California Penal Code section 26820, which provides

9  that "[n]o handgun or imitation handgun, or placard advertising the sale or other transfer thereof,

10  shall be displayed in any part of the premises where it can readily be seen from the outside."

11       Section 26820 satisfies constitutional requirements for regulation of commercial speech.

12  California has a substantial interest in decreasing handgun violence, and section 26820 directly

13  advances that interest by dampening demand for emotion-driven impulse purchases of handguns.

14  Because section 26820 restricts no more speech than necessary to achieve that goal, plaintiffs

15  cannot establish a likelihood of success on the merits of their First Amendment claim, and, as a

16  result, they cannot show either irreparable harm or that equity favors an injunction.  This Court

17  should therefore deny plaintiffs' motion for preliminary relief.

18

**BACKGROUND**

19  **I.**    **CALIFORNIA'S REGULATION OF HANDGUN ADVERTISEMENTS VISIBLE FROM THE**
             **OUTSIDE OF LICENSED FIREARMS RETAILERS.**
20

21       California's regulation of outdoor handgun advertising began about a century ago.  Around

22  the turn of the twentieth century, concealable firearms—pistols and revolvers—became a growing

23  source of social concern.[1]  A rise in handgun violence, including President William McKinley's

24  1901 assassination, spurred regulation.[2]  New York, America's largest city, felt the effects of

25  handgun violence acutely.[3]  Between 1910 and 1911, the city's mayor was shot in the neck by a

26

---

27    [1] *See* Lee Kennett & James LaVerne Anderson, *The Gun in America* 165-67 (1975).
      [2] *See id.* at 165-67.
      [3] *See id.* at 170-74.
28

disgruntled civil servant wielding a pistol, a public revolver battle erupted within a fraternal organization, protesting laborers were shot by someone they mistook for a scab, ethnic gang wars were fueled by handguns, and a well-known novelist was murdered by a violinist who then turned his revolver on himself.[4]   The city's coroner later estimated that firearms homicides increased 50% in 1910.[5]   This violence was part of a larger trend of increasing handgun use in the commission of crimes; between 1907 and 1910, the New York City police confiscated more than seven revolvers a day, 10,567 in all.[6]

New York State responded by enacting the Sullivan Law, the first statute in the United States that regulated the carrying of concealed firearms as well as the sale and possession of firearms.[7]   The Sullivan Law made it a felony to carry a concealed firearm without a license.[8]   It also required a permit to possess a concealable firearm, and it required sellers to keep records of sales.[9]   Many states followed New York's lead.

California enacted a law to regulate firearms capable of being concealed on the person in 1917.[10]   Around the same time, the United States Revolver Association developed a model firearms law that it promoted to state legislatures and the American Bar Association's committee on uniform laws.[11]   The Revolver Association drafted its model law in consultation with various police officials, academics, and military groups.[12]   California adopted the Revolver Association's model law in 1923, repealing the 1917 law.[13]   Though it modified some aspects of the model law,

---

[4]   *Id.* at 172-74.
[5]   *Id.* at 174.
[6]   *Id.* at 179.
[7]   *Id.* at 175; *see also Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 84-85 (2d Cir. 2012) (discussing origins of Sullivan Law and noting that it arose from the "rise in violent crime associated with concealable firearms in the early twentieth century").
[8]   Kennett & Anderson, *supra*, at 181-82.
[9]   *Id.* at 182.
[10]   Richards Decl. Ex. 1 (1917 Cal. Stat. ch. 145).
[11]   *See* Richards Decl. Ex. 2 (*Proceedings of the Thirty-Fourth Annual Meeting of the National Conference of Commissioners on Uniform State Laws*, 47 Ann. Rep. A.B.A. 522, 565 (1924)); Richards Decl. Ex. 3 (*Handbook of the National Conference of Commissioners on Uniform State Laws* 728-32 (1924)).
[12]   Richards Decl. Ex. 3 (*Handbook, supra* note 11, at 724).
[13]   *See* Richards Decl. Ex. 4 (1923 Cal. Stat. ch. 339); Richards Decl. Ex. 5 (Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767, 767 (1926) ("The California Act of 1923 . . . follows the Revolver Association Act very closely.")).

2

California adopted the regulation of handgun advertising visible from the outside of firearms retailers without alteration.[14]   The language of the 1923 law is essentially the same language now found in section 26820.[15]

Although the legislative history of California's enactment of the Revolver Association's model law may no longer exist, other contemporaneous sources provide clues to legislative intent. According to one newspaper article, the Governor signed the bill at the behest of the president of the Sacramento Rifle and Revolver Club.[16]   The bill was "[a]imed at disarming the lawless," and the club president was quoted as saying that it was modeled on a similar bill offered in Congress for sales in the District of Columbia.[17]   Concerns about handgun violence were indeed widespread.  For instance, in 1922, a special committee of the ABA noted that 90% of murder victims nationwide were killed with pistols and that firearms emboldened criminals to commit violent crime.[18]   A few years later, the California Crime Commission reported that "[r]obberies and burglaries are almost invariably committed with the aid of pistols" and that "[g]uns are frequently used in murders, manslaughters, highjacking and rum-running."[19]

In 1925, the ABA's committee on uniform laws adopted the Revolver Association's model firearms law, with minor changes, as the Uniform Firearms Act.[20]   The committee became interested in the Revolver Association's approach after California enacted it, and as national interest in firearms regulation swelled after bootleggers accidentally shot a sitting U.S. Senator on the streets of Washington, D.C.[21]   The committee concluded that the model law had the "intrinsic merits of clearness and simplicity," that it had been accepted by several jurisdictions, and that the

---

[14]   *See* Richards Decl. Ex. 4 (1923 Cal. Stat. ch. 339, § 11(4)).

