# EXHIBIT 5

# HEINONLINE

Citation: 12 A.B.A. J. 767 1926



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Mon Jan 26 20:57:37 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

-- To obtain permission to use this article beyond the scope
   of your HeinOnline license, please use:

   https://www.copyright.com/ccc/basicSearch.do?
   &operation=go&searchType=0
   &lastSearch=simple&all=on&titleOrStdNo=0747-0088

# THE UNIFORM FIREARMS ACT

Recent Development of Firearms Legislation and History of Act——Proposed Measure Preserves Fundamental Provisions of Revolver Association Act—License to Carry As Against License to Purchase or Possess—Summary of Provisions

Charles V. Imlay

*Chairman, Committee on Uniform Firearms Act, Conference of Commissioners on Uniform State Laws*

UNDER the head of "Current Legislation" in the September, 1925, number of this Journal,[1] Mr. Joseph P. Chamberlain reviewed under the title of "Legislatures and the Pistol Problem" a number of recent state statutes enacted to regulate the sale and possession of pistols and revolvers, the general trend of these enactments and their relation to prevailing laws in the various states. At the time Mr. Chamberlain's article was printed, the subject of firearms legislation had just been presented in an exhaustive report to the National Conference of Commissioners on Uniform State Laws by a committee of that body at its sessions in Detroit, August 25-31, 1925, and a first tentative draft of a proposed "Uniform Act to Regulate the Sale and Possession of Firearms" had been discussed in full by the Conference.[2] The proposed act was recommitted by the Conference to its committee and was brought again before the Conference at its sessions in Denver, July 6-12, 1926, in the form of a second tentative draft. As a result, the Conference, after another full discussion, has approved and recommended for adoption by the states, the completed Uniform Firearms Act, which received the approval of the American Bar Association along with other acts presented to the Association at the same place on July 15th by the Standing Committee on Uniform State Laws.

When the subject matter of the Act was first brought to the attention of the National Conference at its meeting at Minneapolis in August, 1923, a movement in the direction of uniform firearms legislation inaugurated by the United States Revolver Association was well under way. That Association, a non-commercial organization of amateur experts in the use of revolvers, had through its legislative committee drafted a proposed uniform law, which had already been enacted in whole or in part in a number of states. The California Act of 1923[3] which had just been passed follows the Revolver Association Act very closely. North Dakota[4] had adopted it on March 7, 1923, practically verbatim. New Hampshire had on May 4, 1923,[5] adopted it with some changes.

Because then of the favor already shown the Revolver Association Act, as well as its intrinsic merits for clearness and simplicity, that law was made the model for discussion by the Conference. Although the draft finally approved by the Conference shows some variations from the model law in the way of additions or omissions and in changes in phraseology, the fundamental principles of the model law have been preserved. And the decision of the committee of the Conference in selecting this model law has received further support in statutes passed since the matter of firearms legislation came before the Conference. The Indiana Act of 1925[6] is almost a verbatim adoption of the Revolver Association Law. And a number of the sections of the latter law are incorporated, without changes, into the Michigan Law of 1925:[7] some others being incorporated with changes. Recent acts in Connecticut,[8] New Jersey,[9] and Oregon,[10] contain more or less verbatim parts of the model law.

### Need for Uniformity

That there is need of more careful regulation of the use of firearms and in particular small firearms (the subject matter of the Uniform Act) is evident from the daily newspaper records of crimes of violence committed with the revolver. The same records attest the desirability of adopting no system of regulation which would prevent the law-abiding citizen from possessing firearms for the defense of his person and property. And the same exigencies which demand the regulation of the sale and use of firearms require that the laws upon the subject be uniform: for no matter how rigid the law of one state may be upon the subject, if the law of a neighboring state be lax, it is easy for the criminal to obtain his weapon in the latter and carry it into the former.

Schemes of regulation have heretofore ranged all the way from the proposal made in the French legislature some months ago that all persons be permitted to arm *ad libitum* to be prepared for the miscreant, to the suggestion made by one of the members of the Conference in the discussion in Detroit, that no one other than a peace officer under any circumstances be permitted to carry a revolver.[11] Nor has there been any serious effort made to regulate the subject by regulating the manufacture of weapons. The nearest approach to this method was the so-called "Shields Bill" introduced in the Senate, April 25, 1921,[12] which was designed to prohibit the transportation in interstate commerce of firearms other than those of army and navy makes. The bill failed of passage. (A more

1. American Bar Association Journal, Vol. XI, p. 596.
2. Handbook Nat. Conf. Commissioners on Uniform State Laws, 1925, pp. 294, 316, 876.
3. Cal. Laws 1923, Ch. 339.
4. N. D. Laws, 1923, Ch. 266.
5. N. H. Laws 1923, ———.
6. Ind. Laws 1925, Ch. 207.
7. Mich. Public Acts 1925—No. 313.
8. Conn. Laws 1923, Ch. 252.
9. N. J. Laws 1924, Ch. 137.
10. Ore. Laws 1925, Ch. 339.
11. Handbook Nat. Conf. Commissioners on Uniform State Laws, 1925, p. 331.
12. S. 1184, 67th Cong.—1st Sess.

recent bill,[13] in the United States House of Representatives, along the same lines, also failed of passage). And no success has attended various other efforts to control the sale of firearms through Congressional legislation.

