UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY RIFLE AND PISTOL LLC; MICHAEL BARYLA; TEN PERCENT FIREARMS; WESLEY MORRIS; SACRAMENTO BLACK RIFLE, INC.; ROBERT ADAMS; PRK ARMS, INC.; JEFFREY MULLEN; IMBERT & SMITHERS, INC.; ALEX ROLSKY<br><br>Plaintiffs,<br><br>v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California; and STEPHEN J. LINDLEY, in his official capacity as Chief of the California Department of Justice Bureau of Firearms,<br><br>Defendants. | No. 2:14-cv-02626-TLN-DAD<br><br>**ORDER** |

The matter is before the Court on Plaintiffs Tracy Rifle and Pistol LLC ("Tracy Rifle"), Michael Baryla, Ten Percent Firearms ("Ten Percent"), Wesley Morris, Sacramento Black Rifle, Inc., Robert Adams, PRK Arms, Inc., Jeffrey Mullen, Imbert & Smithers, Inc. ("Imbert & Smithers"), and Alex Rolsky's Motion for a Preliminary Injunction. (ECF No. 5.) Defendants Kamala D. Harris and Stephen J. Lindley, acting in their official capacities, oppose the motion. (ECF No. 18.) The Court has carefully considered the arguments raised in the parties' filings, and

1

for the reasons discussed below, DENIES the motion for a preliminary injunction.

## BACKGROUND

Plaintiffs – retail firearms dealers – argue that California Penal Code § 26820 violates their free speech rights under the First Amendment of the U.S. Constitution, and therefore seek to preliminarily enjoin Defendants from enforcing the section. Section 26820 provides: "No handgun or imitation handgun, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside."

Specifically, on September 12, 2014, the California Department of Justice Bureau of Firearms ("DOJ") inspected Tracy Rifle and Pistol LLC. At the time of the inspection, four of Tracy Rifle's exterior windows were covered with vinyl decals depicting firearms: three handguns and a rifle. The firearms could be purchased in California and were carried by Tracy Rifle. The DOJ issued a "Notification of Inspection Findings" because of the handgun decals and required Tracy Rifle and Michael Baryla to take corrective action by February 11, 2015. (ECF No. 5-1 at 3–4.)

On or about February 23, 2010, the DOJ inspected Ten Percent Firearms in Taft, California. Displayed on a post in Ten Percent's parking lot was a three-foot by two-foot metal sign shaped like a revolver, hung approximately nine feet off the ground. The DOJ inspector informed Plaintiff Morris that the sign violated the handgun advertising restriction, and Ten Percent Firearms took the sign down. The DOJ then issued a "Notification of Inspection Findings" citing Ten Percent and Morris for violating the ban. (ECF No. 5-1 at 4.)

On January 28, 2015, the DOJ inspected Imbert & Smithers. At the time of inspection the building's exterior displayed the dealership's logo, which incorporates the outline of a single-action revolver. The DOJ issued a "Notification of Inspection Findings" citing Imbert & Smithers and Alex Rolsky for, among other things, violating the handgun advertising restriction, and requiring them to take corrective action by July 28, 2015. (ECF No. 17 at 1.)

Plaintiffs Sacramento Black Rifle, Inc. and its owner Robert Adams, and Plaintiffs PRK Arms, Inc. and its owner Jeffrey Mullen, state they desire to display on-site handgun advertising at these stores. (ECF No. 22 ¶ 32.)

On November 10, 2014, Plaintiffs filed a complaint in this Court, claiming section 26820 deprived Plaintiffs of rights secured by the First Amendment, in violation of 42 U.S.C. § 1983, and seeking declaratory and injunctive relief. (ECF No. 1.) On November 17, 2014, Plaintiffs filed the instant motion for a preliminary injunction.[1] (ECF No. 5.) On February 23, 2015, Defendants filed an opposition. (ECF No. 18.) On March 4, 2015, Plaintiffs filed their reply. (ECF No. 26.)

## STATUTORY FRAMEWORK

### I. Injunctive Relief

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

The Ninth Circuit also permits analysis via a sliding scale approach, such that "'serious questions going to the merits' and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

### II. First Amendment Principles

The First Amendment principles at issue in this case mostly relate to the "likelihood of success on the merits" prong of the *Winter* test. However, given the underlying importance of the aforementioned principles to all four prongs, and the fact that the Government has the burden to justify its speech restrictions, the Court notes some relevant principles at the outset.

