1  BENBROOK LAW GROUP, PC
   BRADLEY A. BENBROOK (SBN 177786)
2  STEPHEN M. DUVERNAY (SBN 250957)
   400 Capitol Mall, Suite 1610
3  Sacramento, CA  95814
   Telephone: (916) 447-4900
4  Facsimile:  (916) 447-4904
   brad@benbrooklawgroup.com
5  steve@benbrooklawgrou.com

6
   EUGENE VOLOKH (SBN 194464)
7  UCLA School of Law
   405 Hilgard Ave.
8  Los Angeles, CA  90095
   Telephone: (310) 206-3926
9  Facsimile: (310) 206-7010
   volokh@law.ucla.edu
10

11 Attorneys for Plaintiffs

12
                    **UNITED STATES DISTRICT COURT**
13
                    **EASTERN DISTRICT OF CALIFORNIA**
14

15

16 TRACY RIFLE AND PISTOL LLC;              Case No.:  2:14-cv-02626-TLN-KJN
   MICHAEL BARYLA; TEN PERCENT
17 FIREARMS; WESLEY MORRIS;                 **EXPERT WITNESS REPORT OF**
   SACRAMENTO BLACK RIFLE, INC.;            **PROFESSOR GARY KLECK**
18 ROBERT ADAMS; PRK ARMS, INC.;
   JEFFREY MULLEN; IMBERT & SMITHERS,
19 INC.; and ALEX ROLSKY,

20              Plaintiffs,

21        v.

22 KAMALA D. HARRIS, in her official capacity
   as Attorney General of California; and
23 STEPHEN J. LINDLEY, in his official capacity
   as Chief of the California Department of Justice
24 Bureau of Firearms,

25              Defendants.

26

27

28

# INTRODUCTION

I am the David Bordua Professor of Criminology and Criminal Justice at Florida State University.  Counsel for the plaintiffs in *Tracy Rifle & Pistol LLC v. Harris* (E.D. Cal. Case No. 2:14-cv-02626-TLN-KJN (TEMP)) have asked me to offer an opinion on the case and this report sets forth my opinions and the scholarly foundation for those opinions.

# QUALIFICATIONS

I received my Ph.D. in Sociology from the University of Illinois in 1979.  I have taught research methods to doctoral students for 38 years, covering statistical data analysis techniques, survey research methods, and strategies for distinguishing better research from poorer quality research.  I have published four books, over 50 articles in refereed journals, and 37 other articles and chapters, most of them on the topic of firearms and violence.  One of those books, *Point Blank: Guns and Violence in America*, won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology."

I also wrote *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001).  My articles have been published in the *American Sociological Review, American Journal of Sociology, Social Forces, Social Problems, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Crime and Delinquency, UCLA Law Review, the Journal of the American Medical Association*, and many other journals.

I have testified before Congress and state legislatures on gun control issues, and my work has been cited by the U.S. Supreme Court.  I have worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, and to the National Research Council Committee on Improving Research Information and Data on Firearms.  I also served as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force, and as a member of the National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence.  I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

A copy of my vita may be found in Exhibit 1.

## COMPENSATION

I am being compensated for my services at an hourly rate of $400.

## MATERIALS CONSIDERED

My opinions are based on the sources cited in this report, and those cited in Exhibits 2-4. I also read the Expert Witness reports of Professor Gregory T. Gundlach and Professor J. John Mann.

## PAST WORK AS AN EXPERT WITNESS

In the past four years I have been deposed as an expert witness in two legal cases:

- *Heller et al. v. District of Columbia*. Deposed 7-2-13.
- *Wilson v. Cook County*. Deposed 9-16-13.

## ASSIGNMENT

I have been asked by Plaintiffs' counsel to provide evidence intended to contradict or rebut evidence on the same subject matter identified in the State's expert witness disclosures.

## SUMMARY OF OPINIONS

1. Criminals usually do not get their crime guns from gun stores, and when they do, they do not get them impulsively.

2. Neither criminals, suicide-prone persons, nor members of the general public can quickly obtain handguns from gun stores in California, because the state requires a ten-day wait before a purchaser can take possession of a gun. Therefore, if restrictions on gun store signage are intended to prevent impulsive acquisitions of handguns from gun stores, they are an unnecessary solution to a nonexistent problem.

