BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 1610
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile:  (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

EUGENE VOLOKH (SBN 194464)
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA  90095
Telephone: (310) 206-3926
Facsimile: (310) 206-7010
volokh@law.ucla.edu

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY RIFLE AND PISTOL LLC; MICHAEL BARYLA; TEN PERCENT FIREARMS; WESLEY MORRIS; SACRAMENTO BLACK RIFLE, INC.; ROBERT ADAMS; PRK ARMS, INC.; JEFFREY MULLEN; IMBERT & SMITHERS, INC.; and ALEX ROLSKY, <br><br> Plaintiffs, <br><br> v. <br><br> KAMALA D. HARRIS, in her official capacity as Attorney General of California; and STEPHEN J. LINDLEY, in his official capacity as Chief of the California Department of Justice Bureau of Firearms, <br><br> Defendants. | Case No.:  2:14-cv-02626-TLN-DB <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date: January 12, 2017 <br> Time: 2:00 p.m. <br> Courtroom: 2 <br> Judge: Troy L. Nunley <br><br> Action filed Nov. 10, 2014 |

## Table of Contents

I.  INTRODUCTION…………………………………………………………….......1

II. STATEMENT OF FACTS…………………………………………………….....2

III. PROCEDURAL BACKGROUND……………………………………………....4

IV. ARGUMENT………………………………………………………………….4

   1. Section 26820 Is Presumptively Invalid Because It Imposes
    A Content- And Speaker- Based Burden On Protected Expression………………6

   2. Section 26820 Fails The *Central Hudson* Test………………………………...7

    A. Section 26820 Impermissibly Relies On "The 'Fear
    That People Would Make Bad Decisions If Given Truthful
    Information.'"………………………………………………………………...8

    B. The State Cannot Prove That Section 26820 "Directly
    and Materially Advances" Its Asserted Interest in Preventing Suicide…….11

      1. The State Continues To Rely On Implausible
      "Speculation Or Conjecture" Rather Than Evidence Showing
      The Ban Will Significantly Reduce Handgun-Related Violence......11

      2. The State's Expert Witnesses Have Not Established
      That Section 26280 Directly And Materially Advances Its
      Asserted Interest In Reducing Handgun Crime and Violence……...14

    C. The State Cannot Demonstrate That Section 26820's Ban
    Is Not More Extensive Than Necessary……………………………...17

V. CONCLUSION…………………………………………………………...19

Table of Authorities

Cases

*44 Liquormart, Inc. v Rhode Island,*
  517 U.S. 484 (1996) ........................................................................................................ passim

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986). ......................................................................................................... 4

*Bigelow v. Virginia,*
  421 U.S. 809 (1975) ....................................................................................................... 1, 5, 10

*Bolger v. Youngs Drug Prods.,*
  463 U.S. 60 (1983) ............................................................................................................... 1, 5

*Carey v. Population Servs. Int'l,*
  431 U.S. 678 (1977) ............................................................................................................. 1, 5

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................................................. 4

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
  447 U.S. 557 (1980) ........................................................................................................ passim

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
  657 F.3d 936 (9th Cir. 2011) ............................................................................................. 18

*Crazy Ely Western Village, LLC v. City of Las Vegas,*
  618 Fed. Appx. 904 (2015) ................................................................................................ 18

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................................................ 1, 2, 5

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ................................................................................................ 6, 11, 12, 17

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
  527 U.S. 173 (1999) ........................................................................................................ passim

*Linmark Assocs., Inc. v. Willingboro Twp.,*
  431 U.S. 85 (1977) ........................................................................................................ 1, 5, 19

*Lorillard Tobacco Co. v. Reilly,*
  533 U.S. 525 (2001) ........................................................................................................ passim

*Pitt News v. Pappert,*
  379 F.3d 96 (3d Cir. 2004) ................................................................................................ 14

*Posadas de P.R. Assocs. v. Tourism Co. of P.R.,*
  478 U.S. 328 (1986) ........................................................................................................... 10

*Project 80's, Inc. v. City of Pocatello,*
  942 F.2d 635 (9th Cir. 1991) ............................................................................................. 18

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ............................................................................................. 6, 7

*Roe v. Wade*,
  410 U.S. 113 (1973) .................................................................................................. 1

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995) ............................................................................ 5, 11, 13, 17

*Silvester v. Harris*,
  41 F. Supp. 3d 927 (E.D. Cal. 2014) ................................................................... 12

*Soremekun v. Thrifty Payless, Inc.*,
  509 F.3d 978 (9th Cir. 2007)................................................................................... 4

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ......................................................................................... passim

*Thompson v. Western States Medical Center*,
  535 U.S. 357 (2002)......................................................................................... passim

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013)................................................................. 8, 14, 18, 19

*W. States Med. Ctr. v. Shalala*,
  238 F.3d 1090 (9th Cir. 2001)............................................................. 9, 12, 13, 18

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .................................................................................................. 6


Statutes

11 C.C.R. § 4250 ............................................................................................................ 13

11 C.C.R. § 4253(a) ....................................................................................................... 13

42 U.S.C. section 1983 ..................................................................................................... 4

Cal. Admin. Code tit. 11, § 4024 ..................................................................................... 2

Cal. Penal Code § 12071(b)(4) ........................................................................................ 3

Cal. Penal Code § 23635 ................................................................................................ 19

Cal. Penal Code § 26715(b) ............................................................................................. 2

Cal. Penal Code § 26800 .................................................................................................. 2

Cal. Penal Code § 26815(a)............................................................................................ 12

Cal. Penal Code § 26820 .......................................................................................... passim

Cal. Penal Code § 26865 ................................................................................................ 19

Cal. Penal Code § 27535 ................................................................................................ 19

1

Cal. Penal Code § 27540(a)................................................................................12

