1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  TAMAR PACHTER, State Bar No. 146083
   Supervising Deputy Attorney General
3  NELSON R. RICHARDS, State Bar No. 246996
   EMMANUELLE S. SOICHET, State Bar No. 290754
4  Deputy Attorneys General
     2550 Mariposa Mall, Room 5090
5    Fresno, CA  93721
     Telephone:  (559) 477-1688
6    Fax:  (559) 445-5106
     E-mail:  Nelson.Richards@doj.ca.gov
7  *Attorneys for Defendants*

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **TRACY RIFLE AND PISTOL LLC et al.,**          2:14-cv-02626-TLN-DB

                                   Plaintiffs,
14

15          v.                                      **DEFENDANTS' NOTICE OF MOTION
                                                    AND MOTION FOR SUMMARY
16                                                  JUDGMENT AND MEMORANDUM OF
    **KAMALA D. HARRIS, in her official**           POINTS AND AUTHORITIES**
17  **capacity as Attorney General of California;
    et al.,**                                       Date:          01/12/2017
18                                                  Time:          2:00 p.m.
                                   Defendants.      Judge:         Hon. Troy L. Nunley
19                                                  Trial Date:    05/30/2017
                                                    Action Filed:  11/10/2014
20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 12, 2017, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Troy L. Nunley, United States District Court, Eastern District of California, 501 I Street, Sacramento, CA 95814, Defendants will and hereby do move the Court for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Rule 260 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Defendants seek summary judgment on all the claims set forth in the First Amended Complaint, ECF No. 22, on the grounds that California Penal Code section 26820 is a lawful regulation of commercial speech that directly advances the State's interests in decreasing handgun violence and suicide and that the statute is no more extensive than necessary to advance those interests.

This motion is based upon this notice of motion and motion, the memorandum of points and authorities in support, Defendants' statement of undisputed fact, the declarations and evidence filed concurrently herewith, and upon any further matters the Court deems appropriate.


Dated:  December 5, 2016                    Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General



/s/ Nelson Richards
NELSON R. RICHARDS
EMMANUELLE S. SOICHET
Deputy Attorneys General
*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

Notice of motion and motion ........................................................................................................... i

Memorandum of points and authorities ........................................................................................ 1

Introduction .................................................................................................................................... 1

Background ..................................................................................................................................... 2

    I.      Statement of facts ............................................................................................................ 2

           A.     Penal code section 26820 restricts only in-store advertising visible from the street. ....................................................................................................... 2

           B.     The association between handguns and both violent crime and suicide. ....................................................................................................... 3

           C.     The expert evidence that a restriction on handgun advertisements visible from the street helps reduce both violent crime and suicide. .......... 5

    II.     Procedural history. ......................................................................................................... 6

           A.     Tracy Rifle files the complaint. ............................................................... 6

           B.     The Court denies Tracy Rifle's motion for preliminary injunction. ........... 6

Legal standard ................................................................................................................................ 8

Argument ....................................................................................................................................... 8

    I.      Regulation of commercial speech is subject to intermediate scrutiny, and survives review where, as here, the Legislature has drawn reasonable inferences based on substantial evidence. ............................................................... 9

    II.     Substantial evidence supports the conclusion that section 26820 directly advances California's interest in reducing handgun violence. ............................. 11

           A.     Substantial evidence supports the conclusion that section 26820 directly advances California's interest in reducing handgun suicides. ............................................................................................... 11

                 1.     Professor Gundlach's opinion provides evidence that section 26820 inhibits handgun purchases by people with impulsive personality traits. ................................................ 11

                 2.     Professor Mann's opinion provides evidence that impulsive people are more likely to commit suicide and that, without section 26820, there would be more handgun suicides in California. ......................................... 13

                 3.     Academic studies further support Professor Mann's opinions and the State's conclusions. ........................................... 14

                 4.     Caselaw shows that the evidence offered by the State satisfies the substantial evidence standard. .................................. 15

ii

**TABLE OF CONTENTS**
(continued)

Page

B.   Substantial evidence supports the conclusion that section 26820 directly advances the California's interest in reducing handgun crimes. ................................................................................ 16

III.   The fit between section 26820 and the California's goal of reducing handgun violence and suicide is reasonable........................................................... 17

Conclusion ...................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page**

CASES

*Asmai v. Johnson*
   No. 2:14-CV-2619-TLN-AC, 2016 WL 1599469 (E.D. Cal. Apr. 21, 2016) ...........................8

*Bd. of Tr. of State Univ. of N.Y. v. Fox*
   492 U.S. 469 (1989) ...................................................................................................9, 17

*Bolger v. Youngs Drug Prods. Corp.*
   463 U.S. 60 (1983) ...............................................................................................................8

*Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n*
   447 U.S. 557 (1980) ................................................................................................ *passim*

*City of Los Angeles v. Alameda Books, Inc.*
   535 U.S. 425 (2002) (plurality opinion) ............................................................................10

*City of Renton v. Playtime Theatres, Inc.*
   475 U.S. 41 (1986) ..........................................................................................................9, 14

*Coyote Publ'g Inc. v. Miller*
   598 F.3d 592 (9th Cir. 2010) ............................................................................................9, 15

*Ctr. for Fair Pub. Policy v. Maricopa County*
   336 F.3d 1153 (9th Cir. 2003) ........................................................................................10, 16

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ...............................................................................................................3

*Drake v. Filko*
   724 F.3d 426 (3d Cir. 2013) ...............................................................................................10

*Edenfield v. Fane*
   507 U.S. 761 (1993) ...............................................................................................................8

*Fla. Bar v. Went For It, Inc.*
   515 U.S. 618 (1995) ..................................................................................................9, 10, 15

*Heller v. District of Columbia*
   801 F.3d 264 (D.C. Cir. 2015) ...................................................................................9, 10, 15

