EXHIBIT 8

# HEINONLINE

Citation: 8 A.B.A. J. 588 1922



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Tue Jan 27 20:46:22 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

-- To obtain permission to use this article beyond the scope
   of your HeinOnline license, please use:

   https://www.copyright.com/ccc/basicSearch.do?
   &operation=go&searchType=0
   &lastSearch=simple&all=on&titleOrStdNo=0747-0088

Case 2:14-cv-02626-TLN-DB   Document 52-10   Filed 12/05/16   Page 3 of 6

wherever possible shall arrange for a "Department of American Citizenship" in all papers, magazines and journals, the material therefor to be furnished by the bureau if requested.

(h) That the Committee request the co-operation of the Commissioners on Uniform State Laws in an effort to have enacted in each State suitable laws making a course each year in the study of and devotion to American institutions and ideals part of the curriculum in all schools and colleges sustained or in any manner supported by public funds.

(5) Your Committee is impressed with the wonderful work done in past years through the "University Scholastic League" organized in Texas, and now expanded under the title "The Citizenship League of American Schools and Colleges." This organization realizes the value of school contests in orations, essays and declamations upon patriotic subjects. It thus arouses the spirit of contest, and this inspires not only the interest of pupils and students, but also arouses the interest of the father and mother.

(6) Your Committee realizes that the plans we have outlined will require the use of considerable money. We feel that the Bar of the country will be liberal in contribution, but we also feel that the burden should not rest upon the Bar alone. We believe

that the public will have enough interest in this cause to see that money enough is provided to enable it to perform the greatest good, and we recommend that the Committee on American Citizenship shall have authority to call for, and receive, contributions to carry on the work—no indebtedness to be created, imposing any obligation upon this Association, or its membership.

Your Committee expresses its deep appreciation for suggestions from many lawyers not members of the Committee, and to numerous teachers and writers in schools and colleges, and to business men—all of whom have expressed their desire to be of service in this great cause. We are sure that when our Citizenship Bureau is organized all these can be relied upon for real assistance. The foregoing plan is intended only to be suggestive. The permanent Committee, when constituted, will be expected to work out in detail an adequate plan in general conformity with this report.

Respectfully submitted,

MARTIN J. WADE,
WALTER GEORGE SMITH,
EDGAR B. TOLMAN,
ANDREW A. BRUCE,
ROBT. E. L. SANER.

# FOR A BETTER ENFORCEMENT OF THE LAW

Special Committee Recommends Many Changes to Make Administration of Justice More Effective But Declares Thorough Enforcement of Existing Laws Will Go Far Towards Solving Problem

THE members of your Committee on Law Enforcement, recognizing not only the great honor conferred upon them, but also the difficulty and importance of their task, immediately after the adjournment of the convention in September last, keeping in touch with one another through their chairman and from time to time by personal meetings, took up their work under your commission.

The first difficulty which confronted us was a discouraging dearth of official information upon the criminal situation in the United States. No other great civilized country is so far behind on this important matter.

First of all we urge the establishment, under the control of the Department of Justice at Washington, of a Federal Bureau of Records and Statistics to which criminal authorities in the several states must regularly report; that such reports, statistics, records, photographs, finger prints, etc., shall be immediately available to officers charged with enforcement of the criminal law throughout the country. Without knowledge of the real situation, it will be impossible thoroughly to diagnose or properly deal with the problems of crime which confront us.

Up to 1910 the government, through its census bureau, compiled a report of prison statistics. While lacking in some essentials, this compilation still supplied much valuable information. In the census of 1920, just when the study of American criminology

could accomplish most, for some unaccountable reason the government abandoned altogether this most important subject. Police records, reports of mayors of cities, and of coroners and prosecuting officers, and like official tabulations are seldom complete or conclusive, for the reason that for the most part they consist not of actual data of crimes proven, but only of accusations of and arrests for crimes.

Without such information before us, it was difficult to begin any thoroughly scientific investigation. However, your committee went to work at all the sources of information it could find. Several of your committee individually visited the larger cities of the country where special movements for the suppression of crime had been inaugurated.

