# EXHIBIT 9

# REPORT

OF THE

# California Crime Commission

## 1929

COMMISSIONERS:

JAMES A. JOHNSTON, Chairman
W. A. BEASLY
BURON FITTS
W. H. HOLLAND
WILLIAM R. McKAY
JUSTIN MILLER
U. S. WEBB

CHRIS B. FOX, Secretary
Tribune Tower, Oakland, Cal.


CALIFORNIA
STATE LIBRARY

GOVERNMENT
PUBLICATIONS

# CONTENTS.

|  | PAGE |
|---|---|
| LETTER OF TRANSMITTAL | 5 |
| ORGANIZATION | 7 |
| INTRODUCTION | 7 |

BILLS RECOMMENDED:

| | |
|---|---|
| Education | 9 |
| Employment | 10 |
| Aid in securing employment | 11 |
| Probation | 11 |
| Affecting parole | 11 |
| Reformatory or intermediate prison for segregation of young first offenders | 12 |
| Provision for productive prison labor | 14 |
| State Bureau of Criminal Identification and Investigation | 15 |
| Special investigators | 16 |
| Police schools | 17 |
| Criminal statistics | 18 |
| Controlling fire arms | 20 |
| Receivers of stolen property | 23 |
| Instructions to juries | 25 |
| Objections to instructions | 26 |
| Compromise of criminal cases | 26 |
| Report of injuries | 28 |
| Solicitation to commit crime | 28 |
| Bail in felony cases | 28 |
| Attempted extortion | 29 |
| Assault with unloaded firearms | 30 |
| Expert testimony and the insanity plea | 30 |

GENERAL RECOMMENDATIONS:

| | |
|---|---|
| Waiver of jury trial in felony cases | 30 |
| County jails | 31 |
| Selection of probation officers and standardization of probation methods | 34 |
| State motor vehicle officers | 34 |
| Border patrol | 35 |
| The teletype | 35 |
| Defense of insanity | 36 |
| Explanation of insanity pleas | 38 |
| Summary of suggestions according to subjects | 39 |
| Conferences and meetings | 39 |
| Conclusion | 41 |

APPENDIX I

SUMMARY OF COMMUNICATIONS RECEIVED:

| | |
|---|---|
| Apprehension | 43 |
| Bail | 45 |
| Bank checks | 45 |
| Cause of crime | 46 |
| Cost of crime | 47 |
| Court delay | 47 |
| Court procedure | 49 |
| District attorney | 50 |
| Educational program | 50 |
| Evidence, comment by court | 51 |
| Firearms | 51 |
| Intermediate penal institutions | 52 |
| Jury and jurors | 53 |
| Juvenile delinquency | 54 |
| Law enforcement | 55 |
| Marriage and divorce | 55 |
| Motion pictures and newspapers | 55 |
| Parole | 56 |
| Perjury | 58 |
| Policemen | 58 |
| Police courts | 58 |
| Police organization | 58 |
| Police records | 59 |
| Statistics | 59 |
| Prevention | 59 |
| Prisons | |

## CONTENTS—Continued

SUMMARY OF COMMUNICATIONS RECEIVED—Continued

| | PAGE |
|---|---|
| Prisoners | 60 |
| Prison labor | 61 |
| Probation | 62 |
| Public opinion | 63 |
| Punishment | 63 |
| Respect for law | 65 |
| Sentence | 65 |
| State prosecutions | 65 |
| State police | 66 |
| Twenty-four hour school | 66 |

APPENDIX II

SUGGESTIONS AND RECOMMENDATIONS OF CHARLES W. FRICKE, JUDGE OF THE SUPERIOR COURT, LOS ANGELES COUNTY:

| | |
|---|---|
| Depositions | 68 |
| Bail—arrest outside of county | 68 |
| Bail bonds | 68 |
| Penal code, section 197 | 68 |
| Information and commitments | 68 |
| Presumption of good character | 68 |
| District attorney subpoena | 68 |
| Attempted extortion | 69 |
| Repeated misdemeanors | 69 |
| Wife as witness | 69 |
| Concealed weapons act—section 13 | 69 |
| Burden of proof | 69 |
| Objections | 69 |
| Judgment and sentence | 70 |
| Probation | 70 |
| Dismissals | 70 |
| Motions for new trials | 70 |
| Former jeopardy | 70 |
| Insanity | 71 |
| Criminal court of appeals | 71 |
| Impeachment of witness | 71 |
| Refreshing the memory | 71 |
| Imprisonment for nonpayment of fines | 71 |
| Burglary with explosives | 72 |
| Means used to commit crime | 72 |
| Concurrent and consecutive sentences | 72 |
| Statute of limitations | 72 |
| Attempts | 72 |
| The insanity defense | 73 |
| Instructions | 73 |

