BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 1610
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile:  (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

EUGENE VOLOKH (SBN 194464)
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA  90095
Telephone: (310) 206-3926
Facsimile: (310) 206-7010
eugene.volokh@gmail.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY RIFLE AND PISTOL LLC; MICHAEL BARYLA; TEN PERCENT FIREARMS; WESLEY MORRIS; SACRAMENTO BLACK RIFLE, INC.; ROBERT ADAMS; PRK ARMS, INC.; JEFFREY MULLEN; IMBERT & SMITHERS, INC.; and ALEX ROLSKY, <br><br>  Plaintiffs, <br><br> v. <br><br> KAMALA D. HARRIS, in her official capacity as Attorney General of California; and STEPHEN J. LINDLEY, in his official capacity as Chief of the California Department of Justice Bureau of Firearms, <br><br>  Defendants. | Case No.:  2:14-cv-02626-TLN-DB <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date: Feb. 23, 2017 <br> Time: 2:00 p.m. <br> Courtroom: 2 <br> Judge: Troy L. Nunley <br><br> Action filed Nov. 10, 2014 |

## Table of Contents

I.    Introduction ...........................................................................................................1

II.   The Sign Ban Still Fails The *Central Hudson* Test ...........................................2

      A.   The State Cannot Satisfy Central Hudson's Third Prong Because Section
           26820 Impermissibly Relies On "The 'Fear That People Would Make
           Bad Decisions If Given Truthful Information.'" .............................................2

      B.   The Sign Ban Does Not Directly And Materially Advance The State's
           Interest .............................................................................................................5

           1.   The 10-Day Waiting Period And Testing Requirement Already
                Prevent Impulse Purchases........................................................................5

           2.   The Sign Ban Is Fatally Underinclusive .................................................6

           3.   The State Cannot Meet Its Burden Of Proving That The Law Directly
                And Materially Advances The Asserted Interest .....................................7

                a.   Content-Based Commercial Speech Restrictions Require A
                     Showing Greater Than The State Proposes .................................8

                b.   The State's Evidence Is Insufficient In Any Event ...................10

                     i.    Professor Gundlach – Marketing Expert .......................12

                     ii.   Professor Mann – Suicide Expert ..................................14

           4.   The State Has Not Produced Evidence That The Law Directly And
                Materially Advances The Interest In Reducing Crime ..........................17

      C.   The State Has Not Proved (Or Even Argued) That Section 26820 Is Not More
           Extensive Than Necessary ..............................................................................17

III.  Conclusion ..........................................................................................................20

1

Table of Authorities

2

Cases

3

*44 Liquormart, Inc. v Rhode Island,*
   517 U.S. 484 (1996) ...................................................................................................*passim*

4

*Bolger v. Youngs Drug Prods. Corp.,*
   463 U.S. 60 (1983) ...........................................................................................................4

5

6

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
   447 U.S. 557 (1980) ................................................................................................*passim*

7

*City of Los Angeles v. Alameda Books, Inc.,*
   535 U.S. 425 (2002) .........................................................................................................8

8

*City of Renton v. Playtime Theaters, Inc.,*
   475 U.S. 41 (1986) ...........................................................................................................8

9

10

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
   657 F.3d 936 (9th Cir. 2011) .....................................................................................18, 19

11

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ...................................................................................................9, 11

12

13

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
   527 U.S. 173 (1999) ................................................................................................*passim*

14

*Linmark Assocs., Inc. v. Willingboro Twp.,*
   431 U.S. 85 (1977) .........................................................................................................19

15

16

*Lorillard Tobacco Co. v. Reilly,*
   533 U.S. 525 (2001) ................................................................................................*passim*

17

*Metro Lights, L.L.C. v. City of Los Angeles,*
   551 F.3d 898 (9th Cir. 2009) ...........................................................................................6

18

19

*Nixon v. Shrink Missouri Gov't PAC,*
   528 U.S. 377 (2000) .........................................................................................................9

20

*Pitt News v. Pappert ,*
   379 F.3d 96 (3d Cir. 2004) ..............................................................................................7

21

22

*Posadas de P.R. Assocs v. Tourism Co. of P.R.,*
   478 U.S. 328 (1988) .........................................................................................................4

23

*Project 80's, Inc. v. City of Pocatello,*
   942 F.2d 635 (9th Cir. 1991) .........................................................................................18

24

25

*Reno v. ACLU,*
   521 U.S. 844 (1997) .........................................................................................................4

26

*Rubin v. Coors Brewing Co.,*
   514 U.S. 476 (1995) .............................................................................................5, 10, 18

27

28

*Silvester v. Harris,*
   843 F.3d 816 (9th Cir. 2016) ..................................................................................6

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) .....................................................................................*passim*

*Thompson v. W. States Med. Ctr.,*
   535 U.S. 357 (2002) .....................................................................................*passim*

*Turner Broad. Sys., Inc. v. FCC,*
   520 U.S. 180 (1997) ..................................................................................................8

*Valle Del Sol Inc. v. Whiting,*
   709 F.3d 808 (9th Cir. 2013) ........................................................................*passim*

*W. States Med. Ctr. v. Shalala,*
   238 F.3d 1090 (9th Cir. 2001) ..................................................................... *passim*

Statutes

11 C.C.R. § 4250 .........................................................................................................6

Cal. Gov't Code § 26820 ...................................................................................*passim*

Cal. Penal Code § 26865 .............................................................................................19

Cal. Penal Code § 27540(a) ..........................................................................................6

Cal. Penal Code § 26815(a) ..........................................................................................6

Cal. Penal Code § 28220 .............................................................................................19

Cal. Penal Code § 31610-31670 ...................................................................................6

Other Authorities

Clinton Amos, et al., *A Meta-Analysis of Consumer Impulse Buying*, 31 J. Retailing & Consumer
   Servs. 86 (2014) ......................................................................................................13

Antonio Rodriguez Andres & Katherine Hempstead, *Gun control and suicide: The impact of state
   firearm regulations in the United States, 1995–2004*, 101 Health Pol'y 95 (2011) ..................13

Utpal M. Dholakia, *Temptation and Reistance: An Integrated Model of Compsumption Impulse
   Formation and Enactment*, 17 J. Psychology & Marketing 955 (2000) ......................................14

Charles R. Taylor, et al., *Understanding the Value of On-Premise Signs as Marketing Devices for
   Legal and Public Policy Purposes*, 31 J. Pub. Pol'y & Marketing 185 (2012) ..........................13

1

# I. INTRODUCTION

2          California Government Code section 26820 restricts truthful onsite advertising at firearms

3    stores (the "Sign Ban").  The United States Supreme Court has dealt extensively with commercial

4    speech issues in the past 20 years, yet the State continues to ignore the series of Supreme Court

5    opinions that control this case: *44 Liquormart, Inc. v Rhode Island*, 517 U.S. 484 (1996) (striking

6    down ban on advertising alcohol retail prices); *Greater New Orleans Broad. Ass'n, Inc. v. United*

7    *States*, 527 U.S. 173 (1999) (striking down restriction on broadcast advertisement of gambling by

8    stations in Louisiana, where such gambling was legal); *Lorillard Tobacco Co. v. Reilly*, 533 U.S.