[15]   *Compare id.* ("No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.") *with* Cal. Penal Code § 26920 ("No handgun or imitation handgun, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside.").

[16]   *See* Richards Decl. Ex. 6 (*New Firearms Law Effective on August 7*, S.F. Chron., July 15, 1923).

[17]   *Id.*; *see also* Richards Decl. Ex. 7 (S. 4012, 67th Cong. (1922)).

[18]   *See* Richards Decl. Ex. 8 (Committee on Law Enforcement, *For a Better Enforcement of the Law*, 8 A.B.A. J. 588, 590-91 (1922)).

[19]   Richards Decl. Ex. 9 (*Report of the California Crime Commission* 20 (1929)).

[20]   *See* Richards Decl. Ex. 5 (Imlay, *supra* note 13, at 767).

[21]   Richards Decl. Ex. 3 (*Handbook*, *supra* note 11, at 712).

3

1   need for a uniform law was "evident from the daily newspaper records of crimes of violence

2   committed with the revolver."[22]  Section 11 of the uniform act addressed dealer licenses,

3   incorporating the same regulation of outdoor handgun advertising as California's law.[23]  Speaking

4   about the licensing section generally, including the outdoor advertising regulation, the committee

5   explained that the provisions were "in line with all modern legislation" and constituted the "chief

6   safeguard" against criminals obtaining firearms.[24]  The National Rifle Association also supported

7   the uniform act, both helping to frame the District of Columbia's version and publicly

8   commending it during 1934 congressional hearings on a national firearms act.[25]

9        The California Crime Commission, looking back on the state's first few years of

10   implementing its version of the firearms law, touted the law as "excellent" and integral to

11   "curbing the unrestrained sale of guns."[26]

12   **II.   SEVERAL PLAINTIFFS VIOLATE SECTION 26820.**

13        Plaintiffs are licensed firearms dealers.  Some of the plaintiffs received notices that they

14   were out of compliance with section 26820.  Compl. ¶¶ 26-29, ECF No. 1.  About five years ago,

15   California's Bureau of Firearms inspected plaintiff Ten Percent Firearms, and gave notice that a

16   metal sign shaped like a revolver that hung above the store violated section 26820.[27]  An

17   employee took the sign down.[28]  In September 2014, the Bureau notified plaintiffs Tracy Rifle &

18   Pistol and its owner, plaintiff Michael Baryla, that large vinyl decals depicting handguns that the

19   store had displayed in its windows violated section 26820.[29]  The handgun decals remain

20   displayed.

21   _____

22   [22]   *See* Richards Decl. Ex. 5 (Imlay, *supra* note 13, at 767).
     [23]   *See* Richards Decl. Ex. 10 (Report of the Standing Committee on Uniform State Laws,
     *Report of the Forty-Ninth Annual Meeting of the American Bar Association* 557-58 (1926)).

23   [24]   *Id.* at 561.
     [25]   Kennett & Anderson, *supra*, at 206, 210.  The outdoor handgun advertising restrictions

24   continue in effect in Washington, D.C.  *See* D.C. Code § 22-4510(a)(6).  Other states codes also
     continue to include the restrictions.  *E.g.*, Ala. Code § 13A-11-79; R.I. Gen. Laws § 11-47-40.

25   [26]   Richards Decl. Ex. 9 (*Report of the California Crime Commission*, *supra* note 19,
     at 22).

26   [27]   Morris Decl. ¶ 4, ECF No. 6; Rowden Decl. ¶ 4, ECF No. 8.
     [28]   Rowden Decl. ¶ 4.

27   [29]   Baryla Decl. ¶¶ 4-5, ECF No. 9.  Exhibit 1 to the Baryla declaration contains pictures

28   of the handgun decals, and exhibit 2 is a redacted version of the Bureau's inspection findings.

4

1    After plaintiffs filed the complaint in this action, the Bureau notified another store and its

2    owner, Imbert & Smithers and Alex Rolsky, that they were in violation of section 26820 because

3    the store's sign incorporates an outline of a revolver.[30]   The Bureau allowed Imbert & Smithers

4    and Rolsky until the end of July 2015 to correct the violation.  The parties have stipulated to

5    joining them as plaintiffs in this action.[31]

6        Other plaintiffs have not violated section 26820, but have said that they would display

7    handgun advertisements visible from the outside of their stores absent the law.[32]

8                                          **ARGUMENT**

9    **I.    LEGAL STANDARD**

10       "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v.*

11   *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs requesting an injunction must

12   establish that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable

13   harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an

14   injunction is in the public interest.  *Id.* at 20.  An injunction may issue only upon a clear showing

15   that plaintiffs are entitled to relief.  *Id.* at 22.