### License to Carry—Not License to Purchase

In adopting the principle of the Revolver Association Act of a license to carry a concealed pistol as against the requirement of a license to purchase or possess, the Uniform Act follows the almost universal system of regulation which has prevailed in the various states, and which has recently been affirmed in the adoption of the act named in North Dakota, New Hampshire, California and Indiana.

New York has long stood virtually alone in favoring the form of regulation by license to purchase under the so-called Sullivan Law, first enacted in 1888 and now existing there with certain amendments.[14] Massachusetts has recently enacted a law along this line.[15] And a recent West Virginia Law seems to approach the principle.[16] Recently there have been a few states which have attempted to go the whole length and require a state-wide registration or a license to possess. In the first group is the Arkansas Law of 1923,[17] which provided for a state-wide registration of pistols already owned and a license and registration of those afterwards acquired. This law was found so impracticable in enforcement that it was later repealed.[18] The Michigan Law of 1925, mentioned above, likewise requires a state-wide registration of all arms possessed, but it does not go the length of the Arkansas Law in imposing the requirement of a license to possess. The registration feature had upon last information not yet been put into effect, because of technical difficulties.

Another attempt to regulate is a law like that of North Carolina of 1923[19] making it unlawful for any person to receive from any postal employee or express or railroad agent within the state, any pistol without having and exhibiting a pistol permit. The latter law Mr. Chamberlain states to be of doubtful constitutionality.[20]

Much has been said of late in the public press in favor of the license to purchase or possess like that of New York. It has been advocated strongly by prosecutors and others engaged in suppressing crime as the surest means of preventing a pistol from getting into the hands of the criminal. But the Conference has inclined to the view of a license to carry, heretofore almost universal and reaffirmed in the recent enactments named.

It is doubtful whether or not a license to purchase or possess could ever be enforced. Legislation to that end would no doubt be followed by an era of pistol bootlegging similar to the liquor bootlegging which followed Prohibition. The criminal records in New York amply demonstrate that the Sullivan Law has not kept weapons out of the hands of criminals. One of the best safeguards against crime is the consciousness on the part of the criminal that the householder possesses arms. A regulation which would make it difficult for a law-abiding citizen to possess arms would make for lawlessness. The requirement of a license to purchase might render it impossible for a citizen to obtain a pistol when he might need it the most: the requirement of a license to possess would forbid his borrowing a pistol from a neighbor at the moment of a pressing emergency. He would be unarmed as against a criminal armed in defiance of law.

### Summary of Provisions of Uniform Act

The Act defines a "pistol or revolver" as a firearm with barrel less than twelve inches in length.[21] It includes in the definition of a "crime of violence" such crimes as are usually committed with the aid of a revolver.[22] When such a crime is committed by one armed with such weapon, a penalty in addition to that for the substantive offense is prescribed.[23] The fact that a criminal is armed with such weapon is *prima facie* evidence of his intention to commit the crime charged.[24]

One convicted in a state of a crime of violence is absolutely forbidden to own or possess a pistol or revolver.[25] The Act forbids the carrying of concealed weapons according to the universal principle in state legislation adopting the modern theory of making the prohibition extend, not only to weapons concealed on the person, but also to vehicles. This is intended to remove the easy method by which a criminal, on being pursued, may transfer a weapon from his pocket to a concealed place in a vehicle.[26] All classes of persons usually excepted by state statutes from the above provisions are excepted by the terms of the Act, and also exceptions are permitted under certain circumstances, for example, carrying a weapon in a dwelling house or place of business.[27]

The Act provides for the issuance of licenses for the carrying of concealed weapons upon a satisfactory showing being made by the applicant as to his character and the necessity for his application.[28] Delivery of firearms to minors under eighteen is forbidden; the age of eighteen being deemed more desirable than the younger age named in a number of statutes and the higher age named in some.[29]

The transfer of a firearm is forbidden to any one who the transferrer may have reasonable cause to believe has been convicted of a crime of violence. A seller may not transfer a weapon on the day of purchase. The Act specifies the means of identifying the purchaser and the preservation of this identification.[30] These provisions, however, do not forbid the lending of a weapon by one citizen to another in case of an emergency.