---

[1] Plaintiffs Imbert & Smithers and Alex Rolsky joined in the motion for preliminary injunction on February 2, 2015. (ECF No. 20). A First Amended Complaint adding Imbert & Smithers and Rolsky was filed on February 27, 2015. (ECF No. 22.)

3

As a starting point for review, the Court uses the test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 566 (1980):

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

The parties agree that the speech at issue – advertisements made on the premises of firearms stores – concerns lawful activity and is not misleading, and so is commercial speech protected by the First Amendment. Therefore only the final three factors are disputed in this case.

Courts are to "review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy. In those circumstances, a ban on speech could screen from public view the underlying governmental policy … in recent years [the Supreme Court] has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity." *Central Hudson*, 447 U.S. at 566 n. 9.

It is error to "conclude[] that *all* commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of expression. The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996). "[W]hen a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands." *Id*.

Further, "[t]he First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "'[T]he fear that people would make bad decisions if given truthful

4

information' cannot justify content-based burdens on speech." *Id.* at 2658 (citing *Thompson v. Western States Medical Center,* 535 U.S. 357, 374 (2002)).

## ANALYSIS

### I. Likelihood of Success on the Merits

For a preliminary injunction to issue, it is Plaintiffs' burden to show a likelihood of success on their challenge to the constitutionality of section 26820. However, because the Government is restricting protected speech it has the burden to show that section 26820 passes scrutiny. *See Burkow v. City of Los Angeles*, 119 F. Supp. 2d 1076 (C.D. Cal. 2000); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061 (10th Cir. 2001) (holding that even on appeal of a denial of a preliminary injunction, which favored the Government, the burden remained on the Government to justify the speech restrictions). The Court follows the analysis done in *Burkow* and *Utah Licensed* and finds that if the Government does not meet its burden under *Central Hudson*, then for the purposes of the preliminary junction Plaintiff has shown a likelihood of success on the merits.[2]

The parties do not dispute that the speech at issue is protected by the First Amendment. Thus, the first part of the *Central Hudson* test is met. Plaintiffs argue that Defendants cannot meet their burden of establishing one or more of the other three prongs: (1) that the restriction at issue seek to further a substantial government interest; (2) that the restriction directly advance the government's interest; and (3) the restriction be no more extensive than is necessary to serve that interest. *Central Hudson*, 447 U.S. at 566.

//

---

[2] A different way of stating the two burdens would be: "As the moving party, the plaintiff bears the burden of clearly showing that the *Central Hudson* test will not be satisfied by this particular regulation of commercial speech." *Bad Frog Brewery, Inc. v. New York State Liquor. Auth.* 1996 WL 705786, at *3 (N.D.N.Y. Dec. 5, 1996). This way of stating the burdens could imply a lesser burden on the Government, such that if the Government raises enough evidence to show it could justify the restriction – i.e. the Government has cast enough doubt on whether Plaintiff could succeed on the merits if the case proceeded to trial – then for the purposes of a preliminary injunction the plaintiff is not likely to succeed on the merits. On appeal of the district court's decision in *Bad Frog* – which was an appeal of the preliminary injunction and a separate summary judgment order – the 2nd Circuit did not expressly take up whether the district court's statement of the two burdens was correct. However, the Second Circuit's discussion indicated that even on an appeal, in which the injunction had been issued in favor of the Government, it was still the Government's burden to show that the *Central Hudson* factors were met. *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 97–101 (2d Cir. 1998).

### A. Substantial interest

The Court looks first to whether section 26820 seeks to further a substantial government interest. The Government states that section 26820 serves California's public health and safety interest in reducing handgun-related crime and violence. The Government directs the Court to data indicating that about 70% to 80% of firearm homicides and 90% of nonfatal firearm victimizations were committed with a handgun, nationwide, from 1993 to 2011; that between 2005 and 2009 over 1,000 Californians used handguns to commit suicide; and that in 2013 90% of guns recovered from crime scenes in California and sent to the state's crime laboratory were handguns. *See* Kamala D. Harris, Attorney General, *2013 Firearms Used in the Commission of Crimes*; Bureau of Justice Statistics, U.S. Department of Justice, *Firearm Violence, 1993-2011* (2013); California Department of Public Health's California Violent Death Reporting System User-Generated Report, Suicides 2005–2009. (ECF No. 19, Ex.'s 12, 13, 14.) The Government further explains that the law was enacted in 1923 to curb rising handgun violence, and the current statute is essentially the same, with only minor alterations in language. (ECF No. 18 at 3–4.)