3. People who commit suicide with guns – even those who commit suicide impulsively - rarely get guns impulsively, shortly before committing suicide, and, as far as anyone can establish, on the rare occasions that they do so they apparently get them specifically for the purpose of committing a suicide that they had already determined they were going to commit.

4. People who commit suicide with firearms are different from those who commit suicide using other methods – more strongly determined to kill themselves, less impulsive, with

more persistent motivations to commit suicide. Thus, facts describing suicides and suicide attempters in general cannot be applied specifically to those who use firearms.

5. The best available evidence indicates that suicide attempts with firearms are no more lethal than suicide attempts by hanging, the suicide method most likely to be substituted if firearms are not available. Opinions to the contrary are based on "cherry-picking" of extreme and unrepresentative studies. Thus, no suicide deaths would be prevented if those who otherwise would have used firearms to kill themselves used hanging instead.

6. The best available evidence indicates that firearms ownership rates affect the rate of *firearms* suicides, but not the total rate of suicide. That is, gun prevalence affects whether people use guns in their suicides, but does not affect how many people kill themselves.

7. I have reviewed the entire body of scholarly research on the links between firearms and violence, including suicide, and am not aware of any evidence that signage in or outside of gun stores increases impulsive purchases of handguns by persons who use them to commit suicide or violent crimes, or that restriction on such signage reduces the number of suicides or violent crime.

## ANALYSIS

I will address each of the State's expert witnesses' claims in the order they appear in their Reports, beginning with Professor Gundlach and proceeding to Professor Mann's report.

### *Expert Witness Report of Professor Gregory T. Gundlach (G)*

Regarding Professor Gundlach's qualifications, while he may be an expert in marketing in general, he presents no evidence of expertise regarding the marketing of firearms. He cites his co-authorship of just two published articles pertaining to the marketing of firearms (Exhibit 2, items 18 and 36), neither of which is based on empirical evidence concerning the marketing of firearms, and neither of which addresses the impact of signage on handgun purchases in general, or impulsive handgun purchases for violent purposes in particular.

Indeed, none of the evidence cited anywhere in G's report pertains specifically to the marketing of *handguns*. He nowhere asserts that marketing practices and effects are identical for all products, so there is no foundation for him to extrapolate from his very generic observations

about marketing in general to the marketing of handguns in particular.  Further, none of the evidence G cites pertains to the purchase, impulsive or otherwise, of handguns or any other product, *by persons who use the product to commit criminal acts or harm themselves*.  In sum, there is a disconnect between his areas of expertise and the opinions he proffers on p. 4.  There is at best only the most remote inferential link between the scholarly sources G cites and the conclusions he draws regarding signage and impulsive purchases of handguns.

G's discussion of impulse buying on pp. 13-15 does not address purchases of handguns at all, and when he finally addresses handguns in a single short paragraph (pp. 15-16), none of his purportedly supporting sources in fn. 70-76 provide empirical evidence documenting large numbers of impulse purchases of handguns, or indeed *any* such purchases.  The source in fn. 70 merely *alludes to* impulsive firearm purchases, but makes no claims of its frequency and presents no relevant empirical evidence.  The source in fn. 71 consists of a single off-the-cuff oral remark made by a single firearms manufacturing firm executive, offering a personal opinion not backed up by any pertinent evidence.  Further, there is no evidence that this speaker defined an impulsive purchase the same as G did.  The source cited in fn. 72 flatly contradicts G's position, concluding that "Women's first gun purchase is *not* typically an impulse buy."  This was the only reference to impulsive gun purchases in the entire cited report.  Neither of the sources cited in fn. 73 or 74 even refer to impulsive gun purchases, never mind contain evidence on the question.  The source cited in fn. 75 made a single reference to impulse purchases of guns (though not of handguns in particular), but presented no evidence of their frequency.  Finally, fn. 76 consists entirely of quotes from two nonrandomly selected self-identified gun buyers who claim to have made impulse buys.  Neither defined what he meant by the term "impulse buy" and, judged in context, the term may only mean there was a short time between the person initially becoming aware of a particular model of guns and making the *decision* to buy it – *not* the time between first exposure to the gun and actually taking possession of it.  For purposes of preventing impulsive acts of gun violence, only the latter time interval is relevant, since one can only do violence with a gun after taking possession of it.