Cal. Penal Code § 28220................................................................................19

Cal. Penal Code §§ 31610-31670.....................................................................13

Fed. R. Civ. P. 56(a)......................................................................................4

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. INTRODUCTION

The sale of handguns is not only legal—it is constitutionally protected.  The First Amendment protects truthful, nonmisleading commercial speech promoting lawful products or services, but especially when the products or services are themselves protected by other constitutional rights, such as the right to abortion or the right to buy contraceptives.[1]  What is true for unenumerated constitutional rights must be at least as true for the enumerated right to bear arms, which includes the right to possess and acquire handguns.[2]

Plaintiff firearms dealers are therefore constitutionally entitled to convey truthful commercial information about handguns to the public, and the public has a corresponding interest in receiving that information.  This includes plaintiffs' right to advertise their products on-site—an especially useful form of advertising for sellers and consumers alike.[3]  Yet California Penal Code § 26820 ("Section 26820") prevents a firearms dealer from displaying any "handgun or imitation handgun, or [a] placard advertising the sale or other transfer thereof" anywhere that can be seen outside the four corners of its store.  Section 26820 thus unconstitutionally prevents firearms dealers from advertising even the most basic commercial information—"Handguns for Sale"—at their places of business.

The government has argued that Section 26820 is constitutional, on the grounds that it helps prevent "impulse purchases."  But even if decreasing handgun ownership is a permissible

---

[1]     *See Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (striking down ban on abortion advertisements, partly because "the activity advertised pertained to constitutional interests," citing *Roe v. Wade*, 410 U.S. 113 (1973)); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 700–01 (1977) (striking down ban on contraceptive advertisements, partly because "the information suppressed by this statute 'related to activity with which, at least in some respects, the State could not interfere'" (citation omitted)); *Bolger v. Youngs Drug Prods.*, 463 U.S. 60, 69 (1983) (striking down ban on mailing contraceptive advertisements, partly because "advertising for contraceptives . . . relates to activity which is protected from unwarranted state interference").

[2]     The ability to obtain a handgun is central to a citizen's ability to exercise the core guarantee secured by the Second Amendment: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)); *see id.* at 628 (handguns are the "class of 'arms'" "overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]"); *id.* at 628–29 (handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family.").

[3]     *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566–67 (2001); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93 (1977).

justification for government regulations following *Heller*, it cannot justify this speech restriction. Even if California believes that buying a handgun is a bad decision, "the 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011) (citation omitted). The Supreme Court has "rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information." *Thompson v. Western States Medical Center*, 535 U.S. 357, 374 (2002).

"The choice 'between the dangers of suppressing information, and the dangers of its misuse if it is freely available' is one that 'the First Amendment makes for us.'" *Sorrell*, 564 U.S. at 578 (citation omitted). So long as responsible, law-abiding adults may purchase handguns in California, the First Amendment prevents the State from enforcing Section 26820's ban on on-site handgun advertising.

## II. STATEMENT OF FACTS

California Penal Code § 26820 prohibits firearms dealers from displaying a "handgun or imitation handgun, or [a] placard advertising the sale or other transfer thereof" "in any part of the premises where it can readily be seen from the outside." As such, it bans any on-site advertisement outside a firearms dealer's premises informing potential customers that the dealer sells handguns, and any in-store advertisement that can be seen through a glass door or window. As shown below, the California Department of Justice, which enforces § 26820, reads the law to ban any displays depicting handguns.

Plaintiffs are retail firearms dealers who wish to display truthful, nonmisleading material advertising the sale of handguns at their places of business. Section 26820 prevents them from doing so, and a dealer's license may be forfeited for violating the handgun advertising restriction. Cal. Penal Code §§ 26800, 26715(b); Cal. Admin. Code tit. 11, § 4024. The Department has restricted each of the plaintiffs' efforts to engage in truthful advertising:

*Tracy Rifle*. On September 12, 2014, the Department's Bureau of Firearms inspected Plaintiff Tracy Rifle and Pistol LLC. (ECF No. 9, Declaration of Michael Baryla ISO Mot. for Preliminary Injunction ("Baryla Decl."), ¶ 4.) At the time of the inspection, four of Tracy Rifle's

exterior windows were covered with large vinyl decals depicting firearms—three handguns and a rifle.  (*Id.*)  As of the date of the inspection, each of these firearms could be lawfully purchased in California, and Tracy Rifle regularly carries each of the four guns depicted in the windows.  (*Id.*) The Bureau of Firearms issued a "Notification of Inspection Findings" citing Plaintiffs Tracy Rifle and Michael Baryla for violating § 26820 because of the handgun decals, and requiring Plaintiffs to take corrective action by February 11, 2015.  (*Id.* ¶ 5.)

*Ten Percent Firearms*. On or about February 23, 2010, the Bureau of Firearms inspected Plaintiff Ten Percent Firearms in Taft, California.  (ECF No. 6, Declaration of Wesley Morris ISO Mot. for Preliminary Injunction ("Morris Decl."), ¶ 4, ER 41; ECF No. 8, Declaration of Dean Rowden ISO Mot. for Preliminary Injunction ("Rowden Decl."), ¶ 3.)  Displayed on a post in Ten Percent's parking lot was a 3-foot by 2-foot three-dimensional metal sign shaped like a revolver, hung approximately 9 feet off the ground.  (Morris Decl., ¶ 4; Rowden Decl., ¶ 3.)  The Bureau inspector informed Plaintiff Morris that the sign violated the handgun advertising restriction, and Ten Percent Firearms immediately took it down.  (Morris Decl., ¶ 4; Rowden Decl., ¶ 4.)  The Bureau of Firearms issued a "Notification of Inspection Findings" citing Plaintiffs Ten Percent Firearms and Morris for violating former Penal Code § 12071(b)(4).  (Morris Decl., ¶ 4; Rowden Decl., ¶ 4.)