*Jackson v. City & County of San Francisco*
   746 F.3d 953 (9th Cir. 2014) .................................................................................... *passim*

*Kachalsky v. County of Westchester*
   701 F.3d 81 (2d Cir. 2012) ....................................................................................................9

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Metro Lights LLC v. City of Los Angeles*
 551 F.3d 898 (9th Cir. 2009) ............................................................................9, 17

4

*Minority Television Project, Inc. v. FCC*
 736 F.3d 1192 (9th Cir. 2013) (en banc) ....................................................................8

5

6

*Ohralik v. Ohio State Bar Ass'n*
 436 U.S. 447 (1978) ....................................................................................................8

7

*Plott Nursing Home v. Burwell*
 779 F.3d 975 (9th Cir. 2015) ......................................................................................9

8

9

*Soremekun v. Thrifty Payless, Inc.*
 509 F.3d 978 (9th Cir. 2007) ......................................................................................8

10

*Tracy Rifle & Pistol LLC v. Harris*
 118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................................ *passim*

11

12

*Tracy Rifle & Pistol LLC v. Harris*
 637 F. App'x 401 (9th Cir. 2016) ..............................................................................8

13

14

*Turner Broad. Sys., Inc. v. FCC*
 512 U.S. 622 (1994) ....................................................................................................9

15

16

*Turner Broad. Sys., Inc. v. FCC*
 520 U.S. 180 (1997) ....................................................................................................9

17

18

*United States v. Carter*
 750 F.3d 462 (4th Cir. 2014) ....................................................................................10

19

*United States v. Edge Broad. Co.*
 509 U.S. 418 (1993) ..................................................................................................15

20

21

*Williams-Yulee v. Fla. Bar*
 135 S. Ct. 1656 (2015) ..............................................................................................10

22

23

**STATUTES**

24

California Penal Code
 § 26815(a) ..................................................................................................................14
 § 26820 ............................................................................................................. *passim*
 § 27540(a) ..................................................................................................................14

25

26

27

28

v

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

1917 Cal. Stat.

4

    Chapter 145 ...................................................................................................2

5

1923 Cal. Stat.

    Chapter 339 ...................................................................................................2

6

**CONSTITUTIONAL PROVISIONS**

7

United States Constitution

8

    First Amendment..............................................................................1, 6, 8, 9

9

**COURT RULES**

10

Fed. R. Civ. P. 56(a).........................................................................................8

11

**OTHER AUTHORITIES**

12

Lee Kennett & James LaVerne Anderson, *The Gun in America* 206 (1975) ...................................3

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Mot. for Summ. J. (2:14-cv-02626-TLN-DB)

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION**

3        California, like the rest of the nation, suffers from an epidemic of handgun violence.

4   Handguns are used disproportionately in crimes committed with a firearm, and several hundred

5   Californians use a handgun to commit suicide every year.  For almost a century, California Penal

6   Code section 26820 has restricted one of the myriad methods of advertising handgun sales in a

7   targeted effort to reduce impulse purchases of handguns and the negative consequences that

8   follow from those purchases.  It prohibits firearms dealers from posting on or in stores those

9   handgun advertisements that can be seen from outside their stores.  Plaintiffs contend that section

10  26820 abridges freedom of speech and thus violates their First Amendment rights.  The State of

11  California argues that the law is a constitutional regulation of commercial speech that satisfies the

12  intermediate-scrutiny test announced by the Supreme Court in *Central Hudson Gas & Electric*

13  *Corp. v. Public Service Commission*, 447 U.S. 557, 563-66 (1980).  Under that test, courts uphold

14  regulations of commercial speech that directly advance an important governmental interest and

15  are no more restrictive than necessary to advance that goal.

16       This Court has already held that California has an important interest in decreasing handgun-

17  related violence and suicide.  The State now moves for summary judgment because it has

18  evidence—several studies and two expert reports—that satisfies the remaining two prongs of the

19  *Central Hudson* test.

20       The studies show that purchasing a handgun is associated with an increase in both the risk

21  of suicide and the risk of dying a violent death.  The expert evidence shows that it is reasonable to

22  conclude that the law reduces impulsive handgun purchases by people with impulsive personality

23  traits, and that people with impulsive personality traits are at a greater risk for suicide than the

24  population in general.  One expert report found revealing evidence that handgun manufacturers

25  recognize that much of their sales are impulse purchases, and design releases of new handguns to

26  profit from such impulse purchases.  Taken together, these studies and expert reports, including

27  the evidence and studies they rely on, support the Legislature's conclusion that section 26820

28  protects the public by reducing impulsive handgun purchases by people with impulsive

1

1   personality traits, and thereby reduces handgun crime and suicide. The law's narrow focus,

2   restricting only handgun advertisements that are likely to induce those undesirable transactions

3   while allowing all other lawful methods of handgun advertising, also means it is no more

4   restrictive than necessary to advance the State's interest.

5        Because the existence of substantial evidence is a legal question, and because the State has

6   provided evidence that satisfies that standard in support of its motion, it is entitled to judgment as

7   a matter of law.

8                                    **BACKGROUND**

    **I.    STATEMENT OF FACTS**

9
        **A.    Penal Code section 26820 restricts only in-store advertising visible from
10              the street.**

11       Section 26820 provides that "[n]o handgun or imitation handgun, or placard advertising the

12  sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be

13  seen from the outside." The law has its origins in the early Twentieth Century.

14       In 1917, the California Legislature enacted the State's first law regulating handguns. 1917

15  Cal. Stat. ch. 145. Around the same time, a national firearms advocacy group, the United States

16  Revolver Association, working together with police officials, academics, and military groups,

17  developed and promoted a model firearms law. Notice of Legislative Facts (NLF) Ex. 2 at 565;

18  NLF Ex. 3 at 723-24, 728-32. Among other things, the model law prohibited licensed firearms

19  dealers from displaying handguns or handgun advertisements visible from the outside of their

20  stores. NLF Ex. 3 at 722.