To the north of us is a country possessing the same substantive laws, the same religions, and, for the most part, similar dominant races; in that country, however, the criminal conditions are strikingly dissimilar to our own.

We believed that an examination into the Canadian situation might be helpful in our investigation. Accordingly, one of your committee, in December of last year, visited the cities of Montreal, Toronto, and Hamilton, and made a visit to the penitentiary at Kingston.

Inasmuch as the statistics in Chicago, owing to the work of the Chicago Crime Commission, are fairly accurate, we beg leave to offer the contrasts shown by these statistics as illuminative of the entire criminal situation.

The population of Canada is about 9,000,000 that of Cook County, Illinois, about 3,000,000, and

*Report presented at annual meeting of American Bar Association at San Francisco, August 10, 1922.

Case 2:14-cv-02626-TLN-DB   Document 52-10   Filed 12/05/16   Page 4 of 6

that of Chicago, 2,700,000. Notwithstanding this, we find that there were in 1921:

In Joliet penitentiary *one* of the Illinois state prisons, 1930 prisoners.

In *all* Canada's penitentiaries, 1930 prisoners.

In Chicago 4785 burglaries.

In Canada 2270 burglaries.

In Chicago 2594 robberies.

In Canada, robberies including larceny from the person, 605.

In Cook County 212 murders.

In Canada 57 murders.

It will not do to say that the Canadians are naturally more law-abiding than we, for the United States census of 1910 shows that when persons born in Canada settle in the United States, they are even a little less law-abiding than the native white citizens of this country.

Out of a Canadian born population of 1,196,070 in this country in 1910, 7956 were in our prisons, and out of the natives of 17 foreign countries living here, Canadians ranked sixth in lawlessness.

The natives of certain European countries which have the best record for law observance, when settled here become the most lawless of all.

These facts seem to dispose of two theories relative to crime:

First, that foreigners are more law-abiding because they are naturally so constituted.

Second, the other contention that crime is largely due to mental disease. It is absurd to contend that we are so mentally inferior to all other nations as to make this difference in crime; if so, why is it that the foreign-born criminals seldom get dementia praecox until they cross the ocean? Dr. Herman Adler and a corps of assisting psychologists spent more than a year investigating the mentality of the inmates of Joliet Penitentiary. The result of these investigations, as presented to your committee, was to the effect that the intelligence of the average prisoner equals that of the average enlisted man in our national army in the World War.

A few of the observable differences between this country and Canada may be noticed at once; Canada has but three large cities, most of its people live in smaller towns and in the country. Further, the administrators of the criminal law in Canada are absolutely beyond the reach of politics. The chief of police in any Canadian city is secure in his office for life if he makes good; so is every other policeman in Canada. The police force is a compactly organized semi-military body. The judge is there for life, and so, practically, if he so desire, is the prosecuting attorney.

Then, too, while the substantive law is the same as our own, the methods of its application are altogether different. Justice is swift and certain. When a Canadian is convicted, in 99 cases out of 100 that ends the matter. The Minister of Justice may, if it is true, interfere if it appears that perhaps the defendant has been convicted on insufficient proof. A large proportion of even the more serious cases are tried by the judge without a jury.

As was stated to your committee, crime flourishes because criminals escape punishment, and criminals escape punishment because there are so many avenues of escape open. The prevalence of the abnormal volume of crime in our larger cities is the result of years of mollycoddling and sympathy by misinformed and ill-advised meddlers.

In Canada the penalties imposed for crime are far more severe than our own. In fact, the theory there seems to involve protection to the public, with only a secondary concern for the criminal.

Again, the general character of our immigrants is different. The Canadian population is homogeneous, ours inextricably heterogeneous. Several European countries encourage emigration to the United States. Some undoubtedly encourage criminal emigration.

Prior to 1900 we had fewer foreign-born criminals than native born. The Immigration Commission appointed by the Sixty-first Congress reported that while this was then true, nevertheless the children of the foreign-born, together with the foreign-born, contributed a larger percentage of criminals in proportion to their number, than the native-born whites.