APPENDIX III

PROPOSED REFORMS IN CALIFORNIA CRIMINAL LAW AND PROCEDURE SUBMITTED BY PROFESSOR C. G. VERNIER, STANFORD UNIVERSITY:

| | |
|---|---|
| Assault | 74 |
| Unloaded gun | 74 |
| Bigamy | 74 |
| Jeopardy | 74 |
| Jeopardy—effect of grant of new trial | 74 |
| Murder | 74, 75 |
| Solicitation | 75 |
| Self-defense | 75 |
| Larceny | 75 |
| Procedure—stay of execution | 75 |
| Verdict | 75 |
| Procedure—rules of court | 75 |
| Procedure—comment on defendants failure to testify | 75 |
| Venue | 76 |
| Procedure—comment by trial judge on evidence | 76 |
| Procedure—alibi | 76 |
| Police | 76 |
| Statistics | 76 |
| Psychopathic laboratories | 77 |
| Jails—penal farms | 77 |
| Insanity | 77 |
| Indemnification | 77 |
| Courts—municipal | |

## CONTENTS—Continued

SUBMITTED BY PROFESSOR C. G. VERNIER, STANDORD UNIVERSITY—
Continued

                                                 PAGE

Witnesses—nonresident _____ 78
Compromise of crime _____ 78
Public torts—reclassification of crimes _____ 78
Recovery of civil damages in criminal prosecution _____ 78
Embezzlement _____ 79
Reasonable doubt _____ 79
Juvenile court—jurisdiction _____ 79
Juvenile court act _____ 79

### APPENDIX IV

Communication From General Tirey L. Ford—

Possible methods of preventing crime _____ 81
The problem presented _____ 82
Parole and the indeterminate sentence _____ 83
Parole _____ 84
Methods of prosecution of persons accused of crime _____ 87
Procedure prescribed by statute _____ 88
Prosecuting attorneys _____ 88
The judiciary _____ 88
Recommendations of Superior Judges J. J. Trabucco and Fred V. Wood _____ 90
Communication from Clarence F. Lea, congressman first district, California _____ 92
Communication from O. K. Cushing, attorney at law, San Francisco _____ 94
Communication from O. F. Snedigar, probation officer Alameda County _____ 96
Delay in bringing defendants to trial _____ 96
Jury system _____ 96
Expert testimony _____ 97
Probation _____ 97
Scientific study of criminals _____ 97

## REPORT OF THE CALIFORNIA CRIME COMMISSION

*To the Governor and the Legislature of the State of California:*

Pursuant to chapter 407 of the Statutes of 1927, the California Crime Commission herewith submits a report containing its findings, conclusions and recommendations relating to the crime situation in the state, accompanied by proposed legislation to carry the same into effect.

All of which is respectfully submitted.

JAMES A. JOHNSTON, *Chairman,*
W. A. BEASLY,
BURON FITTS,
W. H. HOLLAND,
WILLIAM R. McKAY,
JUSTIN MILLER,
U. S. WEBB.

CHRIS B. FOX,
   Secretary.
Dated January 7, 1928.

## CONTENTS—Continued

SUBMITTED BY PROFESSOR C. G. VERNIER, STANFORD UNIVERSITY—Continued

PAGE

Witnesses—nonresident _____ 78
Compromise of crime _____ 78
Public torts—reclassification of crimes_____ 78
Recovery of civil damages in criminal prosecution_____ 78
Embezzlement _____ 79
Reasonable doubt_____ 79
Juvenile court—jurisdiction_____ 79
Juvenile court act_____ 79

## APPENDIX IV

Communication From General Tirey L. Ford—
Possible methods of preventing crime_____ 81
The problem presented_____ 82
Parole and the indeterminate sentence_____ 83
Parole _____ 84
Methods of prosecution of persons accused of crime_____ 87
Procedure prescribed by statute_____ 88
Prosecuting attorneys_____ 88
The judiciary_____ 88
Recommendations of Superior Judges J. J. Trabucco and Fred V. Wood____ 90
Communication from Clarence F. Lea, congressman first district, California____ 92
Communication from O. K. Cushing, attorney at law, San Francisco_____ 94
Communication from O. F. Snedigar, probation officer Alameda County_____ 96
Delay in bringing defendants to trial_____ 96
Jury system_____ 96
Expert testimony_____ 97
Probation _____ 97
Scientific study of criminals_____ 97

## REPORT OF THE CALIFORNIA CRIME COMMISSION

*To the Governor and the Legislature of the State of California:*

Pursuant to chapter 407 of the Statutes of 1927, the California Crime Commission herewith submits a report containing its findings, conclusions and recommendations relating to the crime situation in this state, accompanied by proposed legislation to carry the same into effect.

All of which is respectfully submitted.

JAMES A. JOHNSTON, *Chairman,*
W. A. BEASLY,
BURON FITTS,
W. H. HOLLAND,
WILLIAM R. McKAY,
JUSTIN MILLER,
U. S. WEBB.

CHRIS B. FOX,
    Secretary.

Dated January 7, 1928.

# REPORT OF CALIFORNIA CRIME COMMISSION

Pursuant to the recommendation of the Commission for the Revision of Criminal Procedure in its report to the legislature in 1927, the following statute was enacted which created the California Crime Commission:

## SENATE BILL No. 417

### CHAPTER 407

*An act creating the California Crime Commission, defining its duties, and making appropriation for its expenses.*

(Approved by the Governor May 10, 1927.)

*The people of the State of California do enact as follows:*

SECTION 1. There is hereby created a commission to be known as the California Crime Commission.