9    525 (2001) (striking down restriction on store-front, outdoor, and point-of-sale tobacco

10   advertising); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) (striking down ban on

11   advertising certain pharmaceuticals); and *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011)

12   (concluding that the government may not restrict commercial speech for "fear that people would

13   make bad decisions if given truthful information").  This Court considered all of these cases in the

14   preliminary injunction motion and ruled that the State failed to meet its burden of showing "that

15   section 26820, by limiting impulse buys, will in fact alleviate handgun crime and violence to a

16   material degree."  ECF 32, 11:12–14.

17          Faced with this ruling, the State has changed course.  First, it has narrowed the purported

18   justification for the law by arguing only that the law serves the interest of decreasing handgun-

19   related suicide and essentially abandoning any argument that the law serves the interest of

20   decreasing handgun-related crime and violence generally.  Second, the State has changed its

21   argument as to how the law supposedly "directly advances" that interest: by reducing handgun

22   purchases by an unidentifiable subset of the public with "impulsive personality traits," rather than,

23   as claimed before, by reducing "emotion-driven impulse purchases."  Finally, the State makes a

24   new (and incorrect) argument in favor of a relaxed evidentiary burden.

25          But the Sign Ban is still unconstitutional for (at least) four reasons.

26          1.       As Plaintiffs' moving papers argue, the Court's analysis in *Sorrell* shows that

27   *Central Hudson* is no longer the controlling test for commercial speech restrictions.  *See* Pls.'

28   ///

1    MSJ at 7:22–8:4.  Because the State focuses on *Central Hudson*, we set that point aside in this

2    response.

3            2.      The ban fails *Central Hudson* because the ban aims to restrict speech for "fear that

4    people would make bad decisions if given truthful information," *Sorrell*, 564 U.S. at 577,

5    something that is impermissible even for commercial speech restrictions.  *Id.*; *Thompson*, 535 U.S.

6    at 374.

7            3.      The State cannot satisfy *Central Hudson*'s requirement that the speech restriction

8    "directly and materially advances the state interest involved," because (a) the existing regulatory

9    framework, including the 10-day waiting period, already minimizes or eliminates the opportunity

10   for "impulse" purchases; (b) the law is fatally underinclusive; and (c) the State makes no effort to

11   establish materiality and it continues to be based on impermissible speculation coupled with the

12   general claim, already held to be inadequate by the Court, that fewer guns means fewer suicides.

13           4.      The State cannot satisfy *Central Hudson*'s requirement that the Sign Ban be no

14   "more extensive than is necessary to serve" the State's interest.

15              **II.  THE SIGN BAN STILL FAILS THE *CENTRAL HUDSON* TEST**

16           Both parties agree that the State bears the burden of proving the Sign Ban satisfies the test

17   in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

18   The two most relevant prongs of that test here are that, to be constitutional, a commercial speech

19   restriction must "directly advance the state interest involved," and must be not "more extensive

20   than is necessary to serve that interest."  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 820–21 (9th

21   Cir. 2013) (citations omitted).  Indeed, the restriction must "directly *and materially* advance the

22   asserted governmental interest."  *Lorillard Tobacco*, 533 U.S. at 555 (emphasis added).  Yet

23   Section 26820 does not do so.

24   **A.      The State Cannot Satisfy *Central Hudson*'s Third Prong Because Section 26820
            Impermissibly Relies On "The 'Fear That People Would Make Bad Decisions If
25          Given Truthful Information.'"**

26           Laws that try to restrict commercial speech for fear that listeners will do dangerous things

27   if persuaded by the speech fail the "direct advancement" prong of *Central Hudson*, because they

28   "do[] not advance [the government's goal] in a permissible way."  *Sorrell*, 564 U.S. at 577.  The

public has a constitutionally protected interest in receiving commercial information concerning products they can lawfully purchase.  Advancing state interests based on the "fear that people would make bad decisions if given truthful information" "cannot be said to be direct" advancement of the interest.  *Id.* (internal quotation marks and citation omitted).

The government may not "seek[] to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers—that is, by diminishing [speakers'] ability to influence [listeners'] decisions."  *Id.*  The Supreme Court has "rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information."  *Thompson*, 535 U.S. at 374.  "[A] State's paternalistic assumption that the public will use truthful, nonmisleading commercial information unwisely cannot justify a decision to suppress it."  *44 Liquormart*, 517 U.S. at 497 (plurality op.).  The government may not restrict even commercial speech "to keep people in the dark for what the government perceives to be their own good."  *Id.* at 503.  "[C]ommercial speech may [not] be suppressed in order to further the State's interest in discouraging purchases of the underlying product that is advertised."  *W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1095–96 (9th Cir. 2001) (citation omitted), *aff'd sub nom. Thompson*, 535 U.S. 357.  "[F]ind[ing] expression too persuasive does not permit [the government] to quiet the speech or to burden its messengers."  *Thompson*, 535 U.S. at 578.