16   **II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE
      SECTION 26820 IS A CONSTITUTIONALLY PERMISSIBLE COMMERCIAL SPEECH
17    REGULATION.**

18       Plaintiffs cannot show a likelihood of success on the merits because section 26820 is a

19   permissible regulation of commercial speech.  Commercial speech occupies a "subordinate

20   position in the scale of First Amendment values, and is subject to modes of regulation that might

21   be impermissible in the realm of noncommercial expression."  *Bd. of Tr. of State Univ. of N.Y. v.*

22   *Fox*, 492 U.S. 469, 477 (1989) (quotation marks omitted); *Fla. Bar v. Went For It, Inc.*, 515 U.S.

23   618, 623 (1995) ("We have always been careful to distinguish commercial speech from speech at

24   the First Amendment's core.").  To determine whether regulated speech is commercial speech,

25   courts examine whether it proposes a commercial transaction, whether it is in an advertisement,

26   _____

27   [30]  Stip. & Proposed Order Regarding Joinder of Add'l Pls. 1, ECF No. 17.
      [31]  *Id.*
28   [32]  Mullen Decl. ¶ 3, ECF No. 7; Adams Decl. ¶ 3, ECF No. 10.

                                               5

1   whether it promotes a specific product, and whether the speaker has an underlying economic

2   motive. *See Charles v. City of L.A.*, 697 F.3d 1146, 1151-52 (9th Cir. 2012) (discussing *Bolger v.*

3   *Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983)). By its terms, section 26820 regulates

4   commercial speech because it specifically regulates "advertising," limiting how licensed firearms

5   dealers may display handguns or handgun advertisements that can be seen from the outside of

6   their stores. *See* Cal. Penal Code § 26820; *see also id.* § 26805 (allowing dealers to sell firearms

7   only in buildings designated in license).[33]

8          Regulation of commercial speech is reviewed according to the intermediate-scrutiny test

9   announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557,

10  563-66 (1980). *Coyote Publ'g Inc. v. Miller*, 598 F.3d 592, 598-610 (9th Cir. 2010). The four-

11  part *Central Hudson* test starts by asking whether the commercial speech at issue concerns a

12  lawful activity and is not misleading. *Central Hudson*, 447 U.S. at 566. If so, then government

13  regulation of commercial speech will be upheld so long as the government asserts a substantial

14  interest, the regulation directly advances the government's asserted interest, and the regulation is

15  no more restrictive than necessary to serve that interest. *See id.*

16         Because section 26820 regulates non-misleading speech related to the lawful activity of

17  selling firearms, the merit of plaintiffs' First Amendment claims turns on the final three *Central*

18  *Hudson* factors. As set forth below, section 26820 satisfies the *Central Hudson* test, and

19  plaintiffs thus cannot establish a likelihood of success on the merits.

20

21

22

23         [33] It does not matter, for purposes of First Amendment analysis, that the advertising being

24  regulated may promote commercial activity related to the exercise of a constitutionally protected
    right, here the assertion of a Second Amendment right to bear arms. Commercial speech receives

25  a lesser measure of First Amendment protection. *Fox*, 492 U.S. at 475 ("[C]ommunications can
    constitute commercial speech notwithstanding the fact that they contain discussions of important

26  public issues . . . . We have made clear that advertising which links a product to a current public
    debate is not thereby entitled to the constitutional protection afforded noncommercial speech."

27  (quotation marks omitted)); *Charles*, 697 F.3d at 1152 (explaining that even though a news
    broadcast may receive "full First Amendment protection," that fact does not "cloak all

28  advertisements for the program with noncommercial status").

6

**A. California Has a Substantial Public Health and Safety Interest in Reducing Handgun-Related Crime and Violence.**

California has a substantial public health and safety interest in reducing handgun-related crime and violence. *Cf. District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) (noting the "problem of handgun violence in this country"). The problem of handgun violence has plagued society for at least a century. In the Progressive Era, political assassinations and attempted assassinations, public shoot-outs, and a general rise in violent crime brought handgun violence to the public's attention, as did the fact that so many murders—by some accounts 90%[34]—were committed using a handgun. Today, handgun violence remains a significant problem in California. About half of California's murder victims in recent years were killed with handguns, amounting to over one thousand deaths each year.[35] One 2013 study focusing on California's rural areas noted that 90% of guns recovered from crime scenes and sent to the state's crime laboratory were handguns.[36] A recent nationwide study by the U.S. Department of Justice reports that "[a]bout 70% to 80% of firearm homicides and 90% of nonfatal firearm victimizations were committed with a handgun from 1993 to 2011."[37] In that period, between 6,900 and 13,500 people annually were killed with handguns and between 43,000 and 94,000 people annually were assaulted or otherwise victimized in nonfatal crimes involving handguns.[38]

Suicide is also a prevalent form of handgun violence. Between 2005 and 2009, over 1,000 Californians used handguns to kill themselves.[39]