The Act requires a license of dealers.[31] The giving of this license to the dealer and its retention by him is upon careful conditions, for the breach of which such license will be forfeited.[32] False information in purchasing a firearm or in applying for a license to carry the same is forbidden.[33] The changing of identifying marks on weapons is also forbidden and this prohibition is

---

13. H. R. 4002, 69th Cong., 1st Sess.
14. N. Y. Consolidated Laws of 1897, ss. 1-14.
15. Mass. Gen. L., Chap. 395, Act of May 29, 1926.
16. Act April 23, 1925; Laws 1925, Ch. 95, Amending s. 7, Ch. 148, Code W. Va.
17. Ark. Acts 1923, Ch. 430.
18. Ark. Acts 1925, p. 1047, Act No. 351.
19. N. C. Laws, 1923, Ch. 106.
20. Am. Bar Assn. Journal, vol. XI, p. 598.

21. S. 1 Uniform Firearms Act.
22. *Ibid.*
23. S. 2.
24. S. 3.
25. S. 4.
26. S. 5.
27. S. 6.
28. S. 7.
29. S. 8.
30. S. 9.
31. S. 10.
32. S. 11.
33. S. 12.

fortified by another provision that possession of firearms from which such identifying marks have been obliterated shall be *prima facie* evidence that the possessor has changed the same.[34]

The Act revokes all existing licenses.[35] It exempts antique weapons that are merely curiosities.[36] By a specific provision it supersedes all local ordinances.[37]

A special section provides for penalties for violations of the various provisions of the Act.[38] The amounts of fines and lengths of imprisonment are left blank so that these may be fixed in accordance with the needs and usages of the particular state, having regard to the differences in definitions of misdemeanors and felonies obtaining in the various states. The Act conforms to what is believed to be the sound view of putting the matter of punishment in the discretion of the court.

The Act concludes with the usual provision found in Uniform State Laws, viz., a provision that if any part of the Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of the Act,[39] the definition of a short title, "Uniform Firearms Act,"[40] the naming of an effective date,[41] and the specific repeal of inconsistent laws.[42]

It is believed that the provisions of the Uniform Firearms Act present no constitutional objections, constitute no drastic changes in the law of any jurisdiction, and if adopted generally will not only secure uniformity, but will remove the evils of the present lack of uniformity.

---

34. S. 13.
35. S. 14.
36. S. 15.
37. S. 16.
38. S. 17.
39. S. 18.
40. S. 19.
41. S. 20.
42. S. 21.

# DEPARTMENT OF CURRENT LEGISLATION

## Current Federal Legislation (Continued)

By J. P. CHAMBERLAIN AND MIDDLETON BEAMAN

THE Prohibition Amendment did not relegate to the Congressional waste-paper basket, all the experience gained in the long series of federal statutes under the commerce power to aid the states in enforcing their liquor laws.

The Plant Quarantine Act authorizes the Secretary of Agriculture to quarantine any State against plant diseases and when such quarantine is established shipment of plants into the quarantined State is unlawful under a criminal penalty. Public Resolution 14 provides that until the Secretary has established a quarantine, the act shall not be construed to prevent any state from enforcing its quarantine laws preventing transport of plants into or through the state from any other state in which the transit state finds that a plant disease exists. This statutory interpretation of the earlier law permits the states to act independently of the Government until the Government has acted.* The direct application of the principle of the old laws regulating liquor is in another provision which declares that when a quarantine has been established by the Secretary, plants shipped in violation of the quarantine are subject to the laws of the states into which they are brought "to the same extent and in the same manner as though" the plants "had been produced in such state . . . and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." This is a further illustration of the divesting by Congress of its power over interstate commerce, in respect to a particular article, a procedure sanctioned when applied to intoxicating liquor.[1] The question arises as to whether a violator of the Federal quarantine will be subject to penalty under the Federal law in the Federal courts as well as to a penalty under the State law in the state courts.[2] It is to be noted that previous acts divesting articles of protection against state legislation while in interstate commerce, applied only where interstate commerce was being used as a means of circumventing state laws, while by this statute, the state authority is permitted to act upon articles being transported in breach of a Federal law. Formerly the article was stripped of Federal protection to enforce the law of the state; here it is in addition, a sort of penalty imposed for violation of the Federal regulation.

A further example of the use by Congress of its power over interstate commerce to aid the States in the enforcement of their laws is found in Public 256 which makes it unlawful for any person to deliver to a common carrier for transportation, or for any person knowingly to transport or carry in interstate or foreign commerce any black bass which has been caught, sold, purchased, or possessed in violation of the law of the State or Territory wherein the delivery of the bass for transportation is made or the carrying thereof begins. A criminal penalty is provided for violation. The Act is much the same as the Act of May 25, 1900, commonly known as the "Lacey Act", applicable to wild animals and birds. That Act has never been passed on by the Supreme Court, but has been sustained

---

*A prior judicial interpretation was that the states were prevented from acting in such cases even before any action by the Secretary. Oregon-Washington Railway Co. v. Washington, 46 Sup. Ct. Rep. 279.

1. Re Rahrer, 140 U. S. 545.
2. U. S. v. Lanza, 260 U. S. 377. See also footnote 6.