Plaintiffs argue that an original motivation for enacting the instant ban was curbing immigrant violence, which is an improper justification and irrelevant today. *See e.g. New Firearms Law Effective on August 7*, S.F. Chron., July 15, 1923 (quoting the President of the Sacramento Rifle and Revolver Club for praising the ban's intended "salutary effect in checking tong wars among the Chinese and vendettas among our people who are of Latin descent") (ECF No. 19, Ex. 6). This point is noted, but "the fact that the original motivation behind the ban [] today might be considered an insufficient justification for its perpetuation does not detract from the force of the other interests the ban continues to serve." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978). *See also Bolger v. Young Products Corp.*, 463 U.S. 60, 70 (1983).

The Court agrees that public health and safety issues associated with handgun crime and violence are a substantial Government interest, and that section 26820 seeks to further that interest.

### B. Directly advance the interest

The Court looks next to whether section 26820 directly advances the Government's stated

interest. The Government identifies one overriding rationale for section 26820: by restricting handgun advertisements that are visible from outside the store, section 26820 decreases the number of emotion-driven impulse purchases of handguns, thereby directly reducing handgun crime and violence. The Government makes two arguments in support of this position: 1) that the restriction is consistent with courts' holding that the government may restrict advertising in order to dampen demand; and 2) common sense and public health research support that conclusion that limiting impulse buys reduces handgun crime and violence.

As to the first argument, the Supreme Court and Ninth Circuit have held that the government may restrict advertising in order to dampen demand. *See U.S. v. Edge Broad*, 509 U.S. 418, 434 (1993) ("If there is an immediate connection between advertising [for gambling] and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced"); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 608 (9th Cir. 2010) (advertising restrictions on legal brothels in Nevada "directly and materially advance Nevada's interest in limiting commodification by reducing the market demand for … the exchange of sex acts for money"); *Actmedia, Inc. v. Stroh*, 830 F.2d 957, 959–62 (9th Cir. 1986) (internal quotation marks omitted) (upholding California ban on retail point-of-sale advertisements for alcoholic beverages paid for by manufacturers, and reasoning that the ban, in part, served to "prohibit[] the overly aggressive marketing techniques that had been characteristic of large-scale alcoholic beverage concerns"); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 557 (2001) ("W[e] have acknowledged the theory that product advertising stimulates demand for products, while suppressed advertising may have the opposite effect"); *44 Liquormart*, 517 U.S. at 504–509 (finding that the Government had not produced evidence showing that a restriction on advertising alcohol prices reduced consumption of alcohol, but indicating in its analysis that such evidence could support the "directly advance" prong of the *Central Hudson* test).

However, notwithstanding the fact that our reviewing courts have permitted advertising restrictions in order to dampen demand, "when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First

1 Amendment generally demands." *Liquormart,* 517 U.S. at 501. A State "may not seek to remove
2 a popular but disfavored product from the marketplace by prohibiting truthful, nonmisleading
3 advertisments…." *Sorrell,* 131 S. Ct. at 2671. The "fear that people would make bad decisions if
4 given truthful information" has been rejected as the basis for a commercial speech restriction, and
5 a state may not pursue its policy preferences 'by keeping the public in ignorance.'" *Thompson*,
6 535 U.S. at 374, 375 (citing *Virginia Bd. of Pharmacy v. Virginia Citizens Cons. Counc., Inc.* 425
7 U.S. 748, 770 (1976)). "[T]he power to prohibit or to regulate particular conduct does not
8 necessarily include the power to prohibit or regulate speech about that conduct." *Greater New*
9 *Orleans Broadcasting Ass'n, Inc. v. U.S.* 527 U.S. 173, 174 (1999).