G's effort to support the proposition that many handguns are purchased impulsively falls

afoul one crucial fact that G seems to neglect.  The current case pertains only to purchases of handguns from gun stores in California, but California requires that all handgun buyers wait 10 days before taking possession of a handgun.  While there might be a short time interval between a person's exposure to advertising and their *purchase* of a handgun from a gun store, there is always a 10-day span between purchase and taking possession of any handgun bought in a gun store.  I am not aware of any evidence of California gun dealers violating the 10-day wait requirement, nor do the Defendant's experts cite any such evidence.  As far as can be determined, impulsive acquisitions of handguns from gun stores just does not happen in California.  If the purpose of the State's ban on visible handgun signage is intended to reduce such acquisitions, it is an unnecessary solution to a nonexistent problem.

More generally, criminals do not acquire crime handguns by impulsively purchasing them from gun dealers.  First, only 16% of handgun acquisitions by criminals are made via a purchase from a gun store or other retail outlet, whether impulsive or not (Wright and Rossi 1986, p. 185).  Second, even among those few who do get their guns from gun dealers, many were buying a handgun in addition to others they already owned, which means that failing to make the most recent potential purchase would not deny them a handgun to use in crime.

Third, they do not buy them impulsively, in the sense that they are purchased a short time before committing a violent act with the handgun.  A survey of Florida prison inmates who had committed murder with a handgun found that, of those who had purchased their handgun from a retail source, only 2.3% had owned only one handgun at the time and purchased the murder handgun within three days of the killing (Mannelli 1982).  These figures imply that less than 4/10ths of one percent ($0.023 \times 0.16 = 0.0037$) of handgun acquisitions by criminals could be meaningfully described as impulsive purchases from gun stores, or any other retail outlet for that matter.  Consequently, all of G's evidence concerning impulse buying of goods in general has no relevance to criminal purchases of handguns.

Impulsive purchases of handguns for purposes of committing suicide are similarly rare, but I will reserve discussion of the relevant evidence until addressing Professor Mann's report, since it is focused almost entirely on suicide.

G's section on the "antecedents and triggers to impulse buying" (pp. 26-33) relies almost entirely on a meta-analysis of 63 studies by Amos, Holms and Kenson (2014).  None of these 63 studies pertained specifically to purchases of handguns.  Likewise, none pertained to purchases of *any* products for the purpose of committing a crime or act of self-harm.  The closest this meta-analysis article came to even indirectly addressing handguns was in a discussion of "product type."  The authors documented that the likelihood of an impulse purchase was *not* the same for all product types.  Thus, findings pertaining to one product type cannot be generalized to other product types, as G. implicitly assumes.  The broad product category used by Amos et al. into which handguns would fall would be "general merchandise," and the only finding of this meta-analysis that bore on which broad types of products were more likely to be purchased impulsively was that fashion merchandise was most likely to be purchased impulsively, and general merchandise was *least* likely to be purchased impulsively (p. 93, Table 7).   G. did not include this information in his report.

Conversely, there was only a single, casual, reference to signage in the entire meta-analysis, and no empirical findings regarding the effect of signage on impulsive buying.  More generally, none of empirical research reviewed by G bears on the effect of signage on impulsive buying of handguns by consumers in general or by persons intending to do violence in particular.

### *Expert Witness Report of Professor J. John Mann*

Professor Mann's report is slightly more relevant to the case at hand, since he is expert in some aspects of suicide, primarily the biological causes of suicidal behavior.  He seems not to have expertise, however, on the use of firearms in suicides, the acquisition of the guns used in firearm suicides, whether those acquisitions are impulsive, or the effect of firearm availability on suicidal behavior.  His expertise appears to have only quite limited relevance to the issues in this case, or the gun-related opinions he proffers.  Of the hundreds of published articles listed in his Curriculum Vitae (Mann Expert Report Exhibit A, pp. 12-61), none pertain to either the involvement of firearms in suicide or in any other type of violence.