*Imbert & Smithers*. On January 28, 2015, the DOJ Bureau of Firearms inspected Imbert & Smithers.  (Declaration of Alex Rolsky ISO Summary Judgment ("Rolsky Decl."), ¶ 3.)  At the time of the inspection, the building's exterior displayed a sign featuring the dealership's logo, which incorporates the outline of a single-action revolver.  (*Id.*)  The Bureau of Firearms issued a "Notification of Inspection Findings" citing Imbert & Smithers and Rolsky for violating Section 26820, and requiring them to take corrective action by July 28, 2015.  (*Id.*, ¶ 4.)

Each Plaintiff wants to display truthful, nonmisleading on-site handgun advertising that is visible from the outside of their dealerships, and would do so, but for § 26820 and the threat of forfeiting their dealer's licenses.  (Baryla Decl., ¶ 6; Morris Decl., ¶ 5; Rolsky Decl., ¶ 5; ECF No. 10, Declaration of Robert Adams ISO Mot. for Preliminary Injunction, ¶ 3; ECF No. 7, Declaration of Jeffrey Mullen ISO Mot. for Preliminary Injunction, ¶¶ 3–4.)

### III. PROCEDURAL BACKGROUND

Plaintiffs filed suit on November 10, 2014, alleging a single claim for relief for violation of 42 U.S.C. section 1983, on the grounds that § 26820 violates the First Amendment.  ECF No. 1. Plaintiffs filed a motion for preliminary injunction the following week.  ECF No. 5.  On July 16, 2015, the Court issued an order denying Plaintiffs' motion.  ECF No. 32.  In doing so, the Court held that although "it is more likely than not that Plaintiffs will succeed on the merits of their First Amendment claim," *id.* at p. 12, it declined to issue an injunction.  When considering the balance of equities and potential harm to the public, the district court concluded that the "costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave."  *Id.* at 16.

Plaintiffs appealed the Court's denial of their preliminary injunction motion to the Ninth Circuit.  ECF No. 33.  On February 23, 2016, the Ninth Circuit issued a memorandum opinion affirming the Court's denial, and issued a final mandate on March 17, 2016.

### IV. ARGUMENT

Summary judgment shall be granted if the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation and quotation omitted).  A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence to support the non-moving party's case."  *Id.*

**California Penal Code § 26820 Violates the First Amendment**

Section 26820 is unconstitutional because it prohibits firearms dealers from disseminating truthful, nonmisleading commercial information about a lawful, constitutionally protected product. The Supreme Court has struck down bans on advertising of abortion and contraceptives, partly because "the activity advertised pertained to constitutional interests" and "the information suppressed by [the ban] 'related to activity with which, at least in some respects, the State could not interfere.'" *Bigelow*, 421 U.S. at 822 (citation omitted) (abortion); *Carey*, 431 U.S. at 700–01 (1977) (contraceptives). The Supreme Court has struck down even a more limited restriction on advertising contraceptives in mailings to people's homes, partly because "advertising for contraceptives . . . relates to activity which is protected from unwarranted state interference." *Bolger*, 463 U.S. at 69. The same heightened constitutional protection would logically extend to speech advertising handguns, since the right to own handguns is constitutionally protected against unwarranted interference by the Second Amendment. *Heller*, 554 U.S. at 628–29, 635.

Of course the First Amendment protects even commercial speech about products and activities that are not themselves constitutionally protected, such as alcohol, tobacco, and gambling.[4] This includes advertising products at the place where they are available. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566–67 (2001); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93 (1977).

The Supreme Court has articulated two different tests for commercial speech restrictions, but in this case both tests point in the same direction. First, Section 26820 fails the heightened scrutiny for content- and speaker-based commercial speech restrictions set forth by *Sorrell* and *Thompson*. Second, Section 26820 fails the commercial speech test articulated in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980), even assuming that this test survives *Sorrell* and *Thompson*. Under either test, the state bears the burden of proving

---

[4]    *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) (disclosure of alcohol content on beer labels); *44 Liquormart, Inc. v Rhode Island*, 517 U.S. 484 (1996) (advertising of alcohol prices); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (outdoor and point-of-sale tobacco advertising); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) (gambling advertising).

the constitutionality of a commercial speech restriction. *Thompson*, 535 U.S. at 373; *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

1.   **Section 26820 Is Presumptively Invalid Because It Imposes A Content- And Speaker-Based Burden On Protected Expression.**

The Supreme Court recently reaffirmed in *Sorrell* that "heightened judicial scrutiny is warranted" when a statute "is designed to impose a specific, content-based burden on protected expression." 564 U.S. at 565. Even in the commercial speech context, "[t]he First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Id.* at 566 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Indeed, "it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory," because such laws are "'presumptively invalid.'" *Id.* at 571 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992)).

In *Sorrell*, the Supreme Court struck down a Vermont law that restricted pharmaceutical companies from using certain industry information to market drugs to doctors.[5] 564 U.S. at 557–59. The Court explained that laws that impose special burdens on disfavored speech and single out disfavored speakers are constitutionally suspect. *Id.* at 564–66. To that end, states are not permitted to advance their policy goals "through the indirect means of restraining certain speech by certain speakers," *id.* at 576, and "may not burden the speech of others in order to tilt public debate in a preferred direction." *Id.* at 578–79. Instead, the Constitution requires that information be made freely available to the public, who are responsible for assessing its value:

> The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented.

*Id.* at 579 (quoting *Edenfield*, 507 U.S. at 767).