21       In 1923, California repealed the 1917 law, replacing it with the Revolver Association's

22  model, which included an advertising restriction. 1923 Cal. Stat. ch. 339; *see also* NLF Ex. 5 at

23  767; NLF Ex. 4 at 701. The advertising restriction adopted in 1923 remains essentially the same

24  today. *Compare* NLF Ex. 4 at 701 ("No pistol or revolver, or imitation thereof, or placard

25  advertising the sale or other transfer thereof, shall be displayed in any part of said premises where

26  it can readily be seen from the outside."), *with* Cal. Penal Code § 26820.

27       Although the legislative history of California's enactment of the Revolver Association's

28  model law is not available to us, contemporaneous sources shed light on its passage. According

                                         2

1    to one newspaper article, the law was "[a]imed at disarming the lawless," NLF Ex. 6, reflecting

2    statewide and nationwide concerns about criminals armed with handguns.  For instance, in 1922,

3    a special committee of the ABA noted that 90% of murder victims nationwide were killed with

4    pistols and that firearms emboldened criminals to commit violent crime.  NLF Ex. 8 at 591.  A

5    few years later, the California Crime Commission reported that "[r]obberies and burglaries are

6    almost invariably committed with the aid of pistols" and that "[g]uns are frequently used in

7    murders, manslaughters, highjacking and rum-running cases."  NLF Ex. 9 at 20.

8            In 1926, the ABA's committee on uniform laws adopted the Revolver Association's model

9    firearms law, with minor changes, as the Uniform Firearms Act.  NLF Ex. 5 at 767.  The

10   committee became interested in the Revolver Association's approach after California enacted it,

11   and as national interest in firearms regulation swelled after a sitting U.S. Senator was accidentally

12   shot on the streets of Washington, D.C. during a gun battle between the police and bootleggers.

13   NLF Ex. 3 at 712.  The committee concluded that the model law had the "intrinsic merits of

14   clearness and simplicity," that it had been accepted by several jurisdictions, and that the need for

15   a uniform law was "evident from the daily newspaper records of crimes of violence committed

16   with the revolver."  NLF Ex. 5 at 767.  Section 11 of the uniform act addressed dealer licenses,

17   incorporating the same regulation of outdoor handgun advertising as California's law.  NLF

18   Ex. 10 at 557-58.  Speaking about the licensing section generally, including the handgun

19   advertising restriction, the committee explained that the provisions were "in line with all modern

20   legislation" and constituted the "chief safeguard" against criminals obtaining firearms.  NLF

21   Ex. 10 at 561.  The National Rifle Association also supported the uniform act, both helping to

22   frame the District of Columbia's version of the law and publicly commending it during 1934

23   congressional hearings on a national firearms act.  Lee Kennett & James LaVerne Anderson, *The*

24   *Gun in America* 206, 210 (1975).

25           **B.    The association between handguns and both violent crime and suicide.**

26           This Court and others have recognized that handgun violence is a substantial public health

27   and safety concern.  *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) (noting

28   the "problem of handgun violence in this country").  A nationwide study by the U.S. Department

                                                    3

1  of Justice reports that "[a]bout 70% to 80% of firearm homicides and 90% of nonfatal firearm

2  victimizations were committed with a handgun from 1993 to 2011."  Defs.' Statement of

3  Undisputed Facts (DSUF) No. 5.  The study documents that, during those years, between 6,900

4  and 13,500 people annually were killed with handguns and between 43,000 and 94,000 people

5  annually were assaulted or otherwise victimized in nonfatal crimes involving handguns.  DSUF

6  No. 5.

7       California and its residents feel these effects acutely.  One study by the California

8  Department of Justice found that about half of California's murder victims in recent years were

9  killed with handguns.  DSUF No. 6.  Another study by the department focusing on California's

10  rural areas noted that 90% of guns recovered from crime scenes and sent to the State's crime

11  laboratory were handguns.  DSUF No. 7.  Suicide is also a prevalent form of handgun violence.

12  State data shows that between 2005 and 2009, over 1,000 Californians used handguns to kill

13  themselves.  DSUF No. 8.

14       Public health studies show that increased handgun ownership is associated with a higher

15  murder rate.  DSUF Nos. 9-10.  Other studies have concluded that handgun purchases are

16  associated with an increase in the likelihood of a violent death.  One study published in the

17  *American Journal of Public Health* found that "[l]egal purchase of a handgun appears to be

18  associated with a long-lasting increased risk of violent death."  DSUF No. 11.  Another published

19  in the *New England Journal of Medicine* found that "purchase of a handgun is associated with

20  substantial changes in the risk of violent death."  DSUF No. 12.  And another published in the

21  journal *Injury Prevention* found that "[a]mong adults who died in California in 1998, those dying

22  from violence were more likely than those dying from non-injury causes to have purchased a

23  handgun."  DSUF No. 13.

24       At least three studies have found that handgun purchases are associated with an increased

25  risk of suicide for the purchaser, a risk that extends to other members of the household.  DSUF

26  No. 14.  One of those studies, which examined firearm and suicide data from California,

27  concluded that buying a handgun is associated with an increase in the risk of suicide, which starts

28  within a week of purchase and lasts for at least six years.  DSUF No. 15.  The study noted that

4

1    "[i]n the first year after the purchase of a handgun, suicide was the leading cause of death among

2    handgun purchasers . . . ."  DSUF No. 15.  It also found that the increase risk of suicide could not

3    be explained by people purchasing a handgun to use in a suicide—fewer than 10% of people who

4    committed suicide or attempted to commit suicide purchased guns for that purpose, and most

5    firearm suicides occurred well after the gun had been purchased.  DSUF No. 15.  Another of the

6    studies, which also examined firearm and suicide data from California, found a "very strong

7    association between handgun purchase and subsequent gun suicide."  DSUF No. 16.