As shown by the United States Census 1910, page 110, out of 100,000 of the native-born white population there were 312.4 prisoners; out of 100,000 of the foreign-born 732.6 were in our prisons.

Finally, there prevails an undefined but palpable difference in the attitude toward the law of the two men upon the street—the Canadian and the American. There exists in some of the European races an inherited fear of law. This fear comes from a time scarcely a century away when the punishment of every serious crime was death for the offender. The races who live across our Northern border have not wholly broken away from that influence.

Following these investigations, your committee, in order to ascertain at first hand the conditions of affairs in the several centers of population, held open sessions: in Washington March 6 and 7, in Chicago April 10 and 11, in Joliet Penitentiary April 12, in New York June 1 and 2, and a final conference in St. Paul July 10 and 11. At these sessions a number of leading penologists and criminologists appeared and testified.

In Joliet prison half a dozen of the more intelligent professional criminals gave us the attitude of the criminal mind.

We have been favored with some thousands of pages of printed and typewritten matter, most of which is of importance and has received our careful attention.

As to whether there actually exists a so-called crime wave in this country, we respectfully report:

In 1880 there were 30,659 prisoners in our penitentiaries; in 1890, 45,233; in 1904, 53,292; in 1910, 58,800. At our solicitation the Crime Commission of Chicago sent a questionnaire to the 85 wardens of state and federal prisons in this country, asking that information be sent us as to the size and character of their prison population.

From all the data and opinions of experts which your committee has been able to gather, we beg leave to report that—particularly since 1890—there has been, and continues, a widening, deepening tide of lawlessness in this country, sometimes momentarily receding, to swell again into greater depth and intensity. At intervals this tide billows into waves that rise and break, but only for a time attracting public attention.

In a statement made before your committee,

Case 2:14-cv-02626-TLN-DB    Document 52-10    Filed 12/05/16    Page 5 of 6

ex-Justice John W. Goff, ex-recorder of New York, summed up the situation thus:

> Officials in some cities claim there is no crime wave. The newspapers throughout the country claim that there is a wave of crime.
>
> Be that as it may, it is not for this committee, or anyone addressing it, to enter into a discussion whether it exists or not; but, at all events, I think it can be safely stated that in the history of this country we have never been before confronted with anything like the criminal conditions we have today . . . Not a day passes that there there is not recounted in the newspapers some terrible outrage involving robbery and murder. . . . In my humble judgment, the cardinal fault in the administration of criminal justice today is the lack of promptness and finality in the administration of law. Statutory regulation and amendment may be of some use, but all statutory legislation has had a tendency within the last quarter of a century in favor of the criminal.

The criminal situation in the United States, so far as crimes of violence are concerned, is worse than that in any other civilized country. Here there is less respect for law. While your committee cannot obtain the exact figures, from all available sources of information, we estimate that there were more than 9500 unlawful homicides last year in this country; that in 1920 there occurred not less than 9000 such homicides, and that in no year during the past 10 years did the number fall below 8500. In other words, during the past 10 years, no less than 85,000 of our citizens have perished by poison, by the pistol or the knife, or by some other unlawful and deadly instrument.

Burglaries have increased in this country during the past 10 years 1200 per cent.

In short, our situation today appears almost as bad as that of England, France, Italy, and Spain as late as 1837, as portrayed by Lord Bowen.

Another important phase of this situation deserves careful attention. We deem it important to note the material difference between the character of crime conditions prevailing here and those abroad. Our regrettable eminence is due in most part to crimes of violence against the person and property. In 1910, out of the 58,800 confined in our state and federal prisons, 15,316, or more than 25 per cent of all prisoners, had committed homicides. While of course this number includes the accumulation of years, this awful fact still bears its own significance.