SEC. 2. Said commission shall consist of a chairman and six other members, all to be appointed by the governor of California, and to hold office at his pleasure.

SEC. 3. It shall be the duty of the California crime commission to make a study of the entire subject of crime, with particular reference to conditions in the State of California, including causes of crime, possible methods of prevention of crime, methods of detection of crime and apprehension of criminals, methods of prosecution of persons accused of crime, the entire subject of penology, and, generally, to make a survey of the entire field of crime, and to report its findings, its conclusions and recommendations to the governor and the legislature of California, which will convene in the year 1929.

SEC. 4. The salary of the chairman and the salary of the secretary of said commission shall be fixed by the commission with the approval of the department of finance. The other members of such commission shall serve without salary, but all members of said commission shall be entitled to their expenses incurred in the performance of their duties.

SEC. 5. Said commission shall have power and authority to employ such expert and other assistance as in its judgment shall be necessary to the proper performance of its duties.

SEC. 6. There is hereby appropriated out of the general funds in the treasury of the State of California the sum of twenty thousand dollars for the expenses of said commission.

## ORGANIZATION

Governor C. C. Young appointed the following members of the commission: James A. Johnston, Chairman; W. A. Beasly, Buron Fitts, W. H. Holland, William R. McKay, Justin Miller and U. S. Webb.

At the organization meeting of the commission held in Sacramento on October 13, 1927, Chris. B. Fox was appointed secretary.

## INTRODUCTORY

The work of the commission has been supplemented to some extent by the work of the Commission for the Study of Problem Children, which was created by an act of the 1927 legislature (chapter 349). The commission is composed of seven members and has for its particular subject the study of juvenile delinquency. The California Crime Commission has also concerned itself with the study of juvenile delinquency and the causes of crime. It has held several joint meetings and cooperated with the Commission for the Study of Problem Children.

Case 2:14-cv-02626-TLN-DB   Document 52-11   Filed 12/05/16   Page 7 of 12

The commission determined to use every agency, facility and resource available, including the experience of other bodies created or organized for similar purpose. The commission began its study by reviewing the surveys made by other state commissions and following this line examined reports of the American Bar Association, American Law Institute, Missouri Crime Survey, Minnesota Crime Commission, Georgia Crime Survey, New York Crime Commsson, Cleveland Foundaton, American Prison Association, Indiana State Conference Committee on Delinquency and the National Crime Commission.

Realizing the necessity of paying particular attention to conditions in the State of California, we communicated with every state, county and city official whose position and duties bring him in contact with crime in any of its phases or at any stage. This included justices of the Supreme and appellate courts, every superior court judge and every municipal and police judge; every district attorney, sheriff, coroner, police chief, probation officer and public defender; managing boards of state institutions, prison wardens, reformatory superintendents and indentification experts; United States judges, commissioners and attorneys; and, because of the importance of the factor of juvenile delinquency, we sent the same communications to every county superintendent of schools. We wrote to members of the Judicial Council, officers and governors of the State Bar and professors of law in the universities of this state.

We addressed ourselves to our United States senators and congressmen and to every member of the legislature, as we felt that in addition to their interest as legislators, many of them had views and opinions resulting from experience gained in other positions.

We also wrote to many persons not holding official positions but who have occasion to contact crime and criminals and court proceedings. In this latter group we included many physicians, psychiatrists, psychologists and educators.

To those with whom we corresponded and whose views and opinions were invited we always asked this question: "What, in your judgment, are the best measures to be taken, either by legislation or otherwise, to improve the administration of criminal justice and reduce crime in California?" Many responded in general terms, showing very genuine interest, some indicated deep study of the questions involved and a few offered concrete suggestions of practical value.

In the endeavor to secure information from officials who did not respond in writing, to uncover views that might be held by persons not holding official positions and to enable citizens generally to voice their opinions and offer suggestions, we held a number of public hearings in Los Angeles, San Francisco, Sacramento, Oakland, Berkeley, San Jose and other places.

We conferred with members of the faculties of the University of California and Stanford University, and held meetings in conjunction with sessions of the State Bar of California at Pasadena, the district attorneys in convention at Del Monte, the Conference of Social Agencies in Yosemite, State Hospital Superintendents at Ukiah and the State Peace Officers' Association in annual convention at San Bernardino.

The opinions expressed at the public hearings were summarized and included in the appendix to minutes of our meetings. The suggestions received in written communications were classified according to sub-

jects, summarized and studied. Specific questions were prepared in advance for discussion at the convention meetings with special groups.

The chairman of our commission visited the prison at Stillwater, Minnesota, for the purpose of investigating industrial developments in that institution. Mr. McKay visited several reformatory institutions in eastern states to learn the methods employed by them in segregating the youthful from the older and more hardened offenders. Dean Miller attended sessions of the National Crime Commission and the Criminal Law Section of the American Bar Association. Attorney General Webb, Judge Beasley, Mr. Fitts, Mr. Holland and Secretary Fox each executed special assignments in connection with our examination and study of proposals.