The premise of the Supreme Court's commercial speech doctrine is that the First Amendment requires that the public be treated as rational consumers.  Of course, the Justices were not naive—they doubtless realized that some people are foolish, impulsive, or even addicted, and they therefore make choices that cause themselves harm.  *Cf. Lorillard Tobacco*, 533 U.S. at 587–90 (Thomas, J., concurring) (identifying top three causes of "preventable death"—tobacco, obesity, and alcohol—and noting the Court's refusal to establish a "'vice' exception to the First Amendment").  After all, *44 Liquormart* was a decision that involved advertising for alcohol, and a significant segment of alcohol consumers are notoriously irrational when it comes to alcohol.[1]  *44*

---

[1]  Much more so than for guns, given that only a tiny fraction of gun consumers misuse their guns. There are about 55 million gun owners in the United States, Time Magazine, *Half the Guns in the U.S. Are Owned by Just 3% of the Population, Report Says*, Sept. 19, 2016, http://ti.me/2jZY4GB,

1   *Liquormart*, 517 U.S. at 503 (plurality op.) ("because bans against truthful, nonmisleading

2   commercial speech rarely seek to protect consumers from either deception or overreaching, they

3   usually rest solely on the offensive assumption that the public will respond 'irrationally' to the

4   truth").  But the Justices have concluded that the First Amendment does not allow the government

5   to use the irrationality of a few in order to interfere with speech by and to the many.  "The choice

6   'between the dangers of suppressing information, and the dangers of its misuse if it is freely

7   available' is one that 'the First Amendment makes for us.'"  *Sorrell*, 564 U.S. at 578 (citation

8   omitted).

9        Indeed, the State's theory could be used to restrict advertising for virtually every sort of

10  legal behavior that the State disapproves of.  After all, impulsive people may impulsively harm

11  themselves and others using many products, such as alcohol, motorcycles, fast food, and more.

12  Yet we know that the government cannot ban price advertising of alcohol even as an attempt to

13  restrain alcohol abuse, *see 44 Liquormart*, or ban tobacco advertising even as an attempt to shield

14  children.  "[T]he governmental interest in protecting children from harmful materials . . . does not

15  justify an unnecessarily broad suppression of speech addressed to adults."  *Lorillard Tobacco*, 533

16  U.S. at 564 (striking down tobacco advertising ban) (quoting *Reno v. ACLU*, 521 U.S. 844, 875

17  (1997)); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 74 (1983) ("The level of

18  discourse reaching a mailbox simply cannot be limited to that which would be suitable for a

19  sandbox").  Likewise, though the Supreme Court once did accept the theory that gambling

20  advertisements can be banned because they could "induce [viewers] . . . to engage in . . .

21  potentially harmful conduct," *Posadas de P.R. Assocs v. Tourism Co. of P.R.*, 478 U.S. 328, 344

22  (1988), the Court overruled *Posadas* on this score in *44 Liquormart*, 517 U.S. 508–14 (plurality

---

24  and less than 500,000 gun crimes, suicides, or noncriminal injuries per year; and many of the
    crimes are doubtless committed by the same criminals.  *See* Nat'l Inst. of Justice, *Gun Violence*,
25  https://www.nij.gov/topics/crime/gun-violence/pages/welcome.aspx (2011 data) (414,562 nonfatal
    gun incidents); Centers for Disease Control, *WISQARS / Fatal Injury Reports, National and*
    *Regional, 1999–2015*, https://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (search for year
26  2011, cause of death Firearm, Intent Homicide and Suicide and Accident) (11,522 firearms
    homicides, 19,990 suicides, 591 fatal accidents); Centers for Disease Control, *WISQARS / Nonfatal*
27  *Injury Reports, 2001–2014*, https://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html (search for
    year 2011, cause Firearm, intent Self-Harm and Unintentional) (3,224 attempted suicide injuries
28  and 14,675 nonfatal accidental injuries).

op.); *id.* at 531 (O'Connor, J., concurring in the judgment) (noting that the Court's commercial speech jurisprudence no longer follows the path charted in *Posadas*).

**B.      The Sign Ban Does Not Directly And Materially Advance The State's Interest.**

The State has shifted its core argument about what state interest Section 26820 serves.  At first, the State argued that the Sign Ban serves the interests of reducing handgun-related crime and handgun-related violence, including suicide.  ECF No. 18 (Opp. to Mot. for Prelim. Inj.) at 7. Now, it is focusing almost entirely on the interest in reducing suicide.  *See* State MSJ at 11:7–17.

And the State has also shifted its core argument about how the law serves the state interest. At first, the State argued that the law was aimed at banning "emotion-driven impulse purchases," ECF 32 at 7:3, in which a person—presumably driven by rage or despair—buys a handgun on impulse and then misuses it.  But this Court rejected that theory, because the "ten day waiting period between the purchase and the transfer of the firearm calls into question what an 'impulse buy' would mean." *Id.* at 10:26–27.  Now, the state argues that the law is actually aimed at "inhibiting purchases by people with impulsive personality traits, who are at greater risk of committing suicide."  State MSJ at 8:19–20.  The state's theory is that the person will see a handgun ad, impulsively buy the gun (not because of "emotion" but perhaps because of whim or acquisitiveness), and then, at some unspecified future time, the person's impulsive temperament will lead him to impulsively misuse the gun that he bought in response to seeing the sign.

We will therefore focus our discussion on the state's revised approach, rather than the one it initially advanced.  And this approach is no more valid than the one the State tried first.

**1.      The 10-Day Waiting Period And Testing Requirement Already Prevent Impulse Purchases.**

First, the analysis under *Central Hudson*'s third prong must consider what regulations are already in place to address the asserted harms.  *E.g.*, *W. States Med. Ctr.*, 238 F.3d at 1095; *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488-91 (1995) (striking down restriction on displaying alcohol content on beer labels partly based on available alternatives "which could advance the Government's asserted interest in a manner less intrusive to respondent's First Amendment rights," because those alternatives "indicate[] that [the law] is more extensive than necessary").

California law already largely prevents impulse purchases, whether they are driven by rage or whim.  Once the background check is completed, eliminating impulse purchases is the entire point of the waiting period for those who do not already own a gun.  "The waiting period provides time not only for a background check, but also for a cooling-off period to deter violence resulting from impulsive purchases of firearms."  *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016).  Flighty people who want something on impulse are unlikely to go through with the process if they know that it involves waiting 10 days and taking a multiple-choice test on state law and safe gun handling.  Cal. Penal Code §§ 26815(a), 27540(a), 31610-31670; 11 C.C.R. § 4250 *et seq*.