---

[34] *See* Richards Decl. Ex. 8 (Committee on Law Enforcement, *supra* note 18, at 590-91).
[35] Richards Decl. Ex. 11 (Kamala D. Harris, Attorney General, *Homicide in California, 2013* 31 (2013)).
[36] Richards Decl. Ex. 12 (Kamala D. Harris, Attorney General, *2013 Firearms Used in the Commission of Crimes* 2 (2013)).
[37] Richards Decl. Ex. 13 (Bureau of Justice Statistics, U.S. Department of Justice, *Firearm Violence, 1993-2011* 1 (2013)).
[38] *Id.* at 3, 20.
[39] Richards Decl. Ex. 14. Exhibit 14 is a printout from the California Department of Public Health's California Violent Death Reporting System, available at http://epicenter.cdph.ca.gov/. Although suicide does not appear to have been a significant consideration in the adoption of California's 1923 law, the state is not limited to its original reasons for passing a law in intermediate-scrutiny review. *See Bolger*, 463 U.S. at 71 (permitting government to "advance[] interests that concededly were not asserted when the prohibition was enacted into law. This reliance is permissible since the insufficiency of the original motivation does not diminish other interests that the restriction may now serve"); *Ohralik v. Ohio State Bar*
(continued...)

7

These statistics demonstrate that handguns play a significant role in crime and violent deaths. As compared with other types of firearms, they play a unique role in criminal activity and suicide. The Ninth Circuit has recognized that government has a "self-evident" public-safety interest in regulating handguns themselves to reduce the risk of firearm injury and death. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 965 (9th Cir. 2014) (upholding ordinance requiring locked storage of firearms in the home against Second Amendment challenge on intermediate-scrutiny review). The government's public safety interest is equally strong in regulating commercial speech. *See Fox*, 492 U.S. at 475 (recognizing substantial government interest in "promoting safety and security" on public college campuses); *Metro Lights, LLC v. City of L.A.*, 551 F.3d 898, 904 (9th Cir. 2009) (recognizing "traffic safety" as a substantial government interest).

**B.    Section 26820 Directly Advances California's Interests by Decreasing the Likelihood of Emotion-Driven Impulse Purchases of Handguns.**

Section 26820 directly advances California's public health and safety interest in diminishing handgun-related crime and violence. The law targets impulse purchases of handguns: it does not regulate advertising inside the store that can be seen by people already there but that cannot be seen outside, nor does it regulate advertising that is not on or in a store; it regulates only advertising that can be seen by persons near a store. Those people, who otherwise might not enter the store, might respond on impulse to an advertisement in the store by entering and purchasing a handgun—indeed, that is the self-evident purpose of that kind of advertising, to draw people in and induce them to purchase a handgun. By restricting handgun ads that are visible from outside the store, section 26820 is designed to decrease the number of emotion-driven impulse purchases of handguns, and thereby reduce handgun-related crime and violence. As set forth below, the law, public health research, as well as history, consensus and simple common sense, demonstrate that public health and safety are advanced by limiting handgun advertising visible from the outside of a store.

---

(…continued)

*Ass'n*, 436 U.S. 447, 460 ("[T]he fact that the original motivation behind the ban on solicitation today might be considered an insufficient justification for its perpetuation does not detract from the force of the other interests the ban continues to serve.").

1

**1.   Courts have found that advertising regulations can directly advance a substantial state interest by dampening demand.**

2

3     The Supreme Court has long held that the government may restrict advertising in order to

4  dampen demand, and thereby advance a substantial government interest.  *See, e.g.*, *United States*

5  *v. Edge Broad.*, 509 U.S. 418, 434 (1993) ("If there is an immediate connection between

6  advertising [for gambling] and demand, and the federal regulation decreases advertising, it stands

7  to reason that the policy of decreasing demand for gambling is correspondingly advanced.").

8     The Ninth Circuit has also recognized that "advertising tends to stimulate demand for

9  products and services," *Coyote Publ'g*, 598 F.3d at 609, and has held that the state may advance a

10  substantial interest by restricting advertising to limit demand for products and services that have

11  negative effects on purchasers or a detrimental impact on those not party to the transaction.  In

12  *Actmedia, Inc. v. Stroh*, the court reviewed a 1935 California statute banning retail point-of-sale

13  advertisements for alcoholic beverages paid for by their manufacturers.  830 F.2d 957, 959-62

14  (9th Cir. 1986).  The ban was enacted in response to "widely held" concerns that paid

15  advertisements could promote both anticompetitive conduct and excessive alcohol consumption.

16  *See id.* at 967.  The court held that the ban directly advanced the state's dual interests in

17  preventing vertical and horizontal integration in the alcoholic beverage industry and promoting

18  temperance, stating that it "hesitate[d] to disagree with the accumulated, common-sense

19  judgments of the lawmakers who originally enacted the provision or who have retained it in

20  effect."  *Id.* (quotation marks and alterations omitted).  Just as restrictions on point-of-sale

21  advertising of alcohol directly promoted California's substantial interest in temperance, the

22  restrictions on advertising handguns on the outside of firearm retailers directly promotes the

23  state's substantial interest in promoting public safety.

24     Similarly, in *Coyote Publishing*, the Ninth Circuit held that Nevada's advertising

25  restrictions on legal brothels directly advanced the state's substantial interest in limiting the

26  commodification of sex.  598 F.3d at 608.  And in *Association of National Advertisers v.*

27  *Lungren*, the court held that a California statute limiting how consumer product manufacturers

28  could use certain environmental buzzwords, such as "biodegradable" and "recycled," in their

9

1    advertising directly advanced the State's interest in environmental protection.  *See* 44 F.3d 726,

2    728 (9th Cir. 1994).