10 On balance, the weight of authority shows strong disfavor with restrictions on
11 advertisements that are neither misleading nor related to the fair bargaining process, which is the
12 case with the advertisements at issue here. *Liquormart*, 517 U.S. at 501. However, it is
13 permissible in certain circumstances for the government to restrict advertising in order to dampen
14 demand for legal products. The Court acknowledges that this is a distinct case, in that the product
15 at issue is handguns. However, Plaintiffs identify no legal authority that in this context,
16 advertising designed to dampen demand is per se violative of the First Amendment. Therefore at
17 this juncture the Court does not make that finding.

18 The Government's second argument, still under the second prong of the *Central Hudson*
19 analysis, is that simply put it is reasonable to conclude that impulsive handgun purchases made
20 after a customer sees an advertisement outside the store – as opposed to purchases made with
21 deliberation after the customer has already entered the store – contribute to greater handgun crime
22 and violence. On this point, the Government appeals to "history, consensus, and 'simple common
23 sense.'" *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (citing *Burson v. Freeman*,
24 504 U.S. 191, 211 (1992)). The Government submits further legislative history and data – in
25 addition to the data referenced, *supra* – to establish the link between handgun ownership and
26 crime, violence, and suicide. *See e.g.* John Henry Sloan et al., *Hangdun Regulations, Crime,*
27 *Assaults, and Homicide: A Tale of Two Cities*, 318 New Eng. J. Med. 913, 922 (1988) (comparing
28 Seattle, Washington, with Vancouver, British Columbia, and concluding that "[v]irtually all of

the excess risk of aggravated assault in Seattle was explained by a sevenfold higher rate of assaults involving firearms. Despite similar rates of robbery and burglary and only small differences in the rates of simple and aggravated assault, … Seattle had substantially higher rates of homicide than Vancouver. Most of the excess mortality was due to an almost fivefold higher rate of murders with handguns in Seattle."); Mathew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New Eng. J. Med. 898, 990 (2008) ("The empirical evidence linking suicide risk in the United States to the presence of firearms in the home is compelling. There are at least a dozen U.S. case-control studies in the peer-reviewed literature, all of which have found that a gun in the home is associated with an increased risk of suicide. The increase in risk is large, typically 2 to 10 times that in homes without guns."); Garen J. Wintemute et al., *Morality Among Recent Purchasers of Handguns*, 341 New Eng. J. Med. 1583, 1586 (1999) ("[P]urchase of a handgun is associated with substantial changes in the risk of violent death.") (ECF No. 19, Ex.'s 15, 17, 20.)

In response, Plaintiffs argue that the aforementioned data do not speak to the relevant issue, which is whether impulse purchases of handguns contribute to crimes or violence, not whether more purchases of handguns, as a general matter, contributes to crimes or violence. Plaintiffs produce data, for instance, showing that the average period of time between the first retail sale of a firearm and recovery of the firearm by law enforcement is nearly 14 years. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Trace Data – 2013 (California)* at 8.[3] The same set of data shows that in 2013, law enforcement agencies recovered 32,343 firearms used in connection with a crime in California, but less than two percent were recovered within 3 months of purchase. *Id.* at 3, 8. Apparently the argument here would be – though the relevance is questionable – that firearms are less likely to be used in crimes shortly after their purchase.

Plaintiffs also dispute that it is reasonable to assume limiting impulse buys limits handgun violence, because there is at least a ten day waiting period between the time of the buy and the release to the purchaser. *See* Cal. Penal Code §§ 26815(a) and 27540(a). Plaintiffs argue that the

---

[3] Available at http://1.usa.gov/1AydtlK. Accessed June 17, 2015.

9

1  instant ban, aimed only at handgun advertising, is not supported by common sense because there
2  is not a corresponding ban on the advertising of other guns such as hunting rifles. Plaintiffs argue
3  that it is not reasonable, for instance, to assume a purchaser will be unmoved by a "large neon
4  sign blaring 'GUNS GUNS GUNS' or a fifteen-foot-high depiction of a modern sporting rifle,"
5  but will be moved by decals in a window depicting handguns or a sign containing the word
6  "handgun". (ECF No. 26 at 11.) Plaintiffs also point out that firearms dealers may advertise
7  handguns online and in broadcast and print media. (ECF No. 5-1 at 11.) Hypothetically,
8  Plaintiffs argue, a dealer may even "hire someone to dress up as a revolver and stand on the
9  public sidewalk or a major intersection, directing consumers to the store," since this would not be
10 speech occurring on the premises. (ECF No. 5-1 at 11–12.)