Regarding the five topics M identifies in his description of his Assignment, his expertise, as conveyed by his resume and his expert report, applies only to Topic One, the connection between

impulsive personality traits and suicide.  Correspondingly, I do not dispute his opinion that "impulsive personality traits increase the risk of suicide" (p. 3).  The rest of my discussion will be devoted to rebutting the rest of M's opinions, summarized in sections 12 through 15 on p. 3.  I divide my rebuttal into the same section heading, I to V, used by M, skipping Section I.

**Section II**

M claims (p. 6) that "having a handgun in the home is a risk factor for firearm suicide." He is not qualified to render an opinion on this topic, having never done any research on the topic. The three specific studies he cites in support (Exhibits 17-19) are a tiny cherry-picked subset of studies on the guns/suicide link, and, contrary to M's claims, do not even address the effects of "having a handgun in the home."  Rather, those studies addressed the statistical association between *purchase* of a handgun and suicide.  The distinction is not a mere quibble.  People frequently acquire, then get rid of firearms – gun ownership is highly fluid (Cook and Ludwig 1998).  Thus, acquiring a handgun at one time does not guarantee that the purchaser possesses a handgun up to a year later.  Further, none of these three studies established that any of the recently purchased handguns were used in a suicide.  Indeed, none of the studies established that *any* handgun was used in the suicides, since their research did not distinguish firearms suicides committed with handguns from firearms suicides committed with shotguns or rifles.  This is a serious problem, since about half of firearms suicides are committed with rifles or shotguns (Kleck 1997).  M seems to misapprehend just what was measured in these studies, erroneously stating (p. 8, line 14) that they measured "having a handgun in the home."

M also claims that these three studies somehow establish a link between handgun possession (or purchase) and *impulsive* suicide, but nothing in these studies established that any of the firearm suicides examined were impulsive.  Cummings et al. (1997, p. 976) even conceded that the average time interval between handgun purchase and firearms suicide was *10.7 years*, and never less than 11 days – hardly supportive of gun suicides being quickly triggered by a handgun purchase.

Wintemute and his colleague (1999) claimed to have documented suicides occurring after a "recent" handgun purchase, but defined "recent" as being within *a year* of the handgun purchase.

EXPERT WITNESS REPORT OF PROFESSOR GARY KLECK
-7-

1  They did report that the risk of firearm suicide is *relatively* higher in the weeks immediately
2  following a handgun purchase, but their method of presenting their findings prevented readers
3  from determining whether any significant number of gun suicides actually occurred in this period,
4  as opposed to merely being less rare than those occurring months or years after the handgun
5  purchase.  When these authors finally got around to saying something directly about the frequency
6  of suicides occurring "shortly" after purchasing a handgun, it was to acknowledge that it is rare:
7  "handgun purchasers accounted for only 10.3 percent of those who committed suicide by firearm
8  statewide in the year after their handgun purchases" (p. 1587).  A suicide that follows a handgun
9  purchase by as much as a year can hardly be described as impulsively driven by the handgun
10 purchase.  And suicides that did follow a handgun purchase by only *a few days* must be a tiny
11 fraction of the 10.3 percent cited by Wintemute et al. as occurring *within 365 days* of the handgun
12 purchase.  In short, the main fact to be derived from this study is that suicides following
13 immediately after a handgun purchase are extremely rare, a fact that plainly does not support
14 Professor Mann's argument.
15     Finally, the study by Grassel et al. (Exhibit 18) parallels the Wintemute study in noting the
16 occurrence of suicides among handgun users and in using the same definition of a "recent"
17 handgun purchase – one occurring as much as a year before the suicide.  Again, it had nothing to
18 say about handgun purchases triggering impulsive suicides.
19     The more important question is whether these studies do anything more than establish a
20 meaningless statistical *association* between handgun purchase and suicide.  That is, do they
21 establish that handgun purchases *cause* an increase in the risk of suicide?  If there is no causal
22 effect of handgun purchases on suicide, then reducing impulsive handgun purchases would not
23 cause a reduction in suicide.
24     Establishing causation in nonexperimental or observational research like this requires that
25 the research control for "confounding variables."  In this field of research, a confounding variable
26 is a variable that (a) affects suicide *and* (b) is also correlated with handgun purchase or ownership.
27 None of the three studies cited by Mann controlled for a single confounding variable.
28     In Exhibit 2, I (a) review the full body of case-control studies on the guns/suicide link, not

just a cherry-picked selection of three such studies, (b) identify 19 known or likely confounding variables, and (c) document that none of the studies controlled for even half of the confounding variables they needed to control in order to isolate the effect of gun ownership on suicide (and that most did not control for *any* confounders). Wintemute and his colleagues even explicitly concede this point (1999, p. 1588: "We cannot determine …"), acknowledging that they did not control for even *one* confounding variable.