Section 26820 suffers from the same constitutional infirmities confronted in *Sorrell*. The

---

[5]   Specifically, the law banned pharmacies and insurers from selling, and pharmaceutical manufacturers and marketers from relying on, data about a doctor's prescription practices (so-called "prescriber-identifying information") for marketing purposes, without first having the doctor's consent. *Sorrell*, 564 U.S. at 568.

advertising restriction is content-based.  The law applies only to guns—indeed, it applies only to handguns and does not apply to other firearms such as rifles or shotguns.  No separate statute imposes a similar restriction on advertising the sale of rifles or shotguns,[6] and Plaintiffs are unaware of any other California law that imposes an outright ban on a retailer advertising a product that may lawfully be purchased from its store.

And Section 26820 engages in speaker-based discrimination by singling out firearms dealers.  Thus, for example, a dealer is prevented from displaying advertisements that feature handguns in a campaign to promote public safety through the responsible use of handguns for self-defense.  But an anti-gun group would remain free under Section 26820 to use similar imagery to picket in front of that same dealer, encouraging people not to purchase handguns or warning of the dangers of gun violence (indeed, the First Amendment protects such speech as well).  So too, the statute operates in a way that is viewpoint-discriminatory, *i.e.*, anti-handgun.  *Cf. Sorrell*, 564 U.S. at 564 (noting that the law "burden[ed] disfavored speech by disfavored speakers" because it allowed the state to "supply academic organizations with prescriber-identifying information to use in countering the messages of brand-name pharmaceutical manufacturers and in promoting the prescription of generic drugs," but denied manufacturers' sales representatives the right to use the same "prescriber-identifying information" "for marketing").  Because Section 26820 imposes a content- and speaker-based burden on protected expression that is, in practice, viewpoint-discriminatory, it is "'presumptively invalid.'"  *Id.* at 571 (quoting *R.A.V.*, 505 U.S. at 382, and concluding that "[a]s in previous cases, . . . the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied").

## 2.    Section 26820 Fails The *Central Hudson* Test.

The Court's analysis in *Sorrell* reflects the fact that the Court has cast doubt on whether *Central Hudson* should remain the controlling test for commercial speech restrictions.  *Thompson*, 535 U.S. at 367–68 (collecting cases); *Lorillard Tobacco*, 533 U.S. at 554 (same); *Greater New Orleans Broad. Ass'n,* 527 U.S. at 197 (Thomas, J., concurring in judgment); *44 Liquormart*, 517

---

[6]      Of course, banning rifle or shotgun advertisements would also be unconstitutional.

U.S. at 510–14 (plurality opinion); *id.* at 517 (Scalia, J., concurring in part and concurring in judgment); *see also Sorrell*, 564 U.S. at 572 (citing *Central Hudson* only once in the majority opinion, to support the proposition that "the State must show *at least*" the elements set forth by *Central Hudson* (emphasis added)).  The Supreme Court has further stressed that "a blanket prohibition against truthful, nonmisleading speech about a lawful product"—such as the fact that handguns are available for purchase—is reviewed "with 'special care,' mindful that speech prohibitions of [that] type rarely survive constitutional review."  *44 Liquormart, Inc.*, 517 U.S. at 504 (plurality opinion) (citing *Central Hudson*, 447 U.S. at 566 n.9).  But in any event, Section 26820 fails even the scrutiny set forth under *Central Hudson*.[7]

Under *Central Hudson*, restrictions on such commercial speech are constitutional only if

1.  the speech is misleading or related to unlawful activity (which the speech in this case is not), or

2.  the restrictions serve "a substantial [state] interest,"

3.  they "directly advance the state interest involved," and

4.  they are not "more extensive than is necessary to serve that interest."

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 820–21 (9th Cir. 2013) (citations omitted).

On the first prong, the parties agree that the speech at issue—handgun advertisements made on the premises of firearms stores—concerns lawful activity and is not misleading.  As to the second prong, the State has asserted an interest in "diminishing handgun-related crime and violence" by reducing emotion-driven "impulse" purchases of handguns." *See* Preliminary Injunction Order, ECF No. 32, at p. 7.  Accepting this interest as important, Section 26820 is unconstitutional.

**A.   Section 26820 Impermissibly Relies On "The 'Fear That People Would Make Bad Decisions If Given Truthful Information.'"**

The "'fear that people would make bad decisions if given truthful information'" "cannot

---

[7]      As noted above, several Justices have expressed concern that *Central Hudson* is not a stringent enough a test, but the Court has declined to "break new ground" because each of the challenged restrictions failed whether the Court applied *Central Hudson* or a more restrictive standard.  *Greater New Orleans Broad. Ass'n*, 527 U.S. at 184; *Lorillard Tobacco*, 533 U.S. at 554–55; *Thompson*, 535 U.S. at 368.

justify content-based burdens on speech," including commercial speech.  *Sorrell*, 564 U.S. at 577.

The high court has "rejected the notion that the Government has an interest in preventing the

dissemination of truthful commercial information in order to prevent members of the public from

making bad decisions with the information."  *Thompson*, 535 U.S. at 374; *see also 44 Liquormart*,

517 U.S. at 497 ("[A] State's paternalistic assumption that the public will use truthful,

nonmisleading commercial information unwisely cannot justify a decision to suppress it.").  "The

choice 'between the dangers of suppressing information, and the dangers of its misuse if it is freely

available' is one that 'the First Amendment makes for us.'"  *Sorrell*, 564 U.S. at 578 (citation

omitted).

> Even if . . . the government had marshaled sufficient evidence to show that
> compounded drugs are dangerous and their volume should be limited, prohibitions
> on truthful speech are still strongly disfavored. "We have never held that
> commercial speech may be suppressed in order to further the State's interest in
> discouraging purchases of the underlying product that is advertised."