8         **C.    The expert evidence that a restriction on handgun advertisements visible
9              from the street helps reduce both violent crime and suicide.**

10        The State retained and designated two experts, Gregory T. Gundlach, J.D., Ph.D., a

11   marketing professor at the University of North Florida's business school, and J. John Mann,

12   M.D., Ph.D., a neuroscientist and psychiatry professor at Columbia University who also treats

13   patients for suicidal behavior in his clinical practice.  ECF No. 43.  Tracy Rifle did not designate

14   any affirmative experts, but did designate one rebuttal expert, Gary Kleck, Ph.D., a criminology

15   professor at Florida State University.  ECF No. 46.

16        Professor Gundlach is an expert in marketing and public policy practices who has

17   conducted academic analyses, including forensic analyses, of marketing and consumer issues in

18   public policy associated with the marketing of firearms.  ECF No. 43-1 ¶ 4.  Based on his

19   knowledge and expertise in marketing, Professor Gundlach has opined that it is reasonable to

20   conclude that Penal Code section 26820 inhibits impulsive handgun purchases by people who

21   tend to be impulsive and that if the law were invalidated, and signs of the sort used by Tracy Rifle

22   and other plaintiffs became more common, impulse purchases by impulsive people would

23   increase.  *See* DSUF Nos. 17-18, 23-25.

24        Professor Mann is a medical doctor and professor of neurochemistry whose research

25   employs functional brain imaging, neurochemistry, epidemiology, and molecular genetics to

26   probe the causes of depression and suicide.  ECF 43-2 ¶ 2.  He has published over 600 peer-

27   reviewed papers and edited 11 books on the subjects of the biology and treatment of mood

28   disorders, suicidal behavior, and other psychiatric disorders, and the National Institutes of Health

5

1  has continuously funded his work since 1984.  ECF 43-2 ¶ 2.  He also has a clinical practice

2  specializing in the treatment of mood disorders and suicidal behavior.  ECF 43-2 ¶ 2.  He has

3  been involved in numerous organizations, including the International Academy of Suicide

4  Research and the American Foundation for Suicide Prevention.  ECF 43-2 ¶ 3.  His report in this

5  case offers three central opinions.  First, impulsive personality traits increase the risk of suicide.

6  DSUF No. 28.  Second, the availability of a firearm, particularly a handgun, in the home increases

7  the risk of suicide for impulsive individuals.  DSUF No. 30.  And third, if the invalidation of

8  California Penal Code section 26820 would result in an increase in handgun purchases by people

9  with impulsive personality traits, there would be an increase in handgun suicides.  DSUF No. 36.

10  **II.   PROCEDURAL HISTORY.**

11      **A.   Tracy Rifle files the complaint.**

12      Tracy Rifle, Ten Percent Firearms, Imbert & Smithers, and their respective owners, all

13  displayed handgun signs in violation of section 26820, and they were all cited for the violation by

14  the Bureau of Firearms.  DSUF Nos. 1-3.  They, along with the other plaintiffs—Sacramento

15  Black Rifle, Inc., PRK Arms, Inc., and their respective owners—desire to display handgun

16  advertisements that are restricted by section 26820.  DSUF No. 4.

17      Several of the plaintiffs filed the complaint in this case in 2014 naming California Attorney

18  General Kamala Harris and Chief of the California Department of Justice Stephen Lindley in their

19  official capacities (together, generally, the State) as defendants.  ECF No. 1.  Shortly after filing

20  the complaint, they moved for a preliminary injunction.  ECF No. 5.  While the motion was

21  pending, they filed a first amended complaint to add additional firearms retailers as plaintiffs,

22  who joined the pending motion.  ECF Nos. 20, 22.

23      **B.   The Court denies Tracy Rifle's motion for preliminary injunction.**

24      This Court denied the motion for preliminary injunction in an opinion in which it

25  extensively analyzed the *Central Hudson* factors.  *Tracy Rifle & Pistol LLC v. Harris*, 118 F.

26  Supp. 3d 1182 (E.D. Cal. 2015).  That test asks whether (1) the regulated speech is protected by

27  the First Amendment; (2) the restriction seeks to further a substantial government interest; (3) the

28  restriction directly advances the government's interest; and (4) the restriction is no more

1    extensive than necessary to serve that interest. *Id.* at 1186. The parties did not dispute that

2    section 26820 regulates lawful speech. *Id.* And the Court found that the State had satisfied the

3    second prong, ruling that "public health and safety issues associated with handgun crime and

4    violence are a substantial Government interest, and that section 26820 seeks to further that

5    interest."[1] *Id.* at 1187.

6        On the third prong, however, the Court ruled insufficient the State's evidence that section

7    26820 directly advances the State's interest in decreasing handgun crime and violence. *Id.* at

8    1187-90. The Court found that it was reasonable to conclude that the law "will prevent some

9    purchases that would result from passersby seeing the advertisement and entering the store to

10   make a purchase" and that the State had established "a clear connection between the increased

11   circulation of handguns and increased handgun-related violence." *Id.* at 1189. But it concluded

12   that the controlling questions was "whether the instant ban limits impulse buys and in turn leads

13   to less handgun crime and violence, not as a general matter whether less handguns means less

14   crime and violence," and that the State had not cited any evidence supporting that conclusion. *Id.*

15   It also observed that California's 10-day waiting period and firearms dealers' ability to advertise

16   in other media made it more difficult for the State to establish an inferential connection between

17   section 26820's advertising restriction and decreased violence. *Id.* It left open the possibility,

18   however, that the statute may "lessen purchases by the type of person who would buy a handgun

19   on impulse after seeing an advertisement visible from outside the store, and who would proceed

20   into the store to start the paperwork process even if she could not take possession at that time."

21   *Id.* at 1190.