The evidence before us shows that there has been since 1910 a steady and terrible increase not only in homicides, but also in burglaries and robberies. One state has in its different prisons 3547 inmates; of these 1429 are guilty of taking the lives of human beings. Taken at random, a few prison records showing the number incarcerated for homicide the first of January of this year will illustrate the general situation:

| | Population | Homicides |
|---|---|---|
| California, San Quentin | 2,585 | 482 |
| Nevada | 150 | 26 |
| Idaho | 295 | 50 |
| New Mexico | 358 | 77 |
| Delaware | 349 | 28 |
| New Jersey, Trenton | 1,286 | 290 |
| Kentucky | 544 | 169 |
| Joliet, Illinois | 1,930 | 454 |
| North Dakota | 235 | 26 |
| Georgia | 3,547 | 1,429 |
| South Dakota | 320 { no murders { 5 manslaughter | |
| Indiana | 1,451 | 332 |
| Mississippi | 1,590 | 641 |
| Iowa | 755 | 144 |

Deliberate murder, burglary and robbery will seldom be attempted unless the criminal is armed. In European countries the criminals, as a rule, are not armed.

On the other hand, in crimes which indicate the dishonesty of the people, such as larceny, extortion, counterfeiting, forgery, fraud and other crimes of swindling, a comparison of conditions demonstrates that the morals of this country are better than in any other of the large countries of the world. The American people are an honest people; commercial integrity here works to a higher standard than in any other land, the morality of the country is higher, the lives of its citizens are cleaner, offenses against women and children are less frequent and more universally abhorred.

The criminals of this country number less than one-third of 1 per cent of the entire population. One serious obstacle to the enforcement of the criminal law arises from the attitude of the law-abiding citizen when called upon to aid in its actual administration. The American temperament adjusts itself to sympathy with the accused and a corresponding disregard for the rights of the public. In cases where much public feeling is aroused the man of affairs too often deserts the cause of justice. Chief Justice Scanlan, of the Criminal Court of Chicago, referring to some labor trials in his court a few years ago, said:

> Three hundred and eighty business men were called for jury service and 379 of them perjured themselves out of the jury box.

Want of sympathy, if not actual disrespect for the law, reaches up to the highest stations and extends down to the lowest. The ultimate enforcement of the law rests upon the jury box. If the average American citizen had without sympathy or prejudice performed his duty this terrible record would not have to be written.

In a general way the committee has endeavored to consider the question in a three-fold aspect:

First, the extent of lawlessness in this country and a comparison as between the conditions in this country and those in other civilized nations.

Second, the causes of lawlessness.

Third, suggestions as to possible remedies.

Crime and lawlessness in the United States have been steadily on the increase and out of proportion to our growth, and there has been a steady and growing disrespect for law. In our opinion this is not a result of the war. We do not find the proportional increase in crime from 1916 to 1922 greater than from 1910 to 1916, and we have not been able to discover that crimes of violence have materially increased in France, England, or Canada during or since the war, although the effects of the war naturally must be more marked in those countries.

It is our united opinion that the means provided in the United States for coping with crime and criminals are today neither adequate nor efficient, for example:

First, we find that the parole and probation laws, as administered, very generally fail to accomplish the purposes for which the laws were designed and weaken the administration of criminal justice. We recommend that first offenders, and first of-

Case 2:14-cv-02626-TLN-DB   Document 52-10   Filed 12/05/16   Page 6 of 6

fenders only, should be eligible for probation. The theory of the law, of course, is that the prisoner, on account of his good conduct, and where it has been demonstrated in the opinion of expert parole authorities that it is safe for the public generally, should be released. It is unquestionably true that in substantially all of the cases, no matter what the crime nor how hardened the criminal, the boards of parole, with little if any discrimination, have released the prisoner at the end of the minimum of the sentence. Those responsible for such administration overlook the purposes of punishment as a deterrent, disregard utterly the safety of the public, and defeat the very purpose of the law. We recommend that the indeterminate sentence laws should be modified so as to apply to first offenders only, and we believe, too, that neither probation nor parole should be permitted those convicted of homicide, burglary, rape or highway robbery.