In the communications received and at the hearings held many opinions have been expressed, many theories advanced, many suggestions offered, a few practical remedies proposed. We have carefully considered every communication received and every suggestion tendered, keeping in mind always the necessity and advisability of being practical. Some things brought to our attention as supposedly requiring new legislation were found to be already covered by existing law. This provokes the thought and comment that the understanding and enforcement of old laws is as much needed and may be as effective as the passing of new ones.

At any rate we are not inclined to hasty drafting of new legislation, not disposed to tinker unnecessarily with the present laws, or to make useless changes in the codes, nor to add to the number of statute crimes; therefore we have submitted all suggestions and proposals to this test: Is this likely to prevent, reduce or minimize crime; make it more difficult to commit crime; or escape its consequences?

The legislation that we are recommending aims at these points: to prevent crime in the first instance; to prevent the repetition of crime by those who have already offended once; to prevent opportunity for committing crime by those who have offended and who seem likely to continue in a course of crime.

The Commission offers the following bills and suggestions for your consideration:

## EDUCATION

The Commission submits and recommends the enactment of three bills relating to the determination of ability and aptitude in public schools. One bill amends section 1683 of the Political Code, relating to public schools, one amends section 1751 of the Political Code relating to high schools and another amends section 4 of the part-time vocational opportunities act of May 27, 1919.

We are finding anew that every investigator and every commission seeking crime causes has discovered before, that crime is committed by the very young, many of them rash, reckless and bold, while still in their teens. Examination of case histories show frequent instances of many offenses preceding the first conviction and the records of apparently hardened though youthful offenders show known delinquency traceable back into childhood. The desperate bandit of today is the delinquent of yesterday, the puzzling problem child of the day before. It is because we did not solve the problem he presented, because we allowed him to remain unadjusted that we now deem it necessary to

provide severe penalties and harsh measures of repression including the habitual criminal statutes.

There are various opinions about causes of crime and numerous suggestions for punishing the offenders, but the one thing upon which there seems to be unanimity of agreement by all students of the problem is that criminal tendencies assert themselves very early in life, that youth is the time of lawlessness and that early recognition of the signs of delinquency and early corrective treatment should be more systematic and more scientific. It is not beyond our ability to discover and treat tendencies in school days. The neglected youth or the unsolved problem child is the genesis of crime. Considering the advances being made by educators, psychologists and psychiatrists in influencing human behavior it seems wise to provide for early examination of ability and aptitude so that our children may have the best possible adjustment to living in right relations with others.

## EMPLOYMENT

The commission submits and recommends the enactment of a bill to regulate and stabilize employment and, so far as may be, to insure its steadiness and continuance.

In 1921 the legislature enacted a law, chapter 246, to provide for the extension of the public works of the state during periods of extraordinary unemployment caused by temporary industrial depression. It aimed to relieve unemployment by having the board of control expend the available emergency fund in extension of public work in manner calculated to furnish the maximum of public employment thus relieving distress. There is no doubt about the good intent of the measure or the good it might do if its provisions could be put into practice during the existence of a period of extraordinary unemployment. But such a period would pass before the machinery to make the investigation could get fairly started. Today the need is for measures to regularize and stabilize employment and insure its steadiness and continuance rather than relief for the distress caused by unemployment. We feel that regular employment has a stabilizing influence and provides insurance against crime; therefore we are proposing that it shall be the duty of the department of public works to ascertain and secure from the various departments, bureaus, boards and commissions of the state plans for such extension of the public works of the state as shall be best adapted to supply increased opportunities for advantageous public labor and to furnish regular and continuous employment to workers during periods and seasons of slackness in agricultural and industrial pursuits during temporary unemployment, and especially for the purpose of anticipating and so far as possible preventing any condition of extraordinary unemployment.

### AID IN SECURING EMPLOYMENT

The commission submits and recommends the enactment of a bill amending the act of May 17, 1915, establishing free employment bureaus to extend further aid to those seeking employment.

We have a very excellent provision in law for free employment bureaus. They have accomplished an immense good, both to those

seeking work and those having work to offer. Located in the centers of population or in the midst of industrial and agricultural activity these bureaus are in position to know the present and anticipate the future labor requirements of the various sections of the state. They could do more effective work if they had the means for bringing the manless job and the jobless man together. We recommend that the Department of Industrial Relations, Division of Employment Bureaus, be empowered to make loans or advances for, and arrange for or to furnish transportation, tools, meals, board, lodgings and any other assistance necessary and proper for carrying out the object, spirit and purposes of the free employment bureau act, namely: to furnish employees to employers seeking help, and to assist persons desiring work to secure and continue in employment.

## PROBATION

The commission submits and recommends the enactment of a bill amending section 1203 of the Penal Code relating to probation. It makes it the duty of the judge to refer to the probation officer all cases in which he desires to consider probation. The probation officer must make an investigation and file a written report as a record in the case. The judge must consider the report. If probation is denied a copy of the report shall be sent to the Board of Prison Directors.