### 2.    The Sign Ban Is Fatally Underinclusive.

Second, the Sign Ban is so underinclusive that it diminishes the credibility of the government's argument.  The Ninth Circuit has recently stressed that underinclusivity is a "consideration in the direct advancement inquiry."  *Valle Del Sol v. Whiting*, 709 F.3d 808, 824 (9th Cir. 2013):

> "*Central Hudson* requires a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application."  We term a law that distinguishes among types of commercial speech without such a logical connection "underinclusive."  As we discuss here, underinclusivity is relevant to *Central Hudson*'s direct advancement prong because it "may diminish the credibility of the government's rationale for restricting speech in the first place."

*Id.* at 824 (quoting *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009)).

The State and its marketing expert cannot explain why a person would respond irrationally to the phrase "Handguns for Sale," but would not be similarly affected by "Guns for Sale," or a large neon "GUNS GUNS GUNS" sign, or a fifteen-foot-high depiction of a modern sporting rifle, all of which are legal.  The State has offered no evidence—expert or otherwise—to support its theory that on-site handgun advertisements are somehow special in promoting impulse purchases, in a way that other advertisements are not.  And of course the hypothetical impulsive purchaser who is lured into a gun store by a sign promoting rifles or shotguns (or guns generally) could then impulsively buy a handgun instead.  The law thus "distinguishes among the indistinct, permitting a variety of speech that poses the same risks the Government purports to fear."  *Greater New Orleans*, 527 U.S. at 195 (striking down a commercial speech restriction partly on these grounds).

1   Moreover, the law also underinclusively targets only on-site advertising.  Any buyers,

2   "impulsive" or not, must be willing to accept a 10-day waiting period.  If their impulsiveness is not

3   counteracted by that wait, they are unlikely to be deterred by the short trip to the store after they

4   see a (perfectly legal) billboard with directions to the store (which might be mere blocks away), a

5   print advertisement with a map to the store, or radio jingle that makes it easy to find the store.  And

6   because the State's marketing expert offered no opinion on how much the Sign Ban supposedly

7   decreases impulse purchases of handguns, there is no evidence before the Court to show

8   "materiality"—we have no idea how many sales occur in response to particular types of

9   advertising stimuli, or what proportion of sales are stimulated by advertisement at all.

10   The Third Circuit, in an opinion by then-Judge Alito, reached a similar conclusion in *Pitt*

11   *News v. Pappert*, which struck down a law restricting alcohol advertising in publications directly

12   targeted to college students.  379 F.3d 96, 107–09 (3d Cir. 2004).  The court reasoned that

13   Pennsylvania's law "applie[d] only to advertising in a very narrow sector of the media," and the

14   state failed to show that "eliminating ads in [a] narrow sector [of the media] will do any good"

15   because students "will still be exposed to a torrent of beer ads on television and the radio, and they

16   will still see alcoholic beverage ads in other publications" including other publications displayed

17   on campus.  *Id.* at 107.  The same is true of Section 26820.

18   **3.      The State Cannot Meet Its Burden Of Proving That The Law Directly and**
19   **Materially Advances The Asserted Interest.**

20   As this Court stressed at the preliminary injunction stage, the State must produce evidence

21   that Section 26820 "will in fact alleviate handgun crime and violence to a material degree."  ECF

22   No. 32 at 11:13–14.

23   **a.      Content-Based Commercial Speech Restrictions Require A Showing**
     **Greater Than The State Proposes.**

24   The State tries to lighten its evidentiary burden by urging the Court to "give 'substantial

25   deference to the predictive judgments of [the legislature].'"  State's MSJ at 9:14–10:25, 15:1–16:21

26   (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (involving challenge to cable

27   television "must carry" rule under intermediate scrutiny standard applicable to content-neutral

28   restrictions).  The State likewise urges reliance on *City of Renton v. Playtime Theaters, Inc.*, 475

1  U.S. 41, 52 (1986), and its statement that legislatures "must be allowed a reasonable opportunity to

2  experiment" in a case involving a zoning challenge to adult theaters as a restriction that impacts

3  speech.

4        But the permissive standards of *Turner* and *City of Renton* do not apply here.  Not all

5  "intermediate scrutiny" tests are the same; the government's evidentiary burden varies based on

6  the type of restriction at issue(Indeed, the tests are substantively not the same, either; the "directly

7  and materially advances" prong of the *Central Hudson* test does not appear in the test for content-

8  neutral restrictions.[2])  The Supreme Court has shown time and again that it will almost always

9  strike down restrictions on non-misleading commercial speech; but in other situations (such as the

10 regulation of adult business as in *City of Renton* or when evaluating content-neutral speech

11 restrictions as in *Turner*), the Court has much more often upheld the restrictions, often because it

12 required less detailed evidence.

13        Thus, neither *Turner* nor *City of Renton* even cited, let alone applied, *Central Hudson*,

14 because neither involved a content-based commercial speech restriction.  As the Court explained in

15 *City of Los Angeles v. Alameda Books, Inc.*, "*Renton* requires that municipal ordinances receive

16 only intermediate scrutiny if they are content neutral.  There is less reason to be concerned that

17 municipalities will use these ordinances to discriminate against unpopular speech." 535 U.S. 425,

18 440 (2002).  And *Sorrell* leaves no doubt that *Renton*'s deferential approach is not suited to

19 content-based commercial speech restrictions.  564 U.S. at 566 (explaining that "The First

20 Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech

21 because of disagreement with the message it conveys,'" and distinguishing *Renton* as a case

22 involving content-neutral restrictions).[3]  *See also 44 Liquormart*, 517 U.S. at 508–11 (plurality op.)

23 ──────────────

24 [2]  "A content-neutral regulation will be sustained under the First Amendment if it advances
    important governmental interests unrelated to the suppression of free speech and does not burden
    substantially more speech than necessary to further those interests." *Turner*, 520 U.S. at 189

25 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  Likewise, the "appropriate inquiry"
    for evaluating the zoning restriction in *City of Renton* was "whether the Renton ordinance is

26 designed to serve a substantial governmental interest and allows for reasonable alternative avenues
    of communication." 475 U.S. at 50.

27 [3]  For the same reasons, the State cannot rely on various Second Amendment cases applying
    intermediate scrutiny tests, e.g., *Heller v. District of Columbia*, 801 F.3d 264, 272–73 (D.C. Cir.