3         Here, reducing demand for handguns by regulating advertising would reduce the number of

4    handguns sold, and correspondingly the number of handgun-related crimes and suicides.

> ###   2.   Common sense and public health research both support the conclusion that section 26820 directly advances California's interest in decreasing handgun violence.

7         Regulation of commercial speech may be "based solely on history, consensus, and simple

8    common sense." *Fla. Bar*, 515 U.S. at 628 (quotation marks omitted).  It is reasonable to

9    conclude that handgun purchases made on impulse in response to advertising that can be seen

10   from the outside of a firearms store—as opposed to those made with deliberation, by people who

11   have decided to enter a firearms store—are more likely to be used in a violent crime or suicide,

12   and that targeting such impulse purchases would help to reduce the danger to public safety

13   associated with handguns.  *See Actmedia*, 830 F.2d at 967 (reasoning that by "reducing the

14   quantity of advertising that is seen in retail establishments selling alcoholic beverages, the

15   provision also directly furthers California's interest in promoting temperance"); *Coyote Publ'g*,

16   598 F.3d at 608 (explaining that "the advertising restrictions directly and materially advance

17   Nevada's interest in limiting commodification by reducing the market demand for, and thus the

18   incidence of, the exchange of sex acts for money, which by definition is commodifying of sex");

19   *Lungren*, 44 F.3d at 735 (explaining that the advertising restrictions advanced the state's interest

20   in environmental protection by incentivizing product "improvements [that] translate directly into

21   less waste being dumped and dumped waste decomposing more rapidly").[40]  This conclusion is

22   borne out not only by history and common sense, but also by relevant public health research.

---

[40]   *See also G & G Fremont LLC v. City of Las Vegas*, No. 2:14–CV–1006 JCM (PAL), 2014 WL 5062548, at *1, 3 (D. Nev. Oct. 9, 2014) (denying motion for preliminary injunction and reasoning that Las Vegas ordinance forbidding liquor stores on a particular street from "posting [alcohol] prices visible to individuals outside the establishment" likely advanced the city's interest in reducing alcohol consumption on that street); *cf. Jackson*, 746 F.3d at 966 (explaining that "[b]ased on the evidence that locking firearms increases safety in a number of different respects, San Francisco has drawn a reasonable inference that mandating that guns be kept locked when not being carried will increase public safety and reduce firearm casualties").

The advertising regulation in section 26820 has been in effect for almost a century. California enacted the law based upon a model law drafted by gun-rights advocates and adopted by other jurisdictions and the American Bar Association's committee on uniform laws.[41]  In the face of a rising national tide of handgun violence, those supporting the law, including section 26820's restrictions on advertising, viewed it as one of the "chief safeguards" in preventing criminals from getting guns.[42]

Public health research further bolsters the conclusion that dampening impulse purchases of handguns by regulating advertising will reduce handgun-related violent crime and suicide. Studies have shown that increased handgun ownership is associated with a higher murder rate.[43] Other studies have concluded that purchasing a handgun is associated with the risk of violent death.[44]  Handgun purchases are also associated with an increased risk of suicide, not just for the handgun buyer, but also for members of the buyer's household.[45]  One study published in the *New England Journal of Medicine* examined firearm and suicide data from California and concluded that buying a handgun increases the risk of suicide within a week of purchase, an effect that

---

[41]  *See, e.g.*, Richards Decl. Ex. 5 (Imlay, *supra* note 13, at 767).

[42]  *See* Richards Decl. Ex. 10 (Standing Committee Report, *supra* note 23, at 557-58).

[43]  *See* Richards Decl. Ex. 15 (John Henry Sloan et al., *Handgun Regulations, Crime, Assaults, and Homicide: A Tale of Two Cities*, 318 New Eng. J. Med. 913, 922 (1988) (comparing Seattle, Washington, with Vancouver, British Columbia, and concluding that "[v]irtually all of the excess risk of aggravated assault in Seattle was explained by a sevenfold higher rate of assaults involving firearms. Despite similar rates of robbery and burglary and only small differences in the rates of simple and aggravated assault, . . . Seattle had substantially higher rates of homicide than Vancouver. Most of the excess mortality was due to an almost fivefold higher rate of murders with handguns in Seattle."); *see also* Richards Decl. Ex. 16 (Michael Siegel et al., *The Relationship Between Gun Ownership and Firearm Homicide Rates in the United States, 1981-2010*, 103 Am. J. Public Health 2098, 2098 (2013) ("We found a robust relationship between gun ownership and firearm homicide rate . . . .")).