11 The Court agrees that it is reasonable to infer that precluding firearms stores from
12 advertising handguns in a way that can be seen from outside the store – for instance precluding a
13 sign that says "Handguns for Sale" – will prevent some purchases that would result from
14 passersby seeing the advertisement and entering the store to make a purchase. The
15 aforementioned data cited by the Government also shows a clear connection between the
16 increased circulation of handguns and increased handgun-related violence. However, the specific
17 issue is whether the instant ban limits impulse buys and in turn leads to less handgun crime and
18 violence, not as a general matter whether less handguns means less crime and violence. The
19 Government does not cite any data in its Opposition – although it should be acknowledged the
20 difficulties that may lie in finding such data, if it exists at all – clearly bearing on this specific
21 issue.

22 Further, in light of the fact that there is a ten day wait period between the time of the buy
23 and the release to the purchaser, the fact that there are not corresponding advertising restrictions
24 on other firearms such as rifles, and the fact that handgun advertisements are not banned from
25 online, broadcast, and print media, the Government's common sense argument is unsubstantiated.
26 In particular, the fact that there is a ten day waiting period between the purchase and the transfer
27 of the firearm calls into question what an "impulse buy" would mean. One obvious scenario
28 underlying the Government's justification would be a person wanting to commit a violent act,

seeing the sign "Handguns for Sale" while passing a store, taking possession of the handgun at that time, and then carrying out the act. But generally speaking, this type of scenario is not possible given a ten day waiting period.[4] It is possible that the Government wishes to lessen purchases by the type of person who would buy a handgun on impulse after seeing an advertisement visible from outside the store, and who would proceed into the store to start the paperwork process even if she could not take possession at that time. However, the Government does not identify evidence – and there is not an obvious common sense connection – leading to the conclusion that limiting purchases by this type of person either materially limits the numbers of handgun purchases in California, or materially limits the handgun crime and violence associated with such purchases.

The legislative history and data cited by the Government in its Opposition (ECF No. 18), and the Government's common sense argument, do not adequately support the position that section 26820, by limiting impulse buys, will in fact alleviate handgun crime and violence to a material degree. *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). Therefore, the Court finds the Government has not met its burden under the "directly advance" prong of *Central Hudson*.

### C. No more restrictive than necessary

Under the final prong of *Central Hudson*, the Government must show that section 26820 is no more restrictive than necessary to achieve the Government's asserted interest. On the one hand, if the purpose of section 26820 is to minimize impulse buys of handguns by passersby and thereby manage handgun violence, then a restriction on advertising of handguns targeted only at passersby – with no bearing on print, online, or broadcast advertising – is proportional in scope to the interest served. *Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). However, "[t]he four parts of the *Central Hudson* test are not entirely discrete. All are important and, to a certain extent, interrelated: Each raises a relevant question that may not be dispositive to the First Amendment inquiry, but the answer to which may inform a judgment concerning the other three."

---

[4] The Court understands that, generally speaking, there is a 10 day waiting period before transfer of the firearm can take place. Cal. Penal Code §§ 26815(a) and 27540(a). Although there are exceptions; *see e.g. Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014) (finding the 10 day wait period violated the Second Amendment for those who already lawfully possessed a firearm, or a valid Concealed Carry Weapon License, or both a valid Certification of Eligibility and a firearm).

1 *Greater New Orleans*, 527 U.S at 183–84 (1999). "The [not more extensive than necessary] part of the test complements the direct-advancement inquiry." *Id.* at 188. The Court has found there is not adequate evidence produced by the Government showing how, specifically, limiting impulse buys from passersby helps to manage handgun crime and violence. For the same reasons, the Government also does not show that section 26820 is no more extensive than necessary to achieve that interest. Section 26820 is narrowly tailored to advertisements targeting passersby, but the Government has not shown that the ban is "narrowly tailored to achieve the desired objective" of managing handgun crime and violence. *Bd. of Tr. of State Univ.*, 492 U.S. at 477.

    D. Conclusion

The Government does not meet its burden of showing that the *Central Hudson* elements, in tandem with the additional First Amendment principles discussed above, are met. Therefore, Plaintiffs raise serious questions going to the merits of their First Amendment challenge to section 26820. On balance – based on the arguments and evidence currently before the Court – the Court also finds it is more likely than not that Plaintiffs will succeed on the merits of their First Amendment claim.