Further, the failure to control for these confounding variables biases the association between guns and suicide upward, mistakenly attributing to gun ownership the suicide-elevating effects of other variables that happen to be correlated with gun ownership. In sum, these studies do not establish, even weakly, that handgun purchases increase the likelihood of a person committing suicide, and certainly do not establish an effect on impulsive suicides, as M claims.

To be sure, a very small number of suicides are preceded by a handgun purchase a short time before. This does not, however, establish that the handgun purchase had any effect on the likelihood of the suicide. Imagine a person who, after weeks or months contemplating suicide, becomes determined to kill themselves, decides to commit the suicide with a handgun, but does not already own one. Very likely they would buy a handgun for the purpose of killing themselves and then kill themselves with it. One could not, however, reasonably assert that the handgun purchase in any sense caused the suicide. Rather, the handgun purchase was merely the next-to-last step in the process of committing a suicide that the person had already decided to commit. Wintemute and his colleagues explicitly acknowledged this potential interpretation of their handgun purchase/suicide association, conceding that "some purchasers bought handguns with the intention of killing themselves" (p. 1587).

Most firearm suicides use guns they have had for years, and did not buy for purposes of committing suicide (Cummings et al. 1997, p. 976), but among the few who do buy a gun shortly before committing suicide, all may have done so for the specific purpose of committing a suicide that they had already decided to commit. Certainly nothing in the extant research contradicts this interpretation.

M asserts that "suicidal behavior is generally impulsive and 70% of suicide attempts act

less than one hour after deciding to kill themselves" (p. 7, lines 1-2).  The statement is misleading because it is accurate only with regard to suicide attempts and completed suicides using all methods – *not firearms suicides in particular*.  The single source that M cites to support this claim (in his fn. 10, p. 7) had no evidence pertaining specifically to firearms suicides.

M likewise asserts that nonfatal suicide attempts are rarely followed by a later successful (fatal) suicide attempt, but the sole source he cites to support this claim (Owens 2002) again pertained only to suicides in general, containing no information about firearms suicide attempts in particular.

The reason this distinction is important is because firearms suicides are different from most other suicides in crucial ways that bear on how preventable they are.  While many suicides *in general* are impulsive, Fox and Weissman (1975) found that this was less true of suicide attempters who used shooting and other more serious methods.  Likewise, while most suicide attempts *in general* are not followed by subsequent suicide attempts, at least three studies have found that attempts using the *more lethal* methods, including shooting, are more likely to try to kill themselves again if their initial attempt failed (Tuckman and Youngman 1963; Eisenthal, Farberow, and Shneidman 1966; Tuckman and Youngman 1968).  This supports the view that suicide attempts made with firearms are more seriously intended, committed by more lethally minded attempters who had more long-lasting motives to commit suicide.

**Section III**

The authors of case-control studies of the guns/suicide association are usually silent on the question of just how or why gun ownership would increase the risk of suicide, perhaps because they consider it to self-evident.  M. makes very explicit a specific reason why handgun purchases or ownership would cause an increased risk of suicide, and not merely lead to substitution of other methods.  He claims that "attempted suicide using a firearm is more often fatal than any of the other means of suicide amongst those in the top ten most frequently used methods" (p. 8, lines 8-9).  He cites just two studies in support of this extreme claim (Chapdelaine et al. 1991 and Spicer and Miller 2000, in his fn. 21).

M's citation of the Chapdelaine et al. study, however, seems to be mistaken.  This article

did not have any evidence on fatality rates of suicide attempts using different methods. The Chapdelaine et al. study cannot be seen as supporting the position for which it is cited.