*W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1095–96 (9th Cir. 2001) (quoting *Central Hudson*,

447 U.S. at 574 (Blackmun, J., concurring)), *aff'd sub nom. Thompson*, 535 U.S. 357.  Put simply,

a state may not pursue its policy preferences "by keeping the public in ignorance."  *Thompson*, 535

U.S. at 375.

Laws that try to restrict commercial speech for fear that listeners will do dangerous things

if persuaded by the speech therefore fail the "direct advancement" prong of *Central Hudson*,

because they "do[] not advance [the government's goal] in a permissible way."  *Sorrell*, 564 U.S.

at 577.  Advancing state interests based on the "fear that people would make bad decisions if given

truthful information" "cannot be said to be direct" advancement of the interest.  *Id.* (internal

quotation marks and citation omitted).  The government's "seek[ing] to achieve its policy

objectives through the indirect means of restraining certain speech by certain speakers—that is, by

diminishing [speakers'] ability to influence [listeners'] decisions," *id.*, is unacceptable.

In *Sorrell*, as here, the premise of the State's argument was "that the force of speech can

justify the government's attempts to stifle it."  564 U.S. at 577.  Yet the Court held that the State's

"find[ing] expression too persuasive does not permit it to quiet the speech or to burden its

messengers."  *Id.* at 578.  The same is true here.

1

2   In the 1980s and early 1990s, the Supreme Court sometimes took a less speech-protective

3   view.  In particular, in *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341–43

4   (1986), the Court upheld a restriction on gambling advertising justified by the desire to diminish

5   local consumer demand for gambling.  But *Posadas* was overruled by *44 Liquormart*.  517 U.S. at

6   509 (lead op.) (noting that "[t]he casino advertising ban was designed to keep truthful,

7   nonmisleading speech from members of the public for fear that they would be more likely to

8   gamble if they received it," but concluding that "we are now persuaded that *Posadas* erroneously

9   performed the First Amendment analysis"); *id.* at 531–32 (Rehnquist, C.J., dissenting) (likewise

10   rejecting the *Posadas* analysis).  More generally, the *44 Liquormart* lead opinion concluded that,

11   
12   [B]ans against truthful, nonmisleading commercial speech . . . usually rest solely on
the offensive assumption that the public will respond "irrationally" to the truth.  The
First Amendment directs us to be especially skeptical of regulations that seek to
13   keep people in the dark for what the government perceives to be their own good.

14   517 U.S. at 503 (citation omitted).  And that view was accepted by a majority of the Supreme

15   Court in *Sorrell*, 564 U.S. at 577, and *Thompson*, 535 U.S. at 375.  In short, a state "may not seek

16   to remove a popular but disfavored product from the marketplace by prohibiting truthful,

17   nonmisleading advertisements."  *Sorrell*, 564 U.S. at 577–78.

18   That handguns are constitutionally protected only amplifies the conclusion that § 26820 is

19   unconstitutional.  The Attorney General thinks that people's exercise of their Second Amendment

20   rights is unwise and dangerous.  As a result, the Attorney General would like people not to

21   exercise those constitutional rights, much as, in *Bigelow v. Virginia,* 421 U.S. 809 (1975), the

22   Virginia Legislature wanted people not to exercise their constitutional rights to abortion.

23   Yet *Bigelow* held, precisely contrary to the State's demand-dampening theory, that the

24   government may not advance its interest "in shielding its citizens from information" about

25   constitutionally protected activities.  421 U.S. at 827–28.  "This asserted interest, even if

26   understandable, [is] entitled to little, if any weight under the circumstances."  *Id.* at 828.  The same

27   is true in this case.

28   At the preliminary injunction stage, the State argued that Section 26820 promoted a public

safety interest in reducing handgun-related crime and violence.  It is worth noting that the State appears to have dramatically narrowed the scope of the asserted interest in discovery.  Rather than contending the statute addresses handgun-related violence generally, the State's expert testimony focuses entirely on the goal of reducing suicide.  While of course deterring suicide is a worthy goal, the State hopes to achieve that goal by shielding people from information because the State thinks buying a gun is a "bad decision."  Just as in *Sorrell*, so here, "While [the government's] stated policy goals may be proper," a law that aims to prevent bad decisions by consumers "does not advance them in a permissible way."  *Sorrell*, 564 U.S. at 577.

### B.  The State Cannot Prove That Section 26820 "Directly and Materially Advances" Its Asserted Interest in Preventing Suicide

Even setting aside the prohibition on restricting commercial speech because of a worry that people would be persuaded by it, Section 26820 is unconstitutional because "[a] regulation cannot be sustained if it 'provides only ineffective or remote support for the government's purpose,' or if there is 'little chance' that the restriction will advance the State's goal."  *Lorillard Tobacco*, 533 U.S. at 566 (citations omitted).  "[T]his requirement [is] critical; otherwise, a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression."  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (citation and internal quotation marks omitted).

### 1.  The State Continues To Rely On Implausible "Speculation Or Conjecture" Rather Than Evidence Showing The Ban Will Significantly Reduce Handgun-Related Violence.

In *Edenfield v. Fane*, the Court stressed the heavy burden facing government entities hoping to justify censorship under *Central Hudson*'s third prong:

> It is well established that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it."  This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and *that its restriction will in fact alleviate them to a material degree*.

507 U.S. 761, 770 (1993) (emphasis added).  The Ninth Circuit likewise emphasized in *W. States Med. Ctr.* that this burden must be satisfied with "evidentiary support" and "not mere speculation." 238 F.3d at 1095 ("government offer[ed] no evidence demonstrating that its restrictions would

succeed in striking the balance it claims is a substantial interest, or even would protect the public health"); *id*. ("Such speculation certainly does not suffice when the State takes aim at accurate commercial information for paternalistic ends.") (quoting *44 Liquormart*, 517 U.S. at 507 (plurality op.)).  Thus, at the preliminary injunction stage, this Court stressed that, under *Central Hudson*'s third prong, the State must produce evidence that Section 26820 "will in fact alleviate handgun crime and violence to a material degree."  ECF No. 32, 11:13-14.