22       Considering the intertwined nature of the last two prongs of the *Central Hudson* test, the

23   Court ruled that the inadequacy of the State's showing on the third prong also meant that it had

24   not satisfied the fourth prong. *Id.* at 1190-91. It explained that while the State had shown that

25   section 26820 is "narrowly tailored to advertisements targeting passersby," it had not shown that

26

   _____

27       [1] Because the parties did not dispute the first *Central Hudson* prong and because the
     Court found that the State had satisfied the second prong, this brief addresses the two remaining
     prongs.

28

1    the law is "narrowly tailored to achieve the desired objective." *Id.* at 1190-91 (quotation marks

2    omitted).

3        The Court still denied the preliminary injunction because the balance of equities and public

4    interest weighed against taking the extraordinary step of issuing an injunction before the merits

5    had been decided. *Id.* at 1193-1195.  Tracy Rifle appealed the Court's order, and the Ninth

6    Circuit affirmed. *Tracy Rifle & Pistol LLC v. Harris*, 637 F. App'x 401 (9th Cir. 2016).

7                                      **LEGAL STANDARD**

8        A court must grant summary judgment in favor of a moving party that shows there is no

9    genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed.

10   R. Civ. P. 56(a); *Asmai v. Johnson*, No. 2:14-CV-2619-TLN-AC, 2016 WL 1599469, at *2 (E.D.

11   Cal. Apr. 21, 2016).  "Where the moving party will have the burden of proof on an issue at trial,

12   the movant must affirmatively demonstrate that no reasonable trier of fact could find other than

13   for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In

14   this case, the State has that burden on its motion because it bears the burden of justifying the laws

15   that regulate commercial speech at trial, giving it the burden on this motion. *See Edenfield v.*

16   *Fane*, 507 U.S. 761, 770 (1993).

17                                         **ARGUMENT**

18       Substantial evidence shows that section 26820 directly advances the State's interest in

19   decreasing handgun violence and suicides by inhibiting purchases by people with impulsive

20   personality traits, who are at a greater risk of committing suicide.[2]  This evidence also supports

21   the conclusion that the fit between section 26820 and the State's goal is reasonable.

---

22       [2]  Although the legislative history for section 26820 is not available, the State may
23   advance new justifications for a commercial speech restriction in response to a lawsuit
     challenging the restriction. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 (1983)
24   (permitting government to "advance[] interests that concededly were not asserted when the
     prohibition was enacted into law.  This reliance is permissible since the insufficiency of the
25   original motivation does not diminish other interests that the restriction may now serve"); *Ohralik*
     *v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("[T]he fact that the original motivation behind
26   the ban on solicitation today might be considered an insufficient justification for its perpetuation
     does not detract from the force of the other interests the ban continues to serve.").  Courts have
27   also recognized this principle in intermediate-scrutiny First Amendment cases outside the
     commercial speech context. *See, e.g.*, *Minority Television Project, Inc. v. FCC*, 736 F.3d 1192
28   (9th Cir. 2013) (en banc) (stating that, "[a]s a matter of course, in multiple First Amendment
                                                                          (continued…)

                                               8

1    I.    **Regulation of Commercial Speech Is Subject to Intermediate Scrutiny,
          and Survives Review Where, as Here, the Legislature Has Drawn
2          Reasonable Inferences Based On Substantial Evidence.**

3          Commercial speech occupies "subordinate position in the scale of First Amendment values,

4    and is subject to modes of regulation that might be impermissible in the realm of noncommercial

5    expression." *Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (quotation marks

6    omitted); *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("We have always been careful

7    to distinguish commercial speech from speech at the First Amendment's core.").  As a result,

8    courts review laws that restrict commercial speech using intermediate scrutiny.  *Coyote Publ'g*

9    *Inc. v. Miller*, 598 F.3d 592, 598 (9th Cir. 2010) ("Restrictions on commercial speech are now

10   reviewed under the standard of intermediate scrutiny announced in *Central Hudson* . . . .").

11   Challenges to commercial speech generally involve questions of law that are resolved on

12   summary judgment.  *See, e.g.*, *id.* at 597; *Metro Lights LLC v. City of Los Angeles*, 551 F.3d 898,

13   911 (9th Cir. 2009).

14         When applying the intermediate scrutiny standard, courts give "substantial deference to the

15   predictive judgments of [the legislature]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195

16   (1997).  Lawmakers "must be allowed a reasonable opportunity to experiment with solutions to

17   admittedly serious problems." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986).

18   "It is the legislature's job . . . to weigh conflicting evidence and make policy judgments."

19   *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012).  The courts' narrow role is to

20   "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on

21   substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality);

22   *Heller v. District of Columbia*, 801 F.3d 264, 273 (D.C. Cir. 2015) ("[I]t is our remit to determine

23   only whether the [government] has drawn reasonable inferences based on substantial evidence."

24   (quotation marks omitted)).

25
     _____

26   (…continued)
     cases, the [Supreme] Court has looked beyond the record before Congress at the time of
27   enactment").  Accordingly, to avoid awkward constructions, this brief attributes the reasons
     advanced in this case to the State and the Legislature.
28

9

1   "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such

2   relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Plott*

3   *Nursing Home v. Burwell*, 779 F.3d 975, 981 (9th Cir. 2015).  It need not be direct; the legislature

4   may rely evidence "reasonably believed to be relevant to the problem . . . ." *Renton*, 475 U.S. at

5   51.  And it need not be empirical.  *See, e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S.

6   425, 439 (2002) (plurality opinion) (explaining that city did not need empirical data to support its

7   conclusion that its adult-bookstore ordinance would lower crime); *Ctr. for Fair Pub. Policy v.*

8   *Maricopa County*, 336 F.3d 1153, 1168 (9th Cir. 2003) (rejecting argument that local government

9   needed empirical data to support its ordinance restricting the hours of sexually oriented

10  businesses).