Second, we find that over 90 per cent of the murders in this country are committed by the use of pistols. We find that the laws prohibiting the carrying of firearms or deadly weapons are ineffective—in fact, that they work to the benefit of the criminal rather than to the law-abiding citizen. The revolver serves no useful purpose in the community today. We recommend that the manufacture and sale of pistols, and of cartridges or ammunition designed to be used in them, shall be absolutely prohibited, save as such manufacture shall be necessary for governmental and official use under proper legal regulation and control.

Third, we find the causes for delay in criminal cases so varied and the conditions so differing, that we hesitate to make specific recommendations. Certainly it is true that the criminals and not the public benefit by these delays. The Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy trial." As everyone familiar with criminal prosecution knows, this is the kind of enjoyment that few charged with crime desire.

Dilatory motions, such as motions to inspect the grand jury minutes, which the trial judge may take under consideration almost indefinitely; motions for an order dismissing an indictment, from which, if granted, the prosecution in many of our states has no right to appeal; adjournments on account of other engagements of counsel, a privilege greatly abused in some jurisdictions, and many other causes for delay, all accrue to the benefit of the law-breaker.

We recommend that the state be given every right to appeal now enjoyed by a defendant—except from a verdict of not guilty, and we recommend that the prosecutor in a criminal trial shall have the right to call the attention of the jury to the fact that the defendant has failed to take the stand or has failed himself to contradict or deny the testimony offered by the prosecution.

We recommend that the state be given the right to amend the indictment upon proper terms, in matters of form.

We recommend that there should be but one appeal from a judgment of conviction in the trial court.

We recommend that there be enacted legislation limiting the time during which judges or courts may hold under advisement dilatory motions made in criminal trials; that at the expiration of such time, without action, such a motion shall be deemed to be denied.

Fourth, we find that in some of the states the jury is the final judge both of the law and the facts. The court may inform the jurors as to the law, but he must instruct them that while he has expressed his opinion, they must be the final judges, not only as to the facts, but as to the law, and its application to the evidence. Thus it is clearly within the power of jurors absolutely to nullify the laws of a sovereign state and there is no appeal on the part of the government from their determination. We believe that such a condition is absolutely subversive of a government of law and we recommend the repeal of such statutes.

Fifth, we find in various jurisdictions glaring abuses in the matter of bail, both in the amount imposed and in the sufficiency of security offered.

Sixth, we find that further legislation should be enacted by the Congress to punish and prevent lynching and mob violence.

Seventh, we find that more stringent laws limiting and controlling immigration should be enacted and enforced.

Eighth, we find that the bill now pending in the Congress, increasing the number of United States District Judges and conferring powers upon the Chief Justice and Senior Circuit Judges to have supervision over the work of the courts and see that the dockets are kept clear, should be enacted.

Ninth, no meritorious case, whether civil or criminal, that is cognizable in the courts of the country, ought to be denied the services of an able, courageous and loyal advocate. And no man or woman, however humble, ought to be able to say in any American community that justice is too expensive for the poor. We therefore urge that in every community the members of this association volunteer to aid, without fee, the worthy poor who are being oppressed, defrauded or otherwise wronged, and who have not the means to employ counsel.

Tenth, first offenders must be segregated from veteran criminals, for the jails throughout the land today are breeding places for crime, and the young and thoughtless who may often be reclaimed, are taught by professional criminals to scorn the restraints of society; and in this connection we may well consider the extension of psychopathic laboratories established as adjuncts to the criminal courts.

From what has been intimated, many more specific recommendations could have been made which, if adopted, might improve the efficiency of our courts. But in the opinion of the committee it is not necessary to wait another day, or to wait for new laws. Such laws would be helpful, but if we honestly and thoroughly enforce those which we already have, we shall have traveled a long ways towards the solution of the problem.

Respectfully submitted,

WILLIAM B. SWANEY, *Chairman,*
MARCUS KAVANAGH,
CHARLES S. WHITMAN,
WADE H. ELLIS,
CHARLES W. FARNHAM,
                                        Committee.