One of the newer developments in the administration of criminal justice is the granting of probation by the trial judge in criminal cases. A similar procedure, particularly in the case of minor offenses, is known as "suspended sentence." In either event the procedure consists in suspending the sentence of a person convicted of crime and of releasing him upon certain terms and conditions, the violation of which may result in his being returned into court for sentencing in terms of fine or imprisonment. As is frequently the case, in the developing of new procedures, there have been many variations in the methods of various judges and other officers concerned in the probation process. There has also been widespread public criticism of the use or, as some people seem to think, abuse of probation and much bitterness of feeling has been engendered in the minds of police officials by reason of the methods in vogue in particular courts. The following may be listed as some of the objections to the present methods:

(1) Insufficient information upon the part of the judge as to the history, reputation and character of the convicted person. This results from lack of time or unwillingness to hear reports of arresting officers and to read and consider reports of probation officers. It involves also the lack of sufficient probation officers properly trained to make adequate reports for such purposes.

(2) Lack of uniformity of method of granting probation. This results from lack of similar training on the part of judges, tenderheartedness and sympathy for appeals made by effective pleaders as well as lack of understanding of the facts set out in (1) above. It is believed that an investigation will show that particular judges are much more lenient in granting probation than are other judges, and that attorneys engaged in the practice of criminal law are familiar

with this fact and try to have their applications for probation heard by judges who are known as more lenient than others.

(3) Influence alleged to be used upon judges, probation officers and others, to secure probation and to secure lack of supervision following the granting of probation.

(4) Improper facilities for care and supervision of persons on probation with the result that such persons are rarely brought back into court again unless and until they have committed other crimes.

(5) Confusion which has resulted from the new law permitting judges to sentence men convicted of felony to terms in the county jail as one of the terms of probation. The result is to further eliminate the difference between felonies and misdemeanors already practically impossible to distinguish; to complicate problems of administration in the county jails; and to change the theory upon which probation is granted, from one of leniency granted under conditions designed to rehabilitate the offender to one of reducing penalties of convicted felons and of avoiding the operation of the indeterminate sentence law and the power of parole exercised by the state board of prison directors.

The Crime Commission proposes legislation designed to change methods of procedure now in use in connection with the granting of probation so that in each case a report must be made by a probation officer following a careful investigation; consideration must be given to such report by the judge and the recommendations of the probation officer. Such a record will make possible a scientific study of the use of probation in felony cases and will provide a scientific basis upon which further legislation may be passed if it be needed to further remedy the existing situation.

## AFFECTING PAROLE

*Adopted ch 872*

The commission will recommend the enactment of a measure which will combine the Parole Act with the Indeterminate Sentence Law (1168 Penal Code), thus harmonizing certain seemingly inconsistent provisions of law and making other changes in existing sections of the Penal Code having to do with minimum terms of imprisonment and extending the powers of the State Board of Prison Directors with respect to parole.

## REFORMATORY OR INTERMEDIATE PRISON FOR SEGREGATION OF YOUNG FIRST OFFENDERS

*Adopted ch 624*

The commission submits and recommends the enactment of a bill providing for the construction of an intermediate prison for first offenders between the ages of eighteen and twenty-four years.

The question of the establishment of a penal institution for first offenders is not a new one in the State of California. Some twenty years ago Governor Young sponsored such a bill, and, in fact, land was provided for the purpose of carrying into effect the provisions of the law. Certain conditions obtained which made it necessary to change the plans provided for the establishment of such an institution, and since that time nothing more has been done looking toward the establishment of such a prison. Of late there has been much agitation for the establishment of a penal institution midway between the

reform school and the state prison to which might be committed persons who, on account of their age or the nature of the act itself, might not be fit inmates for a reform school, yet not sufficiently hardened to be incarcerated in a state prison.

The commission has given the establishment of such an institution much consideration. Scores of letters were sent to lawyers, penologists, editors, publicists, social workers, officials, and others relative to the establishment of such an institution, and there has been an almost universal response that the demand for such an institution is now most apparent.

At the present time the reform schools and state prisons are crowded to overflowing. There is much agitation for the establishment of another state prison. There is abundant record to show that many criminals of the present fall in the years from 18 to 24. Many of these persons have committed more than one serious offense, and the question of dealing with them has become acute and at the same time perplexing.

The nature of the institution itself is one which has given rise to much discussion. In our opinion persons should be committed to this institution who are not over 24 years of age. Persons over this age have certainly secured to themselves that degree of discretion which should impose upon them the necessity of right living. It also seems that the age limit, so far as a minimum is concerned, should be fixed at 18 years.

The commitment of all first offenders to this institution would not necessarily indicate that they should be kept there indefinitely. It is the opinion of your commission that the rules and regulations incident to the government of this institution should be flexible enough to admit of the transfer of persons originally committed to this institution to one of the state's prisons whenever in the opinion of the governing board of the institution the person in question becomes incorrigible, or otherwise not amenable to discipline, and when the best interests of the institution and the inmates generally might make such transfer imperative.

It is also the opinion of this commission that the court should be vested with authority to commit to a state prison any individual convicted of an offense coming within the age limits of 18 to 24, even though a first offender, when in the opinion of the court the person in question is so hardened and abandoned as not to be fit for incarceration in this institution. We feel in this way that the institution would be kept as an institution for first offenders, or for those who seem susceptible of reformation.

The government of such an institution, as heretofore indicated, should be in the control of the State Board of Prison Directors.