28 2015) (applying *Turner*'s "substantial evidence" formula).  And the State's citation to an out-of-

1  (rejecting state argument that courts should defer to "'legislative judgment' in determining that a

2  price advertising ban would best promote temperance").

3       The heightened scrutiny standard that applies in *Central Hudson* challenges to direct,

4  content-based restrictions on commercial speech imposes a more demanding evidentiary burden on

5  the State.  "A regulation cannot be sustained if it 'provides only ineffective or remote support for

6  the government's purpose,' or if there is 'little chance' that the restriction will advance the State's

7  goal."  *Lorillard Tobacco*, 533 U.S. at 566 (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993),

8  and *Greater New Orleans*, 527 U.S. at 193).  Of particular importance here, where the Court has

9  already expressed doubt that evidence could ever establish the State's unusual theory, "[t]he

10  quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative

11  judgments will vary up or down with the novelty and plausibility of the justification raised."  *Nixon*

12  *v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000).

13       The State again ignores controlling Supreme Court case law that makes clear the burden

14  the government faces when it takes aim at protected speech.  In *Edenfield v. Fane*, the Court

15  stressed the heavy burden facing government entities hoping to justify censorship under *Central*

16  *Hudson*'s third prong:

17       It is well established that "[t]he party seeking to uphold a restriction on commercial
18       speech carries the burden of justifying it."  This burden is not satisfied by mere
         speculation or conjecture; rather, a governmental body seeking to sustain a
         restriction on commercial speech must demonstrate that the harms it recites are real
19       and *that its restriction will in fact alleviate them to a material degree*.

20  507 U.S. at 770 (emphasis added).  The Ninth Circuit likewise emphasized in *W. States Med. Ctr.*

21  that this burden must be satisfied with "evidentiary support" and "not mere speculation."  238 F.3d

22  at 1095 ("government offer[ed] no evidence demonstrating that its restrictions would succeed in

23  striking the balance it claims is a substantial interest, or even would protect the public health"); *id.*

24  (quoting *44 Liquormart* for the proposition that the government's speculation concerning the

25  effectiveness of a regulation "does not suffice when the State takes aim at accurate commercial

26  _____

27  context evidentiary observation in *Drake v. Filko*, 724 F.3d 426, 439 (3d Cir. 2013), fares no
    better; that court's Second Amendment intermediate scrutiny likewise applied the "substantial
    deference" standard from *Turner Broadcasting*, which is not the standard for content-based
28  commercial speech restrictions.

1   information for paternalistic ends.").  "[T]his requirement [is] critical; otherwise, a State could

2   with ease restrict commercial speech in the service of other objectives that could not themselves

3   justify a burden on commercial expression."  *Rubin*, 514 U.S. at 487 (citation and internal

4   quotation marks omitted).  In sum, the State is wrong to argue for borrowing a reduced "substantial

5   evidence" standard into the commercial speech test from other areas of the law.

6               **b.      The State's Evidence Is Insufficient In Any Event.**

7          The State's evidence must thus be closely examined—and, on examination, it proves to be

8   inadequate.  The State first cites a series of studies making the general claim that increased

9   handgun ownership is associated with a higher risk of crime, violence, and suicide.  The

10  government cited exactly these studies at the preliminary injunction stage (compare State's

11  summary judgment exhibits 11–19, with exhibits 11–19 to its preliminary injunction opposition,

12  ECF 19-11 through 19-19).  And the Court rejected this sort of justification for the Sign Ban

13  because it failed to address the specific issue in the case:

14          The Court agrees that it is reasonable to infer that precluding firearms stores from
            advertising handguns in a way that can be seen from outside the store . . . will
15          prevent some purchases that would result from passersby seeing the advertisement
            and entering the store to make a purchase. The aforementioned data cited by the
16          Government also shows a clear connection between the increased circulation of
            handguns and increased handgun-related violence. However, the specific issue is
17          whether the instant ban limits impulse buys and in turn leads to less handgun crime
            and violence, not as a general matter whether less handguns means less crime and
18          violence.

19  ECF No. 32 at 10:11–21.

20         In trying to bridge the obvious gap, the State retained two expert witnesses, Professor

21  Gregory Gundlach (a marketing expert) and Dr. J. John Mann (an expert on suicide).  According to

22  the State, its argument has two steps: Professor Gundlach opines that "the advertisements restricted

23  by section 26820 inhibit purchases by people with impulsive personality traits."  Dr. Mann then

24  opines that "people with impulsive personality traits are at a higher risk for committing suicide."

25  But neither Prof. Gundlach nor Dr. Mann has offered an opinion that encompasses the critical

26  issues—whether Section 26280's "ban limits impulse buys and in turn leads to less handgun crime

27  and violence" that is (1) material and (2) distinct from the general notion that "less handguns

28  means less crime and violence."  ECF No. 32 at 10:16–18; *id.* at 11:13–14.

Again, the State has failed to produce any evidence, expert or otherwise, that Section 26820 "*will in fact* alleviate [the asserted harms] to a *material* degree." *Edenfield*, 507 U.S. at 770 (emphasis added); ECF No. 32 at 11:12–14 (citing *Edenfield*'s materiality requirement). Section 26820 thus "cannot be sustained" because (at best) "it 'provides only ineffective or remote support for the government's purpose.'" *Lorillard Tobacco*, 533 U.S. at 566 (citations omitted).  Even recognizing the difficulty of assigning some sort of numerical figure that establishes a "material" effect on suicide levels, neither expert opined *at all* on the magnitude of the sign ban's supposed effect on decreasing impulse purchases of handguns by people with impulsive personality traits, or on decreasing the number of suicides associated with such purchases.  *See* Section 3(b)(i)-(ii), below.  And *44 Liquormart* concluded that, even when the commercial speech deals with dangerous activity (there, purchase of alcohol, which contributes to many more deaths each year than handguns do[4]), "the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so 'to a material degree.'"  517 U.S. at 505 (plurality op.); *id.* at 518 (Scalia, J., concurring) (agreeing that the restriction on price advertising of alcohol violated *Central Hudson*, despite the argument that such price advertising would decrease alcohol consumption).