[44]  *E.g.*, Richards Decl. Ex. 17 (Peter Cummings et al., *The Association Between the Purchase of a Handgun and Homicide or Suicide*, 87 Am. J. Pub. Health 974, 974 (1997) ("Legal purchase of a handgun appears to be associated with a long-lasting increased risk of violent death.")); Richards Decl. Ex. 18 (Garen J. Wintemute et al., *Mortality Among Recent Purchasers of Handguns*, 341 New Eng. J. Med. 1583, 1586 (1999) ("[P]urchase of a handgun is associated with substantial changes in the risk of violent death.")); Richards Decl. Ex. 19 (K.M. Grassel et al., *Association Between Handgun Purchase and Mortality from Firearm Injury*, 9 Injury Prevention 48, 48 (2003) ("Among adults who died in California in 1998, those dying from violence were more likely than those dying from non-injury causes to have purchased a handgun.")).

[45]  Richards Decl. Ex. 17 (Cummings et al., *supra* note 44, at 975 ("Our finding of an increased relative risk for suicide among persons in families that purchased handguns agrees in general with the findings of previous case-control studies of suicide and gun ownership.")).

11

1  remained apparent for at least six years.[46]  The authors reasoned that the increase could not be

2  explained by gun purchases by people contemplating suicide—fewer than 10% of people who

3  committed suicide or attempted to commit suicide purchased guns for that purpose, and most

4  firearm suicides occurred well after the gun had been purchased.[47]  Another study found a "very

5  strong association between handgun purchase and subsequent gun suicide."[48]  These results are

6  typical.  A 2008 *New England Journal of Medicine* article emphasized the wealth of research

7  finding an association between guns in the home and suicide.[49]

8  　　　　Together, these studies establish the modern link between handgun ownership and violent

9  crime and suicide that has been noted for more than a century.

10  　　　　**3.　　Plaintiffs' arguments that section 26820 does not directly advance**
　　　　　　　**California's interests are misguided.**

11  　　　　Plaintiffs rely on *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), to support their

12  argument that no attempt by the government to limit the sale of a product can withstand scrutiny.

13  *See* Pls.' Br. 11, ECF No. 5-1.  But that case is inapposite because it did not consider a restriction

14  on advertising at all; it considered a Vermont statute regulating the sale, disclosure, and use of

15  pharmacy records that reveal the prescribing practices of doctors, to prevent pharmaceutical

16  companies specifically from using them to market to doctors.  *Sorrell*, 131 S. Ct. at 2659, 2662-

17  63.  The Court held the law unconstitutional as a content- and speaker-based restriction on speech

18  that did not survive heightened scrutiny because the law did not directly advance the state's

19  proffered interests.  *See id.* at 2672.  The state asserted a privacy interest, but the purportedly

20  private information was available to "anyone for any reason save one," pharmaceutical

21  marketing; and the state asserted an interest in lowering healthcare costs, but essentially

22  abandoned that interest at oral argument.  *See id.* at 2668, 2670.

23  
24  　　　　[46]　Richards Decl. Ex. 18 (Wintemute et al., *supra* note 44, at 1583).
　　　　[47]　*Id.* at 1587.

25  　　　　[48]　Richards Decl. Ex. 19 (Grassel et al., *supra* note 44, at 51).
　　　　[49]　Richards Decl. Ex. 20 (Mathew Miller & David Hemenway, *Guns and Suicide in the*

26  *United States*, 359 New Eng. J. Med. 898, 990 (2008) ("The empirical evidence linking suicide
risk in the United States to the presence of firearms in the home is compelling.  There are at least

27  a dozen U.S. case-control studies in the peer-reviewed literature, all of which have found that a
gun in the home is associated with an increased risk of suicide.  The increase in risk is large,
typically 2 to 10 times that in homes without guns . . . .")).

28

1       Plaintiffs also contend that section 26820 is ineffective and underinclusive.  Pls.' Br. 11-12.

2    They say it is "hard to see" how section 26820 will alleviate any public safety harms.  *Id.* at 11.

3    But California legislators, lawmakers in other jurisdictions, the ABA, firearms-rights advocacy

4    groups, including the NRA, and public-health researchers have all reached a different conclusion

5    based on evidence, experience, and common sense.[50]  Plaintiffs argue further that section 26820

6    cannot advance California's interest because it is underinclusive, allowing other handgun

7    advertising in print, on the internet, by broadcast, and by paid mascots dressed handing out fliers

8    near a licensed firearms dealer's store.  Pls.' Br. 11.  But the goal of section 26820 is not to

9    eliminate all demand for handgun purchases; it is to narrowly target impulsive handgun

10    purchases.

11       The state does not need to take an all-or-nothing approach to regulating handgun

12    advertising.  *See Coyote Publ'g*, 598 F.3d at 610 ("The First Amendment does not require that a

13    regulatory regime single-mindedly pursue one objective to the exclusion of all others to survive

14    the intermediate scrutiny applied to commercial speech regulations."); *see also Edge Broad.*, 509

15    U.S. at 434 ("Nor do we require that the Government make progress on every front before it can

16    make progress on any front. . . .  [T]he Government may be said to advance its purpose by

17    substantially reducing lottery advertising, even where it is not wholly eradicated.").  For instance,

18    in *Actmedia*, California's ban on paid point-of-sale alcohol ads permitted numerous other forms

19    of alcohol advertising, yet the court held that the law directly advanced California's interest in

20    promoting temperance.  *See* 830 F.2d at 966-67.[51]  Or, to borrow an example used by the

21    Supreme Court, Congress has "altogether banned the broadcast advertising of cigarettes, even

22    though it could hardly have believed that this regulation would keep the public wholly ignorant of

23    the availability of cigarettes."  *See Edge Broad.*, 509 U.S. at 434 (citing 15 U.S.C. § 1335).