    **II.**    **Irreparable Injury**

    A. Compliance with section 26820

Plaintiffs provide no specific evidence that they will suffer irreparable harm due to the immediate consequences of compliance with section 26820. In the case of Tracy Pistol, this would involve taking down window vinyls containing handgun decals, based on a DOJ inspection that occurred in September, 2014. In the case of Imbert & Smithers, this would involve taking down a sign on the building's exterior displaying its dealership logo, based on an inspection occurring in January, 2015. In the case of Ten Percent Firearms, this involved taking down a three by two foot sign shaped like a handgun hung outside the store, based on an inspection occurring in February, 2010. In the case of the other Plaintiffs, they would continue to be prohibited, against their desire, from advertising in a way that violated section 26820. One obvious potential for harm would be the loss of prospective customers. The Ninth Circuit has

12

1 found that the "threatened loss of prospective customers or goodwill certainly supports a finding
2 of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240
3 F.3d 832, 841 (9th Cir. 2001). However also, "[t]ypically, monetary harm does not constitute
4 irreparable harm." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009).
5 "Economic damages are not traditionally considered irreparable because the injury *can later be*
6 *remedied by a damage award." Id.* at 852 (emphasis in original). Further, as Plaintiffs
7 themselves argue, they are not prevented from advertising handguns in other media, or
8 advertising by use of the word "Guns" or with depictions of other firearms in a way visible from
9 outside the store. Therefore, there is not specific evidence that Plaintiffs will lose business during
10 the pendency of this case. In any event, Plaintiffs make no real argument to this effect. Their
11 primary argument, discussed *supra*, relates to the inherent harm caused by a violation of their
12 commercial speech rights.

        B.  Loss of license

14         Plaintiffs also argue that choosing not to comply with section 26820 may cause them to
15 lose their dealership licenses. Plaintiffs do not support their position, however, that they may
16 willingly violate a section of the California Penal Code, and then by virtue of the immediate
17 consequences claim irreparable harm for the purposes of prevailing on a preliminary injunction
18 motion. On this point, Plaintiffs reference *Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir.
19 2011), affirming a permanent injunction preventing the enforcement of a Maryland statute
20 effectively prohibiting an adult entertainment club that featured nude dancing from selling
21 alcohol. The Fourth Circuit reasoned that "the threatened injury in this case (i.e., license
22 revocation) constituted 'direct penalization, as opposed to incidental inhibition' of First
23 Amendment rights, thus making it the sort that could not be remedied absent an action." *Id.* at
24 302. However, the issue here is a preliminary injunction pending adjudication on the merits –
25 thus invoking Plaintiffs' burden of showing the need for an extraordinary remedy. Plaintiffs also
26 reference *Giovani Carandola, Ltd v. Bason*, 303 F.3d 507 (4th Cir. 2002), affirming a preliminary
27 injunction preventing the enforcement of a North Carolina statute prohibiting entertainment
28 involving simulated sexual activity. As to irreparable harm, the Fourth Circuit considered that

13

1 plaintiff, an adult entertainment club operator, "face[d] the threat of a substantial fine and
2 temporary suspension of its license on the basis of past conduct, and prospectively, the loss of
3 valuable business opportunities." *Id.* at 520. The Court agrees that *Giovani* offers support to
4 Plaintiffs' position, but it is extra-Circuit authority with no particularly similarity in facts to the
5 instant case. Plaintiffs make no real argument that, outside of their injuries under the First
6 Amendment, they will suffer irreparable harm in the interim while their case is pending.

   C. Loss of First Amendment rights

The chief argument put forth by Plaintiffs is that the "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 684 F.3d 1196, 1207-08 (9th Cir. 2009) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Valle del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013); *Sammartano v. First Judicial Dist. Court, in & for Cnty. of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002); *Jacobsen v. U.S. Postal Service*, 812 F.2d 1151, 1154 (9th Cir. 1987). See *also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005) ("We therefore assume that plaintiffs have suffered irreparable injury when a government deprives plaintiffs of their commercial speech rights").