As to the one relevant study cited by M (Spicer and Miller 2000), this is the most extreme and unrepresentative of all the studies on this topic, reporting a far larger difference in fatality rates between shooting and hanging suicide attempts than any other study. Thus, having it be the only real supporting source (given the inaptness of the Chapdelaine et al. study) is unsound. The *full* body of research is reviewed in my Exhibit 3. There have been *seven* previously published studies comparing the fatality rates of suicide attempts by shooting with attempts by hanging, and the Spicer and Miller study is the *only* one to indicate a large difference in fatality rates between these two methods. Indeed, two prior studies indicate somewhat *lower* fatality rates of shooting attempts than hanging attempts, and the rest indicate only slight differences in fatality rates.

In Exhibit 3 I have added to the body of evidence by analyzing a far larger set of suicides and attempted suicides than has ever been previously examined, covering the entire United States for the most recent 14-year period for which the relevant data are available. The analysis indicates that there is no significant difference between the fatality rates of firearm and hanging suicide attempts. Thus, M is mistaken – suicide attempts using a firearm are *not* more often fatal than any other means of suicide.

People only need one method to commit suicide, and hanging is one method that is just as lethal as shooting. Further, hanging is already the second most common method of suicide after shooting, and only requires materials (rope or something like it for a noose, and a sturdy support for the noose) that are essentially universally available. In sum, there is no sound reason to believe that there would be anything less than 100% substitution of hanging among persons who otherwise would have used a firearm to commit suicide.

**Section IV**

In his section IV, M makes the unexceptionable assertion that multiple strategies should be adopted to prevent suicides, but does not make an evidence-based case for why controls on handguns should be one of those strategies. He relies on his own unpublished review to support the claim that "states in the USA that have enacted more broad or multifaceted legislation have

been more successful at lowering *firearm* suicide rates" (p. 9, lines 1-2, emphasis added).  This assertion, however, is not the same as a claim that gun control legislation prevents suicide or saves lives.  If the only thing that gun laws accomplished was to reduce *firearm* suicide rates, but without reducing total suicides, there would be no savings of lives and no benefit to the public.  This issue is explained at greater length in my Exhibit 4.

In any case, none of the studies that M reviewed assessed the impact of gun control laws on impulsive firearms suicides, nor did any of them assess the impact of restrictions on gun store signage on firearms suicides, impulsive or otherwise.  M notes that "guns used for suicide are bought a mean of 11 years before the suicide" (p. 9, lines 2-3) but does not discuss the fact that this contradicts the picture he paints of people committing firearms suicides impulsively after buying a handgun.

M. asserts that "young people and many adults are … more likely to buy a gun impulsively" but does not cite any evidence in support of this proposition.  This is because, to my knowledge, there is no such evidence.  Recall that it is only handgun purchases from gun stores are relevant to the current case.  M does not acknowledge that no "young people" under the age of 21 years can legally buy a handgun from a gun store (or any other licensed source) anywhere in the U.S., impulsively or otherwise, as this is prohibited by the federal Gun Control Act of 1968.

There is an underlying assumption needed to plausibly argue that gun control laws reduce total suicides: the assumption that firearm prevalence increases the total suicide rate.  That is, the causal chain assumed by the authors of all of the gun control studies cited by M is: Gun Control Laws reduce Gun Prevalence, and Gun Prevalence has a positive effect on total suicide rates.  In his Section IV, M specifically argues that higher gun prevalence causes higher *firearm* suicide rates (p. 7, lines 10-18), though he says nothing about whether it affects total suicide rates.

My Exhibit 4 reviews the entire research literature on the effect of firearm prevalence on suicide rates.  It shows that although firearm ownership levels affect rates of *firearm* suicide, they have no effect on the total suicide rate, and thus do not affect how many people kill themselves.  Gun prevalence levels only affect the choice of method for suicide, not how many total suicides are committed.  Perhaps this is why M so carefully states only that gun ownership rates affect "the

firearm suicide rate" (p. 7, lines 10-17; p. 8, lines 1-2).  Thus, reducing gun prevalence through expanded gun control, or by any other means, would not reduce the number of suicides.