The State has not heeded this call.  Rather, it is apparent from discovery undertaken since the preliminary injunction that the State's core theory continues to rest on the very sort of "speculation or conjecture" rejected in *Edenfield* and *W. States Med. Ctr.*

Indeed, the government's speculation and conjecture remains especially implausible under the circumstances here.  The State's argument that Section 26820 directly advances its public safety interest rests on a peculiar hypothetical.  It imagines a person who is in the grip of some "emotion" (presumably anger or despair), who would not enter a firearms dealership to buy a handgun in the absence of on-site advertising—even though he is seized by an emotion that presumably makes him contemplate violence, and even though everyone knows that handguns are commercially available.

That the store has signs saying "Guns" and signs depicting rifles or shotguns does not influence him at all.  That handguns are constantly in the news and in entertainment media does not influence him at all.  But when he sees the word "handguns" or a picture of a handgun on a store sign, he responds on "impulse," and buys a handgun that he otherwise would not buy.  He then leaves the firearms dealer and proceeds to commit a handgun crime (or commit suicide).  This is a far-fetched enough scenario as it is.  But on top of that, California law imposes a 10-day waiting period before a buyer can pick up any gun that he buys.  Cal. Penal Code §§ 26815(a) and 27540(a).[8]  Our hypothetical buyer—gripped by emotion, easily swayed by one particular kind of

---

[8]     *Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014), struck down the 10-day waiting period only to the extent that the waiting period applied to people who already possess a firearm, or to the few people who have been screened for suitability to possess a firearm because they have received a valid Carry Concealed Weapon license or a current Certificate of Eligibility to possess and purchase firearms.  *Id.* at 967–71.  *Silvester* is consistent with plaintiffs' argument; in this case,

advertisement, buying a gun on impulse—would therefore have to have an "impulse" that lasts for 10 days.  But an "impulse," by definition, does not last 10 days.

In short, the regulatory framework here undermines any argument that Section 26820 directly and materially advances the asserted goal.  *W. States Med. Ctr.*, 238 F.3d at 1095; *Greater New Orleans*, 527 U.S. at 190–93 (invalidating restriction based in part on "[t]he operation of [the statute] and its attendant regulatory regime"); *Rubin*, 514 U.S. at 488–90.  The Court has already acknowledged that the State's "common sense argument is unsubstantiated" in light of separate California law.  ECF No. 32 at 10–11.  It is impossible to show that the sign restriction "directly and materially" reduces impulsive purchases—even setting aside the lack of evidence showing a material decrease in violence as a result of such purchases—in light of the 10-day waiting period.

And California law imposes roadblocks to "impulsive" purchases even before the paperwork for purchasing a handgun can begin.  In particular, a purchase transaction cannot be processed in the Attorney General's computerized system until a prospective buyer passes a 30-question firearm safety test prepared by the Attorney General's office.  Cal. Penal Code §§ 31610-31670; 11 C.C.R. § 4250 et seq.  The test covers such subjects as:

- "The laws applicable to carrying and handling firearms, particularly handguns."
- "The responsibilities of ownership of firearms, particularly handguns."
- "What constitutes safe firearm storage."
- "Issues associated with bringing a firearm into the home."
- "Prevention strategies to address issues associated with bringing firearms into the home."

11 C.C.R. § 4253(a).  Only would-be purchasers who correctly answer at least 23 of the questions may obtain a Firearm Safety Certificate and proceed with their purchase.  *Id*., subd. (g).

Likewise, Section 26820's underinclusiveness prevents the State from making a "direct and material" advancement showing:  By targeting only on-site advertising, the restriction "permits a variety of speech that poses the same risks the Government purports to fear, while banning

the State's interest in limiting "impulse" purchases here does not apply to those purchasers who already possess a firearm.

messages unlikely to cause any harm at all."  *Greater New Orleans,* 527 U.S. at 195 (viewing this as a basis for striking down a restriction on commercial speech).  How does an onsite handgun advertisement cause a person to become swept up with emotion in a manner differently than a billboard with directions to the store, a print advertisement with a map to the store, or radio jingle that makes it easy to find a store?  The State's rationale is premised on an emotion-driven impulse that survives a 10-day waiting period; certainly such an impulse would withstand a drive to a firearms dealer.

The State still cannot explain why a person would respond irrationally to the phrase "Handguns for Sale," but would not be similarly affected by the phrase "Guns for Sale," or a large neon "GUNS GUNS GUNS" sign, or a fifteen-foot-high depiction of a modern sporting rifle, all of which are legal.  The State has offered no evidence—expert or otherwise—to support its theory that on-site handgun advertisements are somehow special in promoting impulse purchases, in a way that other advertisements are not.  A speech restriction's "underinclusivity is relevant to *Central Hudson*'s direct advancement prong because it 'may diminish the credibility of the government's rationale for restricting speech in the first place.'"  *Valle Del Sol*, 709 F.3d at 824.

The Third Circuit, in an opinion by then-Judge Alito reached a similar conclusion in *Pitt News v. Pappert*, which struck down a law restricting alcohol advertising in publications directly targeted to college students.  379 F.3d 96, 107–09 (3d Cir. 2004).  The court reasoned that Pennsylvania's law "applie[d] only to advertising in a very narrow sector of the media," and the commonwealth failed to show that "eliminating ads in [a] narrow sector [of the media] will do any good" because students "will still be exposed to a torrent of beer ads on television and the radio, and they will still see alcoholic beverage ads in other publications" including other publications displayed on campus.  *Id.* at 107.  The same is true of § 26820.