11      Substantial evidence can take many forms:  "history, consensus, and simple common

12  sense," *Fla. Bar*, 515 U.S. at 628 (quotation marks omitted); correlational evidence, *see, e.g.*,

13  *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014) (ruling that the argument challenging a

14  firearm regulation "assumes, incorrectly, that Congress may not regulate based on correlational

15  evidence"); and intuition, *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015) (accepting as

16  "intuitive" the connection between Florida's judicial canon preventing judges from personally

17  soliciting campaign funds and the state's interest in protecting the integrity of the judiciary and

18  maintaining the public's confidence in an impartial judiciary).

19      Where the legislature can draw a reasonable inference from substantial evidence, "summary

20  judgment . . . is appropriate regardless of whether the evidence is in conflict."  *See Heller*, 801

21  F.3d at 273 (quotation marks omitted); *see also Drake v. Filko*, 724 F.3d 426, 439 (3d Cir. 2013)

22  ("Even accepting that there may be conflicting empirical evidence as to the relationship between

23  public handgun carrying and public safety, this does not suggest, let alone compel, a conclusion

24  that the 'fit' between New Jersey's individualized, tailored approach and public safety is not

25  'reasonable.'").

26

27

28

10

1    **II.    SUBSTANTIAL EVIDENCE SUPPORTS THE CONCLUSION THAT SECTION 26820**
     **DIRECTLY ADVANCES CALIFORNIA'S INTEREST IN REDUCING HANDGUN VIOLENCE.**

2

3        The State has submitted evidence that satisfies the third *Central Hudson* prong.  The State's

4    submissions provide substantial evidence in support of the Legislature's determination that the

5    law reduces the handgun suicide rate and the separate determination that the law reduces handgun

6    crime.

7        **A.    Substantial evidence supports the conclusion that section 26820 directly**
             **advances California's interest in reducing handgun suicides.**

8

9        Section 26820 directly advances the State's interest in decreasing handgun suicides because

10   the law inhibits handgun purchases by people with impulsive personality traits, who, as a group,

11   are at a higher risk for suicide than the population in general.  The reasoning underlying that

12   conclusion proceeds in two steps, each of which is supported by the opinion of one of the State's

13   experts.  First, the advertisements restricted by section 26820 inhibit purchases by people with

14   impulsive personality traits, a conclusion supported by Professor Gundlach's expert report.  And

15   second, people with impulsive personality traits are at a higher risk for committing suicide, a

16   conclusion supported by Professor Mann's expert report.  The conclusion is further supported by

17   various social science studies as well as by common sense.

18       **1.    Professor Gundlach's opinion provides evidence that section 26820**
             **inhibits handgun purchases by people with impulsive personality**
             **traits.**

19

20       Professor Gundlach explains how, in the field of marketing, it is generally recognized that

21   signage encourages impulse purchases, and how "[s]ection 26820 may be reasonably described to

22   act as a constraint and impediment to the impulse purchase of a handgun that would otherwise be

23   induced by on-premise signage and graphics."  *See* DSUF No. 23.  He also explains how, in the

24   field of marketing, it is generally recognized that people who buy on impulse tend to have

25   impulsivity as a personality trait.  *See* DSUF No. 24.  In his professional opinion, it is signs like

26   those used by Tracy Rifle and restricted by section 26820 have the greatest effect on people

27   whose personality traits make them predisposed to buy on impulse.  *See* DSUF Nos. 25-27.

28

11

His report documents the relationship between signage and impulse purchasing and discusses the extensive research on impulse purchasing. ECF No. 43-1 ¶¶ 20-48. It also discusses the evidence that firearms are purchased on impulse. DSUF No. 19. For instance, Professor Gundlach cites the statements by the Chief Executive Officer of Sturm, Ruger & Company, a handgun manufacturer, that "we try to build thousands of units of a new product before launching it. That's really important because so much of firearms purchases is an impulse buy." DSUF No. 20. Professor Gundlach also documents an industry trade group's observation that, at least for men, the first purchase of a firearm is typically on impulse. *See* DSUF No. 21. And he identifies accounts of impulse purchases by individual consumers. DSUF No. 22.

In connection with his analysis of impulse purchasing, Professor Gundlach relies on research into the cognitive processes of impulse purchasing to analyze section 26820, explaining that "limitations on the use of on-premise signage and graphics like those set forth in Section 26820 act as a constraint and impediment to the impulse purchase of a handgun that would otherwise be induced by such on-premise signage and graphics," and that "[i]t is precisely in the way described by these researchers that Section 26820 may be reasonably described to act as a constraint and impediment to the impulse purchase of a handgun that would otherwise be induced by on-premise signage and graphics." DSUF No. 23. He explains that the research identifies "dispositional antecedents"—personality traits—that affect buying decisions. DSUF No. 24. That research has found that impulse buying is "associated with impulsivity and related personality traits," that people with impulse buying tendencies have "higher unreflective, immediate, spontaneous, and kinetic traits," and that "the tendency to buy impulsively is rooted in facets of personality." DSUF No. 24.

Professor Gundlach explains that situational variables, including the types of signs and graphics displayed and posted by plaintiffs in violation of Penal Code section 26820, together with dispositional variables on the part of individuals, explain the tendency of consumers to buy a handgun on impulse. DSUF No. 25. He concludes that "if retail managers of handguns can use signage and graphics like that proscribed by Section 26820 to influence the situation surrounding the purchase of a handgun, they can have the greatest impact on purchasers of handguns who are

12

1   predisposed to buy on impulse." DSUF No. 26. He concludes, further, that "based on the

2   analysis of decades of empirical research, . . . it is reasonable to conclude that limitations placed

3   on the use of marketing stimuli in the retail environment and involving visually appealing on-

4   premise signs and graphics of the type proscribed by Section 26820, reduce the impulse purchase

5   of handguns by consumers predisposed to purchase them." DSUF No. 27. Professor Gundlach

6   checks the connections he makes between empirical research and section 26820 against the

7   theoretical research on impulse buying and finds that his conclusions are supported by that

8   research as well. DSUF No. 27.