It is imperative that every opportunity should be provided within the institution for vocational and industrial training for each person incarcerated therein, and each inmate should be required to perform a certain task, and in addition undertake to learn some trade or vocation which would provide him with the means of earning a livelihood when released. The merit system should also be instituted, and credit should be given in accordance with the schedule now in effect in our state prisons. The salutary provisions of the parole system

should also be provided for this institution. When the inmates are released upon parole they should be subject to the same strict conditions which obtain with respect to prisoners who are released from San Quentin and Folsom. We feel that this work could be adequately assumed by the parole officer, although it is necessary that additional help be afforded him for the duties which would attend the supervision of the persons released from this institution.

In our opinion the following benefits would accrue from such an institution:

1. Young and impressionable first offenders would be segregated from older offenders many of them repeaters.

2. Persons would be punished who might otherwise be released on probation, rather than sent to state prison, as so often obtains at the present time.

3. The inmates of this institution, including persons coming within a certain designated class, of like age, would be more amenable to discipline, and would have impressed upon themselves an object lesson the salutary effect of which can not be denied.

4. By reason of the fact that the inmates of such an institution would include a selected group of individuals, so to speak, not hardened in crime, opportunity to provide them with vocational and industrial training would be practicable.

5. This institution would play an important part in the elimination of the recidivist by reason of the selective methods employed, the segregation practiced, and the opportunity afforded to learn some honorable and useful vocation or trade to be practiced by the inmate upon his discharge.

Inasmuch as more facilities must be provided, we feel that the additional institution here recommended would be best adapted to relieve present overcrowded conditions at San Quentin. By instituting the reformatory plan, there is offered the hope of weaning young first offenders away from lives of crime.

## PROVISION FOR PRODUCTIVE PRISON LABOR

The commission submits and recommends the enactment of a bill providing for productive activities of prisoners at state prisons and reformatories, providing for payments and credits for such work, defining the powers and duties of the state board of prison directors in respect thereto and prescribing certain penalties and forfeitures.

This bill is designed to expand the industrial activities of the state prisons, to require prisoners to earn their support while in prison, and to give them opportunity to share in the proceeds of their productive labor above the cost of their support, under rules and regulations to be established by the prison directors.

It is the intention of this measure to provide labor and to require and compel able-bodied prisoners to work for their support and to afford them opportunity to earn by diligent labor while in prison so that if a prisoner is capable and works hard he may have the means to support himself, when he is discharged from prison, until he can obtain employment.

It also provides that a prisoner capable of earning by his labor while in prison may pay a percentage of what he earns to his dependents so that those dependent upon any prisoner shall not be left in want by reason of his commitment for crime.

At the present time convicts leaving the prison are supplied with clothing, the amount of money necessary to pay transportation to the place from which sentenced, and five dollars additional. The purpose of the law now proposed and here referred to is to provide incentive to the prisoners to do more and better work and develop in themselves habits of industry and skill as well as disposition and determination to earn their living, and as such habits are inculcated in prisoners they may be weaned away from criminal tendencies.

It is not expected that prisoners would be able to earn very much under this plan, at any rate not in the beginning, for necessarily the Prison Directors would start slowly and develop the plan gradually. But it provides a sensible, practical plan for prisoners to show whether or not they are capable of supporting themselves when the opportunity to earn is offered.

## STATE BUREAU OF CRIMINAL IDENTIFICATION AND INVESTIGATION

The commission submits and recommends the enactment of a bill amending the act creating the State Bureau of Criminal Identification and Investigation. The bill provides for the appointment by the board of managers of special investigators to assist peace officers throughout the state in detecting and apprehending criminals. It also requires the bureau to compile, and certain state officers to furnish, statistics on crime. It is made the duty of the Bureau to arrange for police schools.

The California State Bureau of Criminal Identification and Investigation was reorganized by legislative act in 1917. It has continued ever since without material change in the character of its work or the number of its personnel. In view of the relatively small budget under which the bureau has been operating the result of its efforts is highly creditable.

The time is ripe for the further expansion and usefulness of this bureau. There are several functions which it could perform with great advantage to the state. The Commission recommends three additional functions to be performed by this bureau, which are as follows:

1. Attaching several specialists in crime detection to the bureau and making them available, upon request, to peace officers throughout the state to assist in the apprehension of criminals.

2. Arranging for police schools.

3. Requiring the appointment of a competent statistician whose duty it will be to gather and compile information and statistics of crime and making it the duty of certain officers to furnish information and statistics on standard forms.

**Special Investigators.** The commission has inquired of many peace officers in California as to the usefulness of special investigators or detectives who might be available to them or to other peace officers throughout the state upon request made to the Bureau of Criminal

erty stolen and recovered. Much valuable information can be obtained from the reports published by these governmental departments.

Many reports are published by police departments in this state. To a large extent they are filled with lists of police personnel, data regarding traffic violations, history of the department, names of retired officers, pension lists, relief associations, departmental budgets and matters of purely local concern. Very little space is devoted to the classification and number of crimes committed, arrests made, number of convictions, offenders held to answer, disposition of cases, causes and extent of crime, methods of prevention, police schools, or such kindred subjects as would be valuable for the study of crime conditions. Such reports as are published are compiled according to the idea of the commanding officer of the various police departments. Each differs from the other. They are valueless as a basis for the study of crime in a state-wide sense. The same holds true of reports compiled by probation officers, sheriffs and coroners.