Moreover, the State's expert evidence suffers from several other flaws:

### i.      Professor Gundlach – Marketing Expert.

Professor Gundlach opined that Section 26820 "inhibits impulsive handgun purchases by people who tend to be impulsive."  State's MSJ at 5:20–21.  But Professor Gundlach's opinion is carefully circumscribed.  He explicitly declined to offer an opinion on the *magnitude* of Section 26820's effect on decreasing impulse purchases of firearms.  Gundlach Depo. Tr., 12:11–17; 60:15–61:4.  And he likewise explicitly declined to offer an opinion on whether limiting impulse purchases of handguns leads to less handgun crime and violence.  *Id.*, 12:18–23.  Thus, even taking Prof. Gundlach's opinion at face value—that the statute has a "direct" impact in limiting

---

[4]  *See* Centers for Disease Control, *Alcohol and Public Health*, https://www.cdc.gov/alcohol/fact-sheets/alcohol-use.htm ("Excessive alcohol use led to approximately 88,000 deaths . . . each year in the United States from 2006 – 2010"); *supra* note 1 (collecting data that showed about 32,000 total firearms deaths in the United States in 2011, some of which were not from handguns).

impulse purchases of handguns—his opinion falls short of establishing that the statute "materially advance[s]" the government's interest in reducing handgun crime and violence.

Beyond that, the foundation for Professor Gundlach's opinion is insufficient:

- None of the evidence cited in his report pertains specifically to the marketing of handguns.
- Nor does the evidence Professor Gundlach cites connect the "impulsive" purchase of handguns, or any other product, by persons who use the product to harm themselves or to commit criminal acts.
- What little evidence Professor Gundlach relies on to tie "impulse" purchases to the firearms industry—a remark by a firearms manufacturer executive during an earnings call, a passing mention in an industry publication, and two commenters on firearms blogs—is shaky at best.  ECF No. 43-1, Gundlach Report, ¶ 33 & nn.71–76.  Yet this is the entire foundation for his claim that "firearms are known to be purchased on impulse."[5]

Indeed, the evidence that Professor Gundlach cited suggests that firearms—unlike fashion merchandise or supermarket products—fall into a product category least likely to involve impulse purchasing.  *See* Clinton Amos, et al., *A Meta-Analysis of Consumer Impulse Buying*, 31 J. Retailing & Consumer Servs. 86 (2014) (in-press copy at 8) ("An examination of product type did produce substantial differences as impulse buying was greater for fashion merchandise than supermarket purchases and general merchandise").  And Gundlach confirmed that none of the studies he relied on specifically address the impact of advertising on impulse purchases of handguns in general, or focus on California in particular.[6]  Gundlach Tr. 27:9–29:13.

---

[5]  *Florida Bar v. Went for It, Inc.*, 515 U.S. 618 (1995), cited by the government (State's MSJ at 15:21–28), which upheld a restriction on speech that intruded into the privacy of potentially unwilling listeners' homes, is far removed from this case.  Cases such as *44 Liquormart*, on the other hand, are quite similar to our case, which involves restrictions aimed at preventing willing listeners from being persuaded by commercial speech that they willingly observe.  But to the extent that *Florida Bar* sheds light on what evidence suffices to show "direct and material" advancement of an interest, it shows only that the Court relied on statistical studies focused closely on the precise behavior that the law banned (direct mailings by lawyers to accident victims shortly after an accident).  *Id.* at 626–27.

[6]  Gundlach identifies two articles he claims connect impulse purchases and firearms, but neither of these articles provide any relevant insight on firearms advertising.  *See* Gundlach Tr. at 27:9–29:20.  The first article, Charles R. Taylor, et al., *Understanding the Value of On-Premise Signs as Marketing Devices for Legal and Public Policy Purposes*, 31 J. Pub. Pol'y & Marketing 185 (2012), makes brief references to on-premises signs leading to consumers making "impulse stops,"

Professor Gundlach's opinion also fails to account for California's handgun purchase regulations. The "impulse" purchase scenario that he describes is characterized by a "sudden" or "unplanned" decision to purchase a product, where the purchaser has a "diminished regard" for consequences. *See* ECF No. 43-1Gundlach Report, 16–21. Yet Professor Gundlach did not address the various direct regulations governing handgun purchases that ensure purchases are neither sudden (buyers must pass a background check and waiting period) nor completed without understanding the gravity of the purchase (buyers must pass a test on firearms laws and safety, and demonstrate safe handling of the firearm).

This omission sharply undermines Professor Gundlach's argument. Professor Gundlach identifies three types of so-called "constraining factors" that can disrupt the impulse-buying temptation by providing the opportunity for cognitive evaluation of a potential purchase. Gundlach Report, ¶ 47. These factors include

> (1) Current impediments to acting on impulse (that is, "the consumer may not have adequate time or money, or may be reminded of implicit but stringent behavioral rules used to guide behavior");
>
> (2) Consideration of long-term consequences; and
>
> (3) Anticipatory emotions (that is, the consumer's "anticipation of future consequences" may constrain a purchase, such as if the consumer "imagine[s] the positive emotional experience from successfully resisting the urge, or the negative affect from enacting the impulse").

Gundlach Report, ¶ 47; *see* Utpal M. Dholakia, *Temptation and Reistance: An Integrated Model of Compsumption Impulse Formation and Enactment*, 17 J. Psychology & Marketing 955, 961 (2000). Prof. Gundlach argues that Section 26820 acts as such a "current impediment" constraint

///

---

but does not specifically address (or even mention) firearms. And the second article, Antonio Rodriguez Andres & Katherine Hempstead, *Gun control and suicide: The impact of state firearm regulations in the United States, 1995–2004*, 101 Health Pol'y 95 (2011), supports Plaintiffs: It explains that certain direct firearms regulations, including cooling-off periods and permitting requirements, serve to reduce the consequences of "impulsive" firearms purchases. *Id.* at 96.

because it shields consumers from advertising that may encourage an impulse purchase.  ECF No. 43-1, Gundlach Report, ¶ 48.

But Prof. Gundlach's opinion is silent on what other—much more effective—constraining factors California law already provides that might render Section 26820 a pointless add-on.  In particular, though this part of Prof. Gundlach's opinion relies in large part on Professor Utpal Dholakia's article, the opinion is silent on the critical insight from Dholakia's work:  That individuals can and do resist the consumption impulse, and the opportunity for *cognitive evaluation* is the critical point of resistance.  *See* Dholakia, 17 J. Psychology & Marketing at 959–66 & 960 Figure 1.  And that is precisely what California's waiting period and testing requirements accomplish; they provide the opportunity for cognitive evaluation that can disrupt the so-called "consumption impulse" much more effectively than does a requirement that signs promoting guns outside gun stores only mention long guns rather than handguns.