24

25       [50]  *See* notes 10 to 26 and 41 to 49, *supra*.

26       [51]  *Cf. Lungren*, 44 F.3d at 736 ("[I]ntermediate scrutiny requires that restrictions on
speech 'leave open ample alternative channels for communication of the information[.]'" (quoting

27    *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))); *Jackson*, 746 F.3d at 960 ("[F]irearm
regulations which leave open alternative channels for self-defense are less likely to place a severe

28    burden on the Second Amendment right than those which do not.").

1    Plaintiffs argue that section 26820 is also underinclusive because store owners can post

2    advertisements for long guns on the outside of their stores.  *Id.* at 11.  Long guns, however, are

3    not associated with crime and violence in the way handguns are.[52]  Insisting that handguns and

4    long guns be treated similarly thus relies on a faulty comparison.

5    **C.    Section 26820 Limits Commercial Speech No More Than Necessary to**
     **Advance California's Interest in Public Health and Safety.**

6

7    Section 26820 satisfies the final prong of the *Central Hudson* test because it restricts

8    commercial speech no more than necessary to advance the state's substantial interest in public

9    safety.  When determining whether this test is met, courts look for a fit between the government's

10   ends and the means chosen to accomplish those ends that is reasonable, "that represents not

11   necessarily the single best disposition but one whose scope is in proportion to the interest served

12   . . . ." *Fox*, 492 U.S. at 480 (quotation marks omitted).  So long as a statute falls within those

13   bounds, courts "leave it to governmental decisionmakers to judge what manner of regulation may

14   best be employed." *Id.*  In fact, the Supreme Court has written "of the difficulty of establishing

15   with precision the point at which restrictions become more extensive than their objective

16   requires," and of the virtue of providing "the Legislative and Executive Branches needed leeway

17   in a field (commercial speech) traditionally subject to government regulation . . . ." *Id.* at 481

18   (quotation marks omitted).

19   Section 26820 regulates only handgun advertising that can be seen from outside a store, and

20   that is designed to induce someone to enter a retailer and make an impulse handgun purchase.  As

21   plaintiffs point out, they are free to engage in various other forms of handgun advertising,

22   including online, in magazines, or on the radio.  *See* Pls.' Br. 11.  Stores may also advertise

23   indoors, so long as those advertisements are not visible from the outside.  None of those forms of

24   advertising has the same direct connection to impulse purchases:  they do not target passersby

25   who are otherwise indifferent and induce them to enter a firearm retailer and buy a handgun.  All

26

27   [52] *See, e.g.*, Richards Decl. Ex. 13 (Bureau of Justice Statistics, *supra* note 37, at 1, 20 (reporting that handguns are used in about four out of five firearms homicides and nine out of ten nonfatal firearm victimizations)).

28

14

1   of the other types of advertising require, at the very least, a prospective handgun buyer to engage

2   in additional reflection or to have some additional intention or purpose before entering a retailer

3   and making a purchase.

4        Plaintiffs argue that section 26820 is not reasonably tailored to fit the state's interest in

5   decreasing handgun violence.  Pls.' Br. 13-14.  They contend that the law is overinclusive

6   because California has two reasonable alternatives:  it can enforce existing laws or pass more

7   laws regulating handguns and it can "conduct an educational campaign and promote responsible

8   handgun use."  Pls.' Br. 14.  Neither of those vaguely stated suggestions addresses the impulse

9   purchases that section 26820 targets.  It is not clear which current laws could be enforced to

10  address the specific problem of impulse handgun purchases.  Nor do plaintiffs explain what

11  "additional direct regulation" could achieve that purpose.  *See* Pls.' Br. 14.  Plaintiffs also do not

12  explain how an educational campaign could have the same direct effect as section 26820.

13  Moreover, plaintiffs cite no evidence suggesting that either of these approaches would be as

14  effective or efficient in decreasing impulsive handgun purchases as section 26820.  Simply

15  positing alternatives without any showing that they would be more effective and more efficient

16  does not serve to demonstrate that a law fails the fourth *Central Hudson* prong.  Plaintiffs, in

17  essence, urge this Court to apply a least-restrictive-means test.  But that standard has been

18  rejected in favor of the reasonable fit test.  *Fla. Bar*, 515 U.S. at 632; *cf. Jackson*, 746 F.3d at 966

19  ("Intermediate scrutiny does not require that [San Francisco's handgun storage ordinance] be the

20  *least* restrictive means of reducing handgun-related deaths.").