In *Klein*, for instance, the Ninth Circuit considered a city's anti-littering ordinance, which prohibited the leafleting – on the topic of immigration policy – of unoccupied vehicles parked on city streets. After finding plaintiff likely would succeed on the merits of his First Amendment claim, the *Klein* court found irreparable harm because a loss of First Amendment freedoms, particularly in the political speech context, constituted irreparable injury. *Klein*, 684 F.3d at 1207–08. More on point because it involved commercial speech is *Valle del Sol*, which involved a challenge to an Arizona state law that prohibited the solicitation of day laborers by a motor vehicle occupant if the motor vehicle blocked traffic. After concluding that plaintiffs likely would succeed on the merits, the Ninth Circuit found irreparable harm on the basis that the restriction on the instant commercial speech constituted a loss of First Amendment freedom and so "unquestionably constitutes irreparable injury." *Valle del Sol*, 709 F.3d at 828.

On the other hand, "the assertion of First Amendment rights does not automatically

14

1 require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he
2 shows a likelihood of success on the merits." *Hohe v. Casey*, 868 F.2d 69, 73 (1989). It is
3 "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for
4 preliminary injunction purposes." *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th
5 Cir. 1984). It is the "direct penalization, as opposed to incidental inhibition, of First Amendment
6 rights [that] constitutes irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir.
7 1983).

8 In this case, section 26820 does not involve an incidental inhibition on First Amendment
9 rights; rather, its only purpose is to target a specific type of commercial speech, subject to DOJ
10 enforcement. Therefore, the Court follows the plain directive from *Valle del Sol* and *Elrod* and so
11 finds Plaintiffs, because they have shown a likelihood of success on the merits on their First
12 Amendment claims, also show a likelihood of irreparable harm.

13 However, the Court views this harm to carry minimal weight in the four-part test for
14 injunctive relief under *Winter*. As discussed, Plaintiffs are not prevented from advertising
15 handguns in a similar way in other media, from advertising firearms in general in a way visible
16 from outside the store, or from advertising other firearms such as hunting rifles in a way visible
17 from outside the store. So it appears that there are alternative means by which Plaintiffs' message
18 that they sell handguns can be conveyed. It is the Government's point that a passerby seeing an
19 advertisement "Handguns for Sale," or a picture of a handgun, might be uniquely motivated to
20 enter the store to make a purchase. But it is also reasonable to infer that the same customer,
21 viewing an advertisement that states only "Guns for Sale" in large neon letters, may still enter the
22 store impulsively. It is also reasonable to infer that the same customer will understand that the
23 store sells handguns simply by virtue of the fact that it sells guns. Drawing this inference perhaps
24 shows the pointlessness of section 26820. But the fact that section 26820 is so narrowly drawn
25 does not weigh in Plaintiffs' favor for the purposes of finding irreparable harm.

26 **III.** **Balance of the Equities and Public Interest**

27 "Once an applicant satisfies the first two factors [likelihood of success on the merits and
28 irreparable harm], the traditional stay inquiry calls for assessing the harm to the opposing party

15

and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *U.S. S.E.C. v. Wilde*, 2013 WL 2303761, at *8 (C.D. Cal. May 20, 2013); *Native Songbird Care and Conservation v. LaHood*, 2013 WL 3355657, at *12 (N.D. Cal. July 2, 2013). In the instant case, the balance of equities does not tip in Plaintiffs' favor and it is not in the public interest to issue a preliminary injunction. This is due to the conduct at issue – impulse buys and the relevance this may have to handgun crime and violence – which the instant speech restriction is aimed at dampening, and the potential consequences to the public and the Government based on ruling on an incomplete set of facts.

Plaintiffs argue an injunction would pose no threat to public safety since California's direct restrictions on the purchase and sale of handguns would remain unaffected. However, "[i]f the judge grants the preliminary injunction to a plaintiff who it later turns out is not entitled to any judicial relief – whose legal rights have not been violated – the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the injunction causes to the defendant while it is in effect. If the judge denies the preliminary injunction to a plaintiff who it later turns out is entitled to judicial relief, the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the denial of the preliminary injunction does to the plaintiff." *American Hosp. Supply Corp. v. Hospital Products Ltd.* 780 F.2d 589, 593 (7th Cir. 1986) (Posner, J.). The costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave. These costs would affect members of the public, and they would affect the Government which is tasked with managing handgun violence. By contrast, the cost of continued compliance with section 26820 during the pendency of this lawsuit appears to render little harm to Plaintiffs, outside of the inherent harm imposed by a violation of their First Amendment Rights. With due consideration to the serious First Amendment questions raised by Plaintiffs, and their likelihood of success on the merits, the implications of being mistaken in this case indicate it is in the public interest to deny the injunction, and the balance of the equities tips in the Government's favor.