M's very constricted review of studies on the impact of gun laws on suicide rates relies solely on the most methodologically primitive studies (his fn 28-30), and ignores the most technically sophisticated study, that of Kleck and Patterson 1993 (p. 274 and associated text), which simultaneously assessed the impact of 19 different types of gun control on total suicide rates, firearm suicide rates, and on firearm suicide rates, and controlled for more than a dozen potential confounding variables.  This study indicated that gun laws do not affect total suicide rates.

To my knowledge, there are no studies of the impact of restrictions on gun store signage on rates of suicide or any other form of violence or crime, nor did M cite any such studies.  He appears to assume that if there are *any* gun control laws that are effective in reducing *any* kind of suicide, then this must imply that California's restrictions on gun store signage must also be effective in preventing impulsive suicides.  If this is not his premise, there was no point to his citation of research on the effects of a miscellany of other gun control measures.

**Section V**

M appears to lack professional expertise to offer regarding the topics addressed in Section V.  His remarks consist of unsupported personal opinions, linked together with  speculation.  For example, he "predicts" that invalidation of section 26820 would increase handgun sales, which would in turn cause increased handgun suicides, but offers no evidence to support either prediction.  He bases his opinion on "the strong relationship between gun availability and the risk of *firearm* suicide" (p. 11, line11, emphasis added).  Note once again that M does not claim that increased handgun sales would increase the total number of people who would kill themselves, but only the number who would do so with firearms.  As shown in Exhibit 4, most studies, and certainly the methodologically strongest studies, indicate that gun levels affect rates of firearm suicide but not total suicide.  Thus, there is no sound foundation for predicting that an increase in handgun sales would increase total suicides, and it is trivial from the standpoint of the public's wellbeing whether increased sales would only affect the percent of suicides that were committed

with firearms.

M's implied prediction that invalidation of section 26820 would increase impulsive handgun purchases from gun stores is especially implausible in light of the existence of California's 10-day waiting period requirement, which makes it impossible for anyone to buy a handgun from a gun store and take possession of it quickly. People might *pay* for a handgun impulsively, but they could not take physical possession of it quickly, and only a handgun that a person physically possesses can be used to commit suicide.

In sum, M does *not* establish that the availability of firearms causes increases in the risk of suicide, either impulsive or not, does *not* establish that attempted suicides with firearms are more fatal than attempted suicides by all other means, does *not* establish that either restrictions on gun store signage or gun control laws in general reduce the number of suicides, and does *not* establish that invalidation of section 26820 would increase suicides, impulsive or otherwise. His opinions are all either contradicted by reviews of the full array of relevant research studies or have no logical connection with the research he cites.

**References**

Cook, Philip J., and Jens Ludwig. 1996. *Guns in America*. Washington, D.C.: Police Foundation.

Cummings, Peter, David C. Grossman, and Robert S. Thompson. 1997. The association between the purchase of a handgun and homicide or suicide. *American Journal of Public Health* 87:974-978.

Eisenthal, Sherman, Norman L. Farberow, and Edwin S. Shneidman, *Followup of neuropsychiatric patients in suicide observation status*, Public Health Reports 81:97–990 (1966).

Fox, K., and M. Weissman, *Suicide attempts and drugs: contradiction between method and intent*, Social Psychiatry 10:31–38 (1975).

Kleck, Gary. 1997. *Targeting Guns: Firearms and their Control*. NY: Aldine.

Kleck, Gary, and E. Britt Patterson. 1993. The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology* 9:249-287.

///

Manelli, Ted, *Handgun Control*, Unpublished report to the Executive Office of the Governor, State of Florida, Tallahassee, Florida (1982).

Tuckman, Jacob, and William F. Youngman, *Suicide risk among persons attempting suicide*, *Public Health Reports* 78:585–587 (1963).

Tuckman, Jacob, and William F. Youngman, *Identifying suicide risk groups among attempted suicides*, Public Health Reports 78:763–766 (1968).

Wright, James D., and Peter H. Rossi, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms* (New York: Aldine 1986).

Dated:  August 15, 2016

By s/Gary Kleck
Gary Kleck, Ph.D.
David J. Bordua Professor of Criminology and Criminal Justice
College of Criminology and Criminal Justice
Florida State University