> **2.   The State's Expert Witnesses Have Not Established that Section 26280 Directly And Materially Advances Its Asserted Interest In Reducing Handgun Crime And Violence.**

The State identified two expert witnesses in discovery, but neither has offered opinions that patch the constitutional holes the Court identified at the preliminary injunction stage.  Indeed, neither expert has offered an opinion that encompasses the critical issue on the third *Central*

*Hudson* prong that the Court highlighted in its preliminary injunction ruling: whether Section 26280's "ban limits impulse buys and in turn leads to less handgun crime and violence" that is *material*.  ECF No. 32, 10:16–18; *id*. at 11:13-14.  Plaintiffs' opposition to the State's motion will elaborate on the State's expert testimony in much greater detail, but we offer this preview.

Professor Gregory Gundlach, the State's marketing expert, offered a carefully circumscribed opinion: that Section 26280's handgun advertising restriction "contributes in a negative way to the impulsive purchase of handguns."  Gundlach Report, 4:8–15.  But he explicitly declined to offer an opinion on the *magnitude* of Section 26820's effect on decreasing impulse purchases of firearms.  Gundlach Depo. Tr., 12:11–17; 60:15–61:4.  And he likewise explicitly declined to offer an opinion on whether limiting impulse purchases of handguns leads to less handgun crime and violence.  *Id.*, 12:18–23.  Thus, even taking Prof. Gundlach's opinion at face value—that the statute has a "direct" impact in limiting impulse purchases of handguns—his opinion falls short of establishing that the statute "materially advance[s]" the government's interest in reducing handgun crime and violence.

Prof. Gundlach's opinion also falls under its own weight.  The "impulse" purchase scenario that he describes is characterized by a "sudden" or "unplanned" decision to purchase a product, where the purchaser has a "diminished regard" for consequences.  *See* Gundlach Report, 16–21.  Yet the various direct regulations governing handgun purchases ensure that purchases are neither sudden (a purchaser must pass a background check and waiting period) nor completed without understanding the gravity of the purchase (purchasers must pass a test on firearms laws and safety, and demonstrate safe handling of the firearm).  *See infra*.

The opinion of Dr. J. John Mann, the State's suicide expert, fares no better.  Dr. Mann also offers a limited opinion:  *Assuming* the critical point that if Section 26280 "is invalidated, there will be an increase in handgun purchases by people with impulsive personality traits," he "would predict that there would be an increase in the number of handgun suicides in proportion to the increase in handgun purchases."  Mann Report, 11:6–10.  While the Court has already rejected the State's attempt to justify the statute based on the assertion that "less handguns means less crime and violence," ECF No. 32, 10:16–18, this is the core of Dr. Mann's opinion.  *See*, *e.g.*, Mann

Depo. Tr. at 35:9–37:20.  On the question of materiality, Dr. Mann has no idea; he just believes that "[i]f a single extra handgun is sold, from then on upwards you're going to be increasing the risk of somebody dying by firearm suicide."  *Id.* at 66–67.

One brief exchange efficiently demonstrates many of the flaws outlined above that pervade the State's effort to justify Section 26280:

> Q.  Dr. Mann, do you have an opinion as to whether the law that's at issue in this case is effective in curbing suicides?
>
> A.  To the extent that this law may reduce the number of firearms purchases, handgun purchases, it is effective.
>
> Q   And do you have an understanding as to whether it does reduce handgun purchases?
>
> A.  I don't know.
>
> Q.  If this law were effective in curbing suicides, would you expect California's suicide rates to be lower than rates in states without similar law?
>
> A.  This law is one part of a complex mosaic effect as it affects suicide rates and firearm suicide rates, and so comparing such comparisons are difficult.
>
> Q.  Okay.  Understanding that such comparisons are difficult, is it possible to isolate the impact of this law on deter[ring] suicide?
>
> A.  *Theoretically, yes.*
>
> Q. Okay.  Explain the theoretical possibility, if you would, please.
>
> A. There's evidence that those states in the union that have the most stringent controls on gun purchases and gun safety and so on have lower firearm suicide rates than other states. In fact, the differences in suicide rates between such, if you like, more stringent law states versus less stringent law states is entirely explicable quantitatively by the difference in firearm suicides.  So on that basis, one would expect that if California has additional legal measures in place that impact firearm purchases, that that will translate directly into an impact on firearm suicide rates and to a secondary degree on overall suicide rates, and that impact will be greater for younger people than older people.
>
> Q.  And that's based -- is that based on an assumption that a restriction makes it -- reduces the overall supply of handguns?
>
> A.  Yes. *The more restriction, the fewer handguns, the lower the firearm suicide rate, and therefore, potentially the lower overall suicide rate.*

Mann Depo. Tr. 63:5–64:20 (emphases added).  And the highly theoretical nature of this speculation was well illustrated by the fact that Dr. Mann had not even read the statute he was

1  hired to defend.  *Id*. at 41:12–14.

2  In short, the State has not "demonstrate[d] that . . . [the] restriction will in fact alleviate [the

3  asserted harms] to a material degree."  *Edenfield*, 507 U.S. at 770.  Rather, Section 26820 "cannot

4  be sustained" because "it 'provides only ineffective or remote support for the government's

5  purpose'"—if it provides any support at all.  *Lorillard Tobacco*, 533 U.S. at 566 (citations

6  omitted).  And, as Part A noted, the government in any event may not advance its goals by trying

7  to shield consumers, the overwhelming majority of whom are thoughtful and responsible, from

8  accurate speech that the government thinks may lead to bad decisions.