9        **2.    Professor Mann's opinion provides evidence that impulsive people
           are more likely to commit suicide and that, without section 26820,**
10         **there would be more handgun suicides in California.**

11          Professor Mann offers the opinion that people with impulsive personality traits are more

12   likely to make a suicide attempt and that having a handgun in the home further increases the risk

13   that they will. *See* DSUF Nos. 28-33. On the question of impulsivity and suicide, he explains

14   that people who commit suicide have "a more pronounced trait of impulsiveness"; that "[s]uicidal

15   behavior is transmitted in families and the familial transmission is linked to the transmission of

16   this trait of impulsiveness"; and that the "impulsive trait has been related to deficits in executive

17   function, whereby the person when making a decision about making a suicide attempt or opting

18   for the possibility of help through antidepressant . . . opts for the quick fix for their emotional pain

19   by making a suicide attempt." DSUF No. 29. Professor Mann further explains that "[s]uicidal

20   behavior is generally impulsive and 70% of suicide attempters act less than one hour after

21   deciding to kill themselves." DSUF No. 32.

22          Having a handgun in the home gives impulsive people quick and definitive way to act on

23   that impulse. *See* DSUF No. 30-33. Professor Mann supports that conclusion by citing an article

24   that he co-authored on firearms and suicide prevention that was recently published in the

25   *American Journal of Psychiatry*, and he also cites social science research showing that the firearm

26   suicide rate decreases as the firearm ownership rate decreases and that states with higher firearm

27   ownership have higher firearm suicide rates but comparable non-firearm suicide rates. DSUF

28   Nos. 31, 33.

1   Based on his expertise and other opinions, Professor Mann concludes that, if invalidating

2   California Penal Code section 26820 would result in an increase in handgun purchases by people

3   with impulsive personality traits, there would be an increase in handgun suicides.  DSUF No. 36.

4&5          **3.     Academic studies further support Professor Mann's opinions and the State's conclusions.**

6   Several studies, including two using California data, have found that handgun purchases are

7   associated with an increased risk of suicide for the purchaser and members of the purchaser's

8   household.  DSUF No. 14.  The findings relating to risk for members of a purchaser's household

9   support Professor Mann's observation that suicidal behavior is transmitted in families, which is

10   likely explained by transmission of impulsivity from one generation to the next.  *See* DSUF

11   No. 29.  Similarly, his conclusions about the handgun posing an increased risk for impulsive

12   people are supported by the finding that fewer than 10% of people who committed suicide or

13   attempted to commit suicide purchased a handgun for that purpose and that, in the year following

14   a handgun purchase, suicide was the leading cause of death for purchasers.  *See* DSUF No. 15.

15   For these reasons, California's 10-day waiting period does not fully address concerns about

16   handgun purchases and suicide.  *See Tracy Rifle*, 118 F. Supp. 3d at 1190-91 (questioning

17   whether the 10-day waiting period in Cal. Penal Code §§ 26815(a), 27540(a) resolves concerns

18   about handgun suicide).  A person may view and advertisement like that posted by Tracy Rifle,

19   purchase a firearm, and later use it to commit suicide.  Or, a person may be contemplating

20   suicide, view an advertisement like the one posted by Tracy Rifle, and impulsively purchase a

21   handgun as a way of exploring the act or palliating his emotional pain by obtaining the means to

22   commit the act.  At-risk people like these, as well as other people with impulsive personality traits

23   and members of their households, are not fully protected by the 10-day waiting period.  Two

24   studies using data from California, and thus accounting for the effect of the 10-day waiting

25   period, support this conclusion.  *See* DSUF No. 15.  Both found an association between the

26   purchase of a handgun and handgun suicide.  *See* DSUF Nos. 15-16.

27

28

1
     **4.    Caselaw shows that the evidence offered by the State satisfies the substantial evidence standard.**

2

3
     The State must be given a "reasonable opportunity to experiment with solutions" to the

4
tragic and senseless problem of handgun suicide.  *See Renton*, 475 U.S. at 52.  And the two expert

5
reports and studies more than meet the threshold for substantial evidence supporting reasonable

6
inference that section 26820 will directly advance the State's goal of decreasing handgun suicide.

7
*See Heller*, 801 F.3d at 273 (noting that on intermediate scrutiny review a court's job is to

8
determine that the government has drawn reasonable inferences based on substantial evidence).

9
The evidence in this case compares favorably to the evidence in other cases where courts have

10
upheld laws under the intermediate scrutiny standard.

11
     In *Coyote Publishing*, the Ninth Circuit upheld a Nevada law restricting advertising of legal

12
brothels, finding that the law satisfied the third *Central Hudson* prong because it directly

13
advanced the Nevada's interest in decreasing the commodification of sex.  *See Coyote Publ'g*,

14
598 F.3d at 608.  The court's analysis discussed general historical sources and academic articles

15
on prostitution.  *See id.* at 604-05.  But in analyzing the third *Central Hudson* prong, the court

16
relied on common sense and reasoning by analogy to conclude that the law satisfied the third

17
prong.  *See id.* at 608-09.  Likewise, in *United States v. Edge Broadcasting Co.*, 509 U.S. 418

18
(1993), the Supreme Court relied on history and common sense to hold that the federal

19
restrictions on advertising of state-run lotteries directly advanced the federal government's

20
interest in discouraging participation in lotteries in states that had chosen not to permit them.  509

21
U.S. at 427-28.  And in *Florida Bar*, the Supreme Court relied on a study showing that Florida

22
residents had "negative feelings" about attorneys who use direct mail advertising and anecdotal

23
accounts reporting abuse of direct solicitation to uphold the state's restriction on attorneys using

24
direct mailings to solicit personal injury or wrongful death clients within 30 days of an accident.