The commission is strongly in favor of the establishing of a section within the State Bureau of Criminal Identification and Investigation devoted to the extention of its present work of gathering information which will enable the Governor, his cabinet and the legislature to know something about crime conditions in this state. It is a task which the state should assume.

## CONTROLLING FIREARMS

The commission submits and recommends the enactment of a bill amending the act of 1923, regulating the possession, sale and use of pistols, revolvers and other firearms capable of being concealed upon the person. The bill requires all persons desiring to purchase a firearm capable of concealment to file an application to carry such weapon. Such application shall contain information regarding applicant, including his finger prints. Copies of all applications and dealers registers must be mailed to the State Bureau of Criminal Identification and Investigation to be checked.

In a very large percentage of the serious crimes now being committed, a firearm of some sort is used. Robberies and burglaries are almost invariably committed with the aid of pistols. Guns are frequently used in murders, manslaughters, highjacking and rum-running cases. The pistol came into its own, as an effective weapon of the criminal, when the present day automobile made the fast getaway possible. Automobiles are being used not only as a means of escape but as a place from which shots are fired.

The sale of automobiles can not be regulated to keep them out of the hands of criminals, but the sale of firearms can be regulated and effectively controlled. Pistols are acquired by criminals in two ways; by purchase or by theft. The purchase of firearms by undesirable persons should be prevented as far as is humanly possible. The Baumes Committee of New York in 1926 made the following observations relative to firearms:

"It is unquestionably true that the pistol is one of the greatest, if not the greatest, menaces to the peace of society today, and that its free use in the commission of crimes of violence has caused more unrest among people, and added more to the horror of crimes than any other one thing. It is one reason why crimes of violence are common today and the criminal successful

in such crimes, particularly holdups and robberies. Add to this the use of the automobile for quick getaway and you have a complete picture of the terror which is spread among people and of a situation which puzzles the police to detect or prevent, and the courts to punish.

While New York state was a pioneer in seeking to control the use of pistols, there is still the necessity for some means to be found by which the consequence of the use of pistols by criminals can be made so dreaded that they will be deterred from using them. It is stated by a prominent authority that there are more people shot to death in the United States by pistols than in all the rest of the world.

The government officials charged with the responsibility for the enforcement of criminal laws are of the opinion that the control of the pistol is of fundamental importance. Three international police conventions, representing forty-seven nations of the world have, by formal resolution, expressed this view."

(Report of the Crime Commission of New York state, 1926, pages 14–15.)

In 1927 the Crime Commission of New York state, in its report, said:

"Firearms in private homes cause many tragedies and are of little avail for defense against criminals. The argument that a revolver in a man's pocket is a protection, is a fallacy. He is safer without a gun than with one. The ordinary citizen walking along the street, even though he has a gun in his hip pocket, if suddenly called upon to "stick-em-up" and feels a pistol stuck into his ribs, is likely to comply with such a demand, that is if he is an intelligent person, for the crook can always beat him to it in the use of a gun. Similarly a householder confronting an armed burglar who has invaded his home at night seldom has opportunity to get his gun from where it is kept and defend himself. Here again the crook "beats him to it."

Some persons take the view that there is no use in any of the states enacting pistol laws and that nothing can be done until the federal government controls pistols. It is also held that there is no use in the state of New York enacting an effective pistol law so long as a man can cross into New Jersey and get all the pistols he wants or can go to Connecticut or to some other neighboring state and get them there, or send an order to a mail order house and get a pistol through the mails.

This is a partial and short-sighted view of the situation. In the first place it is probable that the federal government can never control the sale and use of pistols in the various states, for that power has not been delegated to it by the states. Probably all that the federal government can do is to prohibit the transportation of pistols in the mails, the importation of pistols into the country from outside and the transportation of pistols from one state into another state, where that state has laws forbidding or controlling the sale of pistols.

The recent enactment by congress of a law forbidding the transportation of pistols in the mails should go far to stop the mail order business in pistols, but all a person needs to do to get a gun, even with this new enactment, is to have his pistol sent by express; and dealers in pistols who have made large sums of money in this profitable trade are not likely to cense that trade because of this change in the statute. It was entirely proper to have such a law enacted, however, for the government should not even have the semblance of being a participant in crime.

  *       *       *       *       *       *       *.

We have no patience with the parrot-like cry that no law can be enacted which will keep guns out of the hands of crooks. This may be true and may not be true. If such an argument were taken seriously it would apply to all legislation. It would be just as wise to say that there is no use in enacting a law against the sale and use of dangerous narcotic drugs, for it will never be possible to completely keep these out of the hands of persons who wish to peddle them, or to use them, and the analogy might be extended further but a discussion of the subject in that aspect is profitless. There is no doubt that the Sullivan law, inadequate as it is, has proved a most effective weapon in enabling the police to deal with crime and criminals. What is needed now is to strengthen that law to meet modern conditions."

(Report of the Crime Commission of New York state, 1927, pages 16–17.)