### ii.     Professor Mann – Suicide Expert.

Dr. Mann also offers a limited opinion:  *Assuming* the critical point that if Section 26280 "is invalidated, there will be an increase in handgun purchases by people with impulsive personality traits," he "would predict that there would be an increase in the number of handgun suicides in proportion to the increase in handgun purchases."  ECF No. 43-2, Mann Report 11:6–10.  On the question of materiality, Dr. Mann has no idea.  Mann Depo. Trans. 61:15–62:19.

The suicide expert hired to help the State prove that the Sign Ban "directly and materially advances" the State's interest in reducing suicide could thus do nothing of the sort.  On the fundamental question of whether the Sign Ban is effective at all, he could not offer an opinion, choosing instead to fall back on the general notion that all that matters is the availability of guns, so "[*t*]*o the extent that this law may reduce* the number of firearms purchases, handgun purchases, it is effective."  *Id.* 63:5–10 (emphasis added); *id.* 40:9–21 ("if there's a change in the. . . handgun/firearm availability due to a change in purchases . . . there will be an impact on firearm suicide").  But as to whether it even "does reduce handgun purchases," he does not know.  *Id.* 63:11–13.

///

Dr. Mann could have attributed this uncertainty to his lack of knowledge about any scholarly research into whether restrictions on firearms advertisements are effective in preventing suicides, *id*. at 30:15–18, or the fact that he is "not an expert on the impacts of types of advertising or advertising in general o[n] buying behavior" or of firearms purchasing habits, *id*. 42:2–4; 95:23–25, or that *he had not even read the law involved in this case*. *Id*. 41:13–14.  Rather, he testified that his uncertainty about whether the Sign Ban is effective arises for a more fundamental reason.  This single law "is one part of a complex mosaic" (*id*. at 63:17) of firearm regulations designed to reduce the availability of firearms; and since it is only availability, in his view, that matters for purposes of reducing suicide, he cannot say whether this particular law is effective:

> Q. . . . Understanding that such comparisons are difficult, is it possible to isolate the impact of this law on deter[ring] suicide?
>
> A. *Theoretically, yes*.
>
> Q. Okay.   Explain the theoretical possibility, if you would, please.
>
> A. There's evidence that those states in the union that have the most stringent controls on gun purchases and gun safety and so on have lower firearm suicide rates than other states.  In fact, the differences in suicide rates between such, if you like, more stringent law states versus less stringent law states is entirely explicable quantitatively by the difference in firearm suicides.  So on that basis, one would expect that if California has additional legal measures in place that impact firearm purchases, that that will translate directly into an impact on firearm suicide rates and to a secondary degree on overall suicide rates, and that impact will be greater for younger people than older people.
>
> Q. And that's based—is that based on an assumption that a restriction makes it—reduces the overall supply of handguns?
>
> A. Yes. *The more restriction, the fewer handguns, the lower the firearm suicide rate, and therefore, <u>potentially</u> the lower overall suicide rate.*
>
> Q. . . . Can you explain whether it's possible in your view to measure the effect of just this one law?
>
> A. You'd use the same approach that you'd use if you're wondering whether an antibiotic was helpful in keeping people alive.  You could ban the prescription of the antibiotic.  Stop the prescription of antibiotic and see if more people die.  You could repeal this law and see if there are more suicides.

*Id*. 63:20–65:6 (emphasis added).

Thus, while the Court has already rejected the State's attempt to justify the statute based on the assertion that "less handguns means less crime and violence," ECF No. 32 at 10:16–18, this is

the core of Dr. Mann's opinion. *See*, *e.g.*, Mann Depo. Tr. at 35:9–37:20.  Over and over again, he testified that greater availability of firearms in the home is associated with increased suicide rates—in other words, more guns equals more suicide. *E.g.*, 10:15–21; 59:14–24; 71:12–17.

As a result, Dr. Mann also stressed repeatedly that his opinion—that striking down the law could lead to an undetermined increase in suicide—does not even turn on purchases by impulsive people.  Rather, according to him, it is the availability of handguns in the home (whether the gun was purchased by the person considering suicide or a member of their family) that determines the risk of suicide. *E.g.*, 60:2–5 ("The gun in the house is what places people at risk.  It's not necessarily whether they bought the gun or another family member bought the gun.  The gun in the house places them at risk."); 46:16–20 ("Signs that encourage people to buy guns will increase the risk of suicide and firearm suicide specifically in individuals who buy guns and in their families because it's the gun in the household that places people at risk."); 90:2–16.

Further preventing any finding of "direct advancement" with respect to the connection between purchases as opposed to "availability" generally, Dr. Mann also confirmed in his report and his testimony that "[s]uicidal behavior is generally impulsive, and 70% of suicide attempters act less than one hour after deciding to kill themselves, meaning they tend to use a readily available method." *Id.* 86:15–87:23; ECF No. 43-2, Mann Expert Report at 7:1–2.  If the impulse lasts longer than an hour, it typically passes within a few hours or a few days, Mann Depo. Tr. at 91:9–13, which means the 10-day waiting period would do its job and allow the suicidal impulse to pass: "The suicide—these suicide crises pass.  In California you have—I think it's a ten-day waiting period, which is a terrific thing, by the way.  So that allows time for that—perhaps for a lot of people for that initial suicide crisis to pass . . . ." *Id.* 85:5-10.

Finally, Dr. Mann affirmed his prior writing to the effect that "prevention methods must consider that firearm suicide *overwhelmingly* involves guns that are already purchased" as opposed to involving guns purchased in order to commit suicide. *Id.* 84:6–15.  In fact, he acknowledged writing that handguns used in suicides have existed in the user's house for a mean of *10.7 years*. *Id.* 84:16–85:17.  In sum, Dr. Mann's testimony strongly undermines any argument that the Sign

///

1    Ban, and its supposed focus on preventing purchases by a special population of "impulsive"

2    people, "directly and materially advances" the State's asserted interest.