21        **D.    No Special Heightened Scrutiny Applies to Regulation of Advertisements.**

22        Plaintiffs also contend that this Court should apply some form of specially heightened

23  scrutiny to section 26820 and deem it presumptively invalid based on the Supreme Court's

24  decision in *Sorrell*.  Pls.' Br. 6-7.  But, as discussed earlier, *Sorrell* does not provide guidance

25  here.  Plaintiffs argue that this heightened form of scrutiny should apply because section 26820 is

26  a content- or speaker-based restriction.  But all commercial speech regulation can be classified

27  that way—for example, the restrictions on brothel advertising in *Coyote Publishing*, 598 F.3d

28  at 597, or the restrictions on liquor advertising in *Actmedia*, 830 F.2d at 959.  That does not mean

15

1  that the *Central Hudson* standard does not apply. *See Metro Lights*, 551 F.3d at 903 n.6

2  ("[W]hether or not the City's regulation is content-based, the *Central Hudson* test still applies

3  because of the reduced protection given to commercial speech."); *Coyote Publ'g*, 598 F.3d at 599

4  n.10 (same).[53]

5      If plaintiffs are suggesting that *Sorrel* abrogated over 30 years of precedent that applies

6  intermediate scrutiny to commercial speech regulations, they are wrong. *See* Pls.' Br. 6. *Sorrell*

7  did not overrule the *Central Hudson* line of cases; it applied the *Central Hudson* test and

8  concluded that Vermont's statute forbidding the sale of doctors' prescription-buying preferences

9  to pharmaceutical manufacturers did not satisfy the standard. *See* 131 S. Ct. at 2667-72. Indeed,

10  courts in the Ninth Circuit and elsewhere have continued to apply *Central Hudson* in the wake of

11  *Sorrell. See, e.g.*, *Retail Digital Network, LLC v. Appelsmith*, 945 F. Supp. 2d 1119, 1125-26

12  (C.D. Cal. 2013) (holding that *Sorrell* did not change the *Central Hudson* test and that "that

13  *Sorrell* is not 'clearly irreconcilable' with the Ninth Circuit's reasoning in *Actmedia*"); *G & G*

14  *Freemont*, 2014 WL 5062548, at *2-3 (applying *Central Hudson* in 2014 challenge to Las Vegas

15  law restricting outdoor liquor advertising).[54]

16  **III.   BECAUSE SECTION 26820 DOES NOT VIOLATE THE FIRST AMENDMENT,**
       **PLAINTIFFS CANNOT ESTABLISH THAT THEY ARE LIKELY TO SUFFER**
17     **IRREPARABLE HARM.**

18      Plaintiffs cannot establish that they will suffer irreparable harm in the absence of

19  preliminary injunctive relief because they cannot show they are likely to succeed on their First

20  Amendment theory. *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir.2005) (holding that

21  _____

22      [53]  Application of intermediate scrutiny to content-based speech restrictions is not unique
    to the commercial speech context. *See, e.g.*, *Minority Television Project, Inc. v. FCC*, 736 F.3d
23  1192, 1197-99 (9th Cir. 2013) (en banc) (applying intermediate scrutiny to content-based FCC
    restrictions on public broadcast stations).
        [54]  *See also 1-800-411-Pain Referral Serv. LLC v. Otto*, 744 F.3d 1045, 1054-55 (8th Cir.
24  2014) (discussing *Sorrell* and concluding that the "upshot is that when a court determines
    commercial speech restrictions are content- or speaker-based, it should then assess their
25  constitutionality under *Central Hudson*"); *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303,
    308 (E.D. Pa. 2012) ("[T]he Supreme Court stopped far short of overhauling nearly three decades
26  of precedent, which is clearly demonstrated by the fact that the opinion characterizes commercial
    speech precedence, including *Central Hudson* itself, for support. . . . If the Court wished to
27  disrupt the long-established commercial speech doctrine as [sic] applying intermediate scrutiny, it
    would have expressly done so." (citations omitted)).

28

1   because the plaintiffs' had not established a probability of success on the merits of their First

2   Amendment claim, their purported First Amendment harm did not outweigh the federal

3   government's interest in enforcing its rules); *see also Eller Media Co. v. City of Oakland*, No.

4   C98–2237 FMS, 1998 WL 549494, at *7 (N.D. Cal. Aug. 28, 1998) ("Plaintiffs are not entitled to

5   a finding of 'irreparable injury' by virtue of pleading a constitutional claim.").

6   **IV.   THE BALANCE OF EQUITIES TIPS IN CALIFORNIA'S FAVOR.**

7        The balance of equities weighs in favor of the state.  Given the weakness of plaintiffs' First

8   Amendment claim, they cannot offset the principle that "[a]ny time a State is enjoined by a court

9   from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable

10  injury."  *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers) (quotation marks

11  omitted); *see also Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is

12  clear that a state suffers irreparable injury whenever an enactment of its people or their

13  representatives is enjoined.").

14                        **CONCLUSION**

15       For the foregoing reasons, this Court should deny plaintiffs' motion for preliminary

16  injunction.

17

18  Dated:  February 23, 2015                    Respectfully Submitted,

19                                              KAMALA D. HARRIS
                                                Attorney General of California
20                                              TAMAR PACHTER
                                                Supervising Deputy Attorney General
21

22

23                                              /s/ Nelson R. Richards
                                                NELSON R. RICHARDS
24                                              EMMANUELLE S. SOICHET
                                                Deputy Attorneys General
25                                              *Attorneys for Defendants*
                                                *Attorneys for Defendants*
26                                              *Kamala D. Harris and*
                                                *Stephen J. Lindley*
27  SA2014119177
    95131690.doc

28

                                     17