On this point, the Court notes the four cases relied upon heavily by Plaintiffs throughout their briefing: *44 Liquormart*, 517 U.S. at 516 (striking down prohibition on advertisement of

16

1  retail prices of alcohol); *Greater New Orleans*, 527 U.S. at 194 (striking restriction on broadcast
2  advertisement of gambling by stations in Louisiana, where such gambling was legal); *Lorillard*,
3  533 U.S. at 571 (striking store-front, outdoor, and point-of-sale restrictions on tobacco
4  advertising); and *Thompson*, 535 U.S. at 377 (striking prohibition on advertisement of certain
5  pharmaceuticals). Arguably, the instant subject matter – to the extent it may implicate handgun
6  crime and violence – presents a more serious subject matter than each of the aforementioned
7  cases.

8  There is also a distinction in the procedural posture of the instant motion and the
9  aforementioned cases. In *Greater New Orleans*, *Lorillard*, and *Thompson*, the district courts
10 ruled on summary judgment motions. In *44 Liquormart*, the district court ruled on a motion for
11 declaratory judgment, and only after extensive findings of fact regarding the effects of alcohol
12 advertising, based on a review of research studies and expert testimony.[5] 829 F. Supp. 543, 546-
13 49 (D.R.I. 1993). In the instant case, while it appears the facts involving the advertisements
14 themselves and the DOJ's citations are not disputed, what is disputed is the relevance of the data
15 cited by the Government and its common sense rationale connecting impulse buys to handgun
16 crime and violence. Given the seriousness of these issues, it is not in the public interest to impose
17 the extraordinary remedy of a preliminary injunction without further fact finding and more formal
18 guidance. *See also Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014) (conducting a bench
19 trial and thereafter invalidating the ten day waiting period in certain circumstances).

20 Finally, the Court notes that the instant injunction has the character of a mandatory
21 injunction, in that it seeks to alter the status quo by preventing California from enforcing section
22 26820. "[W]here a party seeks mandatory preliminary relief that goes well beyond maintaining
23 the status quo *pendente lite*, courts should be extremely cautious about issuing a preliminary
24 injunction." *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984). On

---

[5] The Court anticipates analogous findings of fact will be required at a later time. On balance, submitting the instant motion without oral argument, and declining to set an evidentiary hearing for the purposes of this motion, probably is more prejudicial to the Government than Plaintiffs. Some of the inconclusiveness as to the effect of the data or legislative history cited by the Government – inconclusiveness which weighs against the Government – could have received greater import if, for instance, the Court heard expert testimony. However, the Court views the matter as submitted, without further hearing or gathering of evidence, to adequately capture the dispositive issues for this motion.

17

the one hand, the status quo could be construed as the fact that the advertisements at issue either were – or currently are – visible outside of the firearms stores who now bring suit, and thus are in violation of section 26820. For instance, as to Imbert & Smithers, the DOJ inspected Imbert & Smithers in January, 2015, and required Imbert & Smithers to take down the logo from the building's exterior by July 28, 2015. (ECF No. 17 at 1.) So the status quo could be construed as holding in place Imbert & Smithers' display of their logo on the exterior of their building. However, it is more accurate to state the status quo as the fact that the DOJ is currently enforcing section 26820. Though the parties do not provide briefing on the regularity of DOJ enforcement in the past, the DOJ was at least enforcing the statute in February, 2010, when it inspected Ten Percent Firearms. (ECF No. 5-1 at 4.) Plaintiffs seek an injunction that would prevent enforcement of section 26820, across California, during the pendency of this lawsuit. Granting the injunction would alter the status quo by requiring California to alter its regulatory scheme and practices as they pertain to firearms. Therefore, the Court takes the requisite caution in deciding against altering the status quo. With due consideration to the free speech considerations raised by Plaintiffs, which are also of public interest, a cautionary approach that favors denial greater serves the public interest than granting the injunction.

* * * *

In consideration of the four factors under *Winter*, Plaintiffs' Motion for a Preliminary Injunction is hereby DENIED.

Dated: July 15, 2015

_____
Troy L. Nunley
United States District Judge

18