9  **C.    The State Cannot Demonstrate That Section 26820's Ban Is Not More Extensive Than
       Necessary.**

10  Section 26820 also fails the fourth and final step of the *Central Hudson* analysis, which

11  asks "whether the speech restriction is not more extensive than necessary to serve the interests that

12  support it."  *Lorillard Tobacco*, 533 U.S. at 556 (citation and quotation marks omitted).  This step

13  reflects the view that, "[i]f the First Amendment means anything, it means that regulating speech

14  must be a last—not first—resort."  *Thompson*, 535 U.S. at 373.  "[I]f the Government could

15  achieve its interests in a manner that does not restrict speech, or that restricts less speech, the

16  Government must do so."  *Id.* at 371–72 (striking down a restriction on drug advertising; collecting

17  cases); *44 Liquormart*, 517 U.S. at 507 (plurality opinion) (striking down restriction on advertising

18  the price of alcoholic beverages partly because "[i]t is perfectly obvious that alternative forms of

19  regulation that would not involve any restriction on speech would be more likely to achieve the

20  State's goal"); *Greater New Orleans Broad. Ass'n*, 527 U.S. at 192 ("There surely are practical

21  and nonspeech-related forms of regulation . . . that could more directly and effectively alleviate

22  some of the social costs of casino gambling."); *Rubin*, 514 U.S. at 491 (striking down restriction

23  on displaying the alcohol content on beer labels partly based on the available alternatives "which

24  could advance the Government's asserted interest in a manner less intrusive to respondent's First

25  Amendment rights," because those alternatives "indicate[] that [the law] is more extensive than

26  necessary").

27  Accordingly, regulations satisfy prong four only if they are "narrowly tailored to achieve

28

the desired objective." *Lorillard*, 533 U.S. at 556.  Speech restrictions do not satisfy prong four "[i]f clear alternatives exist that can advance the government's asserted interest in a manner far less intrusive to . . . free speech rights." *W. States*, 238 F.3d at 1095.  As a result, the government "must consider pursuing its interests through conduct-based regulations before enacting speech-based regulations." *Valle Del Sol*, 709 F.3d at 827.  Consistent with Supreme Court precedent, the Ninth Circuit has invalidated commercial speech regulations as overinclusive where enforcement of preexisting laws would serve its interest without burdening speech.  *Valle Del Sol*, 709 F.3d at 826–27; *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011) (applying time, place or manner test, but relying on commercial speech precedent); *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir. 1991) ("restrictions which disregard far less restrictive and more precise means are not narrowly tailored"); *see also Crazy Ely Western Village, LLC v. City of Las Vegas*, 618 Fed. Appx. 904 (2015) (remanding challenge to on-site alcohol advertising restriction for consideration of whether Las Vegas could satisfy the third and fourth *Central Hudson* prongs).

In *Valle Del Sol*, plaintiffs challenged an Arizona law barring in-street solicitation of day laborers, which the state claimed was justified by its interest in traffic safety.  The Ninth Circuit held that the solicitation ban failed the fourth step of the *Central Hudson* test because Arizona could serve its interest without burdening speech by enforcing its existing traffic safety regulations and by enacting additional speech-neutral regulations.  709 F.3d at 826–27.

In reaching this conclusion, the appellate court quoted with approval its decision striking down a similar ordinance in *Comite de Journaleros* because "[t]he City has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *Id.* at 826 (quoting *Comite de Journaleros*, 657 F.3d at 949).  The Court explained that "[*Comite de Journaleros*] was based on the longstanding rule that, because restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." 709 F.3d at 826.

Here, as in *Valle Del Sol*, the state "could have advanced its interest in [public] safety directly, without reference to speech," *id.*—in fact, the state has already done so, through the

1    waiting period and through the other restrictions that it already imposes on gun buyers.[9]  It could

2    serve its interest by enforcing these existing laws and regulations, and, if such enforcement efforts

3    prove insufficient, the Legislature can pass additional direct regulations (within constitutionally

4    permissible boundaries).  *See Valle Del Sol*, 709 F.3d at 826–27.

5         Or the State could take steps to address the asserted governmental interest that do not

6    involve any restriction on speech.  For example, if California is concerned about the danger of gun

7    violence, it could conduct an educational campaign and promote responsible handgun use.  As the

8    Supreme Court noted in *Lorillard Tobacco*, "if [the government's] concern is that tobacco

9    advertising communicates a message with which it disagrees, it could seek to counteract that

10   message with 'more speech, not enforced silence.'"  533 U.S. at 586 (citation omitted); *see also*

11   *Linmark Assocs.*, 431 U.S. at 97 (highlighting availability of counterspeech); *Sorrell*, 564 U.S. at

12   578 (citing *Linmark*).

13        California thus has ample alternative means to advance its interest without restricting

14   speech.  And because Section 26820 restricts more speech than "necessary" to accomplish its

15   interests, the statute fails the *Central Hudson* test and thus violates the First Amendment.

16                              **V. CONCLUSION**

17        For the reasons set forth above, the Court should grant Plaintiffs' motion for summary

18   judgment and enter judgment in Plaintiffs' favor.

19

20

21

22

23

24

25   [9]      There are several additional direct regulations governing the sale of handguns that promote
     the State's interest in reducing handgun violence.  These include the state and federal background
26   checks, Cal. Penal Code § 28220, the "Firearm Safety Certificate" program and its test
     requirements, *supra*; and the requirement that purchasers demonstrate (to the dealer) that they
27   know how to safely handle the firearm, § 26865, and purchase a "firearm safety device" (such as a
     trigger lock) designed to prevent use by children or unauthorized users, § 23635, and limits
28   purchasers to one handgun in a 30-day period, § 27535.

Dated:  December 5, 2016

BENBROOK LAW GROUP, PC


By s/ Bradley A. Benbrook
    BRADLEY A. BENBROOK
    Attorneys for Plaintiffs


    s/ Eugene Volokh
    Attorney for Plaintiffs