25
515 U.S. 618; *see also id.* at 628 (noting the dissent's criticism that the Court did not have the

26
study or good "indications of the sample size or selection procedures employed by" the study's

27
author, and responding that "we do not read our case law to require that empirical data come to us

28
accompanied by a surfeit of background information").

15

Intermediate scrutiny cases from outside the commercial-speech context also support the conclusion that the State has offered substantial evidence here.  In *Center for Fair Public Policy*, the Ninth Circuit upheld an Arizona statute restricting the hours of operation of sexually oriented businesses based on evidence that the court called "hardly overwhelming":  a fact-sheet summarizing studies on secondary effects of sexually-oriented businesses, one of which pertained to the hours of operation, and testimonial evidence from legislative hearings in which witnesses expressed concerns about crime in their neighborhood.  336 F.3d at 1167.  In *Jackson v. City and County of San Francisco*, the Ninth Circuit upheld an ordinance requiring that handguns be stored in a locked container or disabled with an approved trigger lock when not in use.  746 F.3d 953 (9th Cir. 2014).  The court explained that the city had offered evidence that storing handguns in locked containers reduces the risk of accidental and intentional handgun-related deaths and that, based on the evidence, the city had "drawn a reasonable inference that mandating that guns be kept locked when not being carried will increase public safety and reduce firearms tragedies." *Id.* at 966; *see also id.* at 965 ("[W]e do not impose an unnecessarily rigid burden of proof . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." (quotation marks omitted)).

These cases reflect the respect for lawmakers' predictive judgments that the State should receive here.  Section 26820 has been the law in California for over 90 years.  That long history combined with common sense and the reasonable inferences that can be drawn from the evidence discussed above entitles the State to judgment as a matter of law on the third *Central Hudson* prong.

**B.    Substantial evidence supports the conclusion that section 26820 directly advances the California's interest in reducing handgun crimes.**

The evidence supporting the conclusion that section 26820 can be reasonably expected to reduce handgun crimes is not as robust as the evidence supporting the conclusion that section 26820 can reasonably be expected to reduce handgun suicides.  But it still satisfies the substantial evidence requirement.

16

1    Handguns are used in tens-of-thousands of crimes each year, and are vastly overrepresented

2    in firearm homicides and nonfatal firearm victimizations.  DSUF No. 5.  Data from California

3    shows a similar trend.  DSUF No. 7.  Social science research has found that increased handgun

4    ownership is associated with a higher murder rate.  DSUF No. 9.  And it has found that buying a

5    handgun increases the risk of a violent death for the owner.  DSUF Nos. 10-13.

6         Together with Professor Gundlach's conclusion that the advertisements restricted by section

7    26820 tend to induce purchases by people with impulsive personality traits, these studies and data

8    constitute substantial evidence from which the State could reasonably conclude that impulsive

9    people are more likely to engage in crime, and that, by reducing the number of impulsive people

10   who buy handguns, handgun crime will decrease.

11   **III.    THE FIT BETWEEN SECTION 26820 AND THE CALIFORNIA'S GOAL OF REDUCING
12            HANDGUN VIOLENCE AND SUICIDE IS REASONABLE.**

13        Section 26820 satisfies the narrow tailoring requirement, which requires only that the fit

14   between the State's ends and the means chosen to accomplish those ends is "reasonable"; it need

15   not be "the single best disposition but one whose scope is in proportion to the interest served."

16   *Fox*, 492 U.S. at 480 (quotation marks omitted).  So long as a statute falls within those bounds,

17   courts "leave it to governmental decisionmakers to judge what manner of regulation may best be

18   employed."  *Id.*  Section 26820 easily satisfies this standard because it restricts a very narrow

19   class of advertisements to reduce the type of transaction they induce in an effort to address the

20   serious problem of handgun suicide.

21        In marketing terminology, as explained by Professor Gundlach, section 26820 targets a

22   nexus of situational and dispositional variables that are likely to result in impulsive people buying

23   a handgun impulsively.  *See* DSUF Nos. 25-27.  The law targets no more speech than necessary

24   to achieve the goal of limiting those sorts of transactions, and the socially deleterious effect of

25   those transactions, leaving open essentially limitless advertising alternatives.  It thus satisfies the

26   fourth *Central Hudson* prong.  *See Metro Lights*, 551 F.3d at 911 ("[T]he narrow tailoring

27   requirement guards against over-regulation rather than under-regulation.").

28

17

1    The evidence submitted in support of this motion should also resolve the narrow tailoring

2    issue that this Court identified in its preliminary injunction ruling.  The Court ruled that because

3    the third and fourth *Central Hudson* prongs are interrelated, and because the Court had not found

4    the evidence cited in the State's opposition adequate, the State had not shown that section 26820

5    is no more restrictive than necessary.  *Tracy Rifle*, 118 F. Supp. 3d at 1190-91.  The State's goal

6    of decreasing impulsive handgun purchases by people who are at higher risk for suicide than the

7    population in general fits very well with section 26820's restriction on the type of advertisements

8    most likely to result in those purchases.

9                                    **CONCLUSION**

10    For the foregoing reasons, this Court should grant the Defendants' motion for summary

11    judgment.

12

13

14    Dated:  December 5, 2016                    Respectfully Submitted,

15                                               KAMALA D. HARRIS
                                                 Attorney General of California
16                                               TAMAR PACHTER
                                                 Supervising Deputy Attorney General
17

18

19                                               /s/ Nelson Richards
                                                 NELSON R. RICHARDS
20                                               EMMANUELLE S. SOICHET
                                                 Deputy Attorneys General
21                                               *Attorneys for Defendants*

22    SA2014119177
      95207637.doc

23

24

25

26

27

28

18