Clarence S. Morrill, superintendent of the Bureau of Criminal Identification and Investigation of the State of California, made the following comment to the commission:

> "The report of the sale of firearms by dealers should be sent to the State Bureau of Criminal Identification rather than to the county clerk. It would be a good idea to require the purchaser of a firearm to have a permit before he makes the purchase. It would likewise be helpful to cause the purchaser of a firearm to have his fingers printed."

Court Smith, warden of Folsom Prison, at a meeting of the commission in Sacramento, said:

> "A chief of police in one part of the state should not be permitted to grant a permit to a person residing in another part of the state to carry a firearm. If a person moves to another part of the state after getting a permit, he should be required to get a new permit at the place where he carries the gun. Criminals often get guns from stolen automobiles or they steal them from homes. Many dealers do not report sales of guns. The same situation applies to the Motor Vehicle Act requiring garage owners to report storage of cars. A similar situation prevails oftentimes with respect to pawnshops. They frequently fail to make reports to officials."

T. N. Koening, chief of police of Sacramento, at a meeting in Sacramento, in speaking of the firearms situation, said:

> "Often when applications are made to me for permission to carry a gun I advise the applicants to buy a police whistle; blowing a police whistle is more protection to the citizen than a gun. The twenty-four-hour notice by the dealer to the police is too short to permit the police to make a proper check of the applicant. The time should be lengthened to forty-eight hours. Finger printing of applicants would assist the police in making a check. I believe the gun law has had the effect of cutting down the sale of firearms. The gun law does not regulate the sale of guns by persons other than the regular dealers."

Chester Rowell of Berkeley has the following to say regarding the use of firearms:

> "Watch the news on this subject, as the writer has done for years, and this is the sort of thing you will always find. In the past thirty years, so far as memory recalls, there have been just two instances in the news in which the weapon kept for protection killed the right person, and in one of these two it was a shotgun. In neither of them was the householder any safer than he would have been if unarmed. But there are literally hundreds of cases in which the weapon, kept supposedly for protection, killed the owner or one of his family. There are dozens in which the burglar was captured and hundreds in which he was frightened away without weapons, and there are not a few in which armed men were shot by burglars or robbers who would not have been hurt if unarmed."

After careful thought the commission will offer to the legislature for consideration a bill, which will amend the present firearms law. The commission recognized that the present gun law of this state is an excellent law and has been of material aid in curbing the unrestrained sale of guns. The amendment to the law is offered solely with the thought of strengthening the statute.

The amendments to the act will make the following changes:

1. Every person who desires the privilege of carrying a pistol (defined in the act as a gun with a barrel less than twelve inches in length) must first apply to the proper peace officer in his community for a permit to carry such weapon. The application shall be in duplicate and shall, in addition to the data now required by the statute, contain the fingerprints of the applicant. A copy of the application shall be mailed to the Bureau of Criminal Identification and Investigation at Sacramento by the peace officer on the day the application is made. It becomes a misdemeanor for any person to give false information in the application.

2. Every person desiring to purchase a pistol or revolver, after procuring a permit to carry such weapon, must present his permit to the merchant, or other person from whom he desires to make the purchase. If the purchase is to be made from a merchant he must sign a register in triplicate. The register, in addition to the data now required by statute, shall set forth the date of the permit and the name of the officer who issued the permit. On the date of sale a triplicate copy of the register sheet will be mailed to the Bureau of Criminal Identification at Sacramento and another to the officer who issued the permit. No revolver shall be delivered to the purchaser until seventy-two hours after the copies of the register are mailed.

3. If the superintendent of the Bureau of Criminal Identification finds that the record of a person making application for a permit to carry a concealed weapon is such that the permit should be refused, he shall so advise the officer to whom the application is made. Upon receipt of such notice from the bureau, it shall be the duty of the officer to deny the application. The Bureau of Criminal Identification is also given the power to prevent the delivery of a pistol to the purchaser if the record of the said person is such that it seems advisable to refuse such purchase.

## RECEIVERS OF STOLEN PROPERTY

The commission submits and recommends the enactment of a bill adding a new section to the Penal Code to be numbered 496c providing that any person receiving stolen property without making diligent inquiry to ascertain that the person selling the property has a legal right to do so, is guilty of a felony. The burden is placed on the defendant to prove that he made such diligent inquiry.

The receiver of stolen property, commonly called "the fence," is frequently a professional criminal. He encourages others to rob, steal and burglarize. He thrives on the crimes of others. Often his outward appearance is that of a good citizen conducting a legitimate business. Under this guise he carries on his nefarious trade.

It has been reliably estimated that ninety per cent of stolen property is not recovered. What becomes of this ninety per cent? The thief who steals it has no use for it unless he can convert it into cash. In order to get cash he must sell it to someone with whom he is in league. One fence may deal with a dozen thieves and be the inducing cause of hundreds of thefts, burglaries and robberies.

It has frequently been brought to the attention of this commission by judges and law enforcing officers in Los Angeles County that young men come to that county from eastern states without adequate means to sustain themselves. They visit pool halls and other hangouts and are advised that a good way to get money is to steal and sell the loot. They are told where they can sell stolen property. Men engaged in the business of dealing in stolen property buy the goods and provide them with money.