3            **4.**      **The State Has Not Produced Evidence That The Law Directly and Materially**

4                     **Advances The Interest In Reducing Crime.**

5          The government briefly and half-heartedly tries to claim that the sign ban reduces handgun

6    crime, on the theory that "the State could reasonably conclude that impulsive people are more

7    likely to engage in crime, and that, by reducing the number of impulsive people who buy

8    handguns, handgun crime will decrease."  State's MSJ at 17:8–10.  The State's concession that its

9    evidence on this point is not "robust" is a drastic understatement: It is lacking altogether, since the

10   State's expert evidence focuses exclusively on how supposed impulsive handgun purchases can

11   lead to suicide.  The State's focus on preventing crime by preventing handgun purchases by an ill-

12   defined segment of the public (not felons, not those who have been committed to mental

13   institutions, but those with an undiagnosed and vaguely identified personality trait) amounts to

14   nothing more conclusory speculation, which "does not suffice when the State takes aim at accurate

15   commercial information for paternalistic ends."  *44 Liquormart*, 517 U.S. at 507–08.

16   **C.**     **The State Has Not Proved (Or Even Argued) That Section 26820 Is Not More**

17          **Extensive Than Necessary.**

18         Section 26820 also fails the fourth step of the *Central Hudson* analysis, which asks

19   "whether the speech restriction is not more extensive than necessary to serve the interests that

20   support it."  *Lorillard Tobacco*, 533 U.S. at 556 (citation and quotation marks omitted).  In fact,

21   the State's summary judgment papers do not even squarely address this factor—the government

22   simply asserts that the "fit" between the speech ban and its public safety goals is "reasonable."

23   State's MSJ at 17:13–18.  But once again, the State ignores controlling Supreme Court case law.

24         *Central Hudson*'s fourth step reflects the view that, "[i]f the First Amendment means

25   anything, it means that regulating speech must be a last—not first—resort."  *Thompson*, 535 U.S.

26   at 373.  "[I]f the Government could achieve its interests in a manner that does not restrict speech,

27   or that restricts less speech, the Government must do so."  *Id.* at 371–72 (striking down a

28   restriction on drug advertising; collecting cases); *44 Liquormart*, 517 U.S. at 507 (plurality op.)

(striking down restriction on advertising the price of alcoholic beverages partly because "[i]t is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal"); *Greater New Orleans*, 527 U.S. at 192 ("There surely are practical and nonspeech-related forms of regulation . . . that could more directly and effectively alleviate some of the social costs of casino gambling."); *Rubin*, 514 U.S. at 491 (striking down restriction on displaying the alcohol content on beer labels partly based on the available alternatives "which could advance the Government's asserted interest in a manner less intrusive to respondent's First Amendment rights," because those alternatives "indicate[] that [the law] is more extensive than necessary").

Accordingly, regulations satisfy prong four only if they are "narrowly tailored to achieve the desired objective." *Lorillard Tobacco*, 533 U.S. at 556.  Speech restrictions do not satisfy this requirement "[i]f clear alternatives exist that can advance the government's asserted interest in a manner far less intrusive to . . . free speech rights." *W. States Med. Ctr.*, 238 F.3d at 1095.  As a result, the government "must consider pursuing its interests through conduct-based regulations before enacting speech-based regulations." *Valle Del Sol*, 709 F.3d at 827.

Consistent with Supreme Court precedent, the Ninth Circuit has invalidated commercial speech regulations as more restrictive than necessary where enforcement of preexisting laws would serve its interest without burdening speech. *Valle Del Sol*, 709 F.3d at 826–27; *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011) (applying time, place, and manner restriction test, but relying on commercial speech precedent); *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir. 1991) ("restrictions which disregard far less restrictive and more precise means are not narrowly tailored").  In *Valle Del Sol*, for instance, plaintiffs challenged an Arizona law barring in-street solicitation of day laborers, which the state claimed was justified by its interest in traffic safety.  The Ninth Circuit held that the solicitation ban was more restrictive than necessary because Arizona could serve its interest without burdening speech by enforcing its existing traffic safety regulations and by enacting additional speech-neutral regulations.  709 F.3d at 826–27.

///

In reaching this conclusion, the appellate court quoted with approval its decision striking down a similar ordinance in *Comite de Journaleros*, because "[t]he City has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *Id.* at 826 (quoting *Comite de Journaleros*, 657 F.3d at 949). The Court explained that "[*Comite de Journaleros*] was based on the longstanding rule that, because restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." 709 F.3d at 826.

Here, as in *Valle Del Sol*, the state "could have advanced its interest in [public] safety directly, without reference to speech," *id.*—in fact, the state has already done so, through the waiting period and through the other restrictions that it already imposes on gun buyers.[7] It could serve its interest by enforcing these existing regulations, and, if such enforcement efforts prove insufficient, the Legislature can pass additional direct regulations (within constitutionally permissible boundaries). *See Valle Del Sol*, 709 F.3d at 826–27.

Or the State could take steps to address the asserted governmental interest that do not involve any restriction on speech. For example, if California is concerned about the danger of gun violence, it could conduct an educational campaign and promote responsible handgun use. As the Supreme Court noted in *Lorillard Tobacco*, "if [the government's] concern is that tobacco advertising communicates a message with which it disagrees, it could seek to counteract that message with 'more speech, not enforced silence.'" 533 U.S. at 586 (citation omitted); *see also Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977) (highlighting availability of counterspeech); *Sorrell*, 564 U.S. at 578 (citing *Linmark*).

California thus has ample alternative means to advance its interest without restricting speech. And because Section 26820 restricts more speech than "necessary" to accomplish its interests, the statute fails the *Central Hudson* test and thus violates the First Amendment.

///

---

[7] These restrictions include the state and federal background checks, Cal. Penal Code § 28220, the "Firearm Safety Certificate" program and its test requirements, *supra*, and the requirement that purchasers demonstrate (to the dealer) that they know how to safely handle the firearm, § 26865.

1

### III. CONCLUSION

2    For the reasons set forth above, the Court should deny Defendants' motion for summary

3    judgment.

4

5    Dated:  February 2, 2017                    BENBROOK LAW GROUP, PC

6                                               By s/ Bradley A. Benbrook

7                                                   BRADLEY A. BENBROOK
                                                   Attorneys for Plaintiffs

8

9                                                  /s Eugene Volokh

10                                                  EUGENE VOLOKH
                                                   Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28