1  BENBROOK LAW GROUP, PC
   BRADLEY A. BENBROOK (SBN 177786)
2  STEPHEN M. DUVERNAY (SBN 250957)
   400 Capitol Mall, Suite 1610
3  Sacramento, CA 95814
   Telephone: (916) 447-4900
4  Facsimile: (916) 447-4904
   brad@benbrooklawgroup.com
5  steve@benbrooklawgroup.com

6
   EUGENE VOLOKH (SBN 194464)
7  UCLA School of Law
   405 Hilgard Ave.
8  Los Angeles, CA 90095
   Telephone: (310) 206-3926
9  Facsimile: (310) 206-7010
   eugene.volokh@gmail.com
10

11 Attorneys for Plaintiffs

12                  UNITED STATES DISTRICT COURT

13                  EASTERN DISTRICT OF CALIFORNIA

14

15

16 TRACY RIFLE AND PISTOL LLC;          Case No.: 2:14-cv-02626-TLN-DB
   MICHAEL BARYLA; TEN PERCENT
17 FIREARMS; WESLEY MORRIS;             **PLAINTIFFS' COMPENDIUM OF**
   SACRAMENTO BLACK RIFLE, INC.;        **EVIDENTIARY DOCUMENTS CITED IN**
18 ROBERT ADAMS; PRK ARMS, INC.;        **OPPOSITION TO DEFENDANTS'**
   JEFFREY MULLEN; IMBERT & SMITHERS,   **MOTION FOR SUMMARY JUDGMENT**
19 INC.; and ALEX ROLSKY,

20              Plaintiffs,

21         v.                            Hearing Date: Feb. 23, 2017
                                         Time: 2:00 p.m.
22 KAMALA D. HARRIS, in her official capacity   Courtroom: 2
   as Attorney General of California; and       Judge: Troy L. Nunley
23 STEPHEN J. LINDLEY, in his official capacity
   as Chief of the California Department of Justice   Action filed Nov. 10, 2014
24 Bureau of Firearms,

25              Defendants.

26

27

28

---

Pursuant to Federal Rule of Civil Procedure 56(c)(1) and Local Rule 260(a), Plaintiffs Tracy Rifle and Pistol LLC, Michael Baryla, Ten Percent Firearms, Wesley Morris, Sacramento Black Rifle, Inc., Robert Adams, PRK Arms, Inc., Jeffrey Mullen, Imbert & Smithers, Inc., and Alex Rolsky submit the following compendium of evidentiary documents in support of their opposition to Defendants' Motion for Summary Judgment.

1.    Deposition of Gregory T. Gundlach, J.D., Ph.D.  A true and correct copy of excerpts from the transcript of Professor Gundlach, taken on October 28, 2016, is attached as Exhibit A.

2.    Deposition of J. John Mann, M.D.  A true and correct copy of excerpts from the transcript of Professor Gundlach, taken on October 31, 2016, is attached as Exhibit B.

3.    A true and correct copy of Clinton Amos, et al., *A Meta-Analysis of Consumer Impulse Buying*, 31 J. Retailing & Consumer Servs. 86 (2014) (in-press copy), is attached as Exhibit C.  This article was cited in ECF No. 43-1, Expert Witness Report of Professor Gregory T. Gundlach.

4.    A true and correct copy of Charles R. Taylor, et al., *Understanding the Value of On-Premise Signs as Marketing Devices for Legal and Public Policy Purposes*, 31 J. Pub. Pol'y & Marketing 185 (2012), is attached as Exhibit D.  This article was cited in ECF No. 43-1, Expert Witness Report of Professor Gregory T. Gundlach.

5.    A true and correct copy of Antonio Rodriguez Andres & Katherine Hempstead, *Gun control and suicide: The impact of state firearm regulations in the United States, 1995–2004*, 101 Health Pol'y 95 (2011), is attached as Exhibit E.  This article was cited in ECF No. 43-1, Expert Witness Report of Professor Gregory T. Gundlach.

6.    A true and correct copy of Utpal M. Dholakia, *Temptation and Reistance: An Integrated Model of Compsumption Impulse Formation and Enactment*, 17 J. Psychology & Marketing 955 (2000), is attached as Exhibit F.  This article was cited in ECF No. 43-1, Expert Witness Report of Professor Gregory T. Gundlach.

Dated:  February 2, 2017             BENBROOK LAW GROUP, PC


                                     By s/Stephen M. Duvernay
                                         STEPHEN M. DUVERNAY
                                         Attorneys for Plaintiffs

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


TRACY RIFLE LLC, et al.,

      Plaintiffs,

-vs-                 No. 2:14-CV-02626-TLN-KJN
                          (TEMP)
KAMALA D. HARRIS, in her
official capacity as Attorney
General of California, et al.,

      Defendants.
_____/


Deposition of

GREGORY T. GUNDLACH, J.D., Ph.D.

Friday, October 28, 2016


Reported by:
KACY PARKER BARAJAS, RMR, CSR No. 10915
Certified Realtime Reporter
Job No. 45971LR

1    Q.        BY MR. DUVERNAY:  And the second piece of that

2    is, to the extent that you find the first portion

3    reasonable, you have also been asked to opine if it is

4    reasonable to conclude that precluding such materials

5    contributes in a negative way to the impulsive purchase

6    of handguns; is that correct?

7    A.        Yes.

8    Q.        Have you been asked to provide an opinion on

9    anything else in this case?

10   A.        No.

11   Q.        Are you prepared to offer an opinion on the

12   magnitude of the positive impact that Section 26820 has

13   on the impulsive purchase of handguns?

14            MR. RICHARDS:  Objection.  Vague.

15            THE WITNESS:  If you mean by "magnitude" a

16   correlation coefficient or some degree of measurement as

17   to the specific relationship, no.

18   Q.        BY MR. DUVERNAY:  And is it correct that you are

19   not offering an opinion on whether limiting impulse

20   purchases of handguns leads to less handgun crime and

21   violence?

22   A.        No.  I'm not offering any opinions of that

23   nature.

24   Q.        Okay.  Let's have you summarize your opinions on

25   the two questions you've been asked to opine.  On the

                                                            12

1    here are that it's reasonable to conclude that the types

2    of prohibitions that are described in Section 26820 would

3    be an example of that.  In other words, we -- by

4    prohibiting the types of placard advertising or imitation

5    handgun signage and display is one way to do that.

6    Q.        BY MR. DUVERNAY:  And is that because it acts as

7    a current impediment?

8    A.        Yes.

9    Q.        I'm going to direct you to paragraph 33, I

10   believe, and the first sentence here is "Firearms,

11   including handguns, are known to be purchased at times on

12   impulse."  Can you point me to support in the academic

13   literature you've reviewed for that statement?

14   A.        One example would be the next sentence which

15   cites a study by Antonio Rodriquez Andres and Katherine

16   Hempstead that speaks to the understanding of firearms

17   including handguns being purchased on impulse.

18   Q.        And in the context of that article, it's your

19   intention that impulsive -- that their use of the phrase

20   "impulsive firearm purchases" is used in the same manner

21   in which the consumer behavior literature uses it?

22   A.        I'm not sure I understand your question.

23   Q.        Is it your contention that in this particular

24   article they are describing an impulsive firearms

25   purchase in the way that we've discussed impulsive

27

1    purchases in the way that it's been defined in the

2    consumer behavior research that you review in the

3    previous paragraphs?

4    A.        It's my reasonable interpretation that they are,

5    given they're using the words "impulsive firearms

6    purchases."

7    Q.        I guess my point is I might use the word

8    impulsive purchase in a loose sense and not necessarily

9    understand what it means in an academic sense, and I'm

10   asking whether or not, in this particular context, they

11   are using it within the bounds of the academic literature

12   that you've described?

13   A.        I believe they are.

14   Q.        Other than the Andres and Hempstead article, are

15   there any other academic studies that consider the

16   impulsive purchase of firearms?

17   A.        Yes.  There's the study that we referenced

18   earlier, Taylor, Sarkees, and Bang entitled

19   "Understanding the Value of On-Premise Signs as Marketing

20   Devices for Legal and Public Policy Purposes."  It also

21   speaks to the impulse purchases of products and includes

22   in their sample firearms dealers.

23   Q.        Okay.  And it's your contention that the Taylor

24   study specifically looks at the impulsive purchase of

25   handguns then?

28

1    A.       They mention and describe and discuss impulse

2    purchases of products and include in their sample

3    firearms dealers.

4    Q.       Okay.  Are you aware of any academic study that

5    looks at impulsive purchase of handguns in California?

6    A.       Not specifically California.

7    Q.       Are you aware of any study that looks at the

8    impulsive purchase of firearms in California?  And I say

9    firearms generally to distinguish it from handguns

10   specifically.

11   A.       If you mean is there a study that was

12   boundarized by a sample of firearms dealers or otherwise

13   purchases limited to California as a state, no, I'm not.

14   Q.       Other than the Taylor study which, as I

15   understand it, looks at a broad cross-section of

16   industries, are you aware of any academic study that

17   specifically looks at the impulsive purchase of

18   handguns?

19   A.       Not an academic study, but there are other

20   studies inducted within the industry that I'm aware of.

21   Q.       And what are those studies?

22   A.       The one that comes to mind first is the study by

23   the National Shooting Sports Foundation which is cited in

24   footnote 72 and is entitled "Changing Faces of the

25   Shooting Sports, Meeting the Needs of an Increasingly

                                                                    29

1    Q.       Okay.  I mean, the thing we're sort of dancing

2    around here is even if we accept as true your opinion

3    that the statute -- and I want to get the words right

4    here -- has a positive impact on the impulsive purchase

5    of handguns, the broader legal question is whether it has

6    a material impact.  And you can make your objections all

7    you want.  Ultimately, that's up to the state to prove.

8    So again I want to confirm that you are not offering an

9    opinion on the magnitude of the impact Section 26820 has

10   on the impulsive purchase of handguns; is that correct?

11            MR. RICHARDS:  I'm going to go ahead and make

12   the objections that Mr. Duvernay suggested.  Contains a

13   legal conclusion and also object on vagueness.

14   Q.       BY MR. DUVERNAY:  And I'll clean up the question

15   because that started with an unnecessary colloquy.  You

16   have not been asked to provide an opinion on the

17   magnitude of the positive impact that the statute,

18   Section 26820, has on the impulsive purchase of handguns;

19   is that correct?

20   A.       If you mean by magnitude an explicit correlation

21   coefficient or some numerical equivalent, I have not.

22   Q.       Okay.  And I mean it like anything beyond --

23   you've not been asked to answer anything beyond it has a

24   positive impact; that is the scope of your -- that is the

25   full extent of your conclusion?

                                                            60

1    A.        The full extent of my conclusion is that it's

2    reasonable to infer given the science that it does have a

3    positive impact on reducing impulse purchases of

4    handguns.

5              MR. DUVERNAY:  Okay.  Go off the record.

6              MR. RICHARDS:  Yeah.

7              (Recess taken.)

8              MR. DUVERNAY:  Let's go back on the record.

9              MR. RICHARDS:  Yes.

10   Q.        BY MR. DUVERNAY:  All right.  I'm going to move

11   to your expertise for a few minutes.  May be shorter than

12   that.  You've referenced your publications in paragraph

13   8, and they're included in Exhibit 3.  It appears the

14   principal focus of your scholarship is antitrust; is that

15   correct?

16   A.        I would characterize it a little more broadly

17   than that as vertical distribution, issues of marketing

18   and public policy associated with retailing and

19   distribution practices of which would include competition

20   policy as well as the matters that we're describing here

21   today.

22   Q.        Sure.  And I'm not trying to knock you out right

23   now.  I'm just honing in on -- the next question is any

24   of your research focused on impulse purchasing in

25   particular?

                                                        61

1              REPORTER'S CERTIFICATE

2          I, KACY PARKER BARAJAS, a duly licensed

3   Certified Shorthand Reporter of the State of California,

4   hereby certify that the witness in the foregoing

5   deposition was by me duly sworn;

6         That said testimony was taken down in

7   stenographic shorthand by me, a disinterested person, at

8   the time and place therein stated and was thereafter

9   reduced to typewriting and that the testimony as

10   transcribed is a true record of the testimony given by

11   the witness.

12         That before completion of the deposition, review

13   of the transcript was requested.  If requested, any

14   changes made by the deponent (and provided to the

15   reporter) during the period allowed are appended hereto.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said deposition.

20         Dated this 10th day of November, 2016.

21

22   _____

23   KACY PARKER BARAJAS
      Registered Merit Reporter
      Certified Realtime Reporter

24   State of California
      Certificate No. 10915

25

73

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


TRACY RIFLE LLC, et al.,

      Plaintiffs,

-vs-                                  No. 2:14-CV-02626-TLN-KJN
                                     (TEMP)
KAMALA D. HARRIS, in her
official capacity as Attorney
General of California, et al.,

      Defendants.
_____/




Deposition of

J. JOHN MANN, M.D.

Monday, October 31, 2016




Reported by:
KACY PARKER BARAJAS, RMR, CSR No. 10915
Certified Realtime Reporter
Job No. 45972LR

1    statute on the books in California limiting such

2    advertising in order to reduce the probability of people

3    purchasing guns who may be at risk or used for suicide or

4    other.

5    Q.       That's what you were told the law was for?

6    A.       Something like that.

7    Q.       Were you aware of the law before that contact?

8    A.       No.

9    Q.       What was your reaction when you learned that

10   this law was in place?

11   A.       I thought it was farsighted.

12   Q.       What do you mean by that?

13   A.       A good idea.

14   Q.       And why is that?

15   A.       Because I believe that there was a relationship

16   between the availability of firearms and firearm

17   suicide.

18   Q.       That was your response upon hearing that the law

19   existed?

20   A.       No.  That was my opinion prior to hearing that

21   the law existed.

22   Q.       Yes.  And when I say "your response," your

23   response and your conclusion that it was a farsighted law

24   that was a good idea, that response was based on your

25   preexisting opinion about the relationship you just

1   otherwise, that references this California law that's the

2   subject of this lawsuit?

3   A.      No.

4   Q.      Are you aware of any academic studies that

5   consider advertising restrictions as a factor in

6   suicide?

7   A.      There are studies that have looked at this

8   question from the perspective of public advertisements,

9   public media spots in terms of suicide prevention, and

10  encouraging people who feel depressed, suicidal, et

11  cetera, to seek help.  That's all I'm aware of.

12  Q.      So those are like public service type of

13  advertising; that's what you're referring to?

14  A.      Yes.

15  Q.      So you're not aware of any studies that consider

16  whether restrictions on the advertisement of firearms are

17  effective in preventing suicides?

18  A.      I know of no such studies.

19  Q.      Are you aware of any studies, same question, as

20  to restricting or preventing violence generally?

21  A.      Violence generally?

22  Q.      Sorry.  That was a bad question.  I want to get

23  to the same point.  Are you aware of any studies in the

24  academic literature that consider whether advertising

25  restrictions on firearms are effective in reducing

30

1    violence, generally?

2    A.       Violence, generally.  Well, I'm really -- my

3    area of expertise is really more about suicide and

4    firearms, not violence in general and firearms.

5    Q.       I understand.  I'm just asking if you're --

6    simply asking if you're aware of any studies that touch

7    on the subject of advertising restrictions as a means of

8    addressing perceived -- or as a means of addressing

9    violence?

10   A.       No.

11   Q.       Okay.  Before we jump into your opinions, I just

12   want to clarify what you're not expressing opinions

13   about.  Just as of the last question, you're not

14   expressing any opinion about the effect of invalidating

15   the law here on anything other than suicide, correct?

16   A.       That is correct.

17   Q.       Your opinions are limited only to suicide

18   issues?

19   A.       Yes.

20   Q.       They're not related to violence among two or

21   more people?

22   A.       No.

23   Q.       Did you reach any opinions that are not

24   expressed in this report and about which you plan to

25   testify in the case?

                                                      31

1    that, as we just mentioned, in the event the law is,

2    invalidated there will be an increase in handgun

3    purchases by people with impulsive personality traits.

4    A.        If the facts were different or the scenario was

5    different or the impact of invalidating that law was

6    different, then the prediction would need to be adjusted

7    accordingly.  That's why the sentence states "in

8    proportion to the increase in handgun purchases."

9    Q.        Okay.  Well, let's focus on that link.  Why do

10   you make the link between the words "in proportion to"

11   and the assumption?

12   A.        What that states is that the bigger the increase

13   in handgun purchases, the bigger the increase in handgun

14   suicides.  The smaller the increase in handgun purchases,

15   the smaller the increase in handgun suicides.

16   Q.        You say in the next sentence, "This opinion is

17   based on the strong relationship between the gun

18   availability and risk of firearm suicide."  Is that

19   really the core of your conclusion and the core of why

20   you made the assumption or the association you just

21   mentioned?

22   A.        Yes.

23   Q.        That assumption, in other words, being -- or the

24   association being, as you just stated, the more handguns

25   that are purchased, you believe the more suicides will

                                                            35

1     result?

2     A.          Yes.

3     Q.          And that relates back to opinion 2, correct,

4     topic 2 on page 6?

5     A.          Correct.

6     Q.          Would you be able to reach your opinion number 5

7     without the assumption that counsel gave you?

8     A.          That opinion holds regardless of what the

9     details of the assumption are actually.

10    Q.          Can you elaborate on that for me?

11    A.          If you believe that -- if you made the

12    assumption that repealing that law will reduce the number

13    of handgun purchases, then that will reduce the number of

14    handgun suicides.

15    Q.          Can you read that answer back.

16                (The record was read back by the reporter as

17    follows:  "Answer:  If you believe that -- if you made

18    the assumption that repealing that law will reduce the

19    number of handgun purchases, then that will reduce the

20    number of handgun suicides.")

21    Q.          BY MR. BENBROOK:  The assumption you made though

22    was the reverse, that repealing the law will increase the

23    number of handgun purchases.

24    A.          Because I was given -- I was responding to the

25    assumption that repealing the law will increase the

1    number of handgun purchases.

2    Q.       So let's go back then to page 9.

3    A.       9?  6?

4    Q.       Excuse me.  Page 11, lines 11 and 12 you state,

5    "The more handguns that are purchased, the more handgun

6    suicides will happen."  Is that really the core of what

7    you're just talking about?

8    A.       That's not the core.  That's not related

9    directly to what I just said now that you asked the court

10   reporter to read back to you.

11   Q.       Well, is this the core of your opinion in number

12   5, the more --

13   A.       The core of my opinion is this opinion is based

14   on the strong relationship between gun availability and

15   the risk of firearm suicide.

16   Q.       Generally, generally in the literature,

17   generally in the world, correct?

18   A.       Yes.  I believe this applies in the

19   United States, in California, and in other parts of the

20   world.

21   Q.       And that's regardless of the personality type of

22   the possessor of the firearm?

23   A.       Personality type, by which you mean what?

24   Q.       Well, I'm referring to other parts of your

25   opinion as examples where you identify impulsive

37

1    statewide basis for California?

2    A.        So if you changed the law in California on this

3    point, it may take a while before the whatever number of

4    increased suicides take place before that reaches what we

5    call a statistically significant effect.  Because as

6    populous as this state is, you need quite a few to die by

7    suicide before a statistician is to say it's

8    statistically significant.

9    Q.        And are you familiar enough with the data to

10   make a prediction on whether or not there would be a

11   material difference in the overall suicide rate if the

12   law were repealed?

13             MR. RICHARDS:  Objection.  Calls for a legal

14   conclusion.

15             THE WITNESS:  One can feel confident that

16   there's going to be -- if there's a change in the

17   firearm -- handgun/firearm availability due to a change

18   in purchases that there will be an impact on firearm

19   suicide.  If there are enough of a change like an

20   increase in firearm suicides, there will be an effect on

21   the overall suicide rate in the state of California.

22   Q.        BY MR. BENBROOK:  Okay.  Well, that's a truism,

23   isn't it?  It relates back to the assumption that you

24   were given.  So let's talk a little bit more about the

25   soundness of the assumption, that if the law were

                                                         40

1   invalidated, there would be more purchases of handguns.

2   And again, you understand -- can you describe the law as

3   you understand it?

4   A.      I didn't express an opinion about the

5   assumption.  I expressed an opinion about the

6   consequences of such an assumption.

7   Q.      I understand that.  And we're here at a

8   deposition where I get to ask you a bunch of questions

9   about the case and your assumptions and your findings.

10  So my question is can you please describe for me the law

11  at issue here, as you understand it?

12  A.      I don't know the details of the law.

13  Q.      Have you read the statute?

14  A.      No.

15  Q.      What's your general understanding of the

16  statute?

17  A.      I understand it refers to advertising by gun

18  stores about the -- regarding the sale of handguns,

19  visible advertising.

20  Q.      And what about the visible advertising?  What

21  does the law restrict to your understanding?

22  A.      It restricts such visible advertising of handgun

23  sales.

24  Q.      Do you know in what manner?

25  A.      I don't know, posters, billboards, displays

41

1    visible to the public.

2    Q.        Okay.  So do you consider yourself an expert on

3    the subject of firearms purchasing habits?

4    A.        No.

5    Q.        Have you conducted any studies on the subject of

6    firearms purchasing habits?

7    A.        I have not.

8    Q.        You state in page 9 of your opinion, line

9    6 -- oh, excuse me, line 5 through 7, "...young people

10   and many adults are at risk for suicide because they are

11   more impulsive and therefore more likely to buy a gun

12   impulsively, especially if they cannot gain access to a

13   gun in the household."  What's your basis for the

14   statement that young people are more likely to buy a gun

15   impulsively?

16   A.        Young people are more impulsive in general, and

17   impulsiveness is a characteristic that applies to

18   decision making in general.  So it applies to decision

19   making in terms of relationships, start a relationship,

20   end a relationship.  It applies to decisions continuing

21   school, quit school, take a job, quit a job, and it

22   applies to buying behaviors, not specifically talking

23   about buying behaviors specifically only for guns, buying

24   anything.

25   Q.        How young is young here when you use the term

                                                          42

1   of a handgun and suicide is greater for young people.

2   A.      Yes.

3   Q.      And I'm asking on what studies do you base that

4   belief, if you can recall?

5   A.      So in this paper that I wrote in the American

6   Journal of Psychiatry with Christina Michel we quoted

7   some or I quoted some data indicating that the effects of

8   restricting firearms and reducing firearm availability

9   is, roughly speaking, double in young people compared to

10  older people, the benefit in terms of reducing firearms

11  suicides.

12  Q.      And that's covered in the article?

13  A.      Yes.

14  Q.      Do you have any basis for an understanding as to

15  what age groups are more or less likely to see a sign at

16  a retail shop?

17  A.      See a sign at a retail shop?

18  Q.      (Nods head.)

19  A.      That's not in my domain of expertise.

20  Q.      Do you consider yourself able to -- well, strike

21  that.  You said you're not an expert on the subject of

22  firearms purchasing habits, correct?

23  A.      Yes.

24  Q.      So you also are not able to -- strike that.

25  Given that, are you able to identify how often impulse

44

1   firearm purchases occur relative to nonimpulsive

2   purchases?

3   A.        I do not know.

4   Q.        Do you have any expertise on identifying the

5   effect of advertising on handgun purchases?

6   A.        I do not.

7   Q.        And likewise, do you have expertise on

8   identifying the effect of one type of advertising versus

9   another when it comes to handgun purchases?

10  A.        I do not have such expertise.

11  Q.        And you had mentioned earlier you have a general

12  understanding that the law at issue restricts advertising

13  in some ways.  Do you recall how it restricts

14  advertising?

15  A.        No.

16  Q.        Do you recall that it's a restriction on

17  Internet advertising?

18  A.        I don't know that.

19  Q.        Do you know whether it's a restriction on

20  advertising in periodicals?

21  A.        I don't know.

22  Q.        So do you have an understanding of the

23  percentage of the population that is at risk from seeing

24  a sign that advertises handguns?

25  A.        Can you say that again.

45

1          MR. BENBROOK:  Can you read the question back,

2     please.

3          (The record was read back by the reporter as

4     follows:  "Question:  So do you have an understanding of

5     the percentage of the population that is at risk from

6     seeing a sign that advertises handguns?")

7          THE WITNESS:  At risk for what?

8     Q.     BY MR. BENBROOK:  Well, that's what I'm asking

9     you.  You're an expert in a case advocating that a law

10    that restricts speech should continue to restrict speech,

11    and I'm asking who in the population is at risk from

12    being exposed to that speech?

13    A.        There's a certain proportion of the population

14    that's at risk for suicide.  There's a certain proportion

15    of the population that are -- live in the same household

16    as people at risk for suicide.  Signs that encourage

17    people to buy guns will increase the risk of suicide and

18    firearm suicide specifically in individuals who buy the

19    guns and in their families because it's the gun in the

20    household that places people at risk.

21    Q.        Let's go back a couple sentences.  On what basis

22    do you say that guns or that advertisements or signs,

23    communications that communicate the availability of guns

24    will lead to greater purchases of guns, if you're not an

25    expert in such matters?

                                                           46

1       the store faced with the same sign as a nonimpulsive

2       person.  If they have in their mind that they're

3       interested in a handgun, then the more content in the

4       sign that relates to specifically a handgun, the more

5       effect it's going to have on them than a sign that has

6       less content that refers to a handgun specifically.

7       Q.      Okay.  Well, I'm talking about the personality

8       traits of the person viewing the sign.

9       A.      I just addressed that.

10      Q.      Do people -- can you identify any reason based

11      on your medical expertise that an impulsive person would

12      be more likely to enter a store after seeing a sign with

13      a handgun than say a flashing light that said "guns"?

14      A.      I'm not an expert on advertising.  I'm not an

15      expert on advertising handguns.  My area is the

16      interaction between suicidal behavior and certain

17      characteristics of people which include impulsiveness.

18      If that impulsiveness places available to them handguns,

19      they are at greater risk than nonimpulsive people.  If

20      that does -- if whatever it is does it through them

21      buying the gun or a family member buying the gun, it

22      probably doesn't matter that much, but anything that

23      increases the chances of them coming -- having a gun made

24      available to them will increase the risk.

25      Q.      You say it probably doesn't matter that much.

                                                          59

1    What are you referring to?

2    A.        The gun in the house is what places people at

3    risk.  It's not necessarily whether they bought the gun

4    or another family member bought the gun.  The gun in the

5    house places them at risk.

6    Q.        I know but you just said something doesn't

7    matter that much.

8    A.        Whether they end up buying the gun or another

9    member of their family buys the gun.

10   Q.        Do impulsive people have -- the impulsive people

11   that you're positing here in your expert report, do they

12   have a reduced cognitive function such that they would be

13   less able than average people to interpret signs?

14   A.        No.  What do you mean by "interpret signs"?

15   Q.        That's fine.  I just -- just a question.  So you

16   don't have a -- you testified you don't have a basis for

17   stating whether based on your expertise there would be

18   more handgun purchases based on the three different

19   signs; is that correct?

20   A.        I pointed out that the -- in response to your

21   question about a person interested in buying a handgun

22   that signs that are more salient or stimuli that are more

23   salient are more likely to evoke the response.  The

24   response being handgun, yes, that's what I'm interested

25   in.  Maybe I'll get one.  If it has a picture of a

                                                              60

1    handgun right in the middle of the sign, that appears to

2    be, on the face of it, a distinctly more salient sign.

3    Less neutral, more likely to evoke a response.

4    Q.        Okay.  For the hypothetical person in the grip

5    of suicidal ideation that you're speaking about or

6    writing about in your report --

7              MR. RICHARDS:  Objection.  I'm sorry.  Finish

8    your question.

9    Q.        -- do you have any basis on which to

10   characterize their purchasing habits?

11             MR. RICHARDS:  Objection.  Mischaracterizes the

12   report.

13             THE WITNESS:  Impulsive people are impulsive in

14   many domains, relationships, employment, purchasing.

15   Q.        BY MR. BENBROOK:  Do you have any idea about the

16   number of handgun purchases that are stimulated in

17   California by retail advertising?

18   A.        I do not.

19   Q.        Have you researched the subject?

20   A.        I have not.

21   Q.        Are you aware of any research on the subject?

22   A.        No.

23   Q.        Do you have any idea about the percentage of

24   handgun purchases stimulated in California by retail as

25   opposed to other types of advertising, retail being a

                                                        61

1    sign like we have in Exhibits 11, 12, and 13 at the

2    retail location?

3    A.        Ah, and other types?

4    Q.        Other types, broadcast, Internet, periodicals,

5    billboards.

6    A.        That's not my area of expertise.

7    Q.        Are you aware of any research on that subject?

8    A.        There may be a lot of research on that subject,

9    and I'm not aware of it or familiar with it.

10   Q.        So don't know how many more purchases might take

11   place in the event that signs like Exhibit 13 were no

12   longer illegal, do you?

13   A.        I couldn't give you a precise number.

14   Q.        Okay.  Can you give me a general number?

15   A.        No.  I couldn't give you a general number.  As I

16   stated in my opinion, if there were more such handgun

17   purchases, there would be a proportional increase in the

18   number of handgun suicides, and it would be double in

19   young people compared to old people.

20   Q.        You don't know whether it would be more, and

21   that's why you are assuming that for purposes of the

22   opinion, correct?

23   A.        That's what I've been asked, yes.

24           MR. BENBROOK:  All right.  Let's take our lunch

25   break.

                                                              62

1           MR. RICHARDS:  Okay.

2           (The luncheon recess was taken 12:07 p.m. to

3      12:53 p.m.)

4           MR. BENBROOK:  Back on the record.

5      Q.        Dr. Mann, do you have an opinion as to whether

6      the law that's at issue in this case is effective in

7      curbing suicides?

8      A.        To the extent that this law may reduce the

9      number of firearms purchases, handgun purchases, it is

10     effective.

11     Q.        And do you have an understanding as to whether

12     it does reduce handgun purchases?

13     A.        I don't know.

14     Q.        If this law were effective in curbing suicides,

15     would you expect California's suicide rates to be lower

16     than rates in states without similar law?

17     A.        This law is one part of a complex mosaic effect

18     as it affects suicide rates and firearm suicide rates,

19     and so comparing such comparisons are difficult.

20     Q.        Okay.  Understanding that such comparisons are

21     difficult, is it possible to isolate the impact of this

22     law on determining suicide?

23     A.        Theoretically, yes.

24     Q.        Okay.  Explain the theoretical possibility, if

25     you would, please.

63

1    A.        There's evidence that those states in the union

2    that have the most stringent controls on gun purchases

3    and gun safety and so on have lower firearm suicide rates

4    than other states.  In fact, the differences in suicide

5    rates between such, if you like, more stringent law

6    states versus less stringent law states is entirely

7    explicable quantitatively by the difference in firearm

8    suicides.  So on that basis, one would expect that if

9    California has additional legal measures in place that

10   impact firearm purchases, that that will translate

11   directly into an impact on firearm suicide rates and to a

12   secondary degree on overall suicide rates, and that

13   impact will be greater for younger people than older

14   people.

15   Q.        And that's based -- is that based on an

16   assumption that a restriction makes it -- reduces the

17   overall supply of handguns?

18   A.        Yes.  The more restriction, the fewer handguns,

19   the lower the firearm suicide rate, and therefore,

20   potentially the lower overall suicide rate.

21   Q.        So I just want to get back -- I'm not sure your

22   question explained the theoretical possibility of

23   measuring the effect of just this one law on suicide

24   rates.  Can you explain whether it's possible in your

25   view to measure the effect of just this one law?

64

1    A.        You'd use the same approach that you'd use if

2    you're wondering whether an antibiotic was helpful in

3    keeping people alive.  You could ban the prescription of

4    the antibiotic.  Stop the prescription of antibiotic and

5    see if more people die.  You could repeal this law and

6    see if there are more firearm suicides.

7    Q.        That's the way you would test it?

8    A.        No.  You asked me if there was an approach that

9    might evaluate the specific effect of this law.  That

10   would be to keep everything else constant and just repeal

11   this law and see if more people die.

12   Q.        And is it possible to keep everything else

13   constant such that you could isolate the effect of one

14   law like this?

15   A.        But you don't need to do that because there's a

16   large amount of data out there that suggests that there's

17   a robust relationship between firearm availability and

18   firearm suicide rates.  And if you reduce firearm

19   availability, you will reduce firearm suicide rates, and

20   that effect is going to be twice as great for young

21   people as older people.  So then if somebody really feels

22   strongly about this, that this is just more than making

23   money, then risk the lives of some young people and

24   repeal the law.

25   Q.        You understand that this case involves a First

                                                           65

1    don't need to take valuable time leafing through it.

2    A.        Okay.  They're listed here.  There are -- there

3    are two studies actually, but they were a continuation of

4    the same study which compared states in the union that

5    had the most comprehensive antifirearm legislation versus

6    those that had less such, and the -- an example of that

7    is the Connor and Zhong article, 2003.

8    Q.        What page are you referring to here in the

9    exhibit?

10   A.        Page 976, table 5.  Table 5 is headed

11   "Comparison of Gun Legislation and Suicide Rates Across

12   the United States."  So you can see these studies

13   incorporate examination of handgun laws across all 50

14   states, so -- and then the study that I've focused on a

15   bit more was the one looking at the states with

16   unrestrictive or modestly restrictive firearm laws

17   compared to the ones with restrictive laws.  I focused on

18   those because I think that throws the whole thing into

19   clearer relief.  But you can see there has been quite a

20   number of studies done.  This table lists seven studies

21   of this very question.

22   Q.        And returning to my earlier question, how, if

23   you wanted to conduct a study that measured the

24   particular impact of this law, could you do that in the

25   absence of a repeal?

                                                          70

1     A.        No.  Because the most powerful studies are what

2     we call time series studies which are basically a

3     naturalistic experiment in which a state or a country has

4     introduced legislation altering firearm availability.

5     And when that happens, we examine over a period of time

6     what -- what happens as a result of the impact of that

7     legislation.  If legislation is clear and reasonably

8     impactful, then we can see what happens before and after.

9     There are several studies like that that have been

10    conducted, not at a national level in the U.S. because of

11    other factors but overseas.

12    Q.        Turning to your opinion 2 in your report, the

13    heading states, "The Availability of a Firearm,

14    Particularly a Handgun, in the Home Increases the Risk of

15    Suicide for Impulsive Individuals."  That's a summary of

16    your opinion 2, correct?

17    A.        Yes.

18    Q.        And the narrative that follows that, is that a

19    summary of the reasons why you reached that opinion?

20    A.        That is correct.

21    Q.        Now in your report you use the terms

22    availability of handguns and presence of handguns in the

23    home.  Do you basically use those terms

24    interchangeably?

25    A.        Not entirely because availability of handguns

                                                              71

1      number of guns, you are not improving the problem.   If

2      you have a lot of guns and you slow down the rate of

3      increase of guns, you are having an impact on the

4      problem, perhaps not as big as you'd like, but you're

5      having a -- you're helping.

6      Q.        In the "Conclusions" section of your article,

7      second sentence you say "Promising prevention methods

8      must consider that firearm suicide overwhelmingly

9      involves guns that are already purchased."  Are you able

10     to quantify how overwhelmingly firearm suicide involves

11     guns that are already purchased?

12     A.        Well, it -- it's known that even including that

13     study you just cited in California that most firearm

14     suicides use a gun that's been purchased for a while.

15     Estimates vary, six, seven, eight years in the house.

16     Q.        Well, your article says the mean is 10.7 years.

17     A.        Okay.  So I chose 10.7 years.  That's the most

18     conservative in terms of duration.  But if you -- you

19     know there are studies that are tracked or looked at the

20     time between the purchase of a firearm and when the

21     suicide actually takes place.  So I think you just cited

22     that study about three minutes ago.  In the first week

23     there's already a jump in suicides.  It's likely that

24     that means that the people who bought that gun probably

25     bought it with a specific intent of using it for that

                                                            84

1    suicide.  But the suicide rate remains elevated for years

2    after the purchase of a gun which suggests that --

3    several things.  If the person who bought the gun later

4    used it for a suicide, maybe that was the original reason

5    they bought it and they didn't use it immediately.  The

6    suicide -- these suicide crises pass.  In California you

7    have a -- I think it's a ten-day waiting period, which is

8    a terrific thing, by the way.  So that allows time for

9    that -- perhaps for a lot of people for that initial

10   suicide crisis to pass, not in everybody but some people.

11   But these crises come back again later.

12          Most of these people die by suicide because they

13   have a mood disorder, a depressive illness.  Those

14   illnesses are overwhelmingly recurrent.  So maybe they go

15   through a crisis, and then it goes away.  And they get

16   more depressed again, and then it comes back and so on

17   and so forth.

18          Some people buy the method or acquire the method

19   for suicide because the pain of being alive is terrible,

20   and they make a bargain with themselves.  They say I'm

21   going to stick it out because I know if I can't stand it

22   and I've really reached the end of my rope, I'm going to

23   use this gun and kill myself.  And having the gun there

24   gives them the strength to resist acting.  Sounds

25   paradoxical but that's how it works for a lot of people.

                                                          85

1   And then -- but the next time they may not have the

2   strength.  And the next time they get depressed and they

3   feel suicidal, the gun's there, and they pull it out and

4   use it.  So that might explain why the -- one of the

5   reasons why the risk remains elevated over several years.

6            So if the gun wasn't there, the risk is lower

7   regardless of your speculation as to the, you know,

8   mental gymnastics that the person's going through.

9   That's the bottom line.  If the gun's not there, the risk

10  is lower.  If there are more guns, the risk is higher.

11  If the gun is locked up, the risk is lower.  If the

12  ammunition is locked up, the risk is lower.  If the gun's

13  not in the house, the risk is lower.  It all points to

14  the gun.

15  Q.       Okay.  So picking up on one of the many things

16  you just talked about there, let's go back to the first

17  page of your article, and the second paragraph of the

18  text, left-hand column, last sentence you state "Because

19  70% of attempters take less than 1 hour between deciding

20  to kill themselves and the actual attempt, they are more

21  likely to use a method that is at hand."

22            And you make a similar statement in your report.

23  If you would turn to paragraph 24 on page 7.  "Suicidal

24  behavior is generally impulsive, and 70% of suicide

25  attempters act less than one hour after deciding to kill

                                                          86

1    themselves, meaning they tend to use a readily available

2    method."  Do you see that?

3    A.        Uh-huh.

4    Q.        You're stating the same thing really in both

5    places, right?

6    A.        Uh-huh.

7    Q.        So from an impulsiveness standpoint, are you

8    saying that 70 percent of suicide attempts occur within

9    an hour of deciding to kill themselves?

10   A.        That's what this kind of study indicates.

11   Q.        And is that a core element of your opinion as

12   well?

13   A.        It's an important element because -- but it

14   should be understood in the context of the fact that the

15   intent or the thought of -- actually of suicide can be

16   there on and off, you know, for a long time.  But if you

17   ask the person when was it that you finally made up your

18   mind you're going to do it, that's where that one hour

19   comes from.  They've been thinking about it, thinking

20   about it, thinking about it, thinking about it.  When do

21   they actually stand up, walk over to the gun closet and

22   take out the gun?  They do that within one hour of having

23   that final kind of decision in their mind.

24   Q.        And are you assuming that this 70 percent figure

25   applies evenly across all methods of suicides?

87

1    they generally use a gun that's already there.

2    Q.        Well, and in California if you don't have a gun

3    that's already there but you decide you want to commit

4    suicide, it's literally impossible to do so with a gun in

5    less than an hour, right?

6    A.        You mean there's a 10-day waiting period?

7    Q.        Yes.

8    A.        Yes.  That is correct.  But if somebody else has

9    bought a gun or you bought a gun --

10   Q.        But I -- my question assumes that there is no

11   gun in the home or otherwise readily available.

12   A.        Yeah.

13   Q.        And you need to go out and buy a gun.

14   A.        That's what suicide prevention is trying to do

15   is trying to create more households without a gun.

16   Q.        In California, if you don't have a gun in the

17   household and you don't steal it or borrow it from

18   somebody else and you have to go buy it, you've got to

19   wait ten days, right?

20   A.        That is correct.  And the ten-day waiting period

21   is a very good idea, one of several.

22   Q.        Did it impact your analysis in reaching your

23   conclusions?

24   A.        I'm -- I think I'm being very clear.  I think

25   that the ten-day waiting period in California is a

89

1    terrific thing.

2    Q.        I understand that.  I'm asking if it impacted

3    your opinions in this case as to the effect of

4    invalidating the law that's at issue in this case?

5    A.        I see the law in this case as applying to two --

6    to several scenarios.  First of all, the individual who

7    decides to go out and buy a gun because they tend to be a

8    bit more impulsive and more likely to buy a gun.  There

9    could be the individual who's feeling suicidal at the

10   time, but that doesn't necessarily mean that they're

11   going to use the gun at that time.  Second, it also

12   impacts the other members of their family who may go out

13   and buy a gun, putting the gun in the household.  It is a

14   subgroup of individuals that would be impacted by a law

15   that affects the probability of deciding to buy a gun, a

16   subgroup of individuals.

17   Q.        In your article with -- do I call her

18   Dr. Michel?  She's not a -- is she a doctor?

19   A.        She's on her way to be a doctor.

20   Q.        With Ms. Michel.

21   A.        Yes.

22   Q.        You reference a policy in Indiana that allowed

23   police to seize guns from people that they consider

24   dangerous?

25   A.        Yes.

90

1    Q.       You refer to the guns eventually being returned

2    and note even if -- quote, even if the firearm is

3    returned, the seizure serves as a cooling off period

4    allowing the suicidal crisis to pass.  Does this relate

5    to the length of the suicidal crisis that we were just

6    talking about, the roughly one-hour crisis period?

7    A.       The suicide crisis can last longer than an hour.

8    It can last days.

9    Q.       Well, do you have a view on how long the typical

10   suicide crisis lasts?

11   A.       More intensely, hours to days.

12   Q.       And by days, you mean in the single digits?

13   A.       Yes.

14   Q.       What studies do you have in mind when you state

15   that, or do you have any studies in mind?

16   A.       It's very difficult to quantify the -- how

17   severely suicidal they have to be to qualify as a crisis,

18   but if you take a kind of an index, you know, people are

19   put in a hospital because they're feeling acutely

20   suicidal, and putting them into the hospital is the only

21   thing you can do because you want to protect them; and

22   it's not uncommon for them to be feeling a bit better in

23   hours or days of that being done.  So that's a

24   therapeutic intervention.  What I'm attempting to explain

25   is that it's very difficult to do a study leaving people

91

1    Q.       Are you aware of any research on whether a

2    person who is in a suicidal ideation would tend to buy

3    from a licensed dealer as opposed to an unlicensed

4    source?

5    A.       I don't know.

6    Q.       Is there any basis for saying whether such a

7    person would be deterred in any event by a restriction

8    that prohibits a reference to handguns as opposed to guns

9    generally?

10   A.       I don't quite understand the question.

11            MR. BENBROOK:  Could you repeat it back, please.

12            (The record was read back by the reporter as

13   follows:  "Question:  Is there any basis for saying

14   whether such a person would be deterred in any event by a

15   restriction that prohibits a reference to handguns as

16   opposed to guns generally?")

17            THE WITNESS:  What's the reference to handguns,

18   a restriction?

19   Q.       BY MR. BENBROOK:  The restriction in the

20   advertisement itself.  That's the purpose of this law

21   that you are defending with your opinion that prohibits a

22   reference to a handgun as opposed to guns in general.

23   A.       I'm not an expert on the impacts of types of

24   advertising or advertising in general or buying behavior,

25   specifically buying behavior.  What I can say is that

                                                                      95

1    anything that facilitates gun purchases, long guns or

2    handguns, and therefore makes them more readily available

3    is going to have an impact on suicide rates using

4    firearms.

5    Q.      Let's turn to topic 3 which is just one

6    paragraph where you state, "Attempted Suicide Using a

7    Firearm is More Often Fatal Than Any of the Other Means

8    of Suicide Amongst Those in the Top Ten Most Frequently

9    Used Methods."  Can you explain how this observation --

10   this opinion is important to your overall opinion in

11   number 5?

12   A.      Suicide methods that have the least chance of

13   survival are the ones that are most important for

14   reducing or restricting access to because, if the person

15   survives the suicide attempt, then their chances of dying

16   by suicide are probably much smaller.  The suicide rates

17   after a suicide attempt, survival is about one percent

18   per year, approximately.  So if they decide that they're

19   actually going to attempt suicide and they do so, if the

20   method has a higher survival rate, that's clearly

21   advantageous.  It gives them a better chance at a second

22   lease on life.

23   Q.      Okay.  So but my question basically is why did

24   you include this as part of your logical string of

25   getting to opinion number 5?

96

1    try to be very accurate.

2    Q.       There's never been a study of a relationship

3    between an advertising restriction on firearms and

4    suicide, has there, that you're aware of?

5    A.       No.

6    Q.       So at page 9, line 9 -- or actually, yes, 9

7    through 11 you say, "Even if the firearm is eventually

8    purchased, a 'cooling off' period or more difficulty

9    finding stores that sell guns allows the suicidal crisis

10   to potentially pass."  Actually, hold that thought.

11   Let's go back one sentence to lines 7 through 9.  You're

12   talking about impulsive purchases.  You say, "They are

13   therefore likely to be better protected by approaches

14   such as the requirement for a waiting period or if there

15   is less advertising of gun sales analogous to the

16   restrictions on advertising sale of cigarettes."  Do you

17   see that?

18   A.       Yes.

19   Q.       That's not adorned with any citation because, as

20   you just said, there is no study establishing a

21   relationship between advertising restriction and suicide,

22   right?

23   A.       That's correct.

24   Q.       Forgive me if I've already asked you a version

25   of this question, but are you aware of research that

                                                          106

```
 1                    REPORTER'S CERTIFICATE

 2              I, KACY PARKER BARAJAS, a duly licensed

 3       Certified Shorthand Reporter of the State of California,

 4       hereby certify that the witness in the foregoing

 5       deposition was by me duly sworn;

 6              That said testimony was taken down in

 7       stenographic shorthand by me, a disinterested person, at

 8       the time and place therein stated and was thereafter

 9       reduced to typewriting and that the testimony as

10       transcribed is a true record of the testimony given by

11       the witness.

12              That before completion of the deposition, review

13       of the transcript was requested.  If requested, any

14       changes made by the deponent (and provided to the

15       reporter) during the period allowed are appended hereto.

16              I further certify that I am not of counsel or

17       attorney for either or any of the parties to said

18       deposition, nor in any way interested in the outcome of

19       the cause named in said deposition.

20              Dated this 10th day of November, 2016.

21
                            _____
22
                            KACY PARKER BARAJAS
23                          Registered Merit Reporter
                            Certified Realtime Reporter
24                          State of California
                            Certificate No. 10915
25
                                                          121
```

EXHIBIT C

Journal of Retailing and Consumer Services 21 (2014) 86–97

Contents lists available at ScienceDirect

# Journal of Retailing and Consumer Services

journal homepage: www.elsevier.com/locate/jretconser



# A meta-analysis of consumer impulse buying

Clinton Amos [a,*], Gary R. Holmes [b,1], William C. Keneson [c]

[a] Goddard School of Business, Weber State University, 3801 University Circle, Ogden, UT 84408, United States
[b] Breech School of Business Administration, Drury University, 900 North Benton, Springfield, MO 65802, United States
[c] Moore School of Business, University of South Carolina, 1705 College Street, Columbia, SC 29208, United States

## A R T I C L E   I N F O

Article history:
Received 20 September 2012
Received in revised form
18 November 2013
Accepted 19 November 2013
Available online 14 December 2013

Keywords:
Impulse buying
Meta-analysis
Impulsivity
Impulsive
Impulse buying trait
Impulse buying tendency

## A B S T R A C T

This study provides a meta-analysis of the impulse buying literature and examines common antecedents for impulse buying behavior. An exploration of the impulse buying literature results in the establishment of three overarching constructs used as independent variables: dispositional, situational, and socio-demographic variables. The Kruskal–Wallis test was used to assess which variables are shown to have the strongest effect on impulse buying and suggest that the dispositional/situational interaction variables have the strongest relationship with impulse buying followed by dispositional, situational, and socio-demographic main effects, respectively. Specific dispositional, situational, and sociodemographic constructs are explored further along with moderating effects. Implications of the findings are discussed.

© 2013 Elsevier Ltd. All rights reserved.

## 1. Introduction

Retailers are delighted when a shopper feels a sudden impulse to buy a new blouse while browsing at a shopping mall or places a candy bar in their shopping cart while standing in the checkout line. Past research has shown that unplanned purchases account for up to 60% of all purchases (Inman and Winer, 1998; Mattila and Wirtz, 2008) and that impulse buys can account for anywhere from 40% to 80% of purchases depending on product category (e.g., Hausman, 2000; Kacen et al., 2012; NEFE, 2012; West, 1951). The fact that unplanned, and specifically, impulse buying, accounts for a sizable percentage of all purchases is supported by recent industry research. For instance, in a 2012 study by Point-of-Purchase Advertising International, it was reported that 76% of all purchase decisions are made in the store (POPAI, 2012) and according to the National Endowment for Financial Education, more than 87% of American adults admit to making impulse buys (NEFE, 2010). Research by Coca Cola has shown that impulse buying accounts for more than 50% of all grocery purchases (CNBC, 2009). In addition, recent research reports that the Millennial generation is 52% more likely to make an impulse purchase to pamper oneself than any other generation (Tuttle, 2012).

Retailers, armed with the knowledge that consumers frequently make impulse purchases, are interested in the impulse buying phenomenon because they hope to appeal to consumers' impulsive tendencies (e.g., Clover, 1950; Kacen et al., 2012; Pentecost and Andrews, 2010; Puri, 1996). Recently in an online context, researchers have examined how to better appeal to impulse buyers to take advantage of the behavior which has assisted brick-and-mortar retailers flourish for decades (Kervenoael et al., 2009; Park et al., 2012; Verhagen and van Dolen, 2011; Wells et al., 2011). Regardless of context, a primary objective in retailing is to increase impulse temptation to enhance sales (e.g., Beatty and Ferrell, 1998; Kacen et al., 2012; Puri, 1996). Due to the practical implications and pervasiveness of impulse buying, retailing has focused considerable efforts on facilitating the behavior (e.g., Dholakia, 2000; Kervenoael et al., 2009; Roberts and Manolis, 2012). Retailers are not the only group with interest; researchers have also been interested in impulse buying behavior, generating numerous studies in recent decades. Consumer organizations such as the National Consumers' League and American Association of Retired Persons (AARP) have exerted effort to inform consumers about marketers' desires to facilitate the behavior (National Consumers League, 2011; Yeager, 2012).

It is astonishing to note, with the high level of interest from retailers, consumer groups, and researchers, impulse buying is still considered to be a construct without a clear theoretical framework. The definition of impulse buying has evolved over time and there has been little effort to amalgamate the findings related to impulse buying antecedents. Studies have explored a great variety

* Corresponding author. Tel.: +1 801 626 6075; fax: +1 801 626 7423.
E-mail addresses: clintonamos@weber.edu (C. Amos),
gholmes@drury.edu (G.R. Holmes), kenesonw@email.sc.edu (W.C. Keneson).
[1] Tel.: +1 417 873 7828; fax: +1 417 873 7537.

0969-6989/$ - see front matter © 2013 Elsevier Ltd. All rights reserved.
http://dx.doi.org/10.1016/j.jretconser.2013.11.004

of situational, dispositional, and sociodemographic factors ranging from social influence, to consumer traits, to the effects that gender and age have on impulse buying. A recent effort to summarize the impulse buying literature through literature review exists (see Xiao and Nicholson, 2013). However, to our knowledge, no effort to conduct a meta-analysis and quantitatively integrate and empirically analyze relevant findings from the impulse buying literature has been undertaken.

This study's purpose is not to solely categorize the literature like that of a literature review, but also to provide a distinct contribution by quantitatively analyzing relevant findings and examining the relative impact of independent variables while also investigating methodological and substantive moderators. This study investigates impulse buying antecedents in academic literature to determine whether the existing body of literature can yield any theoretically and managerially relevant insights. More specifically, this paper reviews quantitative studies in the literature and documents the relationship between impulse buying behavior and the nature of the variables that influence this type of purchase while also examining any pertinent substantive and methodological moderators.

## 2. Impulse buying

Impulse buying has been recently defined "as a sudden, hedonically complex purchase behavior in which the rapidity of the impulse purchase precludes any thoughtful, deliberate consideration of alternative or future implications" (Sharma et al., 2010, p. 277). This definition has evolved from decades of research regarding impulse buying. In a seminal work, Rook (1987) defined impulse buying as a powerful and persistent urge to buy something immediately. Early research sometimes conveyed impulse buying as an unplanned purchase and often used these terms synonymously in literature (Stern, 1962). Research findings suggest impulse buying behavior can typically be categorized as unplanned, but unplanned purchases cannot always be categorized as impulse buys (e.g., Kacen et al., 2012; Kollat and Willet, 1969; Verhagen and van Dolen, 2011; Zhang et al., 2010). The logic behind this distinction lies in the fact that an unplanned purchase may occur simply because a consumer has a need for the product but failed to place the item on a structured shopping list. Unplanned purchases may not be accompanied by a powerful urge or strong positive feelings usually associated with an impulse buy.

The decision time lapse, the time frame between desire to purchase and the actual purchase, appears short for an unplanned purchase (e.g., Kacen and Lee, 2002; D'Antoni and Shenson, 1973; Rook, 1987; Weun et al., 1998). Time that passes between desire to purchase and actual purchase for an impulse buy is also short but is primarily driven by strong hedonic temptations of immediate satisfaction and improved mood with little or no regard for consequences (Baun and Groeppel-Klein, 2003; Punj, 2011; Puri, 1996; Taute and McQuitty, 2004). Thus, the urge during an impulse buy is extremely powerful and difficult to resist (e.g., Hoch and Loewenstein, 1991; Park et al., 2012; Rook, 1987; Rook and Fisher, 1995). Often consumers describe the event of impulse buying as experiencing a strong temptation for an object of desire and having little behavioral constraint to resist this temptation (e.g., Dholakia, 2000; Khan and Dhar, 2004; Puri, 1996; Roberts and Manolis, 2012; Weinberg and Gottwald, 1982). In sum, impulse buying is typically categorized using three criteria. First, the act is spontaneous and is usually accompanied by a positive emotional charge. Second, the individual making an impulse buy shows a diminished regard for any costs or consequences. Third, the act usually involves a hedonic temptation for

immediate self-fulfillment through consumption (Babin and Harris, 2013; Dholakia, 2000; Sharma et al., 2010; Verhagen and van Dolen, 2011). Temptation associated with immediate gratification characterizes the impulse buying desire and is usually a temporary state (Dholakia, 2000; Puri, 1996; Rook, 1987; Vohs and Faber, 2007). However, the consumption impulse can still exist if the decision time lapse is extended. Time extension does permit consumers to better develop a cognitive evaluation of the impulse thus allowing consideration of constraining factors versus impulse enactment (e.g., Dholakia, 2000). This introduction of constraining factors paves the way for consumers to develop resistance strategies that may cause the consumption impulse to dissipate.

Consumers who do not effectively develop resistance strategies fall prey to the temptation (Baumeister, 2002; Dholakia, 2000; Puri, 1996; Roberts and Manolis, 2012; Sharma et al., 2010) resulting from the excitement and stimulation of an impulse buy and tend to place an emphasis on emotions and feeling during this experience (e.g., Beatty and Ferrell, 1998; Flight et al., 2012; Puri, 1996; Rook, 1987). The temptation that consumers feel stems from both the emotional attraction to the object of desire and the desire for immediate gratification (Hoch and Loewenstein, 1991; Kacen and Lee, 2002; Puri, 1996). Impulse buying temptation often occurs due to sensory contact (e.g., proximity of product or marketing stimuli) and can be augmented by situational (e.g., mood or environmental factors) and individual factors (e.g., impulse buying trait) [Adelaar et al. 2003; Dholakia, 2000; Sharma et al., 2010]. Hence, when people make an impulse buy they are often yielding to temptation (e.g., Baumeister, 2002; Dholakia, 2000; Puri, 1996).

While impulse buying stems from an emotional response and involves temptation it is distinct from compulsive buying (e.g., Babin and Harris, 2013; Flight et al., 2012; Kwak et al., 2006; Sneath et al., 2009). There is a lengthy stream of literature in psychiatry dedicated to compulsive buying which defines it as excessive, repetitive uncontrollable preoccupations, urges, or behaviors pertaining to shopping that lead to subjective distress and impaired functioning (Black, 2007). Individuals with compulsive buying disorder often engage in impulsive consumption, though the compulsive buying disorder phenomenon has a unique detrimental effect on an individual due to the repetitive, out of control nature of compulsive buying (Babin and Harris, 2013; Kukar-Kinney et al., 2009; Flight et al., 2012). Granting research has shown that both impulse buying and compulsive buying may result in the implementation of coping strategies (Yi and Baumgartner, 2011), research has empirically demonstrated the distinctness of the two constructs and that compulsive buying is a conspicuously different phenomenon (Flight et al., 2012; Wood, 1998; Xiao and Nicholson, 2013). For impulse buying, the behavior can be described as an experiential hierarchy of effects whereby the consumer first experiences strong affect for the product, immediately purchases the product, and finally may attempt to justify the act (e.g., Baumeister, 2002; Mowen and Minor, 2006; Puri, 1996). Justification is usually voiced in a set of beliefs the consumer may use to explain the purchase. To some, these beliefs are only used to make one feel better about making an impulse buy, not because of true remorse.

### 2.1. The establishment of impulse buying trait

Murray (1938) described impulsivity as when one responds quickly and without reflection. Impulsivity is relevant to a variety of social science disciplines (Dittmar et al., 1995; Dholakia, 2000; Puri, 1996) and is used interchangeably with impulsiveness (e.g., Johnson et al., 1993; Moeller et al., 2001; Puri, 1996) though the term impulsiveness is more frequently used when describing an individual's trait (e.g., Dholakia, 2000; Kacen et al., 2012, Jones et al.,

2003; Puri, 1996; Rook and Fisher, 1995; Zhang et al., 2010). Impulsiveness results from self-regulation failure where one's own desires override any ability to control those desires (e.g., Beatty and Ferrell, 1998; Hoch and Loewenstein, 1991; Roberts and Manolis, 2012; Vohs and Faber, 2007). General impulsiveness is often characterized as a lack of behavioral control and an immediate preference for surrendering to temptation and past research indicates that a predisposition towards impulse buying correlates strongly with impulsiveness (e.g., Baumeister, 2002; Hausman, 2000; Hoch and Loewenstein, 1991; Puri, 1996; Sharma et al., 2010; Weun et al., 1998; Zhang et al., 2010). In fact, research suggests that the predisposition to make impulse buys likely originates from the more general impulsiveness trait (Eysenck, 1993; Sharma et al., 2010; Puri, 1996; Wells et al., 2011) which is shown to correlate with other tendencies such as variety/novelty seeking tendencies (e.g., Pirog and Roberts, 2007; Sharma et al., 2010). Hence, an individuals' impulse buying tendency/trait is generally considered a subtrait of general impulsiveness (e.g., Beatty and Ferrell, 1998; Gerbing et al., 1987; Puri, 1996; Weun et al., 1998) but has also been shown to be a unique trait (Verplanken and Herabadi, 2001; Weun et al., 1998).

Several researchers explored the concept of individual personality traits of impulsiveness and consumption but a measure failed to emerge during early research (Cobb and Hoyer, 1986; D'Antoni and Shenson, 1973; Kollat and Willet, 1969). Tellegen (1982) developed the Multidimensional Personality Questionnaire (MPQ) that included a Lack of Control variable. Lack of Control represents an insufficient ability to contain an impulse and delay gratification. Thus, individuals who lack control are spontaneous, reckless, and careless, preferring to act out of impulse rather than planned action. Hoch and Loewenstein (1991) explored this lack of control by discussing how consumers attempt to deflect the urge to buy through attacking uncontrolled desire using various willpower strategies. Gerbing et al. (1987) researched the impulsiveness concept and concluded that most impulsive behavior consists of three overarching behavioral components: spontaneity, not persistent, and carefree. Spontaneity consists of thrill seeking, planning-avoidance, and quick decision making while not persistent consists of restlessness, distractibility, and complexity avoidance. Carefree behavior consists of a happy-go-lucky disposition.

Later, Rook and Fisher (1995) developed an initial scale to specifically measure impulse buying trait. Essentially, this scale attempts to measure the impulsiveness trait at it pertains to the purchasing and use of products (e.g., Dholakia, 2000; Kacen et al., 2012; Rook and Fisher, 1995). Rook and Fisher (1995) defined impulse buying trait as a one-dimensional construct that reflects an individual's tendencies "to buy spontaneously, unreflectively, immediately, and kinetically" (Rook and Fisher, 1995, p. 306). Rook and Fisher's (1995) scale was later accompanied by other impulse buying trait scales developed by Puri (1996) and Beatty and Ferrell (1998) and the construct is primarily referred to in the literature as Impulse Buying Tendency (Beatty and Ferrell, 1998; Weun et al., 1998), Impulse Buying Trait (Rook and Fisher, 1995), and the Consumer Impulsiveness Scale (Puri, 1996). Regardless of which label is used, a predisposition towards impulse buying is characterized by both tendencies to experience spontaneous and sudden urges and to act on those urges by making spontaneous consumption choices (Beatty and Ferrell, 1998; Rook and Fisher, 1995; Puri, 1996; Weun et al., 1998) and we refer to this construct in the analysis and throughout the manuscript as IBT. In sum, IBT measures reflect a level of trait consumption impulsiveness and have been shown to vary in intensity among individuals (e.g., Baumeister, 2002; Beatty and Ferrell, 1998; Roberts and Manolis, 2012; Rook and Fisher, 1995). While IBT purports to measure an individual's chronic trait, the impulse buying construct has been used by researchers to measure an individual's decision to make a spontaneous purchase while shopping and not

a chronic disposition (e.g., Adelaar et al., 2003; Park et al., 2012; Rook and Fisher, 1995).

## 2.2. Measuring impulse buying

The literature review revealed that three primary constructs have been used to measure impulse buying: (1) self-reported measures of impulse buying, (2) observed impulse buying behavior, and (3) impulse buying surrogates (e.g., how much an individual spends). Some studies used only one of these constructs to measure impulse buying while other studies opted to use two or more constructs to assess impulse buying. Of the self-reported measures used for impulse buying, most are an adaption from Rook and Fisher (1995) or Beatty and Ferrell (1998). Others either observed actual behavior or asked respondents to respond to questions on past, future behavior, or other's behavior (projective techniques). Since the purpose of this study is to examine factors influencing impulse buying, impulse buying trait was treated as an independent variable and studies exclusively examining factors influencing impulse buying trait, without linking to impulse buying, were excluded from this meta-analysis.

## 3. Antecedents of impulse buying

The primary goal of this meta-analysis is to organize the existing research into a distinct framework where the strength of relative factors can be evaluated based upon the impact on impulse buying. Many researchers have investigated various antecedents of impulse buying behavior but the entire body of work has not been examined in a comprehensive manner and the literature stream remains fragmented (Xiao and Nicholson, 2013). For conducting this meta-analysis, we incorporate a framework that classifies independent impulse buying variables into three categories: dispositional, situational, and sociodemographics.

Dispositional antecedents in the literature are predispositions in which one person differs from another in a relatively permanent and consistent manner and have an effect on buying behavior (Mowen and Minor, 2006). Dispositional characteristics of a person are chronic characteristics that reside with the individual and tend to apply generally across situations (e.g., Beatty and Ferrell, 1998; Rook and Fisher, 1995; Sharma et al., 2010). Dispositional factors relevant to impulse buying include psychological constructs such as IBT, spontaneity, variety/novelty seeking propensity, susceptibility to influence, shopping enjoyment, need for cognition, esteem, openness, ability to regulate emotion, etc. (Sharma et al., 2010).

In contrast to dispositional variables, situational antecedents are external events, stimuli or present states of being the consumer may find themselves in at the moment of impulsive urges (e.g., Beatty and Ferrell, 1998; Dholakia, 2000; Kacen et al., 2012). For instance, a situational factor may be sensory cues in a retail environment, an individual's current mood state, or the presence of others during a shopping situation. Situational variables are usually not under the direct control of the consumer but have a direct impact on the likelihood of impulse buying behavior. Common situational factors examined in the impulse buying literature are affective states (e.g., mood), marketing stimuli (external cues), retail environment (e.g., store layout), hedonic versus utilitarian purchase motives, time or financial constraints, and social factors (e.g., Dholakia, 2000; Kacen et al., 2012; Sharma et al., 2010). Finally, sociodemographic aspects are explored in the impulse buying literature to examine the impact of demographic and socioeconomic variables both of which are beyond the influence of paid marketing activities. The variables identified in our literature search are exemplified by age,



**Fig. 1.** Antecedents of impulse buying.

gender, income, and ethnicity. Adapted from Sharma et al. (2010), Fig. 1 provides a summary of the framework used for this study.

## 4. Method

### 4.1. Meta-analysis

Meta-analysis research methodology offers many distinct advantages over a literature review. Meta-analysis is characterized by the emphasis which is placed on performing an exploration of relevant studies. This emphasis is practically and theoretically significant. As stated by the American Psychological Association (2008), regardless of discipline, a particular literature stream often contains disparate findings, and studies can become so abundant that it is difficult to draw any real conclusions about a particular topic. Meta-analysis allows for the quantitative exploration of past findings in a particular literature stream to provide a more effective means of formulating causal influences and understanding, at least inferentially, why various results occurred (Cooper and Hedges, 1994) and the relative importance of different independent variables (Gravier et al., 2008; Lipsey and Wilson, 2001). The goal of any meta-analysis is to accrue and generalize results across research studies to make the current state of knowledge on a certain substantive matter more transparent, and to help guide future research (e.g., Farley and Lehmann, 1986; Tammo et al., 2001).

The primary advantages of meta-analysis clearly derive from the method's ability to allow researchers' to amalgamate findings across various studies, establish the strength and generalizability of reported relationships, and dissect inconsistent findings (Pan and Sparks, 2012). In addition, it also allows researchers to examine the contribution of small and non-significant effects in a stream of literature (Cooper, 2009; Cooper and Hedges, 1994). The context of impulse buying is a particular area where more than 30 years of research exists without any past efforts to quantitatively summarize the findings within the literature stream. Hence,

a meta-analysis of impulse buying literature can provide a much needed summary of the literature and highlight any disparate findings and gaps in the literature.

### 4.2. Selecting the relevant literature

A comprehensive literature review identified 117 relevant empirical studies that dealt directly (primary focus) or indirectly (secondary focus) with impulse buying. The ABI Inform, EbscoHost, Google Scholar, Digital Dissertations and Science Direct databases were all searched. Peer-reviewed academic journals, as well as trade journals, were searched in marketing, advertising, business, psychology, retailing, and communications fields. Following Garlin and Owen (2006), unpublished studies were pursued through Google, sites of active authors, and the acquisition of dissertations with findings unpublished in peer-reviewed academic journals.

In accordance with Pan et al. (2012), four criteria were established for inclusion in this study: (1) reported samples size, (2) quantitative evaluation of impulse buying antecedents, (3) use of Pearson correlation or statistics than can be transformed into correlations, and (4) examination of relationships reported in multiple studies ($n > 3$). Excluded studies include studies which focused on unplanned purchasing without explicitly investigating impulse buying, studies which focused exclusively on antecedents of the IBT, and studies which focused on compulsive buying behavior. Of the 117 studies originally identified as worthy for further evaluation, 33 articles fit the exclusion criteria or were conceptual. Another 21 failed to report information required to conduct the analysis. Following, Palmatier et al. (2006), email correspondence was sent to corresponding authors to possibly obtain relevant statistics. In total, then, 63 independent samples from 63 studies were retained for this meta-analysis and total number of effects is 345. Studies included in this meta-analysis were published between 1978 and 2012. Though an extensive search was conducted, the articles used in this meta-analysis probably represent a sample, as opposed to the complete population, of the impulse buying literature. But given the wide

**Table 1**
Number of articles included for meta-analysis by publication.

| Publication | Frequency | SCImago quartile[a] |
|---|---|---|
| Journal of Retailing | 5 | Q1 |
| Journal of Business Research | 4 | Q1 |
| Journal of Consumer Research | 4 | Q1 |
| Unpublished Dissertation | 4 | NA |
| Journal of Marketing Theory & Practice | 3 | Q1 |
| Journal of Consumer Psychology | 2 | Q1 |
| Journal of Economic Psychology | 2 | Q2 |
| Journal of Fashion Marketing and Management | 2 | Q2 |
| Journal of International Consumer Marketing | 2 | Q2 |
| Journal of Marketing Research | 2 | Q1 |
| Journal of Retailing and Consumer Services | 2 | Q2 |
| Psychology & Marketing | 2 | Q1 |
| Adolescence | 1 | Q1 |
| Advances in Consumer Research | 1 | NL |
| Asia Pacific Management Review | 1 | Q4 |
| Asian Journal of Social Psychology | 1 | Q2 |
| Communications of the IBIMA | 1 | NL |
| Database Marketing & Customer Strategy Management | 1 | Q3 |
| Direct Marketing: An International Journal | 1 | NL |
| Electronic Commerce Research | 1 | Q1 |
| European Journal of Personality | 1 | Q1 |
| Information & Management | 1 | Q1 |
| International Journal of Obesity | 1 | Q1 |
| International Journal of Organization Theory and Behavior | 1 | NL |
| International Journal of Retail & Distribution Management | 1 | Q2 |
| International Review of Retail, Distribution and Consumer Research | 1 | Q4 |
| Journal of Advertising | 1 | Q1 |
| Journal of Advertising Research | 1 | Q2 |
| Journal of Customer Behaviour | 1 | NL |
| Journal of Global Marketing | 1 | Q3 |
| Journal of Information Technology | 1 | Q1 |
| Journal of International Marketing | 1 | Q1 |
| Journal of Product & Brand Management | 1 | Q2 |
| Journal of Services Marketing | 1 | Q2 |
| Journal of the Association of Information Systems | 1 | Q1 |
| Managerial and Decision Economics | 1 | Q2 |
| Marketing Letters | 1 | Q2 |
| Multivariate Behavior Research | 1 | Q1 |
| Psychological Reports | 1 | Q3 |
| The IUP Journal of Marketing Management | 1 | NL |
| 2nd International Conference on Business and Economic Research | 1 | NL |
| Total | 63 | |

[a] SCImago rating where Q1 means top quartile and Q4 means bottom quartile within a discipline.

diversity of publications (see Table 1) contained in the sample, it should be representative of the relevant impulse buying literature.

### 4.3. Coding data

For the independent variables, the coding of the studies yielded ten substantive and methodologically meaningful categories on which all studies could be compared. The dimensions were independent variable type, experimental effect, study setting, study context, dependent variable metric, sample type, product type, sample country of origin, decade of study, and journal classification. Many of the examined moderator variables coded can be universally applied in a meta-analysis (e.g., sample type, setting, country of origin) while some are distinct to this particular area of study (e.g., context, product type).

A review of the literature revealed 17 independent variables were reported frequently enough to be included in a formal meta-analysis. The antecedents were initially coded verbatim (i.e. the

variables were recorded exactly as recorded in the original manuscripts). Then, substantive independent variables were classified among the three overarching constructs: dispositional, situational, and sociodemographic. Sharma et al.'s (2010) scheme was used as a guide for classifying dispositional and situational variables. Dispositional variables with enough effects for inclusion in the analysis for impulse buying were IBT, dispositional motivational influences, psychographics, and other measures of dispositional traits such as impatience and susceptibility to influence. Situational variables primarily included social influence, situational affect, purchase type (hedonic vs. utilitarian), external cues, retail environment, situational time pressure, product characteristics, available finances at time of purchase, situational motivational forces (e.g., involvement) and shopping behavior (e.g., browsing vs. planned shopping trip). Table 2 provides a more comprehensive description of the independent variables included in this meta-analysis.

In accordance with Brown and Lam (2008) and Pan and Zinkan (2006), coding was performed by two trained coders. Again, the initial coding consisted of coding the independent variables exactly as the authors articulated them. These independent variables were then reinterpreted and grouped into redefined variables. Similar to Table 2, a coding sheet was provided to the coders to aid in classification (Palmatier et al., 2006). In the coding process, articles were initially scanned by each coder highlighting detailed relevant information (e.g., journal, independent/dependent variables, sample size, sample type, reliabilities, etc.). The coders then transferred the information into a spreadsheet for categorization and subsequent analysis. Overall the coders agreed on 87% percent of the codings. Any disagreements about potential inconsistencies in the coding were resolved through discussion. Final coding and placement of individual variables into the overarching constructs can be found in Table 3.

### 5. Analysis

Amongst the original 345 total effects, 251 were statistically significant ($p < .05$) (see Table 3). With respect to methods characteristics, 90.1% of the effects were main effects, 82% of the effects were derived using a survey instrument, and 60% of the effects were acquired using a non-student sample. Approximately 63% of the effects were achieved using a U.S. based sample.

The effect size metric consists of the Pearson product–moment correlation and was calculated from various effect size statistics (e.g., $F$, $t$, $\chi^2$) in accordance with Lipsey and Wilson (2001). These data were skewed (skewness=1.03, skewness std. error=.13) [see Fig. 2] but this was not unexpected, given the small effects associated with behavioral research (Sawyer and Ball, 1981; Wilson and Sherrell, 1993). Correspondingly, the Kruskal–Wallis nonparametric procedure was performed on the absolute value of the Fisher Z transformed effect sizes corrected for attenuation. Kruskal–Wallis provides a powerful alternative to the $t$-test for the equality of means and also provides the added benefit of providing a ranking of means based upon effect size and dispersion (Wilson and Sherrell, 1993). Compared with the $F$-test, the Kruskal–Wallis test has an asymptotic efficiency of 95.5% when used with non-normal populations (Siegal, 1956), does not make assumptions about dispersion, is conservative, and is commonly used in meta analyses in a variety of disciplines (e.g., Amos et al., 2008; Cohen et al., 2006; Rosen, 2000; Wilson and Sherrell, 1993).

The Fisher Z transformation was used since the standard error for the Fisher Z transformed correlation relies solely on sample size and not on the size of the statistic (Hunter and Schmidt, 1990, p. 102). Although the Fisher Z transformation can result in an upward bias, it rarely has any effect on the final outcome of a

**Table 2**
Meta-analysis variable descriptors.

| Variable | Description |
|---|---|
| Available finances | Amount of money at the time of purchase (e.g., pocket money, credit) |
| Ethnicity | Comparisons of various ethnic cohorts (e.g., African American, Caucasian, Hispanic) |
| External cues | Includes environmental cues such as scents, sounds, and promotional stimuli |
| Hedonic | Hedonic versus utilitarian product purchases |
| IBT | Primarily composed of impulse buying trait measures based upon Rook and Fisher (1995) but also includes other measures of trait impulsiveness. |
| Income | Earnings of individuals as expressed in terms of monthly or annual income. |
| Motivation | Includes measures of involvement, internal drive states, and importance of purchase to individual. |
| Negative affect | Includes the measures of negative affect (PANAS), stress, depression, skepticism, and situational negative moods, fatigue. |
| Negative social influence | Normative social influence which constrains or does not encourage buying behavior |
| Positive affect | Includes the measures of positive affect (PANAS), pleasure, excitement, and positive attitudes |
| Positive social influence | Includes various measures of normative social influence encouraging buying behavior |
| Product characteristics | Includes product attributes such as price, product features, and perceptions of quality |
| Psychographics | Includes measures of personality traits and lifestyle factors |
| Retail environment | Store characteristics such as product assortment, store layout, and store size |
| Shopping behavior | Includes purchase frequency, number of comparisons made, shopping frequency, frequency of store visits, and browsing vs. planned shopping |
| Time pressure | Includes situational measures of time pressure and dispositional measures of impatience |

**Table 3**
Distribution of effects.

| Independent variable | % Significant effects ($n = 251$) | % Non-significant effects ($n = 94$) | % All effects ($n = 345$) |
|---|---|---|---|
| Situational | 35.4 | 11.6 | 47.0 |
| Dispositional | 23.5 | 7.2 | 30.7 |
| Sociodemographics | 7.2 | 6.4 | 13.6 |
| S & D interaction | 6.7 | 2.0 | 8.7 |
| Psychographics | 13.3 | 4.9 | 18.3 |
| IBT | 10.4 | 2.1 | 12.5 |
| Shopping behavior | 5.8 | 2.0 | 7.8 |
| Motivation | 4.6 | 1.4 | 6.1 |
| Positive affect | 4.6 | 1.4 | 6.1 |
| Positive social influence | 4.6 | 1.2 | 5.8 |
| External cues | 4.1 | 1.2 | 5.3 |
| Gender | 2.3 | 2.6 | 4.9 |
| Age | 3.2 | 1.2 | 4.4 |
| Product characteristics | 3.2 | 1.2 | 4.4 |
| Retail environment | 3.5 | .9 | 4.4 |
| Negative affect | 3.6 | .9 | 4.4 |
| Hedonic | 3.3 | .9 | 4.1 |
| Time pressure | 2.0 | .9 | 2.9 |
| Income | .6 | 2.0 | 2.6 |
| Negative social influence | .6 | 1.7 | 2.3 |
| Available finances | 1.7 | 0.3 | 2.0 |
| Ethnicity | 1.1 | 0.6 | 1.7 |



**Fig. 2.** Histogram of effect size absolute values.

meta-analysis (Hunter and Schmidt, 1990). Furthermore, where applicable, variables were corrected for attenuation in accordance with Hunter and Schmidt (1990). The mean observed and corrected correlations of each variable are reported in the tables to permit comparison of effect sizes between variables. In accordance with Tammo et al. (2001), analysis was performed on the complete set of measurements since such procedures perform well in recovering the true measurement of the effects. Likewise, procedures which rely on a single value from each study result in a loss of information and make it more difficult to detect moderating effects. While HLM procedures are ideal, straightforward procedures treating all measures as independent provide is a sensible choice (Tammo et al., 2001).

The comprehensive search of multiple sources was conducted to reduce the threat of file-drawer bias (Hawkins et al., 2009)

and the resulting efforts resulted in three dissertations and the representation of impulse buying studies from 41 peer reviewed publications. File-drawer bias, otherwise known as publication bias, describes the tendency of academia to publish significant findings whereas non-significant findings remain unpublished (Cooper, 2009). File-drawer bias was calculated for each independent variable in accordance with Hunter and Schmidt (1990, pp. 510–513). Overall, the results reported in Table 4 were significant and indicate that the threat of file-drawer bias is minimal. This robust result infers the use of published studies does not threaten the integrity of this study's findings. Next, the Q-statistic (Cooper, 2009, pp. 186–189) which provides a powerful test of effect size homogeneity and examines the between-study variance weighted for sample size (e.g., Brown and Lam, 2008; Pan and Sparks, 2012; Pan and Zinkan, 2006) was calculated. For each independent variable, the Q-statistic indicates that the effect sizes for all variables besides income were substantially heterogeneous. Values for the Q-statistic are reported in Table 4.

**Table 4**
File drawer and Q-test statistic.

| Independent variable | k | Observed r | Fisher | File drawer | Q |
|---|---|---|---|---|---|
| Age | 13 | −.078 | −.079 | 151* | 108.51* |
| Available finances | 6 | .137 | .139 | 52* | 25.84* |
| Ethnicity | 4 | .211 | .224 | 12* | 90.59* |
| External cues | 10 | .192 | .199 | 117* | 80.32* |
| Gender | 14 | .151 | .159 | 67* | 54.52* |
| Hedonic | 10 | .298 | .328 | 215* | 187.02* |
| IBT | 23 | .310 | .337 | 983* | 352.07* |
| Income | 7 | .087 | .088 | 5* | 9.04 |
| Motivation | 15 | .267 | .296 | 501* | 943.81* |
| Negative affect | 8 | .299 | .329 | 63* | 196.47* |
| Positive affect | 13 | .234 | .259 | 331* | 340.11* |
| Positive social influence | 12 | .330 | .371 | 294* | 184.68* |
| Product characteristics | 7 | .222 | .259 | 155* | 575.56* |
| Psychographics | 24 | .231 | .249 | 909* | 981.19* |
| Retail environment | 7 | .301 | .355 | 95* | 535.18* |
| Shopping behavior | 9 | .185 | .195 | 124* | 312.20* |
| Time pressure | 6 | .207 | .215 | 77* | 55.35* |

* Significant at .05 level.

**Table 5**
Average ranking of Fisher Z transformed effect size for composite variables.

| Impulse buying | | | | |
|---|---|---|---|---|
| Independent variable | n | Mean rank | Observed r | Corrected Fisher |
| S & D Interaction | 30 | 203.45 | .280 | .335 |
| Dispositional | 106 | 194.44 | .257 | .301 |
| Situational | 162 | 171.44 | .239 | .288 |
| Sociodemographics | 47 | 110.59 | .139 | .147 |
| Total | 345 | $\chi^2=26.14$; $p < .001$ | | |

# 6. Results

## 6.1. Results for predictors of impulse buying

The average ranking of the effect size is shown in Tables 5 and 6. Table 5 shows the results for the four overarching constructs: (1) dispositional variables, (2) situational variables, (3) interaction between dispositional and situational variables (S & D) and (4) sociodemographic variables. The mean ranking of the independent variables indicates that "S & D Interaction" (MR=203.45; Observed r=.28) exercised the most influence on impulse buying. Dispositional variables exercised the second most influence (MR=194.44; Observed r=.26), followed by situational variables (MR=171.44; Observed r=.24), with sociodemographic variables having the least impact (MR=110.59; Observed r=.14). The $\chi^2$ test reveals that significant differences exist between the overarching constructs ($\chi^2=26.14$, $p < .001$).

Next, the constructs were further redefined into more specific categories of comparison and only the main effects (311 total main effects) for each construct was included in the analysis. Interaction effects are excluded and subsequently discussed in the moderator section. Table 2 provides a description of these constructs. When looking at the main effects for the more specific independent constructs we find that "IBT" (MR=206.35; Observed r=.32), "positive social influence" (MR=188.42; Observed r=.27), "retail environment" (MR=174.50; Observed r=.30) "motivation" (MR=171.34; Observed r=.26), and "negative affect" (MR=170.38; Observed r=.28) have the greatest effect on impulse buying while "age" (MR=102.54; Observed r= −.09) and "income" (MR=72.22; Observed r=.09) had the least impact on impulse buying. Table 6 provides the comprehensive listing of the 17 independent variables compared in this meta-analysis for impulse buying. The $\chi^2$ results

**Table 6**
Average ranking of Fisher Z transformed effect size for independent variable main effects.

| Impulse buying | | | | |
|---|---|---|---|---|
| Independent variable | n | Mean rank | Observed r | Corrected Fisher |
| IBT | 40 | 206.35 | .320 | .375 |
| Positive social influence | 12 | 188.42 | .271 | .339 |
| Retail environment | 14 | 174.50 | .299 | .417 |
| Motivation | 22 | 171.34 | .262 | .330 |
| Negative affect | 13 | 170.38 | .283 | .332 |
| Hedonic products | 12 | 169.08 | .289 | .329 |
| Psychographics | 57 | 168.61 | .234 | .272 |
| Positive affect | 21 | 161.31 | .235 | .287 |
| Time pressure | 10 | 148.10 | .207 | .227 |
| External cues | 15 | 139.10 | .180 | .202 |
| Product characteristics | 15 | 138.67 | .222 | .310 |
| Ethnicity | 6 | 137.08 | .211 | .224 |
| Shopping behavior | 27 | 126.81 | .185 | .201 |
| Available finances | 7 | 109.00 | .137 | .152 |
| Gender | 17 | 106.09 | .151 | .160 |
| Age | 14 | 102.54 | −.090 | −.092 |
| Income | 9 | 72.22 | .087 | .091 |
| Total | 311 | $\chi^2=41.30$; $p < .001$ | | |

indicate that the differences in the effects between the variables is significant ($\chi^2=41.30$, $p < .01$).

## 6.2. Moderators and interaction variables

Moderators prominent in literature and with $n > 3$ effects were examined. First, the relationship between IBT and impulse buying is well examined in the literature with research indicating that the strength of the relationship may be augmented by other factors (e.g., Kwak et al., 2006; Lin and Chuang, 2005; Rook and Fisher, 1995). Furthermore, the number of interaction variables examined in relation to IBT, allowed for the IBT–impulse buying relationship to be explored for moderating effects. Positive social influence and negative social influence were most commonly examined in relation to IBT and have been shown to enhance or diminish IB (e.g., Luo, 2005). The results indicate that negative social influence appears to diminish the effects of IBT (Observed r=.11; MR=4.33) while positive social influence appears to positively augment the effects of IBT (Observed r=.44; MR=9.88) [$\chi^2=6.02$, $p < .02$]. Next, positive and negative affect were examined. Past research has indicated that both positive and negative affective states influence impulse buying (Vohs and Baumeister, 2013). However, past research has shown that positive affect has a greater influence on impulse buying than negative affect (Beatty and Ferrell, 1998; Flight et al., 2012). Our results revealed a slightly higher mean ranking for negative affect (MR=170.92) than positive affect (MR=161.88).

To explore this inconsistency further, we reexamined the distinct variables to determine whether we could uncover a possible explanation. Negative affect, in particular, negative mood has traditionally encompassed such states as anxiety, depression, and fatigue (Hockey et al., 2000). More recent, literature pertaining to regulatory resources suggests that when in a negative mood, individuals may lapse in self-control to balance their mood state (see Vohs and Baumeister, 2013). People have a finite amount of resources to regulate their behavior and these resources may be depleted by situational forces (Vohs and Baumeister, 2013). When an individual is in a state (e.g., fatigue) where their resources for regulating behavior are depleted they tend to make impulsive decisions due to self-regulatory failure (Vohs and Faber, 2007). Vohs and Faber (2007), make the case that despite the traditional view, resource depletion is distinct from other negative states. The negative affect variable was recoded to distinguish between

resource depletion and other negative states commonly measured using PANAS (Positive and Negative Affect Schedule). When isolating the three variables, resource depletion has the highest mean and (Observed $r=.40$; MR$=22.33$) subsequently followed by positive affect (Observed $r=.26$; MR$=17.19$) and negative affect (Observed $r=.22$; MR$=14.29$). Though, the difference between the three variables is not significant ($\chi^2=2.16$, $p>.33$).

For the variables age, gender, income, available finances, and time pressure the observed correlations were further analyzed for interpretation. Eleven of the fourteen effects reported for age suggested that age negatively correlated with impulse buying with eight significant effects. The three studies which reported a positive relationship between age and impulse buying examined impulse buying in relation to relatively narrow age ranges. For gender, nine of the seventeen effects indicated that men have a greater tendency than women for impulse buying with five of those nine effects significant. Three of the eight effects indicating women have a greater tendency for impulse buying were also significant suggesting that the results are mixed. For income, all nine effects suggest that there is a positive relationship between income and impulse buying but only two effects were significant. In addition, the variable available finances at the time of purchase also indicate a positive relationship with all eight effects in a positive direction and seven significant effects. Finally, less time pressure has been shown to enhance impulse buying behavior with seven out of the ten effects significant. One study did find a negative relationship for impulse buyers and time pressure but this was in comparison to a specific cohort labeled partial planners.

### 6.3. Results for methodological variables

Methodological moderators such as methodological setting, context, and metrics may provide additional insight into disparate findings (Pan et al., 2012; Sultan et al., 1990). Experimental effect, study setting, study context, dependent variable metric, sample type, product type, study country of origin, decade of study, and journal classification were examined in this study. The average rankings of effects were statistically significant for five of the nine dimensions examined. In studies reporting interaction effects (MR$=198.09$; Observed $r=.27$), the average ranking of the effect size was not substantially greater ($\chi^2=2.39$, $p=.12$) than for main effects (MR$=170.26$; Observed $r=.23$). Next, for experimental studies (MR$=195.10$; Observed $r=.27$), the average ranking of the effect size was significantly greater ($\chi^2=3.83$, $p=.05$) than for cross-sectional studies where a survey was administered (MR$=167.63$; Observed $r=.23$). The type of metric used to measure the impulse buying dependent variable did not have an impact as no significant differences were found for scale, behavioral, or behavioral surrogate metrics ($\chi^2=.67$, $p>.75$). An examination of product type did produce substantial differences ($\chi^2=9.04$; $p=.01$) as impulse buying was greater for fashion merchandise (MR$=219.03$; Observed $r=.31$) than supermarket purchases (MR$=176.46$; Observed $r=.26$), and general merchandise (MR$=165.04$; Observed $r=.22$). Further, impulse buying behavior was just as pervasive in online environments as traditional retail ($\chi^2=.02$, $p>.88$). Regarding studies using college students as subjects (MR$=191.26$; Observed $r=.26$), the average ranking of the effect size was statistically greater ($\chi^2=14.01$, $p<.001$) than for studies using non-student subjects (MR$=151.36$; Observed $r=.21$).

Next, when examining the results for three main regions (North America, Europe, and Asia) of the sample, we do find significant results ($\chi^2=14.00$, $p<.001$). Results for North America (MR$=177.91$; Observed $r=.24$) were significantly greater than results for Europe (MR$=126.97$; Observed $r=.17$) or Asia (MR$=144.79$; Observed $r=.21$). When examining the studies by decade,

studies published in the 1980s (MR$=212.59$; Observed $r=.30$) showed the highest correlations followed by studies in the 1990s (MR$=184.78$; Observed $r=.27$) and 2000s (MR$=169.14$; Observed $r=.23$) [$\chi^2=14.86$, $p<.01$]. Approximately 80% of all effects reported were from studies published after 1999.

Finally, studies were divided into groups based upon whether the journal was a top 50 marketing journal as reported in Steward and Lewis's (2010) comprehensive analysis of school journal lists. The results show that there is no significant difference ($\chi^2=1.55$, $p>.46$) in the average correlation size between results from journals in the top 50 (Observed $r=.23$), other journals (R$=.26$), and dissertation/unpublished studies (Observed $r=.22$.) Table 7 shows a comprehensive display of the results for the methodological variables. Practical and theoretical implications associated with each observed effect are substantial and are subsequently discussed.

## 7. Discussion

This meta-analysis provides a much needed amalgamation of the impulse buying literature generated over the last few decades. This present research provides a summary of the findings to this point and establishes a clear direction for research in the future. The culmination of research using impulse buying as the dependent variable offers a clear picture of what researchers have discovered. Impulse buying is a measure of the actual act of impulse buying regardless of whether it occurred because of chronic dispositional traits, unique situations at time of purchase, or some combination of factors. The results for impulse buying

**Table 7**
Methodological variables.

| Variable | $n$ | Mean rank | Observed $r$ | Statistical significance test | |
|---|---|---|---|---|---|
| **Experimental effect** | | | | $\chi^2$ | 2.39 |
| Main effect | 311 | 170.26 | 0.23 | df | 1 |
| Interaction effect | 34 | 198.09 | 0.27 | $p$-value | .122 |
| **Setting** | | | | $\chi^2$ | 3.83 |
| Survey | 283 | 167.63 | 0.23 | df | 1 |
| Experiment | 61 | 195.10 | 0.27 | $p$-value | .05 |
| **Context** | | | | $\chi^2$ | .02 |
| Brick and Mortar | 205 | 130.36 | .23 | df | 1 |
| Online | 54 | 128.65 | .21 | $p$-value | .882 |
| **Metric** | | | | $\chi^2$ | .67 |
| Scale | 204 | 172.84 | 0.23 | df | 2 |
| Behavior | 107 | 169.68 | 0.24 | $p$-value | .754 |
| Behavior surrogate | 34 | 184.43 | 0.25 | | |
| **Product type** | | | | $\chi^2$ | 9.04 |
| Fashion | 35 | 219.03 | .31 | df | 2 |
| Supermarket | 75 | 176.46 | .26 | $p$-value | .011 |
| General merchandise | 235 | 165.04 | .22 | | |
| **Sample** | | | | $\chi^2$ | 14.01 |
| Student | 126 | 191.26 | 0.26 | df | 1 |
| Non-student | 206 | 151.36 | 0.21 | $p$-value | .001 |
| **Region** | | | | $\chi^2$ | 14.00 |
| North America | 225 | 177.91 | 0.24 | df | 2 |
| Europe | 45 | 126.97 | 0.17 | $p$-value | .001 |
| Asia | 59 | 144.79 | 0.21 | | |
| **Decade** | | | | $\chi^2$ | 14.86 |
| 1970s | 6 | 52.00 | 0.05 | df | 4 |
| 1980s | 32 | 212.59 | 0.30 | $p$-value | .005 |
| 1990s | 32 | 184.78 | 0.27 | | |
| 2000s | 266 | 169.14 | 0.23 | | |
| Unpublished | 9 | 188.22 | 0.23 | | |
| **Steward and Lewis (2010) Top 50** | | | | | |
| Top 50 journals | 212 | 167.84 | 0.23 | $\chi^2$ | 1.55 |
| Other journals | 104 | 179.92 | 0.26 | df | 2 |
| Dissertations or unpublished studies | 29 | 185.88 | 0.22 | $p$-value | .460 |

indicate that the reported interactions between situational and dispositional variables have the greatest explanatory value followed by dispositional and situation factors, respectively. Clearly, research in the impulse buying field has unequivocally demonstrated that specific situations coupled with chronic IBT produce the most likely instances of impulse buying. A discussion of specific findings follows.

The meta-analysis confirms that the dispositional variable IBT remains the most prominent antecedent of impulse buying and validates a stream of literature which suggests that a sizable portion of impulse buying behavior is driven by individual traits (Dholakia, 2000) with IBT appearing dominant. Other psychological traits shown to have a substantial positive influence on impulse buying include thrill seeking/variety seeking propensity, shopping enjoyment propensity, instability, the tendency to make quick decisions, and susceptibility to influence. In contrast, psychological traits which have been shown to inhibit impulse buying include self-monitoring, emotional intelligence, price consciousness, and self-control.

An interesting finding is that a substantial number of the situational effects stem from positive social influence which our results indicate is the most influential situational factor on impulse buying. Past research has noted that it is surprising that academic and trade press has given little attention to social influences on impulse buying (Rook and Fisher, 1995; Luo, 2005). As originally purported by Rook and Fisher (1995), moderator analysis confirms that social influence can either elevate or constrain IBT and social norms, along with the social roles of others accompanying a shopping trip, influence the impulse buying levels. While several past investigations in social influence and its influence on the IBT–impulse buying relationship exist, few studies have investigated other moderators of the IBT–impulse buying relationship. Results from Vohs and Faber (2007) suggest that resource depletion moderates the IBT–impulse buying relationship. Jones et al. (2003) found that product involvement influenced the relationship between IBT and impulse buying which is further supported by the strength of the relationship between motivation and impulse buying in this meta-analysis. Further research is needed to confirm these relationships. Furthermore, while identified as a gap in the impulse buying literature in 1998 (Beatty and Ferrell, 1998) greater overall exploration of the interaction effects of impulse buying antecedents are still needed. The effects for interactions between situational and dispositional variables (S & D) show the greatest mean rank on impulse buying but results suggest more research is needed on these types of interactions. In addition, there were little to no reporting of interactions within dispositional or situational variable categories, suggesting that many opportunities exist for future research. Impulse buying theory would suggest that peer influence (e.g., Luo, 2005) accompanied by extreme positive or negative moods (e.g., Flight et al., 2012) might have a compounding effect.

Pertaining to affect, past findings have indicated that both positive affect and negative affect positively influence impulse buying with recent literature suggesting that positive affect is a more stable antecedent of impulse buying than negative affect (Flight et al., 2012). Initially, meta-analysis results indicated that negative affect performed slightly but not substantially better as an antecedent of impulse buying behavior. However, after further investigation, it appears that this higher performance is largely due a few studies investigating resource depletion. While traditional literature, includes fatigue as a negative affective state (e.g., Hockey et al., 2000), more recent literature suggests that states of resource depletion (the depletion of behavior regulating resources due to situational self-control demands) are distinct from other negative affect states and have a greater influence on impulse buying (Vohs and Baumeister, 2013; Vohs and Faber, 2007).

The results of this meta-analysis support the strong relationship between resource depletion and impulse buying. Accounting for this distinction, the results somewhat support past research (e.g., Beatty and Ferrell, 1998; Flight et al., 2012; Verhagen and van Dolen, 2011) which found that positive affect's influence on impulse buying is more robust than negative affect. However, more research is needed to investigate and validate this distinction.

Sociodemographics play a smaller role in the overall impulse buying picture. Our supposition is the overall research stream for impulse buying is still inconclusive about whether factors such as gender, ethnicity, and age explain much of impulse buying for various individuals. Nine of the seventeen effects for gender indicate that men exhibit greater impulse buying while the other eight suggest that women exhibit greater impulse buying. In addition, eight of the seventeen effects for men were significant at the.05 level. The finding for gender somewhat contradicts practitioner research which shows that women tend to engage in impulse shopping more than men (Shoppercentric, 2011). However, this result likely highlights the context dependent nature of the relationship between gender and impulse buying. Future research is needed to understanding if sociodemographic variables have any moderating effects. For instance, research is needed to examine whether sociodemographic variables moderate the relationship between IBT and impulse buying or positive/ negative affect and impulse buying. For example, past research has indicated that men and women use different strategies for regulating negative moods. Women tend to ruminate (compulsively focus on the source of distress) and men tend to search for distractions (Thayer et al., 1994).

The findings relative to age were less muddled. However, with age, the lack of consistency in age groups examined also played a role in producing inconsistent results. In general, younger cohorts tend to be more inclined to impulse buy and demonstrate higher rates of IBT. This result is also backed up by industry data which suggests that age is negatively correlated with impulse buying (Shoppercentric, 2011). Based upon previous findings it appears that sociodemographic factors are not as reliable as other dispositional or situational factors which likely play greater roles as indicators of impulse buying. However, due to the limited number of effects more research is warranted.

Finally, several methodological variables were examined to determine the effects that study design had on effect size. As expected, significantly larger effects were found for experimental studies and studies using college students. The substantial difference likely results from both the greater homogeneity of student responses and the almost exclusive use of student subjects in experimental studies. As noted by Flight et al. (2012), it does appear that student sample response homogeneity produces stronger effects in an impulse buying context. However, consistent with Peterson (2001), no difference in the percentage of significant effects was observed between student (71% of effects significant) and non-student samples (70% of effects significant) suggesting that homogeneity is not a prominent concern in an impulse buying context. Although not substantially larger, the average correlation of interaction effects was larger than main effects. This finding along with the dominance of IBT, is consistent with the assertion by Dholakia (2000) that in many cases an extreme impulsive trait may alone contribute as much to impulse buying behavior as the interaction of multiple variables. Furthermore, no substantial differences were found for the type of metric used to measure impulse buying. This finding lends support for the usefulness of impulse buying scales (e.g., Rook and Fisher, 1995) rigorously developed and validated in previous literature.

Regarding study context, this study reports two important findings. First, impulse buying in a fashion context was substantially greater than impulse buying in supermarket or general

merchandise contexts. Khan and Dhar (2004) indicated that fashion is a context where consumer decisions are dominated by emotional wants rather than functional needs. The prominence of impulse buying in a fashion context reinforces the likely rapid automatic reactions driving fashion consumption choices. Second, no substantial differences were observed in the occurrence of impulse buying behavior in traditional brick-and-mortar retail or online retail. While early in impulse buying literature it was suggested that the greater presence of sensory stimuli made impulse buying more prominent in traditional brick-and-mortar contexts (Kacen, 2003), the results of this meta-analysis suggests tactics to increase impulse buying behavior would be equally effective in both contexts. Improvements in information technology (better display of sensory stimuli) and consumer adoption of online shopping behavior have conditioned consumers to respond to stimuli in an online environment, much the same way they would in more traditional environments (Kacen, 2003; Reed et al., 2002), and spurred online impulse buying behavior (Kervenoael et al., 2009; Park et al., 2012).

Results further suggest that North American cohorts exhibit higher levels of impulse buying behavior than Europe and Asia, respectively. This finding reinforces past research by Kacen and Lee (2002) that more individualistic western cultures exhibit greater impulse buying behavior than Eastern cultures. However, the results suggest that further cultural exploration may be warranted regarding impulse buying behavior. Past research has investigated individualism/collectivism (Kacen and Lee, 2002) and power distance beliefs (Zhang et al., 2010) regarding impulse buying behavior. However, these constructs do not fully explain the differences found between regions of the world. In particular, results of this meta-analysis suggest that impulse buying behavior in Asia is a substantial phenomenon. Is this the result of the adoption of Western values or other factors? Finally, no substantial difference in effect size was found between top 50 journals (Steward and Lewis, 2010), other journals, and dissertations and unpublished studies. The lack of substantial differences provides further support for a lack of publication bias in the sample of studies included in this meta-analysis.

## 8. Managerial implications

Retail managers undoubtedly can benefit from this summary by understanding if they can influence the situation surrounding a purchase, they can have the greatest impact on those consumers who are predisposed to impulse buying. The research on IBT and social influence support the notion that positive social influence enhances IBT and since any given consumer contains the potential to have high levels of IBT, this meta-analysis indicates that retailers may benefit from potential marketing strategies to augment IBT. In particular, communicating to consumers that it is socially acceptable to splurge or by creating a social environment where consumers can reap the rewards of social reward may enhance impulse buying. Specifically, brick-and-mortar retailers may design promotions and in-store displays which convey that it is socially acceptable to make an impulse buy. Both brick-and-mortar and online retailers may examine ways to use social media to allow consumers to experience the social rewards of making an impulse buy. While social media platforms such as Facebook allows for tumultuous bragging more recent apps such as the A/B app allow for more selective bragging (Psfk, 2013). The uses of such tools appear particularly appropriate for fashion retailers, as the results of this meta-analysis indicate that impulse buying is highest for fashion merchandise.

Next, retail environment factors came in third among antecedents impacting impulse buying. These results suggest that factors such as sensory contact with product stimuli, ease of

browsing, and retail esthetics can augment impulse buying in both an offline and online context. Use of appealing visuals, including signage instructing customers to touch, has been shown to substantially increase impulse buying behavior. Other factors such as placing on item on sale and linking a donation to a purchase have been shown to increase impulse buying behavior. With the growing popularity of nonprofits soliciting donations at retail locations (Podsada, 2010) further research should examine the robustness of the link between donation opportunities and impulse buying behavior. Brands such as Tom's shoes or Feed USA may facilitate impulse buying behavior. Donations or the purchase of brands linked to donations may drive impulse buying behavior due to the social visibility of doing a "good deed".

Regarding emotional influences, both positive affect and negative affect have been shown enhance impulse buying behavior. Promotions which appeal to one's desire to celebrate or for a "pick-me-up" may be effective tactics. Furthermore, research regarding regulatory resources suggests that convenience retailers catering to late night clientele may enhance impulse buying behavior through retail environment factors. Finally, reinforcing hedonic appeal or prominently displaying products with hedonic appeal can further drive impulse buying behavior for all retailers.

## 9. Limitations

Despite attempts to conduct this meta-analysis under rigorous constraints, limitations inherently exist. Some empirical studies were excluded because they did not feature statistics which could be used in a meta-analysis. Meta-analyses can also be limited through biases inherent in the tendency for journals to focus on significant findings. However, when examining relevant metrics, it appears that the risk of publication bias is minimal. Even with such concerns it is likely that this study was less affected by this bias than narrative literature reviews. Narrative reviews rarely entail an exhaustive search of the literature (Cooper and Hedges, 1994). Finally, there was a disparity in the number of effects for each source effect. More research is needed on the effects from the interaction of situational and dispositional variables on impulse buying.

## References[2]

(∗) Adelaar, T., Chang, S., Lancendorfer, K.M., Lee, B., Morimoto, M., 2003. Effects of media formats on emotions and impulse buying intent. J. Inform. Technol. 18 (4), 247–266.

American Psychological Association, 2008. Top ten tips for graduate students who want to conduct a meta-analysis. 〈http://www.apa.org/science/about/psa/2008/04/ssc.aspx〉 (retrieved 10.06.13).

Amos, C., Holmes, G., Strutton, D., 2008. Celebrity endorser source effects and effectiveness in advertising: a quantitative synthesis of effect size. Int. J. Advertising 27 (2), 209–234.

Babin, B., Harris, E., 2013. CB5. South-Western, Mason, OH.

Baumeister, R.F., 2002. Yielding to temptation: self-control failure, impulsive purchasing, and consumer behavior. J. Consum. Res. 28 (4), 670–676.

Baun, D., Groeppel-Klein, A., 2003. Joy and surprise as guides to a better understanding of impulse buying behavior. In: Turley, D., Brown, S. (Eds.), European Advances in Consumer Research, vol. 6. Association for Consumer Research, Provo, pp. 290–299.

(∗) Beatty, S.E., Ferrell, M.E., 1998. Impulse buying: modeling its precursors. J. Retailing 74 (2), 169–191.

Black, D.W., 2007. Compulsive buying disorder: a review of evidence. CNS Spectrums 12 (2), 124–132.

Brown, S.P., Lam, S.K., 2008. A meta-analysis of relationships linking employee satisfaction to customer responses. J. Retailing 84 (3), 243–255.

Clover, V.T., 1950. Relative importance of impulse-buying in retail stores. J. Mark. 15 (1), 66–70.

CNBC, 2009. Coca-cola: the real story behind the real thing. 〈http://video.cnbc.com/gallery/?video=1409843923〉 (retrieved 01.05.12).

---

[2] Note: ∗Indicates studies used for meta-analysis.

(∗) Cobb, C.J., Hoyer, W.D., 1986. Planned versus impulse purchase behavior. J. Retailing 62 (4), 384–409.

Cohen, S.M., Dupont, W.D., Courey, M.S., 2006. Quality-of-life impact of non-neoplastic voice disorders: a meta-analysis. Ann. Otol. Rhinol. Laryngol. 115 (2), 128–134.

Cooper, H., Hedges, L.V., 1994. The Handbook of Research Synthesis. Russell Sage Foundation, New York, NY.

Cooper, H., 2009. Research Synthesis and Meta-Analysis: A Step-by-Step Approach, 4th ed. Sage Publications, Inc, Thousand Oaks, CA.

D'Antoni, J.S., Shenson, H.L., 1973. Impulse buying revisited: a behavioral typology. J. Retailing 49 (1), 63–76.

(∗) Dholakia, U.M., 2000. Temptation and resistance: an integrated model of consumption impulse. Psychol. Mark. 17 (11), 955–982.

(∗) Dittmar, H., Beattie, J., Friese, S., 1995. Gender identity and material symbols: objects and decision considerations in impulse purchases. J. Econ. Psychol. 16 (3), 495–511.

Eysenck, H.J., 1993. The nature of impulsivity. In: McCown, W.G., Johnson, J.L., Shure, M.B. (Eds.), The Impulsive Client: Theory, Research, and Treatment. American Psychological Association, Washington, DC.

Farley, J.J., Lehmann, D.R., 1986. Meta-Analyses in Marketing: Generalizations of Response Models. Lexington Books, Lexington.

(∗) Flight, R.L., Roundtree, M.M., Beatty, S.E., 2012. Feeling the urge: affect in impulsive and compulsive buying. J. Mark. Theory Pract. 20 (4), 453–465.

Garlin, F.V., Owen, K., 2006. Setting the tone with the tune: a meta-analytic review of the effects of background music in retail settings. J. Bus. Res. 59 (6), 755–764.

(∗) Gerbing, D.W., Ahadi, S.A., Patton, J.H., 1987. Toward a conceptualization of impulsivity: components across the behavioral and self-report domains. Multivar. Behav. Res. 22 (3), 357–379.

(∗) Gravier, M., Randall, W.S., Strutton, D., 2008. Investigating the role of knowledge in alliance performance. J. Knowl. Manage. 12 (4), 117–130.

Hausman, A., 2000. A Multi-method investigation of consumer motives in impulse buying behavior. J. Consum. Mark. 17 (5), 403–419.

Hawkins, T., Knipper, M.G., Strutton, D., 2009. Opportunism in buyer–supplier relations: new insights from quantitative synthesis. J. Mark. Channels 16 (1), 43–75.

Hoch, S.J., Loewenstein, G.F., 1991. Time-inconsistent preferences and consumer self-control. J. Consum. Res. 17 (4), 492–507.

Hockey, G.R.J., Maule, A.J., Clough, P.J., 2000. Effects of negative mood states on risk in everyday decision making. Cognit. Emotion 14 (6), 823–855.

Hunter, J.E., Schmidt, F.L., 1990. Methods of Meta-Analysis: Correcting Error and Bias in Research Findings. Sage, Newbury Park, CA.

Inman, J.J., Winer, R.S., 1998. Where the rubber meets the road: a model of in-store consumer decision making. Marketing Science Institute Report, pp. 98–122.

Johnson, W.L., Malow, R.M., Corrigan, S.A., McCown, J.A., 1993. Impulsive behavior and substance abuse. In: Johnson, W.G., Johnson, J.L., Shure, M.B. (Eds.), The Impulsive Client: Theory, Research, and Treatment. American Psychological Association, Washington, D.C., pp. 225–246.

(∗) Jones, M.A., Reynolds, K.E., Weun, S., Beatty, S.E., 2003. The product-specific nature of impulse buying tendency. J. Bus. Res. 56 (7), 505–511.

(∗) Kacen, J.J., Lee, J.A., 2002. The influence of culture on consumer impulsive buying behavior. J. Consum. Psychol. 12 (2), 163–176.

Kacen, J., 2003. Bricks and clicks; the buying impulse: an investigation of consumer impulse buying behavior in an online and a traditional retail environment. Eur. Adv. Consum. Res. 6, 271–276.

(∗) Kacen, J.J., Hess, J.D., Walker, D., 2012. Spontaneous selection: the influence of product and retailing factors on consumer impulse purchases. J. Retailing Consum. Serv. 19 (August), 578–588.

Kervenoael, R., Aykac, D.S.O., Palmer, M., 2009. Online social capital: understanding e-impulse buying in practice. J. Retailing Consum. Serv. 16 (4), 320–328.

Khan, U., Dhar, R., 2004. A behavioral decision theoretic perspective on hedonic and utilitarian choice. In: Ratneshwar, S., Mick, D.G. (Eds.), Inside Consumption: Frontiers of Research on Consumer Motives, Goals, and Desires. Routledge, New York, pp. 144–165.

Kollat, D.T., Willet, K.P., 1969. Is impulse purchasing really a useful concept for marketing decisions? J. Mark. 33 (1), 79–83.

Kukar-Kinney, M., Ridway, N.M., Monroe, K.B., 2009. The relationship between consumers' tendencies to buy compulsively and their motivations to shop and buy on the internet. J. Retailing 85 (3), 298–307.

(∗) Kwak, H., Zinkhan, G.M., DeLorme, D.E., Larsen, T., 2006. Revisiting normative influences on impulsive buying behavior and an extension to compulsive buying behavior: a case from South Korea. J. Int. Consum. Mark. 18 (3), 57–80.

(∗) Lin, C.-H., Chuang, S.-C., 2005. The effect of individual differences on adolescent's impulsive buying behavior. Adolescence 40 (159), 551–558.

Lipsey, M.W., Wilson, D.B., 2001. Practical Meta-Analysis. Sage, Newbury Park, CA.

(∗) Luo, X., 2005. How does shopping with others influence impulsive purchasing? J. Consum. Psychol. 15 (4), 288–294.

(∗) Mattila, A.S., Wirtz, J., 2008. The role of store environmental stimulation and social factors on impulse purchasing. J. Serv. Mark. 22 (7), 562–567.

Moeller, F.G., Barratt, E.S., Dougherty, D.M., Schmitz, J.M., Swann, A.C., 2001. Psychiatric aspects of impulsivity. Am. J. Psychiatry 158 (11), 1783–1793.

Mowen, J.C., Minor, M.S., 2006. Consumer Behavior: A Framework. Thomson, Mason, OH.

Murray, H., 1938. Explorations in Personality. Oxford University, New York, NY.

National Consumers League. 2011. Counselling. ⟨http://nationalconsumerleague.org/work/counselling/⟩ (retrieved 06.11.13).

NEFE, 2010. Spendster contest offers redemption for spenders willing to confess. ⟨http://www.nefe.org/press-room/news/spendster-contest-offers-redemption.aspx⟩ (retrieved 01.05.12).

NEFE, 2012. Avoid the holiday shopping hangover. ⟨http://www.nefe.org/press-room/news/avoid-the-holiday-shopping-hangover.aspx⟩ (retrieved 01.11.13).

Palmatier, R.W., Dant, R.P., Grewal, D., Evans, K.R., 2006. Factors influencing the effectiveness of relationship marketing. J. Mark. 70 (4), 136–153.

Pan, Y., Zinkan, G.M., 2006. Determinants of retail patronage: a meta-analytic perspective. J. Retailing 82 (3), 229–243.

Pan, Y., Sheng, S., Xie, F.T., 2012. Antecedents of customer loyalty: an empirical synthesis and reexamination. J. Retailing Consum. Serv. 19 (1), 150–158.

Pan, Y., Sparks, J.R., 2012. Predictors, consequence, and measurement of ethical judgments: review and meta-analysis. J. Bus. Res. 65 (1), 84–91.

(∗) Park, E.J., Kim, E.Y., Funches, V.M., Foxx, W., 2012. Apparel product attributes, web browsing, and e-impulse buying on shopping websites. J. Bus. Res. 65 (11), 1583–1586.

(∗) Pentecost, R., Andrews, L., 2010. Fashion retailing and the bottom line: the effects of generational cohorts, gender, fashion fanship, attitudes, and impulse buying on fashion expenditure. J. Retailing Consum. Serv. 17 (1), 43–52.

Peterson, R.A., 2001. On the use of college students in social science research: insights from a second-order meta-analysis. J. Consum. Res. 28 (3), 450–461.

(∗) Pirog III, S.F., Roberts, J.A., 2007. Personality and credit card misuse among college students: the mediating role of impulsiveness. J. Mark. Theory Pract. 15 (1), 65–77.

Podsada, J., 2010. Retailers solicit donations for charities at checkout. ⟨http://articles.courant.com/2010-12-27/business/hc-charity-at-the-cash-register-20101223_1_charities-retailers-affairs-and-philanthropic-studies⟩ (retrieved 03.05.13).

POPAI, 2012. The 2012 Shopper Engagement Study. Point-of-Purchase Advertising International. ⟨http://www.popai.com/engage/docs/Media-Topline-Final.pdf⟩ (retrieved 10.05.13).

Psfk, 2013. App makes friends' purchase advice a simple choice. ⟨http://www.psfk.com/2013/06/ab-app-social-shopping-feedback.html⟩ (accessed 01.07.13).

Punj, G., 2011. Impulse buying and variety seeking: similarities and differences. J. Bus. Res. 64 (7), 745–748.

Puri, R., 1996. Measuring and modifying consumer impulsiveness: a cost–benefit accessibility framework. J. Consum. Psychol. 5 (2), 87–113.

Reed, P., McCarthy, J., Latif, N., DeJongh, J., 2002. The role of stimuli in a virtual shopping environment: a test of predictions derived from conditioning models of marketing firms. J. Econ. Psych. 23 (4), 449–467.

(∗) Roberts, J.A., Manolis, C., 2012. Cooking up a recipe for self-control: the three ingredients of self-control and its impact on impulse buying. J. Mark. Theory Pract. 20 (2), 173–188.

Rook, D.W., 1987. The buying impulse. J. Consum. Res. 14 (2), 189–199.

(∗) Rook, D.W., Fisher, R.J., 1995. Normative influences on impulsive buying behavior. J. Consum. Res. 22 (3), 305–313.

Rosen, C.S., 2000. Is the sequencing of change processes by stage consistent across health problems? A meta-analysis. Health Psychol. 19 (6), 593–604.

Sawyer, A.G., Ball, A.D., 1981. Statistical power and effect size in marketing research. J. Mark. Res. 18 (3), 275–290.

(∗) Sharma, P., Sivakumaran, B., Marshall, R., 2010. Impulse buying and variety seeking: a trait-correlates perspective. J. Bus. Res. 63 (3), 276–283.

Shoppercentric, 2011. Buying on impulse. ⟨http://www.shoppercentric.com/download?type=press_release&id=14⟩ (retrieved 07.05.12).

Siegal, S., 1956. Nonparametric Tests for the Behavioral Sciences. McGraw-Hill, New York, NY.

(∗) Sneath, J.Z., Lacey, R., Kennett-Hensel, P.A., 2009. Coping with natural disaster: losses, emotions, and impulsive and compulsive buying. Mark. Lett. 20 (1), 45–60.

Stern, H., 1962. The significance of impulse buying today. J. Mark. 26 (2), 59–62.

Steward, M.D., Lewis, B.R., 2010. A comprehensive analysis of marketing journal rankings. J. Mark. Educ. 32 (1), 75–92.

Sultan, F., Farley, J., Lehmann, D., 1990. A meta-analysis of applications of diffusion models. J. Mark. Res. 27 (1), 70–77.

Tammo, H.A., Pieters, B., Pieters, G.M., 2001. Meta-analysis in marketing when studies contain multiple measures. Mark. Lett. 21 (2), 157–169.

Taute, H., McQuitty, S., 2004. Feeling good! going good! An exploratory look at the impulsive purchase of the social good. J. Mark. Theory Pract. 12 (2), 16–27.

Tellegen, A., 1982. Manual for the Multidimensional Personality Questionnaire. Department of Psychology, University of Minnesota, MN. Unpublished manuscript.

Thayer, R.E., Newman, J.R., McClain, T.M., 1994. Self-regulation of mood: strategies for changing a bad mood, raising energy, and reducing tension. J. Pers. Soc. Psychol. 76 (5), 910–925.

Tuttle, B. 2012. Millennials are biggest suckers for selfish impulse buys. Time. ⟨http://business.time.com/2012/04/27/millennials-are-biggest-suckers-for-selfish-impulse-buys/⟩ (retrieved 01.11.13).

(∗) Verhagen, T., van Dolen, W., 2011. The influence of online store beliefs on consumer online impulse buying: a model and empirical application. Inform. Manage. 48 (8), 320–327.

(∗) Verplanken, B., Herabadi, A., 2001. Individual differences in impulse buying tendency: feeling and no thinking. Eur. J. Pers. 15 (S1), S72–S83.

(∗) Vohs, K.D., Faber, R.J., 2007. Spent resources: self-regulatory resource availability affects impulse buying. J. Consum. Res. 33 (4), 537–547.

Vohs, K.D., Baumeister, R.F., 2013. Handbook of Self-Regulation, Research, Theory, and Applications, second edition Guilford Press, New York, NY.

Weinberg, P., Gottwald, W., 1982. Impulsive consumers buying as a result of emotions. J. Bus. Res. 10 (1), 43–57.

(✱) Wells, J.D., Parboteeah, V., Valacich, J.S., 2011. Online impulse buying: understanding the interplay between consumer impulsiveness and website quality. J. Assoc. Inform. Syst. 12 (1), 32–56.

West, C.J., 1951. Results of two years' of study into impulse buying. J. Mark. 15 (3), 362–363.

(✱) Weun, S., Jones, M.A., Beatty, S.E., 1998. Development and validation of the impulse buying scale. Psychol. Rep. 82 (3), 1123–1133.

Wilson, E.J., Sherrell, D.L., 1993. Source effects in communication and persuasion research: a meta-analysis of effect size. J. Acad. Mark. Sci. 21 (2), 101–112.

(✱) Wood, M., 1998. Socio-economic status, delay of gratification, and impulse buying. J. Econ. Psychol. 19 (3), 295–320.

Xiao, S.H., Nicholson, M., 2013. A multidisciplinary cognitive behavioural framework of impulse buying: a systematic review of the literature. Int. J. Manage. Rev. 15 (3), 333–356.

Yeager, J. 2012. 12 ways to avoid impulse buying. American Association of Retired Persons. ⟨http://www.aarp.org/money/budgeting-saving/info-10-2010/savings_challenge_tips_for_impulse_shopping.2.html⟩ (retrieved 06.11.13).

Yi, S., Baumgartner, H., 2011. Coping with guilt and shame in the impulse buying context. J. Econ. Psychol. 32 (3), 458–467.

(✱) Zhang, Y., Winterich, K.P., Mittal, V., 2010. Power distance belief and impulsive buying. J. Mark. Res. 47 (5), 945–954.

## Further reading[2]

(✱) Abratt, R., Goodey, S.D., 1990. Unplanned buying and in-store stimuli in supermarkets. Manage. Decis. Econ. 11 (2), 111–121.

(✱) Amos, C., Spears, N., 2010. Generating a visceral response: effects of visceral cues in weight loss advertising. J. Advertising 39 (3), 25–38.

(✱) Baron, S., Wass, K., 1996. Towards an understanding of airport shopping behavior. Int. Rev. Retail Distrib. Consum. Res. 6 (3), 301–322.

(✱) Bellenger, D.N., Roberson, D.H., Hirschman, E.C., 1978. Impulse buying varies by product. J. Advertising Res. 18 (6), 15–18.

(✱) Bressolles, G., Durrieu, F., Giraud, M., 2007. The impact of electronic service quality's dimensions on customer satisfaction and buying impulse. J. Consum. Behav. 6 (1), 37–56.

(✱) Chen, T., 2008. Online impulse buying and product involvement. Commun. IBIMA 5, 74–81.

(✱) Dawson, S., Kim, M., 2009. External and internal trigger cues of impulse buying online. Direct Mark.: Int. J. 3 (1), 20–34.

(✱) Dawson, S., Kim, M., 2010. Cues on apparel web sites that trigger impulse purchases. J. Fashion Mark. Manage. 14 (2), 230–246.

✱Furoughi, A., Buang, N.A., Sherilou, M., 2011. Exploring impulse buying behavior among Iranian tourists in Malaysia. In: 2nd International Conference on Business and Economic Research Proceedings, pp. 625–631.

(✱) Gupta, S., Heng, X., Sahu, V., 2009. Impact of store size on impulse purchase. IUP J. Mark. Manage. 8 (1), 7–22.

(✱) Gutierrez, B.P., 2004. Determinants of planned vs. impulse buying: the case of the Philippines. Asia Pac. Manage. Rev. 9 (6), 1061–1078.

(✱) Harmancioglu, N., Finney, R.Z., Joseph, M., 2009. Impulse purchases of new products: an empirical analysis. J. Product Brand Manage. 18 (1), 27–37.

(✱) Herabadi, A., 2003. Buying Impulses: A Study on Impulsive Consumption (Doctoral dissertation). University of Nijmegen, Nijmegen.

(✱) Herabadi, A., Verplanken, B., van Knippenberg, A., 2009. Consumption experience of impulse buying in Indonesia: emotional arousal and hedonistic considerations. Asian J. Soc. Psychol. 12 (1), 20–31.

(✱) Iyer, E.S., 1989. Unplanned purchasing: knowledge of shopping environment and time pressure. J. Retailing 65 (1), 40–57.

(✱) Jeffrey, S.A., Hodge, R., 2007. Factors influencing impulse buying during an online purchase. Electron Commer. Res. 7 (3–4), 367–379.

(✱) Luna-Arocas, R., 2008. Self-discrepancy and impulse buying: an exploratory study. Int. J. Organ. Theory Behav. 11 (2), 240–265.

(✱) Mai, N.T., Jung, T.K., Lantz, G., Loeb, S.G., 2003. An exploratory investigation into impulse buying behavior in a transitional economy: a study of urban consumers in Vietnam. J. Int. Mark. 11 (2), 13–35.

(✱) Mattila, A.S., Wirtz, J., 2001. Congruency of scent and music as a driver of in-store evaluations and behavior. J. Retailing 77 (2), 273–289.

(✱) Nederkoorn, C., Guerrieri, R., Havermans, R.C., Roefs, A., Jansen, A., 2009. The interactive effect of hunger and impulsivity on food intake and purchase in virtual supermarket. Int. J. Obes. 33 (8), 905–912.

(✱) Nicholls, J.A.F., Li, F., Roslow, S., Kranendonk, C.J., Mandakovic, T., 2001. Inter-American perspectives from mall shoppers: Chile-United States. J. Global Mark. 15 (1), 87–103.

(✱) Omar, O., Kent, A., 2001. International airport influences on impulsive shopping: trait and normative approach. Int. J. Retail Distrib. Manage. 29 (5), 226–235.

✱Parboteeah, D.V., 2005. A Model of Online Impulse Buying: An Empirical Study (Doctoral dissertation). Washington State University, Pullman, WA.

(✱) Park, C.W., Iyer, E.S., Smith, D.C., 1989. The effects of situational factors on in-store grocery shopping behavior: The role of store environment and time available for shopping. J. Consum. Res. 15 (4), 422–433.

(✱) Park, E.J., Kim, E.Y., Forney, J.C., 2006. A structural model of fashion-oriented impulse buying behavior. J. Fashion Mark. Manage. 10 (4), 433–446.

(✱) Peck, J., Childers, T.L., 2006. If I touch it I have to have it: individual and environmental influences on impulse purchasing. J. Bus. Res. 59 (6), 765–769.

(✱) Piron, F., 1993. A comparison of emotional reactions experienced by planned, unplanned, and impulse purchasers. Adv. Consum. Res. 20, 341–344.

(✱) Rajagopal, 2008. Point-of-sales promotions and buying stimulation in retail stores. J. Database Mark. Cust. Strategy Manag. 15 (4), 249–266.

(✱) Ramanathan, S., Menon, G., 2006. Time-varying effects of chronic hedonic goals on impulsive behavior. J. Mark. Res. 43 (4), 628–641.

✱Rhee, Y.-J., 2006. Online Impulse Buying Behavior With Apparel Products: Relationships With Apparel Involvement, Website Attributes, and Product Category/Price (doctoral dissertation). Virginia Polytechnic Institute and State University, Blacksburg, VA.

(✱) Sloot, L.M., Verhoef, P.C., Franses, P.H., 2005. The impact of brand equity and the hedonic level of products on consumer stock-out reactions. J. Retailing 81 (1), 15–34.

✱Sullivan, G.J., 2008. Got to Have It: The effects of Stress and Automatic Regulation on Stress on Impulse Buying (master's thesis). University of Denver, Denver, CO.

(✱) Wilkes, R.E., Valencia, H., 1986. Shopping related characteristics of Mexican-Americans and blacks. Psychol. Mark. 3 (4), 247–259.

(✱) Zhang, Y., Shrum, L.J., 2009. The influence of self-construal on impulsive consumption. J. Consum. Res. 35 (5), 838–850.

(✱) Zhou, L., Wong, A., 2003. Consumer impulse buying and in-store stimuli in Chinese supermarkets. J. Int. Consum. Mark. 16 (2), 37–53.

EXHIBIT D

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/262087864

# Understanding the Value of On-Premise Signs as Marketing Devices for Legal and Public Policy Purposes

**Article** *in* Journal of Public Policy & Marketing · November 2012

DOI: 10.2307/41714267

CITATIONS

2

READS

144

**3 authors**, including:



Charles R. Taylor

Villanova University

**146** PUBLICATIONS **2,491** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Leveraged Marketing Communications (LMC) View project

All content following this page was uploaded by Charles R. Taylor on 23 December 2014.

The user has requested enhancement of the downloaded file. All in-text references underlined in blue are added to the original document and are linked to publications on ResearchGate, letting you access and read them immediately.

# Understanding the Value of On-Premise Signs as Marketing Devices for Legal and Public Policy Purposes

Charles R. Taylor, Matthew E. Sarkees, and Hae-Kyong Bang

*Although on-premise signs have received scant attention in the academic literature, they serve important functions as marketing and promotional devices. This article provides a conceptual framework that outlines the marketing functions of on-premise signs. It provides support for the framework by surveying small and medium-sized business owners. The authors argue that because of the importance of on-premise signs and the lack of guidance in the literature and in practice, a marketing perspective on the value of signs in needed in legal cases. This perspective should also be considered in the processes local communities use to make decisions about sign codes. To address this missing perspective, the authors propose a new valuation method for estimating the value of signage to the business enterprise. This method is centered on valuing the cost of replacing the customer exposures to the sign, which offers a conservative but just measure of compensation for business owners.*

*Keywords*: promotion, signage, brand equity, integrated marketing communications

On-premise signs are permanent fixtures on the building or grounds of a business (Taylor, Claus, and Claus 2005). These can include traditional building-front signs as well as awnings, canopies, rooftop signs, and murals, among other types. Although there is general recognition of the need for businesses to have on-premise signs in many communities across the United States, considerable disagreement often emerges on signs' economic impact, aesthetic issues, and traffic safety considerations. Federal (as governed by the Manual on Uniform Traffic Control Devices), state, and local codes all play a part in signage regulation. Advocacy organizations on both sides of the issue have attempted to nationalize signage restrictions. Business-friendly national sign organizations, such as the International Sign Association and its local chapters, provide resources for members who need information, networking, and legal contacts. Antisign organizations, such as Scenic America (2012), take the position that on-premise signs can be visually unappealing and can negatively affect the character of a community.

Communities have the legal right to impose restrictions on signage. Although these decisions attempt to balance

*Charles R. Taylor* is John A. Murphy Professor of Marketing (e-mail: raymond.taylor@villanova.edu), and *Hae-Kyong Bang* is Associate Professor of Marketing (e-mail: hae-kyong.bang@villanova.edu), Villanova School of Business, Villanova University. *Matthew E. Sarkees* is Assistant Professor of Marketing, College of Business and Economics, West Virginia University (e-mail: matthew.sarkees@mail.wvu.edu). Les Carlson served as guest editor for this article.

multiple community interests, they do not fully consider the marketing functions of signage (Weinstein 2002). Part of the reason for this lack of consideration in signage regulation and restriction is a paucity of research on signage in marketing and advertising journals.

Sign regulations, particularly with respect to size and materials used in construction, can be problematic for businesses from a marketing perspective because they limit the overall brand experience for customers. A proposed ordinance in a Mississippi town exemplifies this problem. The proposal states that signs should be constructed with traditional materials, such as finished wood, glass, copper, or bronze; cannot be internally illuminated; and cannot display bright yellow, orange, or red on white colors (U.S. Small Business Administration 2003). Research clearly demonstrates that customers respond to such factors as brand-identifying colors (Bellizzi and Hite 1992; Meyers-Levy and Peracchio 1995), shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002). For example, the visibility of McDonald's yellow Golden Arches logo has played an important role in the success of the company. Yet regulations restricting the size of signs below optimum visibility, along with other restrictions, are pervasive.

Thus, the ability to obtain and use adequate signage is highly important to the success of retail and service businesses of all sizes (Taylor, Claus, and Claus 2005). Large retailers, such as Burger King, Best Buy, and Pier 1 Imports, have conducted studies documenting that adequate signage plays a key role in generating sales (Swormstedt 1999; U.S. Small Business Administration 2003). For small

businesses, without the power and resources of the larger brands, the importance of on-premise signs may be a matter of survival for the owners and employees (Claus, Claus, and Claus 2001). It is from this vantage point that marketing can play a primary role in the legal and public policy discussion of on-premise signs. The lack of consideration of the role of marketing is an issue in the context of both (1) the development of sign codes and (2) court cases in which eminent domain proceedings, municipal building projects, or other events result in either removing or blocking the view of the sign.

A key factor in this discussion, and an important point of ongoing dispute, is the valuation of on-premise signs. First, we establish that signage has important marketing functions that create value for firms. A survey of a national sample of on-premise sign users documents the importance of these marketing functions to the business. Second, as the primary focus of this article, we describe an alternative valuation technique that incorporates a marketing perspective on signage. Valuation methods are particularly relevant when communities attempt to restrict or remove on-premise signs or when a business loses access to a sign for one reason or another (e.g., a structure is erected that blocks a clear view of the sign). In general, U.S. courts have accepted valuations as analytical tools to make decisions in cases and compute damages. However, these valuation techniques have largely fallen to appraisers and/or land-planning specialists rather than marketing experts, and therefore perceptions of the value of the signs from a marketing perspective are notably absent. We propose that a new technique, which we refer to as the cost of replacement of customer exposures, should be incorporated in legal cases for signage valuation.

## Conceptual Background: The Marketing Functions of Signs

Marketing managers tend to emphasize consistency across all interactions with customers, in whatever form (e.g., Low 2000; McArthur and Griffin 1997). Thus, it is ironic that the role of on-premise signs in marketing communications has largely been ignored in the academic literature. Though not an exhaustive list, Taylor, Claus, and Claus (2005) propose four significant roles of on-premise signs in many firms' marketing programs: communicating the location of the business, reinforcing advertisements and other marketing variables as part of integrated marketing communications (IMCs), branding the site, and enhancing store image.

### Communicating the Location of the Business

An on-premise sign is often the primary way that consumers learn where a business is located. In this way, the sign plays a key role by "getting the word out" to consumers that the business exists at a given location. For businesses that rely on impulse purchases or serve immediate needs, the sign may often induce an immediate response that leads to a sale. Consumer impulse stops account for a high percentage of customer traffic, ranging from 15% to 45%, depending on the type of business (U.S. Small Business Administration 2003). High visibility is important to communicate where the store is to consumers (Berman and Evans 2007; Dunne and Lusch 2007).

## Reinforcing Advertisements and Other Marketing Variables as Part of IMCs

The way consumers perceive a business is related to a synthesis of messages they receive and the contact they have with the business (Belch and Belch 2004; Chaterjee 2011; Kerr et al. 2008; Taylor 2010). Any variation in the message can damage the business (Garretson and Burton 2005; Goodstein 1993) and its brand equity (Duncan 2005). Exposure to an on-premise sign sends a message to consumers and thus should be viewed as part of a company's IMC strategy. If restrictive regulations prevent a business from displaying the message—for example, through use of an identifiable character (e.g., Chuck E. Cheese, Wendy, Mickey Mouse)—consumers may be confused, thus damaging the brand and the firm (Garretson and Burton 2005).

### Branding the Site

An on-premise sign plays a unique and critical role by branding the site of the business. Trade dress, including trademarks and other aspects, can be used both to enhance immediate recall of the business when passing by and to build positive associations with the business in consumers' minds. Exposure to trade dress through the on-premise sign can be critical in shaping a business's image. In addition, the need to reinforce the brand at the point of purchase for retail and service businesses is fundamental to maximizing brand equity (Taylor, Claus, and Claus 2005).

### Enhancing the Image of the Store or Business

Experts have long agreed that brick-and-mortar retailers must create and reinforce a store image to ensure success (Golden, Albaum, and Zimmer 1987; Pessemier 1980). Storefronts and signage play an important role not only in attracting attention but also in communicating information about the store's image and atmosphere (Berman and Evans 2007). For example, some stores communicate a prestigious image through the use of expensive signage in conjunction with an elegant storefront. Whatever the image of the business, the on-premise sign should demonstrate consistency with it.

### Sales Impact of On-Premise Signs

Many academic and practitioner studies, though mostly from a legal perspective, suggest that businesses would lose sales if on-premise signs were altered, restricted, or removed (e.g., Claus, Claus, and Claus 2001; Ellis, Johnson, and Murphy 1997). The debate surrounding on-premise signs is largely rooted in arguments that customers will not know the location of the business and thus will not enter the store, causing sales to suffer. Related marketing studies support this theory. The notion of an on-premise sign as a type of "feature" notification method may drive customer foot traffic and sales (e.g., Lohse 1997; Zhang, Wedel, and Pieters 2009). As such, a business stands to lose first-time customers and potentially longer-term revenue without an on-premise sign.

# Perspectives from a Survey of On-Premise Sign Users

Some regulators have argued that certain advertising media can serve as a substitute for an on-premise sign. If this were the case, the argument that businesses need on-premise signs to be viable and/or to maximize profitability would be less compelling. Furthermore, the potential for litigation exists, which may have a damaging impact on businesses. Thus, the ongoing national discussion suffers without a perspective from managers regarding on-premise signage.

## Methodology

We drew a sample of 500 businesses randomly from a customer list of a large, national sign company that serves a broad range of U.S. small and medium-sized businesses. The survey was brief, just two pages, to encourage participation and was mailed once. It included a cover letter indicating that the research was for academic purposes and promised anonymity to respondents. A postage paid reply envelope was included, along with a $10 bill as an incentive. The survey instructed the respondents to answer the questions in relation to on-premise signs for their businesses. A total of 261 surveys were returned. Of these, 23 were unusable or incomplete and were dropped, resulting in a final sample of 238, for a response rate of 56%. The surveys came from 33 U.S. geographically dispersed states and represented a variety of retail and service businesses (see Table 1).

Consistent with usage patterns in the industry, the majority of responses were from small businesses. Approximately 86.2% of businesses had 10 or fewer employees, 9.2% had between 11 and 25 employees, 1.9% had between 26 and 50 employees, and 2.7% had 50 or more employees. The sample is also representative of both well-established and newer businesses. Regarding the length of time a business has been in operation, 8.8% had been operating for less than 1 year, 36.5% between 2 and 5 years, 16.5% between 6 and 10 years, 21.1% between 11 and 25 years, and 17.1% for more than 25 years.

## Primary Advantages of On-Premise Signs

On a seven-point Likert scale (1 = "strongly disagree," and 7 = "strongly agree"), the respondents rated on-premise signs at a mean of 5.73 in terms of their ability to help the business attract customers. The respondents also clearly recognized the role of on-premise signs in IMCs, with a mean level of agreement at 5.63 with the statement that the sign "reinforces the other advertising and communications methods we use to attract customers." The mean response for the sign's ability to brand the business was 5.90, and the ability to enhance the store's image was 6.03. These findings are particularly notable given that the questions reflect the respondents' beliefs and understanding that on-premise signs can produce long-term customer relationship benefits, in addition to generating traffic. In an era in which marketing managers emphasize the importance of brand equity, these results underscore the significance of signs for building the brand. The results also show that respondents believed that their signs were cost-effective (M = 5.37) and provided return on investment to the business (M = 5.28). These high ratings are impressive given that they force the managers to think about their signs' bottom-line impact.

Subsequent analysis shows that the findings are robust across subgroups within respondents. We analyzed the difference in means of the survey responses among four groups based on the location of the business (Northeast, Southeast, Midwest, and West). Pairwise comparison tests of the means among the groups showed no significant differences. Pairwise comparison tests of the means based on years in business also showed no significant differences among the groups regarding the perceived value of each of the four roles of on-premise signs (see Table 2). Regarding cost-effectiveness, we found one notable exception. Owners of businesses open for less than one year believed that on-premise signs were significantly more cost-effective than those who were in business between two and five years. For local municipalities, this finding signals that restrictive on-premise regulations may leave location out of the consideration set of new businesses, thus losing potential tax revenue.

## Cost-Effectiveness of Other Media Versus On-Premise Signs

Given the debate over on-premise sign regulations, it is important to examine whether businesses have cost-effective alternatives for on-premise signs. Calls to relax restrictive sign codes are less compelling if other communications devices can perform the same functions. We asked respondents to compare the effectiveness of their on-premise signs directly with other communications mechanisms. The scale used was a seven-point Likert scale anchored by 1 ("not effective") and 7 ("effective"). The mean responses were as follows: billboard (4.87), Internet (4.56), radio (4.40), newspapers (4.37), television (4.24), and yellow pages (4.12). Subsequent statistical analysis reinforces these results. Correlations between the alternative media options and on-premise signs were low (<.22). T-tests comparing the mean of the cost-effectiveness measure of on-premise signs (5.37) with the means of each of the other media alternatives all showed significant differences (see Table 3). These results reinforce recent cost studies of various media alternatives, including on-premise signs (International Sign Association 2006).

**Table 1.    Profile of Respondents by Business Type**

| Business Type | Frequency | Frequency (%) |
|---|---|---|
| Retail | 103 | 43 |
| Restaurant | 49 | 21 |
| Auto repair | 23 | 10 |
| Auto dealer | 12 | 5 |
| Banking/insurance | 10 | 4 |
| Veterinary/pet care | 8 | 3 |
| Convenience/gas | 5 | 2 |
| Hotel | 5 | 2 |
| Entertainment | 4 | 2 |
| Real estate | 3 | 1 |
| Other | 16 | 7 |

**Table 2.    Survey Results for Marketing Functions of On-Premise Signs by Number of Years in Business**

| Marketing Function of On-Premise Signs | Survey Results | | | | |
|---|---|---|---|---|---|
| | Open Less Than 1 Year (n = 21) | Open 2 to 5 Years (n = 87) | Open 6 to 10 Years (n = 36) | Open 11 to 25 Years (n = 52) | Open More Than 25 Years (n = 42) |
| Communicating the location | 5.76 | 5.66 | 5.67 | 5.85 | 5.48 |
| Reinforcing IMC and advertising | 5.90 | 5.64 | 5.56 | 5.70 | 5.10 |
| Branding the site | 6.14 | 5.79 | 5.58 | 6.17 | 5.60 |
| Enhancing the store image | 6.28 | 5.95 | 5.78 | 6.36 | 5.71 |

Notes: Responses are on a seven-point Likert scale ranging from 1 ("strongly disagree") to 7 ("strongly agree"). Pairwise comparisons of means showed no significant differences between groups.

**Table 3.    Cost-Effectiveness of On-Premise Signs Versus Alternative Media Options**

| Perception of Cost-Effectiveness of On-Premise Signs Versus Alternative Media Options | Means Comparison | Significance |
|---|---|---|
| On-premise vs. billboard | $M_O = 5.37$ vs. $M_B = 4.87$ | $t = 4.71, p < .001,$ d.f. $= 238$ |
| On-premise vs. Internet | $M_O = 5.37$ vs. $M_I = 4.56$ | $t = 5.15, p < .001,$ d.f. $= 238$ |
| On-premise vs. radio | $M_O = 5.37$ vs. $M_R = 4.40$ | $t = 5.98, p < .001,$ d.f. $= 238$ |
| On-premise vs. newspapers | $M_O = 5.37$ vs. $M_N = 4.37$ | $t = 6.59, p < .001,$ d.f. $= 238$ |
| On-premise vs. television | $M_O = 5.37$ vs. $M_T = 4.24$ | $t = 6.25, p < .001,$ d.f. $= 238$ |
| On-premise vs. yellow pages | $M_O = 5.37$ vs. $M_Y = 4.12$ | $t = 7.81, p < .001,$ d.f. $= 238$ |

Notes: Responses are on a seven-point Likert scale ranging from 1 ("strongly disagree") to 7 ("strongly agree").

## The Impact of On-Premise Signs on Sales

Of the respondents, 85% indicated that they would lose sales without an on-premise sign. Though not completely unexpected, the average estimate of lost sales was 34.5%, which is significant. We observed no statistically significant differences among the average sales percentage decrease based on geographic location of the business. However, we found one notable difference between the groups based on length of time in business. The businesses in existence for more than 25 years reported a statistically significantly smaller sales percentage decrease than other groups if no on-premise sign were permitted. Perhaps this is due to strong word of mouth, reputational effects, or simple conditioning of customers regarding the location of these businesses. Collectively, these results are indicative of the strong impact of on-premise sign on the success or failure of a business. Most businesses could not absorb losing more than one-third of sales and remain viable.

We further dissected the perceived loss of sales if there was no on-premise sign. Taking the median average perceived sales loss (25%), we split the sample into two groups, a high perceived sales loss (>.25) and a low perceived sales loss (≤.25). We then ran paired t-tests to determine whether a distinct difference emerged in the respondents' perceptions of the four marketing roles of on-premise signs and of cost-effectiveness (see Table 4). Respondents in the high-sales-loss group believed that the contributions of on-premise signs were significantly greater than those in the low-sales-loss group across all four marketing roles (communicating, reinforcing, branding, and enhancing), as well as cost-effective. On the surface, these differences suggest that for those in the low-sales-loss group, a certain level of customer loyalty exists that perhaps partially offsets the loss of the on-premise sign. We found no indication that years in business played a role in the high- versus low-sales-loss difference.

## Discussion

The results of this survey reveal that on-premise signs play a key role in contributing to brand equity for many businesses. They also clearly show that the collective advantages of on-premise signs are unique and cannot be easily duplicated by other IMC devices. Furthermore, the respondents found on-premise signs cost-effective. For many smaller businesses, on-premise signs may be the only mechanism they can reasonably afford that allows them to achieve several marketing objectives. This outcome reinforces a more widespread belief that on-premise marketing activities are more likely to generate greater benefits for companies than other forms, such as television, radio, and print advertising (Grocery Manufacturers Association/Deloitte Consulting LLP 2008). Perhaps the most important finding is that the average loss of sales for the 85% of businesses that reported they would lose sales is nearly 35%. As we mentioned previously, many businesses could not absorb this type of loss and stay viable.

**Table 4.    Marketing Functions of On-Premise Signs by Perceived Sales Loss Without On-Premise Sign**

| Marketing Function of On-Premise Signs | High Perceived Sales Loss (>25%) | Low Perceived Sales Loss (≤25%) | Significance |
|---|---|---|---|
| Communicating the location | 6.35 | 5.20 | $F(1, 237) = 31.13$, $p < .001$ |
| Reinforcing IMC and advertising | 6.21 | 5.12 | $F(1, 237) = 27.58$, $p < .001$ |
| Branding the site | 6.25 | 5.53 | $F(1, 237) = 12.31$, $p < .01$ |
| Enhancing the store image | 6.34 | 5.77 | $F(1, 237) = 9.11$, $p < .01$ |
| Cost-effectiveness | 5.85 | 5.05 | $F(1, 237) = 14.65$, $p < .001$ |

Notes: Responses are on a seven-point Likert scale ranging from 1 ("strongly disagree") to 7 ("strongly agree").

## Valuation of On-Premise Signs

The discussion of the valuation of on-premise signs has largely been from the perspective of appraisers and real estate experts, who rarely incorporate marketing perspectives. This is problematic when communities are considering restrictions on signage or taking a business owner's private property (e.g., the on-premise sign) for public use. Restrictive actions on signage by government entities may not initially trigger compensation for business owners, but they do diminish the value of the private property by limiting the degree to which the sign can effectively serve its marketing functions for the business. Excessive restriction involves "taking" too much of the value of the property, thus increasing the importance of correct valuations.

Although the Fifth Amendment of the U.S. Constitution permits the taking of private property for public use, the key issue of just compensation for the loss of private property (the takings clause) is paramount for all stakeholders. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act) maintains that just compensation for government acquisition of private property is the *greater* of the value of the underlying land traceable to the building, structure, or improvement or the value independent of the land (U.S. Small Business Administration 2003). Thus, fair and equitable valuations in the context of the on-premise sign are appropriate and necessary. However, none of the existing approaches we describe subsequently directly consider the impact of the marketing functions played by signage.

Valuation methodologies for on-premise signs in legal cases originated from the Financial Institutions Reform, Recovery, and Enforcement Act. This act was passed in 1989 as a response to the failures of savings and loans institutions as an effort to regulate appraisers who had certified the value of collateral for many bad loans. The act led to the subsequent development and adoption of the Uniform Standards of Professional Appraisal Practice throughout the United States. Three approaches are recognized according to this standard: the market approach, the income approach, and the cost-of-replacement approach. Table 5 shows the advantages and limitations of each approach.

**Table 5.    Advantages and Limitations of Major Signage Valuation Approaches**

| Market | Income | Cost of Replacement of Exposures |
|---|---|---|
| **Advantages:** | **Advantages:** | **Advantages:** |
| • Incorporates visibility component into the valuation. | • Focus is on lost revenue. | • Effectively estimates value of lost exposures. |
| • Matched pairs can provide an estimate of sales per square foot as a result of visibility. | • Takes into account type of business. | • Conceptually focuses all marketing functions of the signage. |
| | • Attempts to isolate revenue created by the signage. | • Estimates value of lost revenue. |
| | | • Data are normally more readily attainable (e.g., inexpensive, not proprietary). |
| | | • Directly takes into account size of the sign. |
| **Limitations:** | **Limitations:** | **Limitations:** |
| • Matched pairs of other retail sites must be as similar as possible on all aspects except visibility. | • Can be difficult to isolate revenue directly attributable to the signage. | • Data on comparable billboard or out-of-home locations must be available. |
| • Requires time-consuming and expensive surveys. | • Conceptually focuses on value created through identification function instead of all marketing functions. | • Is less applicable to stores that rely on other stores for traffic. |
| • Estimates value of real estate instead of increased sales due to the presence of the sign. | • Cost associated with consumer surveys or marketing data can be expensive. | |
| • Does not take into account expected rates of return to the business. | • Data on revenue attributable to the sign are often considered proprietary. | |

## Market Approach

The market approach attempts to estimate the market value at which a property could be sold at a given point in time. The emphasis is on determining the value of the property if it is resold to another party under normal selling conditions in which neither party (buyer or seller) is under duress. When valuing an on-premise sign itself, as opposed to the value of an overall property, the market approach is somewhat problematic because an existing on-premise sign would normally have little, if any, value to another business. Furthermore, by not considering the value of the sign independently, it does not conform to the specifications of federal regulations under the Uniform Act of 1970. As a result, the market approach has limited value in determining just compensation in some signage cases.

The market approach can be relevant in signage valuation in instances in which differences in retail value based on the visibility component of a retail site can be calculated. In some markets, high-visibility retail sites can command a 20% to 40% premium over low-visibility sites (International Sign Association 2006). If proper signage is not allowed or removed, the assumption is that the site has gone from high visibility to low or no visibility. When a survey of rental and lease figures can be calculated for several retail sites in an area that are similarly situated to the one being valued, an estimate of the increased value of the business in terms of average sales per square foot can be made using the market approach (U.S. Small Business Administration 2003). When applying this approach, it is critically important that similar sites are compared using variables such as the demographics of an area; traffic counts, flow, and parking; and any restrictions on signage, among others (International Sign Association 2006).

A typical application of the market approach involves computing the market value (estimated sales price) of similar sites and comparing the price per square foot of high-versus low-value sites. For example, it might be that within a given shopping center, tenants of high-visibility sites pay an average of $15 more per square feet than tenants of low-visibility sites. In this case, the annual value of the sign would be estimated by multiplying the number of square feet of the store by the rent premium. For example, for a 2500-square-foot store, a $10 rent premium would be valued at $25,500 per year. For a ten-year lease, the value of the sign would be computed as $25,000 × 10, or $250,000.

The market approach recognizes the value that visibility brings to a retail site and provides an estimate of the value provided by that visibility. However, the focus on real estate value instead of income flows generated by the sign makes it less efficient in computing the value of the sign to the specific business based on its expected rate of return. Expected rate of return can vary by industry and size of business, among other factors. Furthermore, implementing the market approach can be difficult, expensive, and time consuming. It is most applicable to situations in which similar stores are located in a given community or area. Moreover, the focus of the market approach is on the value of the property or real estate associated with the business, not on the annual sales accounted for by the sign. Sales impact, for example, is likely a better measure of the direct impact of

the signage on the business, and factors affecting the real estate market can change over time. For businesses whose signage is particularly important for attracting customers, such as hotels that draw passersby from the sign, the market comparison may also underestimate the real value of the sign. Thus, although the market approach can sometimes provide a reasonable estimate of the value of the sign if good data on comparable sites are available, it does not directly account for the type of business and may provide a low estimate of a sign's value under some circumstances.

## Income Approach

The income approach estimates future cash flows and values a property on the basis of the revenue it generates less the real costs of doing business. A primary reason to choose one property over another is the anticipated rate of return on the investment. Typically, before settling on a price for a property and completing a purchase or lease, the prospective buyer has estimated his or her fixed and variable costs and calculated an acceptable net profit or rate of return. In the context of on-premise signage valuation, the focus of the income approach is on isolating the income generated for the business from the presence of the sign.

When applying the income approach, it is necessary to appropriately categorize the type of business involved because the income generated by signage varies depending on the business category (U.S. Small Business Administration 2003). The trade area involved must also be considered. For example, gas stations and restaurants located off an expressway depend more on impulse stops than, for example, an insurance agency serving a local trade area. The insurance agency still needs the sign to identify the business effectively.

As with the market approach, applying the income approach is dependent on the availability of quality data. Two common data sources for this type of comparison are consumer surveys and internal data on same-store sales. Consumer surveys for this purpose are generally conducted at the point of sale; they ask consumers what prompted them to stop at the business the first time they patronized it. Estimates of the proportion of traffic and repeat customers can be generated from this type of survey. Many chain stores and franchises also collect internal data that attempt to isolate the sales impact of the sign. Doing so often involves examining sales of similar stores and/or closely examining the sales impact when a new sign is erected (U.S. Small Business Administration 2003). One problem that sometimes arises when using internally collected data is that many businesses view this information as proprietary. Although firms may be willing to use such data in a case they may be involved in, they are generally reluctant to share such data with competitors or other firms.

Still, if data on the net revenue generated by the sign can be obtained, the income approach can provide an estimate of the value of a sign. For example, consider a hypothetical case in which a consumer electronics store is contractually supposed to have a sign installed on the day of its grand opening, but as a result of a legal dispute, construction of the sign is held up for six months. If it is documented after installation of the sign that 20% of customers first became

aware of the store because of the sign, and its monthly net revenue is $400,000 per month (the amortized cost of purchasing and the cost of maintaining the sign would be deducted from gross revenue), the calculation under the income approach would indicate a monthly loss of $80,000 per month ($400,000 × .20). During the six months, the lost revenue due to the sign would be $480,000 ($80,000 × 6).

In cases in which a sign is permanently taken away, a market capitalization rate can be applied based on the expected rate of return of the specific type of business. For example, if investors expect a 10% annual return on investment in a franchised restaurant and annual lost revenues due to the sign are computed to be $120,000, the calculation would be to divide the annual lost revenue by the market capitalization rate $120,000/.10 to arrive at a valuation of the sign of $1.2 million in revenue.

If comparable store data from similar sites are available, they also can be used to estimate lost income. For example, a franchised restaurant that loses its sign can estimate lost revenue by examining sales at stores that are historically similar in terms of sales revenues, area demographics, size of trade area served, and so forth. However, such comparative data are often difficult to obtain. Another limitation of the income approach is that its application is largely conceptually reliant on the identification function of on-premise signs rather than the larger set of marketing functions. Although this is less of an issue with comparative store data, questions asking why a customer first visited a store may result in an undervaluation of the signage because of the inability to consider other marketing functions (e.g., site branding) or interactions with other forms of promotion.

## Cost-of-Replacement Approach

The final valuation method is the cost-of-replacement or substitution approach. Under this approach, an appraiser estimates the reproduction and/or replacement costs for the property less any accrued depreciation. When applied to real estate, the approach includes a comprehensive set of costs that go beyond construction to include expense items such as interest, permits, and fees. In community zoning terms, on-premise signs represent an accessory land use that is complementary to the primary use. Many times, however, the accessory use is not merely complementary but also essential to the primary use of the site. This is because on-premise signs are influential in attracting customers, helping customers identify and locate the store, and encouraging consumer impulse stops, all of which drive sales. However, when considering the cost of substitution of the on-premise sign, problems arise. The cost of substitution accounts for replacing the business generated by the on-premise sign. The results of the survey we presented previously demonstrate that alternative forms of media do not reproduce the business generated by the on-premise sign. Furthermore, substitutes do not account for consumer impulse. Finally, substitutes do not account for the ongoing costs of providing the substitution. For example, billboards are not a one-time expense but a perpetual expense. Therefore, the cost-of-replacement or substitution valuation methodology can result in less than just compensation for the value of the on-premise sign.

In the past, when appraisers applied the cost-of-replacement approach, their focus was on the cost of replacing the sign's physical structure. From a marketing perspective, this is wholly inadequate because it is consumers' exposures to the sign that provide the value, not the mere existence of the physical sign. The sign would clearly have little value if consumers did not see it.

## A New Approach: Cost of Replacement of Customer Exposures

A more comprehensive and effective method is necessary given the inadequacies of the existing three major approaches. This new method includes the cost of replacing the marketing functions the sign performs. It is the exposure to customers that allows on-premise signs to generate value for businesses. The industry determines the value of sign exposures by using the standard media-planning measure cost-per-thousand exposures (CPM), which is similar to that of advertising media. In advertising, CPM refers to the cost of reaching 1000 members of the target audience once. The CPM allows a company to compare the relative cost of various media options. This is an important measure with respect to optimizing media selection because exposure to target audience members is a fundamental prerequisite for effective advertising. We apply the same principle to on-premise signs: Customers must be exposed to the sign for it to serve its marketing functions.

The new approach focuses not only on the cost of replacing the sign (physical structure) but also on the cost of replacing the marketing functions the sign performs. The best available proxy for the value of the exposures generated by an on-premise sign can be derived from the CPM for outdoor advertising structures (normally billboards) in the immediate geographical area. By computing the annual expense to rent billboard space in the same area, the value of the exposures from the on-premise sign can be estimated. This estimation method can be viewed as a conservative valuation because billboards perform some of the functions of on-premise signs, such as specifying location and reinforcing other aspects of IMC. However, billboards are not physically located at the business and thus cannot reinforce store image or brand the store the way on-premise signs can. Thus, using the value of outdoor advertising's marketplace in the valuation of on-premise signs is a conservative approach.

Estimating the value of the on-premise sign by the cost of replacing customer exposures involves three steps:

1. Computing the number of gross exposures to the on-premise sign by multiplying the number of cars (or the number of people in the case of locations with heavy foot traffic) that pass the business site per month (normally available from State Department of Transportation offices) by the average occupancy per vehicle.[1]

2. Using the number of gross exposures obtained in Step 1 to compute the cost of acquiring that same number with outdoor advertising. This can typically be done by examining data from the Traffic Audit Bureau (or outdoor advertising companies)

---

[1] We can also calculate gross exposures by evaluating the 24-hour daily traffic count and multiplying this number by 30 days to establish a monthly number. This number is adjusted for factors such as geographic location, business hours of operations, and seasonality, among other items.

for a billboard or other appropriate form of an out-of-home advertising site that produces a similar number of exposures. These rates factor into how many people pass by the billboard site and notice it. An outdoor advertising company may also have its own information on rates. The annual cost of replacing the gross exposures is then computed by multiplying the monthly billboard rental fee that would produce the same number of gross exposures as the on-premise sign by 12.

3. Computing the overall value of the on-premise sign as an asset and then dividing the annual net income that would be generated by the sign (for a detailed description, see the "Example Application" subsection) by an appropriate capitalization rate to determine the total value of the on-premise sign based on the income streams that would be produced from the same number of gross exposures.

## Cost of Replacement of Customer Exposures: An Example Application

For the purposes of this illustration, we assume that the business involved appeals in general to those who pass by its location, as would be the case with many retailers, gas stations, and restaurants. The business is a gas station/mini-mart located in the greater Philadelphia area whose signage was visible from both sides of a major intersection. As a result of eminent domain proceedings and with zoning requirements, the signage, which consisted of one large monopole sign, was removed and was not able to be replaced on the busier of the two roads involved. Without the sign, the gas station/mini-mart is not visible to passersby down the main road on which the store is located. The business draws most of its customers from people commuting through the area.

The site on which the sign was placed required a tall sign pointed toward the highway to provide visibility for the business. The removal of the sign enables us to make an appropriate calculation of the loss in business. First, a market approach focused on the resale (salvage) price of the physical structure of the sign is insufficient because it would understate the true value of the sign to the business. The market approach does not factor in the informational function of the on-premise sign or any of the other effects of marketing, such as the value created from the logo display, recall of associations based on other forms of promotion, or enhancement of the store's image. Second, although it is possible to employ the income approach, applications are often premised on the availability of sales at similar stores that have different signage. As mentioned, previously, such data are often not readily available or easily comparable because of the exogenous factors that vary by location.

The on-premise sign is considered a permanent asset, in part because it is clearly visible to viewers at all times. There is no finite period of broadcast or display time (as with radio or television). As a result, CPM must be calculated by factoring in the original cost of the sign structure (purchase price plus cost of installation) and expenses related to maintenance. Depreciation must also be factored in, along with consideration of trade area demographics and traffic counts (whether road traffic or foot traffic). It is also necessary to estimate the proportion of passersby who would not be influenced by the sign or some of its func-

tions. (Depending on the type of business, these passersby could include long-haul truckers and local residents who regularly patronize the business.) Adjustments must also be made for the average number of occupants in a passing vehicle in the cases when vehicular traffic is used.

As reported by the Pennsylvania Department of Transportation on the subject of state highway traffic, an annual average traffic count of 110,000 vehicles, northbound and southbound, pass the sign every day. Another option would be to draw an average daily traffic count from the Traffic Audit Bureau, a national organization created in 1933 by several outdoor advertisers as an independent auditor to improve the process of verifying both the number of people who pass an advertising message on the street and the number who actually notice and read it. The Traffic Audit Bureau has developed highly detailed and sophisticated methods for determining the number of people who have been exposed to particular signs. The industry's billboard visibility rating system is known as the Outdoor Visibility Rating System (OVRS),[2] which is part of the new "Eyes-On" measurement standard and is used to determine whether a sign's placement is such that it can be seen and read.

For purposes of this study, we use the following base calculations:

| | |
|---|---|
| Average cost of sign: | $60,000 |
| Standard depreciation period: | 7 years |
| Average cost of sign per month: | $744 (rounded) |
| Estimated traffic count: | 70,000 cars per day |
| Estimated monthly traffic count (cars per day × 30 days): | 2,100,000 cars per month |
| Estimated number of people per car: | 1.33 |
| Monthly gross exposures in thousands per sign (2.1 million cars × 1.33 ÷ 1000): | 2795 (rounded) |
| CPM formula: | $\frac{\text{monthly cost } \$744}{\text{monthly exposures } 2795}$ |
| Average CPM per sign: | $.27 (rounded) |

We calculate the cost to acquire similar exposures with outdoor advertising structures (based on lease rates that Clear Channel Outdoor Advertising Company would charge if the signs were off-premise/outdoor advertising signs) as follows:

| | |
|---|---|
| Permanent 14' × 48' bulletin: | $2,000 per month |
| Estimated traffic count: | 70,000 cars per day |
| Estimated monthly traffic counts (cars per day × 30 days): | 2,100,000 cars per month |
| Estimated number of people per car: | 1.33 |
| Monthly gross exposures in thousands (2.1 million cars × 1.33 ÷ 1000): | 2795 (rounded) |
| CPM formula: | $\frac{\text{monthly cost } \$2,000}{\text{monthly exposures } 2795}$ |
| Average CPM: | $.72 (rounded) |

---

[2] According to the OVRS system, a sign will only be included in a company's Daily Effective Circulation audit (which verifies the number of adults who view it each day) if that billboard is visible for five seconds, if a maximum of two advertisements are located on the same structure facing in the same direction, if the face of the billboard is located within 150 feet of oncoming traffic, and if the billboard face is angled toward the roadway rather than parallel to it. Under the OVRS, a billboard's rating is increased for various positive locational attributes, including visibility for a period of six seconds or longer.

The CPM for the removed on-premise sign are considerably lower than that for a billboard. This makes sense because after full depreciation, the on-premise sign does not lose value but rather keeps performing its function at no additional cost. If the business had to replace the customer exposures using billboards, costs would likely escalate over time, given the annual payment plus pricing inflation. Moreover, billboards are a highly regulated medium, and the ability to buy space in appropriate medium may be limited, especially because construction of new billboards in greater Philadelphia, as well as in many other markets, is highly limited.

Billboard lease rates for similar sites are $2,000 per face. To estimate annual net income due to the value of customer exposures provided by the sign, we use the following formula:

| Gross Monthly Income | − | Net Monthly Expenses | = | Monthly Income | × | Two Sign Faces | × | 12 Months | = | Annualized Net Income |
|---|---|---|---|---|---|---|---|---|---|---|
| $2,000 | − | $500 | = | $ 1,500 | × | 2 | × | 12 | = | $36,000 |
| | | | | | | | Total Net Income | | = | $36,000 |

Because out-of-home advertising is often a standard part of the media mix sold by large advertising agencies in recent years, prices for billboard space have been relatively stable over time. The scientific nature of the media-planning industry ensures that standard media-planning measures, such as reach, frequency, and CPM, are accurately calculated and monitored. As a result, we are reasonably certain that these figures accurately reflect market conditions and the number of exposures.

As with any valuation technique, a capitalization rate is applied to reflect the idea that investments create continuing annualized revenue streams, and thus a net present value calculation must be made to compute the value of the revenue stream in today's dollars. We can apply a range of capitalization rates based on average rates of return in various industries, such as that for the gas station/mini-mart. With this type of business, a reasonable capitalization rate would fall somewhere between 7% and 9% (U.S. Small Business Administration 2003). Using alternative capitalization rates, we can compute the value of the removed sign as follows:

| Annual Net Income | / | Capitalization Rate | = | Value |
|---|---|---|---|---|
| $36,000 | / | .07 | = | $514,286 |
| $36,000 | / | .08 | = | $450,000 |
| $36,000 | / | .09 | = | $400,000 |

We use the 8% capitalization rate as the best-guess estimate of the sign's value because it is in the middle of the range. As such, with the cost-of-replacement-of-customer-exposures approach, the value to the business of the removed sign is $450,000, based on a lost revenue stream of $36,000 annually. Thus, in the context of regulatory taking, the company owning the sign should be compensated $450,000.

This example documents the effectiveness of using the cost of replacing customer exposures as a basis for signage valuation (for a list of advantages and limitations, see Table 5). Although the example pertains to the context of a legal "takings" case, the approach can be similarly applied to estimate the value of signage to a business based on the value provided by the exposures. This can be done by using company data or industry norms and publicly available information on out-of-home advertising rates. The cost-of-replacement-of-customer-exposures approach is applicable to most common signage contexts in which a retail or service business sign is located in an area where it is exposed to vehicular traffic on a daily basis. This approach provides an effective valuation of the signage because it captures the source of value the sign creates for the business. The approach also accounts for the size of the sign and the type of business in the valuation process. Thus, the technique can be used to provide additional data to communities on the proper valuation of signage when regulatory codes are being developed and implemented. It can also be used in court cases when an appropriate valuation of an on-premise sign is needed. This approach would be less suitable, however, for a small store inside a shopping mall (e.g., a pretzel stand, specialty retailer) because traffic from the mall itself would be highly influential in generating visits to the store.

## Conclusion

The role of on-premise signs in marketing has been an understudied topic. Equally important, marketing perspectives have been virtually absent from discussions of signage valuation, whether at the stage of drafting restrictions or in legal disputes. This article contributes to the literature and the public policy discussion of on-premise signage in both areas by providing (1) a framework for understanding the marketing functions of on-premise signs and (2) a methodology of the cost of replacement of customer exposures that integrates a marketing perspective into valuation.

We also provide empirical evidence that on-premise signs help small businesses (by far the most common size of business in the United States and a critical engine of economic growth) communicate their locations, reinforce advertising as part of their IMC, brand their sites, and enhance store image. A striking finding is that the respondents believed that sales would decrease by approximately 35% without access to an on-premise sign. The respondents also reported that various advertising media are not cost-effective substitutes for on-premise signs.

This study also lends support to the notion that on-premise sign codes of local municipalities should take the needs of businesses into account. Signs must be of adequate size and visibility to be effective, and those establishing codes should account for the marketing functions performed by on-premise signs. Furthermore, in situations in which on-premise sign valuation is necessary, using the cost of replacement of customer exposures is a valid, conservative method for estimating the value of on-premise signs. The adoption of such a method would incorporate a marketing/business perspective into valuation and result in fairer estimates of the value of on-premise signs.

# References

Belch George E. and Michael A. Belch (2004), *Introduction to Advertising and Promotion*, 5th ed. New York: McGraw-Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992), "Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology and Marketing*, 9 (5), 347–63.

Berman, Barry and Joel Evans (2007), *Retail Management: A Strategic Approach*, 10th ed. Englewood Cliffs, NJ: Prentice Hall.

Chatterjee, Patrali (2011), "Drivers of New Product Recommending and Referral Behaviour on Social Network Sites," *International Journal of Advertising*, 30 (1), 77–101.

Claus, R. James, Susan L. Claus, and Thomas A. Claus (2001), *The Value of Signs: A Guide for Property Appraisers, Brokers, Legal Professionals, Sign Users and Municipal Planners*. Sherwood, OR: The Signage Foundation for Communication Excellence.

Duncan, Thomas R. (2005), "IMC in Industry: More Talk Than Walk," *Journal of Advertising*, 34 (4), 5–6.

Dunne, Patrick D. and Robert F. Lusch (2007), *Retailing*, 6th ed. Cincinnati: Thomson South-Western.

Ellis, Seth R., Robert Johnson, and Robin Murphy (1997), *The Economic Value of On-Premise Signage*. (Study conducted at University of San Diego in cooperation with the California Electric Sign Association). Washington, DC: International Sign Association.

Financial Institutions Reform, Recovery, and Enforcement Act (1989), Pub. L. 101-73, 103 Stat. 183, 12 U.S.C. 3331 et seq.

Garretson, Judith and Scot Burton (2005), "The Role of Spokescharacters as Advertisement and Package Cues in Integrated Marketing Communications," *Journal of Marketing*, 69 (October), 118–32.

Golden, Linda L., Gerald Albaum, and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 64 (Winter), 393–410.

Goodstein, Ronald (1993), "Category-Based Applications and Extensions in Advertising: Motivating More Extensive Ad Processing," *Journal of Consumer Research*, 20 (June), 87–99.

Grocery Manufacturers Association/Deloitte Consulting LLP (2008), "Delivering the Promise of Shopper Marketing: Mastering Execution for Competitive Advantage," (accessed February 9, 2012), [available at http://www.deloitte.com/assets/Dcom-UnitedStates/Local%20Assets/Documents/us_cb_cpg_DeloitteGMA_Shopper_Mkt_Report_200810.pdf].

International Sign Association (2006), "Appraising the Value of Signage," *Signline*, (50), 1–12, [available at www.signs.org/Portals/0/docs/signline/signline_50.pdf].

Kerr, Gayle, Don Schultz, Charles H. Patti, and Ilchul Kim (2008), "An Inside-Out Approach to Integrated Marketing Communication: An International Analysis," *International Journal of Advertising*, 27 (4), 511–48.

Lohse, Gerald L. (1997), "Consumer Eye Movement Patterns on Yellow Pages Advertising," *Journal of Advertising*, 26 (1), 61–73.

Low, George S. (2000), "Correlates of Integrated Marketing Communications," *Journal of Advertising Research*, 40 (3), 27–39.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effects of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–45.

McArthur, David N. and Tom Griffin (1997), "A Marketing Management View of Integrated Marketing Communications," *Journal of Advertising Research*, 37 (5), 169–88.

Meyers-Levy, Joan and Laura A. Peracchio (1995), "How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands," *Journal of Consumer Research*, 22 (2), 121–38.

Pessemier, Edgar A. (1980), "Store Image and Positioning," *Journal of Retailing*, 56 (1), 94–106.

Scenic America (2012), "The Truth About Billboards," (accessed February 9, 2012), [available at http://www.scenic.org/billboards-a-sign-control/the-truth-about-billboards].

Swormstedt, Wade (1999), "Delays and Damages," *Signs of the Times*, (March), 52.

Taylor, Charles R. (2010), "IMC in 2010 and Beyond," *International Journal of Advertising*, 29 (2), 161–64.

——, Susan Claus, and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington, DC: U.S. Small Business Administration.

Uniform Relocation Assistance and Real Property Acquisition Policies Act (1970), Pub. L. 91-646, 84 Stat. 1894, 42 U.S.C. 4601.

U.S. Small Business Administration (2003), *Signage Sourcebook: A Signage Handbook*. Washington, DC: U.S. Small Business Administration, in conjunction with Signage Foundation for Communication Excellence.

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs," *Journal of Consumer Research*, 24 (March), 374–94.

Weinstein, Alan (2002), "Legal Issues in the Regulation of On-Premise Signs," in *Context-Sensitive Signage Regulation*, Marya Morris, Douglas Mace, Mark Hinshaw, and Alan Weinstein, eds. Chicago: American Planning Association Planners Press, 119–53.

Zhang, Jie, Michel Wedel, and Rik Pieters (2009), "Sales Effects of Attention to Feature Advertisements: A Bayesian Mediation Analysis," *Journal of Marketing*, 46 (September), 669–81.

View publication stats

EXHIBIT E

Contents lists available at ScienceDirect

# Health Policy

journal homepage: www.elsevier.com/locate/healthpol



# Gun control and suicide: The impact of state firearm regulations in the United States, 1995–2004

Antonio Rodríguez Andrés [a,*], Katherine Hempstead [b,1]

[a] School of Public Health, Department of Health Services Research, University of Aarhus, Bartholins Allé 1, DK - 8000 C, Aarhus, Denmark
[b] The Center for State Health Policy Rutgers, The State University of New Jersey 55 Commercial Avenue, 3rd Floor New Brunswick, NJ 08901-1340, United States

## ARTICLE INFO

*Keywords:*
Suicide
Guns
State regulations
Panel data

## ABSTRACT

*Objective:* To empirically assess the impact of firearm regulation on male suicides.
*Method:* A negative binomial regression model was applied by using a panel of state level data for the years 1995–2004. The model was used to identify the association between several firearm regulations and male suicide rates.
*Results:* Our empirical analysis suggest that firearms regulations which function to reduce overall gun availability have a significant deterrent effect on male suicide, while regulations that seek to prohibit high risk individuals from owning firearms have a lesser effect.
*Conclusions:* Restricting access to lethal means has been identified as an effective approach to suicide prevention, and firearms regulations are one way to reduce gun availability. The analysis suggests that gun control measures such as permit and licensing requirements have a negative effect on suicide rates among males. Since there is considerable heterogeneity among states with regard to gun control, these results suggest that there are opportunities for many states to reduce suicide by expanding their firearms regulations.

© 2010 Elsevier Ireland Ltd. All rights reserved.

## 1. Introduction

### 1.1. Firearms and suicide

Suicide is a major cause of preventable death. In 2006, more than 32,000 suicides occurred in the United States, as compared with approximately 18,000 homicides. In the United States, suicide was the 8th leading cause of death for males, and the 19th leading cause of death for females in 2006. For every suicide, there were more than ten hospitalizations for non-fatal attempts. In 2006, on average 46 Americans committed suicide with a firearm every day, accounting for approximately 50 percent of all suicides [1].

Prevention of suicide is an important part of the American public health agenda, and the goal of many programmatic activities undertaken by the Centers for Disease Control and Prevention (CDC) and other national and state agencies. In an attempt to combat this problem, spending by state mental health agencies (SMHAs) in the U.S. totalled $30.7 billion dollars in 2006 [2]. In recent years, restricting access to firearms and other lethal means has been increasingly recognized as one of the most effective strategies for suicide prevention (for an excellent review of this literature see, for example [3]), and is one of the key elements of suicide prevention in countries such as England [4], and Denmark [5].

There is a considerable body of empirical work that has documented a positive relationship between access to firearms and suicide (e.g. [6,7]). In fact, much of the decline in suicide in the United States over the past decades has been linked to the reduced prevalence of firearms (see for example [7–9]). Although the respective roles of

* Corresponding author. Tel.: +45 89 423122.
*E-mail addresses:* ara@folkesundhed.au.dk (A. Rodríguez Andrés), khempstead@ifh.rutgers.edu (K. Hempstead).
[1] Tel.: +1 732 932 3105; fax: +1 732 932 0069.

0168-8510/$ – see front matter © 2010 Elsevier Ireland Ltd. All rights reserved.
doi:10.1016/j.healthpol.2010.10.005

self-selection and availability in explaining the relationship between guns and suicide have not been completely resolved, the implication in either case is that reducing access to firearms should reduce suicide [10]. Restricting access to firearms has been recommended as a suicide prevention strategy by national and international organizations such as the CDC and the WHO. Gun control policies can serve to reduce overall gun availability by creating barriers to firearm ownership. Additionally, firearms policies can also prevent individuals who are at a relatively higher risk of suicide from purchasing firearms.

### 1.2. Gun control

Gun control is a highly contentious issue in the American political debate. Guns are common in the United States–40 percent of Americans reported having a gun in their home in 2009 (see [11]) Calls for increased regulation are based on the belief that restrictions will reduce gun violence. Regulation is opposed by those who claim infringement on the constitutional right to bear arms, and/or argue that firearm ownership deters crime. In the academic literature, the efficacy of gun control in reducing violence has received considerable attention, although little consensus has emerged from the empirical work (e.g. [9,12–14]).

The current era of gun control in the United States originated with the Brady Handgun Violence Prevention Act (1993)[2], more commonly known, as the Brady Bill. The Brady Bill established a federal requirement for a waiting period of up to five days before the transfer of a handgun to a purchaser. During this period, a background check is performed, which is intended to prohibit individuals with criminal backgrounds from purchasing firearms. The transfer of the handgun is completed whether or not the background check is finalized within the five-day period. The federal waiting period was phased out in 1998 with the development of the National Instant Criminal Background Check System (NICS), administered by the Federal Bureau of Investigation (FBI). Over time, many states have passed laws which matched or surpassed the federal minimums.

There are many different types of state firearm regulations. Some seek to establish general oversight over individuals owning firearms, and mainly consist of permit, registration, and/or license requirements, and bans on the purchase of firearms by minors. These laws also facilitate the tracing of firearms used in crimes to original purchasers. Other state laws seek to prevent gun trafficking and the use of firearms in crimes. These consist of bans on the sale of certain types of firearms, and restrictions on the number of firearms that can be sold to individuals. Restrictions on carrying concealed weapons serve a similar purpose. A number of laws are designed to prevent firearm ownership by individuals considered disproportionately likely to commit gun crimes. These laws include prohibitions on gun ownership by those with criminal histories, such as conviction for a felony, misdemeanor, or domestic violence offence, as well as those with a history of mental illness, and alcohol or drug problem, and minors. The requirement of a "cooling off" period of some specified period before the purchase can be completed is a measure designed to reduce the consequences of impulsive firearm purchases.

There is considerable variation in the comprehensiveness of firearm regulation across U.S. states. Some states have almost no firearm regulation of their own. Forty-four states have a provision in their state constitutions similar to the Second Amendment of the Bill of Rights (the exceptions are California, Iowa, Maryland, Minnesota, New Jersey, and New York). Firearm license holders are subject to the firearm laws of the state in which they are carrying and not the laws of the state in which the permit was issued. Reciprocity between states may exist for certain licenses such as concealed carry permits. These are recognized on a state-by-state basis.

Some firearms regulations are more relevant to suicide prevention than others. Restrictions banning the purchase of guns by convicted felons, or laws banning the sale of "Saturday Night Specials", for example, have little obvious applicability to suicide. Yet other categories of restriction are potentially more salient, particularly those that reduce overall firearm availability. Permit requirements create barriers to gun ownership and may also serve to prevent impulsive purchases. The prohibition of purchases by minors serves a similar function. Some of the "prohibited persons" categories, such as those related to mental illness, a drug or alcohol problem, or history of domestic violence problems may theoretically be relevant to suicide prevention.[3] Mental illness is the single most important risk factor for suicide, and substance abuse and domestic violence are also risk factors. However, while the criteria for "prohibited persons" categories vary by state, they are generally based on fairly serious incidents, such as hospitalization against one's will or conviction records. Such bans are likely to identify only a fraction of the population with mental health, substance abuse, or domestic violence problems.

At the state level, the comprehensiveness of gun control laws tends to be correlated with firearm prevalence. The causality most likely runs in both directions, since restrictive gun control regimes reduce gun ownership, yet these laws are more likely to be passed in states where overall gun ownership rates are low and the population of gun rights advocates is relatively small. In general, Western and more rural states have fewer gun control restrictions and higher rates of gun ownership as compared with more urbanized states in the Northeast. These states also have significantly higher rates of suicide, particularly firearm suicide.

It should be noted that gun control is only one of the factors that affect gun ownership. Aside from geographical patterns related to urbanization, popularity of hunting, and so forth, there are also trends in gun ownership at the

---

[2] The Gun Control Act (1968) was the first firearm act in the USA.

[3] In some states, the alcohol regulation means that sale of firearms are prohibited to people who are intoxicated at the time they are trying to buy them, while in other states it refers to people with a documented alcohol problem. Indeed, in some states it covers both situations.

national level. Widespread anxiety can lead to an increase in firearm purchases, as was the case shortly after September 11th, 2001. Similarly, economic trends can potentially affect the propensity toward gun ownership—although the direction of the effect is not certain. Concern about crime associated with rising unemployment may result in increased gun ownership, while unemployment itself may make guns less affordable to more people. The recent recession does not seem to be associated an increase in gun purchases, as the proportion of households reporting a gun between October 2007 and 2008 was unchanged (see [11]).

## 2. Gun control and suicide: empirical evidence

Much of the empirical evidence on gun control comes from the United States [15] and might not be applicable to other countries [16]. One excellent review of gun control in the United States, framed within the context of historical and rational choice theory, covers attempts to curb firearm violence in that country and the success of such measures, yet has relatively little treatment of the relationship between gun control and suicide [17].

In an important early study of gun ownership and suicide, Kellerman et al. [18] found that individuals who commit suicide in their own homes were disproportionately likely to own a gun. In general, the literature on gun control and suicide has found a negative relationship between firearm restrictions and suicide. However, most of these studies lack a strong design and are essentially pre- and post-comparisons [16]. Lambert and Silva [19] perform a literature review of studies in the United States and Canada and conclude that available information generally supports the notion that gun control reduces suicide rates, particularly among males. A recently published analysis suggests that states where background checks are conducted locally have lower rates of firearm suicide and homicide [20].

Several other studies find no empirical evidence in favor of a relationship between firearms regulations and suicide. However, one study has a weak design, while the other does not capture the most relevant types of firearms regulations. Price et al. [21] use cross-sectional state data for 1999 to perform a simple partial correlation analysis between several types of gun control laws and suicide rates. Their results suggest that gun control laws were not significantly related to suicide in 1999, even after controlling for firearm prevalence. Rosengart et al. [22] conduct a study of the relation between firearm regulations and homicides and suicides using state panel data over 1979–1998. They fail to uncover a statistically robust link between suicide rates and firearm regulations. However, most of the regulations they examined- such as bans on carrying concealed weapons, "junk gun" bans, and quantity sales restrictions are not particularly relevant to suicide.

Several studies in other countries where regulatory change restricted general access to firearms have found evidence of an effect on suicide. Cheung and Dewa [23] examine the relationship between suicide and the implementation of new restrictions on firearms (Bill C-17), using time series data from Canada. They concluded that there was a relationship between means used by young peo-

ple and the imposition of the restrictions. In the case of New Zealand, Beautrais et al. [24] find that after the introduction of legislation restricting ownership and access to firearms, firearm suicides significantly decreased, particularly among the young. Ozanne-Smith et al. [25] similarly conclude that the implementation of a strong reform in New Zealand lowered firearms deaths, particularly suicides. An evaluation of the 1996 National Firearms Agreement (NFA) in Australia documents a decline in firearm suicides after the implementation of the agreement [26]. However, these findings may be confounded with an overall decline in gun ownership that preceded the NFA. Additionally, there was some evidence of increased suicides by hanging.

In Europe, there are a few studies examining the efficacy of firearm regulation in reducing firearm suicides and homicides. For example, in Austria, Kapusta et al. [27] provide evidence that the introduction of restrictive firearm legislation reduced both firearm suicide and homicide. Also, a number of studies in the UK [28,29] have shown that changes in firearm legislation have led to fewer firearm suicides. Another analysis of Austria found that firearm regulations enacted in 1997 had a statistically significant effect on suicide rates [30]. A very recent study in Switzerland, finds a positive association between firearm ownership and firearm suicides at the local level [31].

Much of the empirical literature is based on simple correlations or time series analysis. Most of these models cannot account for correlations that arise between suicide deaths and firearm availability due to exogenous factors. Furthermore, there are many factors affecting suicidal behavior and gun ownership which are not observable. A panel data approach is more compelling in this context, as it is possible to control for unobserved heterogeneity across states. Similarly, time varying factors that affect all states in the same way can be controlled by using fixed specific effects. Additionally, there are many socioeconomic factors that might influence suicide deaths, and can be included in a panel data model.

## 3. Empirical model and data

### 3.1. Empirical model

The basic model that motivates the empirical analysis is that firearm availability affects suicide rates, and that gun control affects firearm availability (see for a discussion of the mechanisms by which firearms might affect death rates [9]). Our hypothesis is that regulations such as permit requirements, which create overall barriers to gun ownership, are the most important way type of gun control from the standpoint of suicide prevention. While it is possible that "prohibited persons" categories can affect the likelihood that certain persons at above average risk of suicide will obtain firearms, the ways in which these categories are defined in most cases will result in the prohibition of a relatively small proportion of people at risk. Firearms regulations designed to prevent gun trafficking or other criminal activity involving guns are not expected to influence suicide rates.

There are several potential complications to this simple model. The first is that of state variation in attitudes towards guns is likely to affect both firearm prevalence and the comprehensiveness of gun control regulation. Additionally, views toward gun ownership evolve over time. Finally, there is the problem of the measurement error of gun ownership.

The basic model can be expressed with two equations:

$$S = \alpha + \beta G + \mu \tag{1}$$

$$G = \delta - \Delta R + \Phi \tag{2}$$

where $S$ is suicide, $G$ is firearm prevalence, and $R$ is firearms regulation. The reduced form is:

$$S = \alpha + \beta\delta - \beta\Delta R + \beta\Phi + \mu \tag{3}$$

The potential endogeneity of firearm prevalence with respect to gun control is reflected in the identifying equation,

$$R = \omega + \eta G + \varphi \tag{4}$$

However, $G$ is not measured annually. For our main specification we estimate the reduced form Eq. (3), thereby assuming that $\eta$ is zero. In an alternative specification, we proxy for $G$ by using the number of hunting licenses per capita, a statistic which is collected annually for all states.

The dependent variable, $S_{ijt}$, is the number of suicides for age group $i = 15$–24, 25–44, 45–64, and 65+; in state $j = 1, \ldots, 50$ during the year $t = 1995, \ldots, 2004$. The independent variables included in the model were based on previous studies of suicide. In particular, the variables selected were: education, income, alcohol consumption, the proportion of the population over age 65, and the proportion of non-Hispanic white population. Each model also includes the relevant population size as a right hand side control variable to normalize by exposure. The specification includes state fixed effects that account for potential unobserved heterogeneity across states. The fixed effects model is appropriate in this case given the almost complete population coverage by the sample and it is likely that the omitted variables captured by the $\alpha_i$ are correlated with some of the included covariates [32]. We also account for the time effect over the years by including time dummies.

The expected value of the number of suicides, conditional on the independent variables is assumed to follow a negative binomial distribution with expected value

$$E\left[\frac{S_{it}}{X_{it}}\right] = \mu_{it} = \exp(x'_{it}\beta) \tag{5}$$

and variance function

$$\text{Var}[\mu_{it}] = \mu_{it} + \alpha(\mu_{it}^2) \tag{6}$$

The negative binomial distribution was assumed since the dependent variable is a count and over-dispersed relative to the Poisson distribution which assumes that the mean is equal to the variance. The negative binomial distribution accounts for extra Poisson dispersion through the quadratic term in the variance function [33].

We face several identification challenges. The first is that gun control regulations by state tend to change slowly,

so there tends to be relatively little within-state year–on-year change. Further, once states adopt particular gun control regulations, they never remove them. For these reasons, it is not possible to analyze leads and lags, which would be a desirable robustness check. To maximize variation, we have created several indices of categories of gun control regulations, which are additive measures of individual measures. The total sample contains 500 state-year observations. The sample period (1995–2004) was chosen because data on gun control regulations by state are not available before 1995, in part because there are relatively few state regulations. Since nearly ninety percent of firearm suicides are committed by males [1], we have excluded females from the analysis. The analysis was conducted using *STATA v.10* statistical software.

### 3.2. Data

#### 3.2.1. Dependent variable

Data on the number of suicides in states over the period 1995–2004 come from the Centers for Disease Control and Prevention (CDC). Deaths included in the study are those categorized as suicides according to the International Classification of Diseases (ICD). In 1999, there was a change in the classification system from ICD–9 to ICD–10. This change in ICD version did not influence suicide classification. For 1995–98, suicide deaths were coded as E950–E959. Starting in 1999 and later, suicide deaths were coded as X60–X84, Y87.0, and U03.

Table 1 displays the average age adjusted male suicide rates[4] across US states for the years 1995–2004.[5] As Table 1 shows reported suicide rates in the US vary considerably across states. The annual average male suicide rate for the whole country during the study period was 21.05 per 100,000. As can be seen, suicide rates vary considerably across states. The suicide rate in Nevada (34.2), for example, is nearly thrice that in New York (11.3). Also it can be seen from the standard deviations that the suicide rate varied substantially over time in each state.

#### 3.2.2. Independent variables

*3.2.2.1. Socio-economic variables.* Data on state personal income (*income*) were obtained from the Bureau of Economic Analysis and deflated by the consumer price index (CPI) extracted from the Bureau of Labor Statistics (BLS). Unemployment rates (*unemployment*) also come from the BLS. Data on per capita ethanol consumption of beer (*beer*), an estimate for the amount of pure ethanol consumption per capita, was extracted from the NIIA Surveillance Reports. Alcohol consumption and economic conditions have been linked to suicide in a number of population level studies (e.g. [34,35]). The percentage of people over 65 (*psh65*) years of age and the proportion of the population which is non-

---

[4] For making comparisons across states and over time, the usual practice is to use age adjusted suicide rates that standardize the rates across the age distribution of the population of interest.

[5] We do not show average suicide rates over 1995–2004 because of the relative position of the states is basically unchanged during the study period.

**Table 1**
Average age-adjusted male suicide rates (per 100,000 pop), by state, 1995–2004.

| State | Average | Std. Dev. |
| --- | --- | --- |
| Alabama | 21.13 | 1.46 |
| Alaska | 31.45 | 4.05 |
| Arizona | 26.37 | 1.52 |
| Arkansas | 22.95 | 0.97 |
| California | 16.79 | 1.85 |
| Colorado | 26.30 | 2.37 |
| Connecticut | 13.59 | 1.40 |
| Delaware | 18.75 | 2.29 |
| Florida | 21.64 | 1.28 |
| Georgia | 19.64 | 0.99 |
| Hawaii | 16.28 | 1.70 |
| Idaho | 27.26 | 2.32 |
| Illinois | 14.50 | 0.99 |
| Indiana | 20.31 | 1.17 |
| Iowa | 18.81 | 1.23 |
| Kansas | 20.60 | 1.28 |
| Kentucky | 22.30 | 0.93 |
| Louisiana | 19.94 | 1.25 |
| Maine | 21.61 | 3.10 |
| Maryland | 16.02 | 1.25 |
| Massachusetts | 11.56 | 1.33 |
| Michigan | 17.83 | 1.02 |
| Minnesota | 16.71 | 1.20 |
| Mississippi | 20.54 | 1.26 |
| Missouri | 21.81 | 1.62 |
| Montana | 33.15 | 3.31 |
| Nebraska | 18.78 | 1.67 |
| Nevada | 34.19 | 3.46 |
| New Hampshire | 19.00 | 1.71 |
| New Jersey | 11.47 | 0.45 |
| New Mexico | 31.48 | 1.30 |
| New York | 11.32 | 1.05 |
| North Carolina | 19.71 | 0.93 |
| North Dakota | 20.45 | 2.67 |
| Ohio | 17.43 | 0.98 |
| Oklahoma | 24.03 | 1.06 |
| Oregon | 25.28 | 1.73 |
| Pennsylvania | 18.88 | 1.11 |
| Rhode Island | 13.25 | 0.99 |
| South Carolina | 19.31 | 1.15 |
| South Dakota | 24.76 | 3.89 |
| Tennessee | 21.93 | 0.53 |
| Texas | 18.59 | 1.37 |
| Utah | 25.51 | 1.90 |
| Vermont | 22.12 | 2.56 |
| Virginia | 19.26 | 1.32 |
| Washington | 21.84 | 1.45 |
| West Virginia | 24.64 | 2.10 |
| Wisconsin | 19.04 | 0.83 |
| Wyoming | 32.29 | 3.96 |
| United States | 21.05 | 5.64 |

*Source*: Centers for Disease Control and Prevention (CDC), and own construction.
*Note*: The District of Columbia is excluded, since it had essentially banned the possession of handguns during the study years.

Hispanic white (*white*) were obtained from the US Census Bureau.

*3.2.2.2. Firearms regulations.* In order to maximize variation across states and over time in the measure of gun control, we created three additive indices that reflect different categories of firearms regulations. The first index––arguably is the most important in terms of suicide prevention––measures general prohibitions. It is the sum of two indicator variables reflecting the presence or absence of permit requirements and prohibitions on firearm purchases by minors. This index thus varies between 0 and 2.

The second index measures prohibitions based on behavioral problems, some of which have been identified as risk factors for suicide. This index is the sum of five indicators variables reflecting the presence or absence of bans on persons with mental health, alcohol, or drug problems, as well as prohibitions on those with prior convictions for misdemeanors and for domestic violence offenses.

Our third and last index captures four types of prohibitions related to the potential purchaser's criminal history. We include this variable primarily as a robustness check, since the prohibitions captured are least likely to affect suicide. The index, varying between 0 and 4, is the sum of indicator variables measuring the presence of prohibitions against "aliens",[6] convicted felons, fugitives from justice, and those who committed serious offenses as juveniles. Data on state gun regulations was obtained from the Bureau of Justice Statistics.[7]

*3.2.2.3. Gun ownership.* Given the relationship between firearm regulations and firearm prevalence, as well as that between firearm prevalence and suicide, it is necessary to control for gun ownership. One concern is the accuracy of data on firearm availability. Gun ownership at the household level is measured every several years by the CDC's Behavioral Risk Factor Surveillance System, but there is no annual data at the state level, and the available data only dates back to 2001. The most commonly used proxies for gun ownership are the proportion of homicides and the proportion of suicides committed with firearms (e.g. [36–42]). These variables are combined to create a measure called Cook's index. However, given that the dependent variable for this analysis is the total number of suicides, it was felt that this proxy was inappropriate. As an alternative, the number of hunting licenses per capita from the Fish and Wild Life Service[8] was used as a control for gun ownership[9]. Hunting licenses per capita and firearm suicides as a proportion of suicides (i.e. Cook's Index) were highly correlated ($r = 0.74$, $p$-value < .05).

Table 2 reports summary statistics for the variables used in regressions.

## 4. Results

The regression results for the negative binomial regression model of suicides are presented in Table 3. In all regression models, the state and year fixed effects are statistically significant. Table 3 shows the incidence rate ratios (henceforth, IRR). The IRR are obtained by exponentiation of the regression coefficients, that is, exp ($\beta$). The expression $100*(\exp(\beta) - 1)$ is the percentage change in the

---

[6] In some states, this prohibition refers to undocumented immigrants, while in others to individuals who have "forsaken their allegiance to the United States".
[7] http://www.ojp.usdoj.gov/bjs/.
[8] Available at www.fws.gov.
[9] The model was also estimated using the firearm suicide proxy, and results were very similar. We do not report them here for brevity.

**Table 2**
Summary statistics ($N = 500$).

| Variables | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|
| *Dependent variables* | | | | |
| Male suicides, total | 484.09 | 476.87 | 49 | 2939 |
| Male suicide, ages 15–24 | 70.95 | 62.67 | 3 | 421 |
| Male suicide, ages 25–44 | 191.06 | 181.23 | 18 | 1191 |
| Male suicide, ages 45–64 | 134.20 | 134.80 | 7 | 831 |
| Male suicide, ages >65 | 93.36 | 102.79 | 1 | 575 |
| *Socio-economic variables* | | | | |
| Percent with bachelor's degree | 24.65 | 4.67 | 12.70 | 38.70 |
| Real per capita income (log) | 10.20 | 0.15 | 9.82 | 10.65 |
| Unemployment rate | 4.81 | 1.17 | 2.20 | 8.20 |
| Beer consumption per capita (units) | 1.27 | 0.20 | 0.73 | 1.91 |
| Percent non-hispanic white (multiply by 100) | 0.78 | 0.15 | 0.26 | 0.99 |
| Percent 65 years or older (same) | 0.14 | 0.11 | 0.05 | 1.34 |
| *Gun supply* | | | | |
| Hunting licenses per capita | 0.087 | 0.071 | 0.007 | 0.340 |
| *Firearm regulation* | | | | |
| *General prohibitions* (1) | | | | |
| Permit requirements | 0.22 | 0.41 | 0 | 1 |
| Ban on purchase by minors | 0.68 | 0.47 | 0 | 1 |
| General prohibitions index | 0.90 | 0.63 | 0 | 2 |
| *Behavioral prohibitions* (2) | | | | |
| Mental health problem | 0.47 | 0.50 | 0 | 1 |
| Alcohol problem | 0.34 | 0.47 | 0 | 1 |
| Drug problem | 0.41 | 0.49 | 0 | 1 |
| Misdemeanor conviction | 0.36 | 0.48 | 0 | 1 |
| Domestic violence conviction | 0.29 | 0.45 | 0 | 1 |
| Behavioral prohibitions index | 1.87 | 1.70 | 0 | 5 |
| *Criminal prohibitions* (3) | | | | |
| Alien | 0.15 | 0.36 | 0 | 1 |
| Felony | 0.73 | 0.45 | 0 | 1 |
| Juvenile offense | 0.41 | 0.49 | 0 | 1 |
| Fugitive | 0.17 | 0.38 | 0 | 1 |
| Criminal prohibitions index | 1.46 | 1.11 | 0 | 4 |

*Sources*: See text.

incidence or risk of suicide mortality for each unit increase in the independent variable.

The first two models show the effects of fixed state and year effects (Model 1), and the fixed effects in addition to a set of socio-demographic variables—namely education, income, alcohol consumption, the proportion of the population over age 65, and the proportion of the population which is non-Hispanic white (Model 2). Model 3 introduces the index of general prohibitions—namely gun control regulations which affect the largest number of people and which create general barriers to entry. We find the general prohibition index to be statistically significant, both individually and when we include our proxy for gun prevalence, (hunting licenses per capita), which enters insignificantly (Model 4).

The next model includes the second index of gun control measures, which aims to capture firearm restrictions based on behavioral issues such as a history of mental health or alcohol/drug problems. While significant, the IRR is 0.9946, as compared with the IRR from Model 3 which was 0.9440, and the coefficient in Model 4 is only significant at the 10 percent level. The addition of the gun ownership measure (Model 5) does not affect the results. Model 6 includes our last index, which captures gun control measures that are hypothesized to be unlikely to affect suicide. This model

is included primarily as a robustness check. As expected, this variable does not enter with a statistically significant coefficient.

Table 4 shows the effects of the specific firearm restrictions on suicide for particular age groups. Separate models were estimated for males aged 15–24, 25–44, 45–64, and 65 years of age and older. In all models, we control for gun prevalence by including the number of hunting licenses per capita. We find that gun control measures do not affect all age groups identically. For instance, a ban on firearm purchases by minors affects suicides particularly among younger males, while restrictions on permits and waiting period requirements have a more deterrent effect on for older males. Unexpectedly, permit requirements appear to have a positive effect on suicide rates among younger males. Among the behavior-related restrictions, prohibitions related to mental health problems are only significant for males aged 25–44 years, and prohibitions related to alcohol problems are only significant for males aged 65 years or older. The drug and misdemeanor conviction bans do not enter significantly for any of the age groups, and the prohibition linked to a history of domestic violence only affects suicides among those aged 45–64 years. None of the criminal prohibitions enter significantly for specific age groups, and are therefore omitted.

**Table 3**

Results of negative binomial regressions with additive indices of firearm restrictions. Regressions for all males, 1995–2004 (*N* = 500). Dependent variable is the number of male suicides, exposure variable is the male population.

| | Model 1 Fixed effects only | Model 2 Socio-economic variables | Model 3 General Prohibitions | Model 4 General prohibitions and hunting licenses per capita | Model 5 Behavioral prohibitions | Model 6 Criminal prohibitions |
|---|---|---|---|---|---|---|
| State Fixed Effects | X | X | X | X | X | X |
| Year Fixed Effects | X | X | X | X | X | X |
| High School graduates (%) | | 0.9985 | 0.9991 | 0.9991 | 0.9986 | 0.9984 |
| S.E. | | 0.0017 | 0.0017 | 0.0017 | 0.0016 | 0.0017 |
| Beer Consumption per capita | | 1.1067 | 1.1022 | 1.1021 | 1.1184 | 1.0988 |
| S.E. | | 0.1062 | 0.1039 | 0.1037 | 0.1012 | 0.1011 |
| Unemployment rate | | 1.0181** | 1.0185** | 1.0185** | 1.0165** | 1.0179** |
| S.E. | | 0.0075 | 0.0076 | 0.0075 | 0.0074 | 0.0073 |
| Log of median HH income | | 0.6394** | 0.6433** | 0.6428** | 0.6376** | 0.6375** |
| S.E. | | 0.1424 | 0.1418 | 0.1429 | 0.1338 | 0.1435 |
| Percent non-Hispanic White | | 3.5333*** | 3.5115*** | 3.5152*** | 3.3638*** | 3.5250*** |
| S.E. | | 1.5326 | 1.5247 | 1.5171 | 0.0145 | 1.5327 |
| Percent > 65 years | | 1.1245*** | 1.1232*** | 1.1232*** | 1.1166*** | 1.1261*** |
| S.E. | | 0.0147 | 0.0153 | 0.0153 | 0.0145 | 0.0157 |
| General prohibitions index (1) | | | 0.9440*** | 0.9438*** | | |
| S.E. | | | 0.0093 | 0.0099 | | |
| Behavioral prohibitions index (2) | | | | | 0.9946* | |
| S.E. | | | | | 0.0030 | |
| Criminal prohibitions index (3) | | | | | | 1.0035 |
| S.E. | | | | | | 0.0068 |
| Hunting Licenses Per Capita | | | | 0.9692 | | |
| S.E. | | | | 0.4548 | | |
| Log likelihood | −2228.3 | −2199.2 | | −2199.1 | −2199.1 | −2200.3 |
| Ln alpha | −7.0532 | −7.6410 | −7.6475 | −7.6477 | −7.6692 | −7.6597 |
| Alpha | 0.0009 | 0.0005 | 0.0005 | 0.0005 | 0.0005 | 0.0005 |

*Notes*: Constant term included but not reported. (1) General prohibitions index: permit requirement, ban on purchase by minor. Range 0–2 (2) Behavioral prohibitions index: mental health, alcohol problems (or intoxication), drug problems, domestic violence conviction, misdemeanor conviction. Range: 0–5. (3) Criminal prohibitions index: alien, prior felony conviction, fugitive from justice, serious offense as a juvenile. Range: 0–4.

* *p* < .10.
** *p* < .05.
*** *p* < .01.

**Table 4**

Results of negative binomial regressions with individual firearm restrictions. Regressions by age groups (15–24, 25–44, 45–64, 65+) *N* = 500. Dependent variable is the number of male suicides, exposure variable is the male population, within age groups.

| | Model 1 15–24 years | Model 2 25–44 years | Model 3 45–64 years | Model 4 65+ |
|---|---|---|---|---|
| General prohibitions | | | | |
| Permit requirement | 1.2043*** | 0.9741 | 0.8601*** | 0.8518*** |
| S.E. | 0.0343 | 0.0188 | 0.0208 | 0.0222 |
| Ban on minor purchase | 0.8715* | 0.8647*** | 0.9867 | 1.0304 |
| S.E. | 0.0679 | 0.0183 | 0.0817 | 0.0756 |
| Behavioral prohibitions | | | | |
| History of mental health problems | 0.9949 | 0.9657*** | 0.9948 | 1.0435 |
| S.E. | 0.0245 | 0.0111 | 0.0212 | 0.0246 |
| History of alcohol abuse | 1.0015 | 1.0085 | 0.9916 | 0.9437*** |
| S.E. | 0.0199 | 0.0168 | 0.0196 | 0.0166 |
| History of drug abuse | 0.9723 | 0.9972 | 1.0017 | 1.0086 |
| S.E. | 0.0229 | 0.0167 | 0.0220 | 0.0241 |
| Misdemeanor conviction | 1.0169 | 0.9848 | 0.9758 | 1.0062 |
| S.E. | 0.0216 | 0.0159 | 0.0160 | 0.0293 |
| Domestic violence conviction | 0.9812 | 1.0048 | 0.9630** | 0.9700 |
| S.E. | 0.0261 | 0.0190 | 0.0167 | 0.0185 |

*Note*: All models include state and year fixed effects, as well as control variables for the level of education, unemployment rate, income per capita, and the percent of non-Hispanic white population. A proxy for gun prevalence (hunting licenses per capita) is also included. Constant term included but not reported.

* *p* < .10.
** *p* < .05.
*** *p* < .01.

## 5. Discussion

Restricting access to lethal means is an important element in suicide prevention. While means restriction activities are not solely focused on firearms, in the United States, firearms are the most significant suicide mechanism, as they are used in more than half of suicides. At the individual and population levels, a number of means restriction activities have been developed to prevent suicides by reducing access to lethal means. Individual activities involve counseling to high-risk individuals about dangers posed by a firearm in their homes. When such activities occur, they are usually directed at individuals who have been identified as being at risk of self-injury, perhaps as a result of a non-fatal suicide attempt. However from a population perspective, gun control remains one of the only avenues to restrict access to firearms.

Our study suggests that general barriers to firearm access created through state regulation can have a significant effect on male suicide rates in the United States. Permit requirements and bans on sales to minors were the most effective of the regulations analyzed. These findings have important implications for U.S. gun control policy, which remains exceptionally heterogeneous across states. While all states except Wyoming have banned sales of handguns to minors, twelve states still allow the sale of long guns to minors. Furthermore, only twelve states currently require purchase permits for firearms.

The political aspect of the gun control debate in the United States has made increased regulation of firearms very difficult in many states, due to the strong advocacy of the gun rights lobby, and the opposition to any restriction on gun ownership by many gun owners. Many of the more controversial aspects of firearms regulations battles concern provisions intended to reduce crime, such as bans on "straw purchases", or limits on the number of guns individuals can purchase in a year. The relationship between firearm prevalence and suicide, while well known in the public health community, rarely if ever enters into the national or state debates over gun control provisions. In very recent years, gun rights groups have made significant gains, most notably in the Supreme Court decision regarding handgun bans in the District of Columbia (District of Columbia v. Heller, 2008). These trends do not bode particularly well for increased regulation of gun ownership in U.S. states. However, while gun control remains a controversial issue both at the state and federal level in the U.S., this analysis of male suicide suggests that there are clear public health benefits to restricting access to firearms through regulation.

## Conflict of interest

The authors have no conflicts of interest.

## Acknowledgements

The authors are grateful to four anonymous reviewers for useful comments and suggestions on an earlier version of this work. The authors also thank Sara Markowitz, Camelia Minoiu, and Gary Kleck for helpful comments and suggestions on earlier drafts.

## References

[1] Centers for Disease Control and Prevention (CDC), National Center for Injury Prevention and Control; 2009.http://www.cdc.gov/ncipc/dvp/suicide/suicide_data_sheet.pdf [accessed 2 February 2009].
[2] National Association of State Mental Health Program Directors Research Institute (NRI); 2006. http://www.nri-inc.org/projects/Profiles/RevExp2008/T20.pdf [accessed 27 September 2010].
[3] Florentine JB, Crane C. Suicide prevention by limiting access to methods: a review of theory and practice. Social Science and Medicine 2010;70:1626–32.
[4] Department of Health. National suicide prevention strategy for England. London; 2002.
[5] Nordentoft M. Prevention of suicide and attempted suicide in Denmark. Danish Medical Bulletin 2007;54:306–69.
[6] Miller M, Hemenway D. Guns and suicide in the United States. The New England Journal of Medicine 2008;4:989–91.
[7] Miller M, Azrael D, Hepburn L, Hemenway D, Lippman S. The association between changes in household firearm ownership and rates of suicide in the United States, 1981–2002. Injury Prevention 2005;12:178–82.
[8] Miller M, Lippman S, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. The Journal of Trauma, Injury, Infection and Critical Care 2007;62:1029–35.
[9] Cook PJ, Ludwig J. The social costs of gun ownership. Journal of Public Economics 2006;90:379–91.
[10] Duggan M. Guns and suicide: correlation or causation? In: Cook P, Ludwig J, editors. Evaluating gun policy. Washington: Brookings Institution Press; 2003.
[11] Gallup Poll. Do you have a gun in your home?; 2009 http://www.gallup.com/poll/1645/Guns.aspx[accessed 5 November 2009].
[12] Lott J, Whitley J. Safe storage, gun laws: accidental deaths, suicides, and crime. Working Paper # 237; 2000. Yale Law School.
[13] Kleck G, Kates D. Armed, New Perspectives on Gun Control. Prometeus:Amherst; 2001.
[14] Kleck G. Measures of gun ownership for macro level crime and violence research. Journal of Research in Crime and Delinquency 2004;41:3–36.
[15] Ludwig J, Cook P. Homicide and Suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. Journal of the American Medical Association 2000;284:585–91.
[16] Killias M, van Kesteren J, Rindlisbacher M. Guns, violent crime and suicide in 21 countries. Canadian Journal of Criminology 2001:429–48.
[17] Cook P, Moore M, Braga A. Gun Control. Working Paper Series SANO1-14, Sanford Institute of Public Policy, Durham, NC; 2001.
[18] Kellerman AL, Rivara FP, Somes G, Reay DT, Francisco J, Banton JG, Prodinsky J, Fligner C, Hackman BB. Suicide in home in relation to gun ownership. New England Journal of Medicine 1992;327:467–72.
[19] Lambert M, Silva P. An update of the impact of gun control legislation on suicide. Psychiatric Quarterly 1998;69:127–34.
[20] Sumner S, Layde P, Guse C. Firearm death rates and association with level of firearm purchase background check. American Journal of Preventive Medicine 2008;35:1–6.
[21] Price J, Thompson A, Dake J. Factors associated with state variations in homicide, suicide, and unintentional firearm deaths. Journal of Community Health 2004;29:271–83.
[22] Rosengart M, Cummings P, Nathens A, Heagerty P, Maier R, Rivara F. An evaluation of state firearm regulations and homicide and suicide death rates. Injury Prevention 2005;11:77–83.
[23] Cheung A, Dewa C. Current trends in youth suicide and firearm regulations. Canadian Journal of Public Health 2005;96:131–5.
[24] Beautrais A, Fergusson D, Horwood L. Firearms legislation and reductions in firearm-related suicide deaths in New Zealand. Australian and New Zealand Journal of Psychiatry 2006;40:253–9.
[25] Ozanne-Smith J, Ashby K, Newstead S, Stathakis V, Clapperton A. Firearm related deaths: the impact of regulatory reform. Injury Prevention 2004;10:280–6.
[26] Klieve H, Barnes M, De Leo D. Controlling firearms use in Australia: has the 1996 gun law reform produced the decrease in rates of suicide with this method? Social Psychiatry and Psychiatric Epidemiology 2009;44:285–92.

[27] Kapusta N, Etzersdorfer E, Krall C, Sonneck G. Firearm legislation reform in the European Union: Impact on firearm availability, firearm suicide and homicide rates in Austria. British Journal of Psychiatry 2007;191:253–7.

[28] Hawton K, Fagg J, Simkin S, Harris L, Malmberg A. Methods used for suicide by farmers in England and Wales. The contribution of availability and its relevance to prevention. British Journal of Psychiatry 1998;173:320–4.

[29] Haw C, Sutton L, Simkin S, Gunnell D, Kapur N, Nowers M, Hawton K. Suicide by gunshot in the United Kingdom: a review of the literature. Medicine, Science and the Law 2004;44:295–310.

[30] Wahlbeck K, Mäkinen M, editors. Prevention of Depression and Suicide. Consensus paper. Luxembourg: European Communities; 2008 http://ec.europa.eu/health/ph.determinants/life.style/mental/docs/Cyprus.pdf [accessed 30 November 2009].

[31] Ajdacic-Gross V, Killias M, Hepp U, Haymoz S, Bopp M, Gutzwiller F, Rössler W. Firearm suicides and availability of firearms: the Swiss experience. European Psychiatry, forthcoming.

[32] Kennedy P. A guide to econometrics. Oxford: Blackwell; 1998.

[33] Cameron C, Trivedi P. Regression analysis of count data. Econometric Society Monograph No. 30, Cambridge University Press; 1998.

[34] Yang B. The economy and suicide: a time-series study of the USA. American Journal of Economics and Sociology 1992;51:87–99.

[35] Markowitz S, Chatterji P, Kaestner R. Estimating the impact of alcohol policies on youth suicide. Journal of Mental Health Policy and Economics 2003;6:37–46.

[36] Lester D. Availability of guns and the likelihood of suicide. Sociology and Social Research 1987;71:287–8.

[37] Lester D. Gun ownership and suicide in the United States. Psychological Medicine 1989;19:519–21.

[38] Hemenway D, Kennedy B, Kawachi R. Firearm prevalence and social capital. Annals of Epidemiology 2001;11:484–90.

[39] Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US Regions and States, 1988–1997. American Journal of Public Health 2002;92:1988–93.

[40] Shennasa E, Dasklakis C, Buka S. Utility of indices of gun availability in the community. Journal of Epidemiology and Community Health 2006;60:44–9.

[41] Azrael D, Cook P, Miller M. State and local prevalence of firearms ownership measurement, structure and trends. Journal of Quantitative Criminology 2004;20:43–62.

[42] Bridges FS, Kunselman JC. Gun availability and use of guns for suicide, homicide, and murder in Canada. Perceptual and Motor Skills 2004;98:594–8.

EXHIBIT F

# Temptation and Resistance: An Integrated Model of Consumption Impulse Formation and Enactment

**Utpal M. Dholakia**
State University of New York at Buffalo

## ABSTRACT

Research pertaining to the consumption impulse is sparse in the
literature. To address this lacuna, the author presents and validates
a detailed theoretical framework explicating the consumption
impulse formation process, and examining the role played by
cognitive and volitional processes in its resistance or enactment. The
model makes the distinction between consonant (harmonious)
impulses and dissonant (conflicting) impulses and elaborates on the
role of the impulsivity trait, situational variables, and constraining
factors in enactment or resistance of the consumption impulse. The
results of two studies provide support to the general working of this
theoretical framework. This research has the potential to inform
many critical issues surrounding consumer behavior, such as
regulating consumption impulses in retail and on-line shopping
environments, and developing interventions for prevention of
harmful consumer behaviors such as addictions. © 2000 John Wiley
& Sons, Inc.

Impulsive consumption behaviors comprise a large class of consumer
behaviors that have received disproportionately little attention by con-
sumer researchers (however, see Rook's research and Puri, 1996). Mar-
keting practitioners, on the other hand, have long realized the impor-
tance of impulsive consumer actions. For instance, much of the retail

Psychology & Marketing
© 2000 John Wiley & Sons, Inc.    Vol. 17(11):955–982 (November 2000)

emphasis in packaged goods focuses on trying to get the consumer to impulsively purchase products at the point of sale. Indeed, store and web site layouts, product packaging elements, and in-store promotions all focus on promoting and regulating such impulsive purchases. Much of early academic marketing research focused on understanding the influence of different merchandising stimuli on impulsive purchase behaviors as well (e.g., Cox, 1964; Patterson, 1963). A second category of impulsive consumption pertains to compulsions and addictions such as smoking, overspending, or overeating (Nataraajan & Goff, 1991). Issues pertaining to such consumption have been a major focus of clinical psychiatrists (e.g., Plutchik & van Praag, 1995), with emphasis on designing effective intervention strategies to mitigate the harmful consequences of such actions (Puri, 1996; see Bütz & Austin, 1993, for a review).

One reason for this lacuna with regard to impulsive phenomena is that many of the dominant consumer behavior paradigms such as behavioral decision theory and attitude research focus on goal-directed and intentional consumer behaviors. This emphasis limits the applicability of these rich bodies of research to issues of consumer impulsivity, its drivers, mediating mechanisms, and consequences. A second reason is that the extant psychological research on this topic has focused more on *hedonic aspects* of impulsive behaviors (e.g., Weinberg & Gottwald, 1982, but see Rook & Fisher, 1995, for an exception), ignoring for the most part the role played by cognitive and volitional processes in the enactment or dissipation of consumption impulses. In addition, relatively little attention has been focused on trying to understand *mechanisms of impulse resistance,* that is, when and how the consumption impulse is successfully thwarted by the consumer. A third and final limitation of existing impulsive consumption behavior research pertains to an inordinate focus on the *purchase* of low-cost, frequently purchased products (e.g., Rook & Hoch, 1985), characterizing such product categories as "impulse," and the underlying appetitive urge as the "buying impulse" (Rook, 1987). This emphasis is limiting, providing a somewhat narrow view of psychological processes surrounding impulsive consumption. The term *consumption impulse* (CI) is used in this article instead, to explicitly acknowledge that the urge can arise in the context of other behaviors of interest to consumer researchers, such as product use, disposal, etc. in addition to purchase of products.

A primary thesis of this research is that much like other behavior types, impulsive consumption behaviors are preceded by distinct psychological processes that can be explicated by a theoretical framework. In this article, an *integrated model of consumption impulse formation and enactment* (CIFE) is presented, elaborating the psychological processes and factors leading to formation of the consumption impulse, and its subsequent dissipation or enactment. The CIFE model describes the role of cognitive and volitional psychological mechanisms during the

impulse enactment process in great detail. Through understanding the psychological processes that govern the formation and enactment of consumer impulses, the framework presented here has the potential to inform many critical issues surrounding such consumer behaviors. From understanding how to better regulate consumer impulses in retail and on-line shopping environments for attainment of specific marketing objectives, to developing interventions for prevention of harmful consumption behaviors such as addictions, understanding how and when consumer impulses translate into behavior is likely to be extremely important for a slew of marketing strategies in both profit and nonprofit contexts.

## A CONCEPTUAL UNDERSTANDING OF IMPULSIVE CONSUMPTION BEHAVIORS

Because Murray's (1938) description of impulsivity as the tendency to respond quickly and without reflection, issues pertaining to impulsive actions have been studied by researchers in a number of social science disciplines, including social work, psychiatry, social psychology, and cognitive biopsychology. Within the diverse treatments of impulsive consumption, many common threads can be found. First, impulsive consumption behaviors are viewed to occur as the result of a sudden, often powerful, and persistent urge to consume, often without much deliberation. As noted before, the consumption impulse may pertain to *product purchase* (e.g., buying a candy bar at the supermarket checkout counter), *product use* (e.g., eating a piece of cheesecake when watching late-night television), or even *product disposal* (e.g., trading in a serviceable car for a new model).

A second characteristic of impulsive behaviors is that such behaviors are associated with an extremely short time span between formation of the CI and its enactment (or dissipation). For instance, biopsychologists Barrett and Patterson (1983) view impulsive behavior to be characterized by actions without adequate reflection, by spur-of-the-moment reactions, and by getting things done quickly. Similarly, education researchers Lurr and Wunderlich (1985) view the bipolar component of responding immediately to a stimulus vs. planning before making a move to be a major constituent of impulsivity. Indeed, impulsive behaviors have frequently been characterized as unplanned behaviors by consumer researchers (e.g., Cobb & Hoyer, 1986).

A third interesting and important point is that the experience of the CI does not necessarily result in behavior. Individuals *can*, and *often do*, resist the CI successfully. For instance, psychiatrists studying aggressive behaviors recognize that aggressive impulses may not get transformed into overt actions because of what they label as *attenuating countervailing forces* such as a timid personality style or concern about

family well-being (Plutchik & van Praag, 1995; also see Nataraajan & Goff, 1991, for a similar view in the case of compulsive consumer behaviors). The theoretical framework presented here considers such non-behavior following the experience of a CI explicitly.

A fourth characteristic of the CI pertains to frequency of occurrence. A CI may occur *either once* (e.g., on encountering a fetching scarf in the clothing store) *or more often* (e.g., the recurring urge to eat calorific foods for someone on a diet) for the same consumer. Finally, researchers have also noted that *psychological conflict* often surrounds enactment of impulsive behaviors (e.g., Emmons, King, & Sheldon, 1993). The CIFE framework elaborates on how and when conflict occurs, and its impact on impulsive behavior enactment.

It is also of value to understand impulsive behaviors in the context of other types of behaviors such as *goal-oriented,* and *mindless* or *automatic* behaviors (e.g., Bagozzi & Dholakia, 1999). Goal-oriented and impulsive behaviors share some interesting characteristics. First, the construct of *consumption impulse* can be thought of as similar to the *intention* construct for goal-directed behaviors in that both have motivational and volitional content. Second, both goal-directed and impulsive actions follow similar stages. For goal-directed behaviors, goal setting (or selection of the goal) occurs first, followed by *goal striving,* that is, effortfully maintaining the goal, planning the best way to attain the goal, and executing this plan of action (Bagozzi & Dholakia, 1999). Impulsive behaviors unfold similarly in that experience of the CI occurs first, followed by its enactment or resistance through execution of actions by the consumer.

But these behaviors have some fundamental differences as well. The first distinction between goal-oriented and impulsive behaviors pertains to the role played by the consumer's goal in enactment of behavior. For goal-oriented behavior, the goal to be attained is explicitly chosen and plays a central role in subsequent motivational and volitional processes for formation and enactment of implementation plans. On the other hand, goals play at most a marginal role in the impulse formation and enactment process. Broad consumption goals (e.g., to have a good time) may make some consumers susceptible to behaving impulsively, but for the most part, intensity of the experienced CI, and the presence or absence of impediments to action are the primary drivers of impulsive behavior enactment.

A second distinction pertains to the amount of time available for processing information, and forming and implementing the plan of action. For goal-directed behavior, information is collected and processed systematically, with consideration of all available goal alternatives. Usually, there is a significant time period from the time goal setting is initiated to enactment of the behavior for goal attainment. For this reason, such behaviors have been called reflective behaviors (Doob, 1990). For impulsive behavior, on the other hand, the entire process of impulse

formation and enactment occurs quickly. To put it succinctly, *whereas intention formation and realization occur deliberately, impulse formation and enactment occur rapidly.* A third distinction between the two behavior types pertains to intention and CI valence. An intention may have *positive* or *negative* valence in that the consumer may form an intention not to purchase a particular brand as readily and justifiably as an intention to purchase the brand. A CI on the other hand, connotes primarily positive valence, indicating a proclivity to engage in the consumption.

It is also valuable to distinguish between impulsive and automatic or mindless behaviors (Bargh & Barndollar, 1996). When behaving *mindlessly,* the consumer interacts with the environment in a passive, reactive fashion and is cognitively inert (Langer & Imber, 1980). Mindless behaviors are characterized as being involuntary, effortless (i.e., not consuming the individual's information processing capacity), and occurring outside of awareness (Bargh, 1989), and are often those for which the consumer has a well-rehearsed script, that is, *habitual behaviors.*

On the other hand, when behaving impulsively the consumer is cognitively alert and not averse to processing pertinent information. Even when the individual is sorely tempted to buy some product, she or he has an unmistakable awareness of positive as well as negative consequences of this action. Indeed, psychological conflict arising from incongruence between emotional (i.e., desires) and cognitive (i.e., evaluations of long-term consequences) preferences has been noted as a frequent characteristic of impulsive consumption behaviors (Emmons et al., 1993; Rook, 1987). The two types of behaviors are related in that if an impulsive action is performed repeatedly (e.g., purchasing a candy bar from the checkout aisle at every supermarket visit), rather than enactment through a CI, it is likely to become a *behavioral tendency* (Oullette & Wood, 1998). It is then likely to get enacted immediately and reflexively on sensory pickup of pertinent cues from the environment and eventually become mindless. In this case, the impulsive behavior becomes habitual because of frequent enactment over time.

## AN INTEGRATED MODEL OF CONSUMPTION IMPULSE FORMATION AND ENACTMENT (CIFE)

The discussion so far suggests that impulsive consumer behaviors constitute a unique class of behaviors that, though not goal-directed in the strict sense, involve motivational, volitional, and cognitive psychological processes. Moreover, these behaviors follow a certain structure with the experience of the consumption impulse (CI) as a central organizing construct. These ideas and knowledge are integrated with recent advances in the social psychology literature on motivational and volitional processes, and a detailed account of impulsive consumption behaviors



**Figure 1.** The CIFE framework.

is presented in this section. This is labeled the *integrated model of consumption impulse formation and enactment* (CIFE). The CIFE theoretical framework is graphically presented in Figure 1.

The natural starting point is the impulse-formation process, and consequently, the CIFE model begins with antecedents of the CI. Three antecedents to the CI are posited in this model. Many consumers experience the CI on visual exposure to the product (Hoch & Loewenstein, 1991). Product presentation aspects such as attractive displays, tempting graphics or copy, or associated sales promotions may also play an important part. For instance, the role of *physical proximity* in impulse experience has been clearly documented in experiments on delay of gratification (Mischel & Mischel, 1983). Physical proximity may activate positive memories associated with the product's consumption in the past, and may also serve to kindle desire for it. Similarly, *temporal proximity* is also a key stimulus in formation of the CI (Loewenstein, 1990). The immediate availability of the product for purchase or consumption may activate a latent need for some consumers, thereby triggering the CI. In the CIFE model, these factors are called *marketing stimuli,* because marketers can control the presentation of such stimuli to the consumer. Marketing stimuli represent the first antecedent factor for formation of the CI.

A second antecedent of the CI is environmental, as well as personal

and social factors surrounding a particular consumption occasion. This antecedent is labeled as *situational factors* (Belk, 1975). Situational factors may increase or decrease the propensity of the consumer to experience the consumption impulse. One important category of situational variables pertains to *environmental conditions* surrounding the particular consumption occasion. For instance, an individual receiving his or her paycheck may be more susceptible to experiencing the CI. A second category of situational factors pertains to the consumer's *current mood state*. A considerable body of research within social psychology has shown that a positive mood state increases the risk-seeking propensity of individuals, and makes them less amenable to systematically process information (see Schwartz & Bohner, 1996, for a review). These tendencies may make the consumers more susceptible to experiencing the CI.

The third antecedent factor in the CIFE model is the *impulsivity trait* of the consumer, which has been extensively studied in the social sciences, in a variety of contexts (e.g., Plutchik & van Praag, 1995; Watson & Clark, 1993). The impulsivity trait has been defined as the tendency to respond quickly and without reflection, and characterized by rapid reaction times, absence of foresight, and a tendency to act without a careful plan (Doob, 1990). Psychometric analysis has shown that impulsivity is characterized well by a single dimension (cf. Plutchik & van Praag, 1995) and is associated with other personality characteristics such as acquisitiveness (Belk, 1985), need for variety (Hirschman, 1980), and risk aversion. In the CIFE model, the impulsivity trait is viewed as an important antecedent factor in the formation of the CI. This antecedent factor is examined in greater detail in the experimental studies.

The presence of one or more of these three antecedents to a sufficient degree culminates in formation of the consumption impulse, an irresistible urge to consume. The CI is viewed as occurring automatically (Isen & Diamond, 1989), because it cannot be blocked from occurring when the antecedents are present with adequate strength. Moreover, it is useful to think of the consumption impulse experience as having an *intensity dimension,* rather than as occurring or not occurring. The influence of each of the three factors in initiating the consumption impulse may vary by individual, as well as on different occasions for the same individual consumer. For instance, the impulsive trait aspect of Jane's personality may cause her to experience the consumption impulse on encountering a beautiful dress in a mall store. In contrast, Sue, who is less impulsive, may experience the consumption impulse mainly on account of a half-off sale for the very same dress. In addition to the main effects of these antecedent factors, the three factors may interact positively as well. Thus, the impulsive trait of Jane on combining with an attractively packaged candy bar on a particular visit to the supermarket may magnify strength of the impulse experienced.

When the consumer experiences the CI, mental responses are automatically triggered to evaluate the presence of possible *constraints to enactment* (Loewenstein, 1990). This view is consistent with the idea held by social psychologists that thoughts regarding action occur spontaneously and primarily out of necessity when action execution involves more than just reflexive responding to cues (Vallacher, 1993). Constraints to CI enactment generally fall into one of three categories. First, the consumer may realize that there are *current impediments* to smooth enactment of actions consistent with the CI. For instance, the consumer may not have adequate time or money, or may be reminded of implicit but stringent behavioral rules used to guide behavior in the past. The second category of constraints pertains to *consideration of long-term deleterious consequences* of enacting the behavior. For instance, an overweight person may consider the future gain of weight from eating a particularly high-calorie, if toothsome, dessert as a constraining factor. Finally, *anticipatory emotions,* defined as affective states resulting from anticipation of future consequences of the chosen course (Bagozzi, Baumgartner, & Pieters, 1998) may also work to constrain the CI enactment. For instance, the consumer may imagine the positive emotional experience from successfully resisting the urge, or the negative affect from enacting the impulse. These three categories of impediments to impulse enactment are labeled as *"constraining factors"* in the CIFE model.

Many research findings in the extant literature are consistent with the view of constraining factors presented here. First, constraining factors are similar to the construct of an interrupt (Bettman, 1979; Hoch & Loewenstein, 1991) that is experienced by consumers and alerts them to the need for cognitive deliberation. Consistent with this idea, many of Rook's (1987) subjects evaluated a particular consumption impulse negatively, explicitly recognizing that they were breaking budgetary or dietary rules. For these subjects, consideration of the rule served as an interrupt or constraining factor. Constraining factors are also similar to countervailing forces proposed by psychiatrists studying aggressive impulsive behaviors. This line of research suggests that on experiencing an aggressive impulse, one or more factors may serve to attenuate its effect and prevent enactment of violent behavior for the individual. Such factors, examples of which include appeasement from others or the memory of a previous injury, are called "attenuating countervailing forces" in the psychiatry literature (Plutchik & van Praag, 1995) and serve to diminish effects of the aggressive impulse, much like constraining factors.

If no constraining factors are identified, the CI may be viewed by the consumer as *harmonious with his or her goals, resources, and situation.* The consumer then responds reflexively through an expression of his or her CI, without further deliberation or hesitation. This type of behavioral scenario can be called the *consonant CI condition.* In this condition,

the strength and interaction of antecedent factors drive formation and subsequent enactment of the CI, and cognitive evaluation of the impulsive behavior or its consequences is minimal.

On the other hand, if constraining factors are identified (as is more likely to be the case), the consumer experiences conflict and ambivalence (Dickman, 1990; Rook, 1987). This experience has been framed in the literature as a psychological conflict between the desire (or the consumption impulse in the CIFE framework) and the strategy of volitional control or willpower of the individual (Hoch & Loewenstein, 1991; Kuhl, 1987). To characterize this conflict, such a behavioral scenario is labeled the *dissonant CI condition.* This distinction between consonant and dissonant CIs follows the distinction made in most motivation theories between motivational systems concerning positive or pleasurable experiences and negative or painful experiences (Higgins, 1996).

According to the CIFE model, the experience of a dissonant CI results in a more thought-based evaluation of the consequences of enacting the CI, and movement from a hedonic impulse-dominated mode of functioning to a more evaluative mode. In some sense, the consumer weighs the pros and cons of behaving in accordance with the CI. This process, which occurs quickly, resulting in a positive or negative evaluation of impulsive behavior enactment, is critical in providing guidance to the consumer (Rook & Fisher, 1995). If the evaluation is positive, the consumer may view the constraining factor as not significant enough, and may proceed with enactment of the CI. In this case, the consumer may feel some amount of psychological uncertainty or conflict, but is likely to enact the CI anyway. On the other hand, if cognitive evaluation of the impulsive behavior is negative, the *volitional system* of the consumer comes into play (Bagozzi & Dholakia, 1999). The most important function of the volitional system is to harness different resistance strategies to counter the CI.

Resistance strategies can be thought of as volitional mechanisms used by the consumer to effortfully fight back the dissonant CI after the behavior is evaluated negatively. Strategies of resistance often involve self-regulation of mental states and processes by the individual through different mechanisms. Research on *control of actions* (Kuhl, 1987) and on *self-control* (e.g., Gilbert, 1993; Thaler & Shefrin, 1981) has identified several such mechanisms, which provide rich insight into the working of the volitional system. One important resistance strategy pertains to *formulation and learning of explicit rules* (Thaler & Shefrin, 1981), which can then be used as guidelines to resist CIs. For instance, a saving or a dieting program may be monitored through a weekly budget, financial or dietary. Explicit rules are particularly useful for frequently occurring CIs such as those associated with addictive or compulsive consumption behaviors.

A second resistance strategy, *selective attention* (Beck & Emery, 1985; Kuhl, 1987) refers to a person's tendency to attend to information sup-

porting the volitionally supported course of action, and to ignore competing information. Such closed-mindedness may encourage a focus away from the tempting CI. Much empirical support exists in the literature for the operation of this process. For instance, Mischel and Mischel (1983) found that children learn to maintain an experimentally induced intention against a more desirable, competing action alternative by avoiding visual contact with the source of distraction. This has also been labeled a *distraction strategy* by impulsive-behavior researchers (Hoch & Loewenstein, 1991). A third resistance strategy is *encoding control,* which facilitates the protective function of the volitional system by encoding selective features of the environment that are related to fighting the CI.

A related strategy is *exposure control* (cf. Gilbert, 1993), where the consumer actively manipulates his environment to reduce effect of the CI-causing stimuli, or to increase effectiveness of other resistance strategies. For example, on experiencing a CI to eat dessert, Fred may quickly remove himself from the proximity of the dessert tray at a sumptuous buffet. Such a resistance strategy has also been called a *distancing strategy* (see Rook & Hoch, 1985, for a detailed discussion).

*Parsimonious information processing* is the fifth resistance strategy that relates to how and when the consumer *stops* processing information. To resist a CI successfully often requires minimizing length of the cognitive evaluation process after one or more constraining factors have been identified, to prevent overlong deliberation regarding the CI. If further cognitive evaluation is viewed as jeopardizing resistance to the CI, the process of cognitive evaluation may be brought to a halt. Parsimonious information processing is especially useful when new information supporting the CI constantly becomes available, as when alluring marketing stimuli keep assaulting the consumer's senses.

Further, research supports the view that failure to resist dissonant CIs successfully may also arise from negative affective states such as dissatisfaction, guilt, or anger at oneself (Kanfer, 1996), or from exposure to sadness-causing stimuli (Mischel, Ebbesen, & Zeiss, 1972). Positive emotional states, on the other hand, promote CI resistance. In this regard, *control of emotions* represents the sixth resistance strategy used to resist CIs. It refers to a set of self-regulatory skills aimed at inhibiting negative emotional states, and avoiding intrusion of emotional task-related thoughts that might undermine efficiency of the protective function of volition (Salovey & Mayer, 1990). Emotion control also enables generation of positive emotions that may be conducive to successful CI resistance.

The seventh mechanism, *motivation control,* refers to a set of self-regulatory activities aimed at bringing high levels of attention and effort to bear on the task of CI resistance. For instance, Jane may believe that she has successfully fended off her CI to buy a new dress, and let her

guard down, only to have the urge return, and result in an impulsive purchase. Motivation control prevents this from happening while the CI is active, and includes strategies such as *substitution* (Hoch & Loewenstein, 1991) where the consumer may give herself a small immediate reward for successfully resisting a larger and more deleterious CI (e.g., celery sticks in lieu of a sack of potato chips). Motivation control is especially salient for resisting pernicious dissonant CIs such as breaking dieting plans, smoking, drinking, etc. In many cases, this strategy may operate through making the *self-efficacy,* that is, the conviction that one can resist the CI successfully (Bandura, 1991) salient to the individual.

These resistance strategies constitute what social psychologists have termed *tactical mental control* (Wegner & Erber, 1993), because the consumer uses some specific scheme to suppress his or her natural state of mind (the impulse), and promote the volitionally chosen state (resistance). The volitional system and its associated resistance strategies are activated when the behavior is evaluated negatively for a dissonant CI, and remains so until the window of opportunity for action enactment closes. In some cases however, in spite of dissonance, the CI proves irresistible and is enacted. In such cases, the volitional system may facilitate coping with failure, as the consumer detaches himself or herself from the unsuccessful CI resistance attempt by inhibiting activation of the resistance elements, and through preventing excessive ruminations about the CI (e.g., "If only I had controlled myself instead of going on an eating binge!").

When the consumer experiences a dissonant CI and evaluates the behavior negatively, an *outcome expectancy,* that is, the subjective likelihood of successfully resisting the CI, given continued effort, is derived. This expectancy is directly influenced by the strength of the CI and the valence of the negative cognitive evaluation, which determines the motivational available for resistance. If expectancy for successful resistance is sufficiently favorable, the volitional system continues to guide the individual toward resistance of the CI until the window of opportunity for CI enactment closes. The consumer may use one or more resistance strategies to resist the impulse. On the other hand, if the expectancy is sufficiently unfavorable, resistance to the CI dwindles, resulting in the eventual enactment of the dissonant negatively evaluated CI. In this case, the consumer may experience conflict during CI enactment, and negative emotions such as guilt or regret. This mechanism of *outcome-expectancy evaluation* is consistent with the Carver and Scheier (1990) views in the *control-theory−based model of self-regulation.*

As the volitional resistance processes operate, the strength of the CI eventually dwindles as the antecedent factors responsible for the CI recede from the consumer's attention. In this case, the CI dissipates without enactment of the behavior. The CIFE model represents a par-

simonious, yet psychologically rich account of the process through which consumption impulses are formed and get enacted or resisted by consumers.

## STUDY 1: IMPULSIVE PRODUCT PURCHASE

In the rest of the article, the key ideas underlying the CIFE model are tested. In particular, the focus is on the differential drivers of behavior enactment in the consonant and dissonant CI conditions, and on the operation of the volitional system. A key idea in the CIFE framework is that in the consonant CI condition, when the consumer does not identify any constraining factors, the CI gets enacted into behavior smoothly, without much cognitive deliberation. In this case, the CIFE model suggests that strength of the antecedent factors should determine the intensity of the CI, which should then drive the impulsive consumption. For tractability and given its relative importance in the existing research (e.g., Dickman, 1990; Rook & Fisher, 1995), this research focuses on the impulsivity trait of the consumer as the antecedent factor of primary interest. It is expected that the impulsivity trait of the consumer will drive behavior enactment when the CI is consonant. At the same time, the CIFE model suggests that the cognitive evaluation should not play a role in enactment of the CI, because the consumer responds reflexively without much deliberation. Following the reasoning above, the research hypothesis can be articulated as follows:

**H1:** In the consonant CI condition, trait impulsivity is the more significant predictor, and cognitive evaluation of behavior is the less significant predictor of impulsive behavior enactment.

Figure 2 shows these hypothesized relationships for the consonant CI condition.

On the other hand, if the consumer identifies one or more constraining factors following the experience of the CI, the CIFE framework posits that a cognitive evaluation of the behavior occurs. For such a dissonant CI, the consumer is more likely to enact the CI if the evaluation is positive and vice versa. The CIFE model thus predicts that valence of the cognitive evaluation is more likely to drive impulsive behavior, whereas antecedent factors such as trait impulsivity will play a relatively unimportant role in its enactment. Following this reasoning, the research hypothesis is stated:

**H2:** In the dissonant CI condition, cognitive evaluation of behavior is the more significant predictor, and trait impulsivity is the less significant predictor of impulsive behavior enactment.



**Figure 2.** Consonant impulse condition.

Figure 3 graphically depicts the relationships presented in Hypothesis 2.

To summarize, it is hypothesized that the type of CI (consonant or dissonant) plays a moderating role in the influence of antecedent factors such as the impulsivity trait and cognitive evaluation on enactment of the impulsive behavior. Additionally, the CIFE framework indicates that when the evaluative process results in a negative judgment of behavior for a dissonant CI, the consumer actively resists the CI. Relative to the case where the consumer evaluates the dissonant CI positively, it is expected that the CI is less likely to be enacted when the cognitive evaluation of the dissonant CI is negative. The following hypothesis formalizes this reasoning:

**H3:** The likelihood of impulsive behavior enactment is significantly less for the dissonant-CI–negative cognitive evaluation condition than for either the dissonant-CI–positive cognitive evaluation condition, or the consonant CI conditions.

In this first study, the research hypotheses are tested in the context of an impulsive product purchase. The experiment conducted to test the hypotheses is described next.



**Figure 3.** Dissonant impulse condition.

## METHOD

### Sample and Data Collection

As a partial fulfillment of a course requirement, 101 undergraduate business students at a large midwestern university participated in the study. The basic framework of the study used an approach similar to that of Rook and Fisher (1995). The subjects were first asked to select one of a set of purchase alternatives in a hypothetical buying scenario. Following the selection of the behavior, the subjects responded to multiple measures eliciting cognitive evaluation of behaving impulsively, as well as the Rook Impulsivity Scale (Rook, 1987; Rook & Fisher, 1995). The details of these measurements are described next.

***Measurement of Impulsive Purchase Behavior.*** The shopping scenario used by Rook and Fisher (1995) was adapted for this study. Subjects were randomly assigned to either the consonant CI condition, or the dissonant CI condition. Subjects assigned to the consonant CI condition were given the following scenario: "Mary (Bob) is a 21-year-old college student. She (He) is well off and generally has plenty of spending money. Mary (Bob) needs to buy a pair of warm socks for an outdoor party this weekend. After work, she (he) goes with her (his) friend Susan (John) to the mall to purchase the socks. As they are walking through Mervyn's, Mary (Bob) sees a great-looking sweater on sale for $75 and

falls in love with it on first sight. Please select which of the following five purchase-decision alternatives Mary (Bob) should make."

On the other hand, subjects in the dissonant CI condition were given the following scenario: "Mary (Bob) is a 21-year-old college student with a part-time job. It is two days before she (he) gets the next paycheck and has only $25 left for necessities. In addition to food, Mary (Bob) needs to buy a pair of warm socks for an outdoor party this weekend. After work, she (he) goes with her (his) friend Susan (John) to the mall to purchase the socks. As they are walking through Mervyn's, Mary (Bob) sees a great-looking sweater on sale for $75 and falls in love with it on first sight. Please select which of the following five purchase-decision alternatives Mary (Bob) should make, by circling the appropriate number."

Subjects in both groups were asked to select one of five purchase-decision alternatives. These choice alternatives, similar to Rook and Fisher (1995), represented varying levels of impulsiveness. From low to high impulsiveness, these alternatives were (1) buy the socks only; not even think about the sweater, (2) buy the socks only; want the sweater but not buy it, (3) decide not to buy the socks and buy the sweater instead, (4) buy both the socks and the sweater with a credit card, and (5) buy both socks and sweater plus matching slacks and a shirt to complete the outfit. To control for the possible effects of the stimulus, half of the subjects were randomly assigned to a scenario with a male protagonist, Bob. An ANOVA conducted subsequently to evaluate the role of protagonist gender found no significant main or interaction effects. Consequently, this variable was dropped from the analysis and is not discussed further. Subjects were also asked to state their agreement with the statement: "Mary (Bob) experienced an impulse to purchase the sweater" on a 5-point scale. This is called the "impulse experience" measure.

***Measurement of the Impulsiveness Trait.*** Much research in the personality literature has found the impulsiveness trait to be unidimensional and measurable by relatively short scales (Plutchik & van Praag, 1995). In the context of consumption, Rook and Fisher (1997) developed a scale, focusing on the individual's impulsiveness trait with respect to purchase and use of products. In keeping with the current focus on consumption, this scale was used to measure the subject's impulsivity trait. A reliability analysis found the Cronbach alpha for the scale to be 0.89, with consistently high interitem correlations, indicating a high level of reliability. This result is consistent with earlier use of this scale (Rook & Fisher, 1997).

***Measurement of Cognitive Evaluation.*** After subjects had made their behavioral choice for the scenario, they were told that the protag-

onist chose the most impulsive behavior (i.e., bought both the socks and the sweater, as well as matching slacks and shirt to complete the new outfit). They were asked to evaluate the protagonist's behavior on a number of measures, designed to tap the cognitive content of their evaluation. A total of 10 bipolar adjective pairs were administered in the semantic-differential format. These included "rational"–"crazy," "acceptable"–"unacceptable," "agreeable"–"disagreeable," and "weak"–"strong." This constitutes a scale measuring the cognitive evaluation of impulsive behavior for the subject. An evaluation of scale reliability indicated a Cronbach alpha of 0.92. The cognitive evaluation scale can therefore be deemed as sufficiently reliable.

## RESULTS

As discussed before, both trait impulsivity and cognitive evaluation of the impulsive behavior were measured with multiple items. Separate factor analyses were conducted on these two sets of measures to obtain parsimonious measures of the two antecedent constructs. Both cognitive evaluation and Rook's impulsivity yielded single-factor solutions with the use of the eigenvalue-greater-than-1 criterion. Factor scores were generated for each variable with the Thompson procedure (Johnston, 1998), and used in subsequent analysis. Given the focus on teasing apart the effects of trait impulsivity and cognitive evaluation, multicollinearity between the two factor scores is a potential problem. To ensure that this is not an issue, the bivariate Pearson correlation coefficient between the factor scores of the impulsivity trait and cognitive evaluation of the impulsive behavior was computed. It was found to be 0.29, which, though significant, is moderate, which indicates that multicollinearity is not problematic to subsequent interpretation of results.

An assumption made in this analysis is that the impulsivity trait of the consumer is the primary determinant of the consumption impulse experience for the purchase scenario used. Consequently, a high level of correspondence between the trait impulsivity and experience of the CI is a necessary condition to test the research hypotheses as well as to verify the working of the CIFE model. To ascertain this the bivariate Pearson correlation was computed for the trait impulsivity factor score and the impulse experience measure. It was found to be 0.75, indicating that subjects high in trait impulsivity were more likely to experience the consumption impulse, and vice versa.

To test the research hypotheses, a general factorial analysis of variance was carried out, with one factor (CI type: consonant, dissonant) and two independent variables (trait impulsivity and cognitive evaluation). The dependent variable in the analysis was degree of impulsivity of the behavior chosen by the subject, measured with the use of the ordered 5-point scale discussed before. Results indicated that the main

effect of the consonant−dissonant CI factor was significant at $F(1,93) = 6.33; p = .014$. The trait impulsivity, at $F(1,93) = 5.56, p = .020$, as well as the cognitive evaluation effects, at $F(1,93) = 23.129, p < .001$ were significant as well. In addition, the consonant−dissonant CI × cognitive evaluation interaction was significant, at $F(1,93) = 4.742, p = .032)$ whereas the trait impulsivity−cognitive evaluation interaction approached significance, at $F(1,93) = 3.422, p = .067)$. The equations for subjects in the two impulse conditions are as follows.

For the consonant CI condition:

$$Behavior = 3.306* + 0.267* \, (Cognitive \; Evaluation) \\ + 0.417* \, (Impulsivity) \\ - 0.07 \, (Cognitive \; Evaluation \times Impulsivity). \quad (1)$$

For the dissonant CI condition:

$$Behavior = 2.822* + 0.709* \, (Cognitive \; Evaluation) \\ + 0.054 \, (Impulsivity) \\ - 0.385* \, (Cognitive \; Evaluation \times Impulsivity). \quad (2)$$

The asterisks indicate statistical significance at the $\alpha = 0.05$ level of significance.

The statistical analysis provides strong support to the research hypotheses and to the CIFE model presented before. In the *consonant CI condition,* the standardized parameter estimates of Eq. (1) indicate that impulsivity plays a more important role. Similarly, although the influence of cognitive evaluation on impulsivity of the behavior is significant, it is less so than the impulsivity trait. These results provide strong support to Hypothesis 1, and suggest that when the consumer does not detect constraints to enacting the CI, the strength of antecedent factors predominates in driving the CI enactment. The more impulsive the consumer, the more likely he or she will be to enact the CI. In this case, cognitive evaluation of impulsive behavior plays a marginal role in influencing behavior enactment.

The results are different for the *dissonant CI condition.* In this case, standardized parameter estimates obtained from the general factorial analysis of variance [Eq. (2)] show that although cognitive evaluation of the impulsive behavior is a significant predictor of behavior enactment, trait impulsivity is not significant. These results provide strong support to Hypothesis 2. As predicted by the CIFE framework, in the dissonant CI condition, the cognitive evaluation of the behavior almost completely drives the enactment of the product purchase CI. Thus, even consumers who are very impulsive by nature may resist the CI successfully in the presence of constraining factors, if they evaluate the behavior negatively.

Hypothesis 3 aimed to validate the existence of the volitional system



**Figure 4.** Proportion of subjects choosing impulsive behavior (Study 1).

in the CIFE model, positing that when the dissonant CI is accompanied by a negative cognitive evaluation of enacting the behavior, the volitional system will resist the CI, resulting in less likelihood of CI enactment. The significant consonant−dissonant CI × cognitive evaluation interaction provides strong support to this hypothesis. Consistent with this, across levels of impulsivity, less than 10% of subjects in the dissonant-CI−negative cognitive evaluation condition engaged in the impulsive behavior, which is significantly lower than any of the other conditions.

In addition, to corroborate these results, the trait impulsivity and cognitive evaluation scores were categorized into two-level factors. Subjects were assigned to the high-impulsivity level or the low-impulsivity level depending on whether the subject's factor score on the Rook's impulsivity scale fell above or below the sample median. A similar procedure was followed to classify subjects as having positive or negative cognitive evaluation of the impulsive behavior. In addition, the dependent variable was divided into either impulsive (if the subject chose 3, 4, or 5 in the scenario) or nonimpulsive (if the subject chose 1 or 2). The proportion of subjects in each cell choosing an impulsive behavior was computed and is graphically summarized in Figure 4.

The figure visually summarizes the discussion indicating that although trait impulsivity drives impulsive behavior in the consonant CI condition, cognitive evaluation is the primary driver in the dissonant CI

condition. Moreover, the role of the volitional system is clearly evident as well. In general, these results strongly support the research hypotheses, and the CIFE framework for impulsive product purchase behaviors.


## STUDY 2: EMOTION-LADEN IMPULSIVE CONSUMPTION

The first study tested research hypotheses derived from the CIFE framework in the context of a product purchase. The constraint here was a practical one: inadequate money to make the purchase. In this case, for the dissonant CI condition, it could be argued that the very nature of the constraint may have made cognitive evaluation necessary, given the need to consider feasibility of action enactment (e.g., making a purchase without adequate cash or credit). What happens when the constraint is less objective, and more emotion laden? This issue arises in the context of self-control when the consumer has to make a choice between alternatives providing positive consequences in the short term but with deleterious long-term impact, and more currently unpleasant but long-term positive outcome alternatives. Issues of dieting, consumption of alcohol, cigarettes and drugs, as well as engaging compulsively in behavior such as gambling, chronic shopping, etc., all fall in this category of impulsive consumption (see Nataraajan & Goff, 1991, for a detailed discussion). As discussed before, this impulsive consumption is qualitatively different from the impulsive purchase of products and services.

In this second study, applicability of the CIFE framework to this type of impulsive consumption is examined. The researcher's thesis is that even when constraining factors are less objective and are laden with emotion, on perceiving the constraint, the consumer will engage in cognitive evaluation and the volitional system will be activated if this evaluation is negative. The cognitive and volitional resistive processes will then act to dampen the consumption impulse. On the other hand, if no constraining factors are identified, the strength of the antecedent factors will determine enactment. The three research hypotheses presented earlier are tested here in the context of emotion-laden impulsive consumption. The study is now described.


## METHOD

### Sample and Data Collection

In exchange for a free tee-shirt, 218 web surfers participated in this study. These subjects were older (mean age = 34.2 years) and had higher average incomes ($M$ = \$47,000) than the sample for the first

study. As in the first study, subjects were first asked to select one of a set of purchase alternatives in a hypothetical buying scenario. Following the selection of the behavior, the subjects completed the detailed cognitive evaluation measures, and the Rook impulsivity scale.

***Measurement of the Impulsive Behavior.*** Subjects were randomly assigned to either the consonant or the dissonant CI conditions. Subjects assigned to the consonant CI condition were given the following scenario: "Joan is a 26-year-old graduate student. She enjoys exercising and running and likes to eat health food. On a weekday morning, Joan decides to have a healthy salad for lunch. After a busy and productive morning at work, in which she gets a lot accomplished, she goes with her friend Lynn to Amer's, her favorite deli. As she is looking though the display, she sees a mouth-watering tray of strawberry cheesecake, her favorite dessert, and feels a strong craving for it immediately. Please select which of the following five options Joan should choose."

On the other hand, subjects assigned to the dissonant CI condition were given the following scenario: "Joan is a 26-year-old graduate student. She is overweight and likes to eat healthy food in order to keep her weight in control. On a weekday morning, Joan decides to have a healthy salad for lunch. After a busy and productive morning at work, in which she gets a lot accomplished, she goes with her friend Lynn to Amer's, her favorite deli. As she is looking though the display, she sees a mouth-watering tray of strawberry cheesecake, her favorite dessert and feels a strong craving for it immediately. Please select which of the following five options Joan should choose."

Subjects in both groups were asked to select one of five purchase decision alternatives. From low to high impulsiveness, these alternatives were (1) get the healthy and low-calorie salad for lunch; not even think about the cheesecake, (2) get the healthy and low-calorie salad for lunch; want the cheesecake but not get it, (3) decide not to get the salad but get the cheesecake instead, (4) get both the salad and the cheesecake, and (5) get both the salad and the cheesecake plus a chicken sandwich to complete the meal.

The impulse experience measure was elicited here as well by asking subjects to state their agreement with the statement "Joan (John) experienced an impulse to get the cheesecake" on a 5-point scale.

***Measurement of the Impulsiveness Trait.*** The 9-item Rook and Fisher (1995) buying impulsiveness scale was used to measure the impulsiveness trait. The reliability of the scale was sufficiently high, with a high Cronbach alpha of 0.89, consistent with earlier results.

***Measurement of Cognitive Evaluation.*** After the subjects had made their behavioral choice for the scenario, they were told that the protagonist chose the most impulsive behavior (i.e., bought the salad and the

cheesecake plus a chicken sandwich to complete the meal). They were asked to evaluate the protagonist's behavior using a cognitive evaluation measure, similar to those used in Study 1. Sufficiently high reliability ($\alpha = 0.91$) was obtained for these measures.

## RESULTS

Separate factor analyses were conducted on these two sets of measures to obtain parsimonious measures of the two antecedent constructs. Both cognitive evaluation and Rook's impulsivity yielded single-factor solutions with the eigenvalue-greater-than-1 criterion. Factor scores were generated for each variable with the use of the Thompson procedure (Johnson, 1998), and used in subsequent analysis. As in Study 1, the correlation between the factor scores of the impulsivity trait and cognitive evaluation of the impulsive behavior was computed to evaluate potential problems of multicollinearity. It was found to be 0.098, and not statistically significant, suggesting that multicollinearity was not an issue. As before, the correspondence between trait impulsivity and the experience of the consumption impulse was evaluated as well. In this case, the Pearson correlation coefficient for the trait impulsivity factor score and the impulse experience measure was found to be 0.77, suggesting that trait impulsivity corresponded highly with experience of the consumption impulse.

A general factorial analysis of variance was conducted, with one factor (CI type: consonant, dissonant) and two independent variables (trait impulsivity and cognitive evaluation). The dependent variable was degree of impulsivity of the behavior chosen by the subject in the scenario. The main effect of the CI condition (consonance vs. dissonance) factor was found to be significant, at $F(1,204) = 52.563$, $p < .001$, as was the cognitive evaluation at $F(1,204) = 29.193$, $p < .001$, and the trait impulsivity effect at $F(1,204) = 11.134$, $p = .001$. In addition, the behavior-type factor $\times$ cognitive evaluation interaction was also significant, at $F(1,204) = 4.237$, $p = .01$. The predictor equations for subjects in the two impulse conditions are as follows.

For the consonant CI condition:

$$\text{Behavior} = 3.363* + 0.238* \text{ (Cognitive Evaluation)} \\ + 0.268* \text{ (Impulsivity)} \\ + 0.01 \text{ (Cognitive Evaluation} \times \text{Impulsivity).} \quad (3)$$

For the dissonant CI condition:

$$\text{Behavior} = 2.349 + 0.531* \text{ (Cognitive Evaluation)} \\ + 0.200* \text{ (Impulsivity)} \\ + 0.046 \text{ (Cognitive Evaluation} \times \text{Impulsivity).} \quad (4)$$



**Figure 5.** Proportion of subjects choosing impulsive behavior (Study 2).

The asterisks indicate statistical significance at the $\alpha = 0.05$ level of significance.

The standardized coefficients in Eqs. (3) and (4) above are comparable. In the consonant CI condition, trait impulsivity has the larger coefficient, whereas cognitive evaluation has the larger impact on impulsive behavior for the dissonant CI condition.

In addition, to further accentuate the results described above, subjects were divided into high trait impulsivity and low trait impulsivity with the use of a median split on the Rook impulsivity factor score. Similarly, subjects were assigned to either the positive cognitive evaluation or the negative cognitive evaluation cells, based on a median split along the cognitive-evaluation factor score. Finally, the dependent variable (impulsive behavior) was divided into either impulsive (if the subject chose 3, 4, or 5 in the scenario) or nonimpulsive (if the subject chose 1 or 2). The proportions of subjects in each cell choosing impulsive behavior were computed for each of the eight cells, and are graphically presented in Figure 5.

The statistical analysis and the graphical summary resoundingly support the research hypotheses and the main ideas underlying the CIFE model in the context of emotion-laden impulsive consumption. As mentioned before, for the consonant CI condition, the standardized parameter estimates of Eq. (3) from the general factorial analysis of variance indicate that the individual's trait impulsivity is the stronger

driver of impulsive behavior than cognitive evaluation, providing support to Hypothesis 1, for emotion-laden impulsive consumption. In this case, essentially, strength of the CI will drive subsequent impulse enactment.

On the other hand, for the dissonant CI condition, the effects of the two factors are reversed. The general factorial ANOVA standardized parameter estimates in Eq. (4) indicate that here, cognitive evaluation is the more significant driver of impulsive behavior, whereas trait impulsivity is a secondary influence. To test Hypothesis 3, a one-way ANOVA was conducted with the dissonant-impulse−negative cognitive evaluation as one factor level, and the other conditions as the second factor level. The dependent variable was impulsiveness of the behavior. Results of the ANOVA indicated that subjects in the dissonant-CI−negative cognitive evaluation condition ($M = 1.81$) were engaged in significantly less impulsive behaviors [$F(1,217) = 89.78; p < .001$] than those in the other experimental conditions ($M = 3.25$). Only about 10.8% of the subjects in this condition engaged in impulsive behavior, whereas 65.4% of subjects in the other conditions engaged in impulsive behavior. These results provide strong support to Hypothesis 3.

In general, these results strongly support the CIFE model for emotion-laden impulsive consumption such as that involving in overeating, drinking, and other compulsive or addictive behaviors.


## GENERAL DISCUSSION

Impulsive consumption has attracted attention for the past several decades because of its pervasiveness, as well as the important practical implications stemming from it. Identifying certain product attributes, packaging elements, or display designs as making consumers more susceptible to purchase impulsively, on which much attention has focused has great value, as has the identification of correlates of the impulsivity trait, but these lines of research fail to provide a satisfactory explanation of when and how impulses are formed and enacted by consumers. Who among us has not experienced the irresistible urge to grab a bar of chocolate at the supermarket checkout line? Such urges are resisted successfully by some consumers, but not by others. Even for the same consumer, the urge may sometimes result in consumption, but may be resisted successfully at other times. In this research, the researcher sought to provide a psychologically rich account of processes determining these outcomes. In two experimental studies, the key postulates of the theoretical framework were tested and verified in the context of impulsive product purchases, as well as emotion-laden impulsive consumption.

The theoretical framework presented here has great value in understanding impulsive consumption for several reasons. First, it provides

a sound basis for conducting theoretical and practical research in this important area of consumer research. Indeed, a number of specific opportunities for refining and extending the scope of the CIFE model are discussed later in this section. Second, through articulating the role of cognitive, motivational, and volitional processes in impulse resistance and enactment, this research places impulsive behavior on an equal footing with the more well-researched, goal-directed, and mindless behaviors. Third, this research has enormous practical significance as well. Purveyors of products and services may focus on one or more of the antecedent factors outlined in the CIFE model to increase the likelihood of occurrence of the consumption impulse. Indeed, an important insight from the CIFE framework is that influence of antecedent factors is a matter of degree *as well as* interaction, in formation of the CI. In other words, an extremely impulsive trait alone may be just as effective in enabling experience of the consumption impulse as the interaction of a much less impulsive trait with effective marketing stimuli. Similarly, multiple marketing stimuli may have the same effect on the consumer. The practical implication is that modifying multiple antecedent factors slightly may result in much higher levels of impulsive consumption at the aggregate level. Similarly, an understanding of resistance strategies is also useful from a practitioner standpoint. If retailers understand how and when specific resistance strategies work, they may design specific tactics to break down the operation of even the most effective resistance strategies. For instance, a retailer may counter the *exposure control* strategy of a resisting consumer by placing the same enticing merchandise at different locations in the store, making it more accessible (and difficult to get away from).

The theoretical findings and the formulation presented here are useful to consumers as well. For consumers interested in resisting impulses as well as for social scientists concerned with devising intervention strategies for addictive and injurious behaviors, this framework provides specific guidance to enhance the effectiveness of resistance, or to prevent experience of the consumption impulse in the first place.

Some future directions stemming from the research described here must also be pointed out. This psychological account of impulse formation and enactment or resistance is parsimonious for elegance of presentation, as well as to make its exposition and validation tenable. Such parsimony necessarily results in less attention on specific aspects. For instance, one natural area where greater focus may beneficially be bestowed is the working of the volitional system and self-resistance strategies. In this article, the focus was on working of these strategies and their success, and less attention was given to aspects of failure, when these strategies fail to resist the impulse. Additional research should seek to examine the short-term and long-term behavioral as well as psychological consequences of resistance failure. Research on mental control failures (e.g., Wegner & Erber, 1993) as well as coping (e.g.,

Nolan-Hoeksema, 1990) has the potential to enlighten this investigation. Expanding on the role of anticipatory emotions, additional research should consider the role of emotions and moods in other aspects of the impulse formation and enactment process. For instance, given that a positive mood state is associated with a greater preference for risk, it is likely that a positive mood may accentuate the impulse-formation potential of the different antecedent factors.

In the empirical studies, the focus was on the impulsivity trait, one antecedent of the consumption impulse. Future research would greatly advance the model presented here through empirically testing the hypothesized relationships through explicit consideration of other antecedent factors. Here, it was demonstrated that consumers indeed inhibit and resist dissonant impulses when they are evaluated negatively. However, more attention also needs to be given to the specific operation of the volitional system and the resistance strategies articulated in the CIFE model. For instance, individual studies may be designed to study the working of specific resistance strategies, resulting in a richer understanding of the impulse resistance process. To conclude, the CIFE framework represents a starting point and opens up many opportunities to deepen understanding of a very pervasive and practically important domain of consumer behavior.

# REFERENCES

Bagozzi, R. P., Baumgartner, H., & Pieters, R. (1998). Goal-directed emotions. Cognition and Emotion, 12, 1–26.

Bagozzi, R. P., & Dholakia, U. M. (1999). Goal-setting and goal-striving in consumer behavior. Journal of Marketing, 63, 19–32.

Bandura, A. (1991). Social cognitive theory of self-regulation. Organization Behavior and Human Decision Processes, 50, 248–287.

Bargh, J. A. (1989). Conditional automaticity: Varieties of automatic influence in social perception and cognition. In J. Uleman & J. Bargh (Eds.), Unintended thought (pp. 3–51). New York: Guilford Press.

Bargh, J. A., & Barndollar, K. (1996). Automaticity in action: The unconscious as repository of chronic goals and motives. In P. Gollwitzer & J. Bargh (Eds.), The psychology of action: Linking cognition and motivation to behavior (pp. 457–481). New York: Guilford Press.

Barrett, E., & Patterson, J. H. (1983). Impulsivity: Cognitive, behavioral and psychophysiological correlates. In M. Zuckerman (Ed.), Biological bases of sensation seeking, impulsivity and anxiety (pp. 77–116). Hillsdale, NJ: Lawrence Erlbaum.

Beck, A. T., & Emery, G. (1985). Anxiety disorders and phobias: A cognitive perspective. New York: Basic Books.

Belk, R. W. (1975). Situational variables and consumer research. Journal of Consumer Research, 12, 157–164.

Belk, R. W. (1985). Materialism: Trait aspects of living in the material world. Journal of Consumer Research, 12, 265–280.

Bettman, J. R. (1979). An information processing theory of consumer choice. Reading, MA: Addison-Wesley.

Bütz, M., & Austin, S. (1993). Management of the adult impulsive client: Identification, timing, and methods of treatment. In W. McGown, J. Johnson, & M. Shore (Eds.), The impulsive client: Theory, research and treatment (pp. 323–344). Washington, DC: American Psychological Association.

Carver, C. S., & Scheier, M. S. (1990). Principles of self-regulation: Action and emotion. In E. T. Higgins & R. Sorrentino (Eds.), Handbook of motivation and cognition: foundations of social behavior (Vol. 2, pp. 3–52). New York: Guilford Press.

Cobb, C. J., & Hoyer, W. D. (1986). Planned versus impulse purchase behavior. Journal of Retailing, 62, 67–81.

Cox, K. (1964). The responsiveness of food sales to shelf space changes in supermarkets. Journal of Marketing Research, 1, 63–67.

Dickman, S. J. (1990). Functional and dysfunctional impulsivity: Personality and cognitive correlates. Journal of Personality and Social Psychology, 58, 95–102.

Doob, L. W. (1990). Hesitation: Impulsivity and reflection. New York: Greenwood Press.

Emmons, R. A., King, L. A., & Sheldon, K. (1993). Goal conflict and the self-regulation of action. In D. Wegner & J. Pennebaker (Eds.), Handbook of mental control (pp. 528–551). Englewood Cliffs, NJ: Prentice Hall.

Gilbert, D. T. (1993). The ascent of man: Mental representation and control of belief. In D. Wegner & J. Pennebaker (Eds.), Handbook of mental control (pp. 57–87). Englewood Cliffs, NJ: Prentice Hall.

Higgins, E. T. (1996). Ideals, oughts and regulatory focus: Affect and motivation from distinct pains and pleasures. In P. Gollwitzer & J. Bargh (Eds.), The psychology of action: Linking cognition and motivation to behavior (pp. 91–114). New York: Guilford Press.

Hirschman, E. C. (1980). Innovativeness, novelty-seeking, and consumer creativity. Journal of Consumer Research, 7, 283–295.

Hoch, S. J., & Loewenstein, G. F. (1991). Time-inconsistent preferences and consumer self-control. Journal of Consumer Research, 15, 492–507.

Isen, A. M., & Diamond, G. A. (1989). Affect and automaticity. In J. Uleman & J. Bargh (Eds.), Unintended thought (pp. 124–154). New York: Guilford Press.

Johnson, D. E. (1998). Applied multivariate methods for data analysts. Pacific Grove, CA: Duxbury Press.

Kanfer, R. (1996). Self-regulatory and other non-ability determinants of skill acquisition. In P. Gollwitzer & J. Bargh (Eds.), The psychology of action: Linking cognition and motivation to behavior (pp. 404–423). New York: Guilford Press.

Kuhl, J. (1987). Action control: The maintenance of motivational states. In F. Halisch & J. Kuhl (Eds.), Motivation, intention and volition (pp. 279–291). Berlin: Springer.

Langer, E. J., & Imber, L. (1980). The role of mindlessness in the perception of deviance. Journal of Personality and Social Psychology, 39, 360–367.

Loewenstein, G. F. (1990). Reference points in intertemporal choice. Unpublished working paper, Center for Decision Research, University of Chicago.

Lurr, M., & Wunderlich, R. A. (1985). A measure of impulsiveness and its relation to extraversion. Education and Psychological Measurement, 45, 251–257.

Mischel, W., Ebbesen, E. G., & Zeiss, A. R. (1972). Cognitive and attentional mechanisms in delay of gratification. Journal of Personality and Social Psychology, 21, 204–218.

Mischel, H. N., & Mischel, W. (1983). The development of children's knowledge of self-control strategies. Child Development, 54, 226–254.

Murray, H. (1938). Explorations in personality. New York: Oxford University Press.

Nataraajan, R., & Goff, B. G. (1991). Compulsive buying: Toward a reconceptualization. In F. W. Rudmin (Ed.), To have possessions: A handbook of ownership and property. Journal of Social Behavior and Personality (Special Issue), 6, 307–328.

Nolan-Hoeksema, S. (1990). Sex differences in depression. Stanford, CA: Stanford University Press.

Oullette, J. A., & Wood, W. (1998). Habit and intention in everyday life: The multiple processes by which past behavior predicts future behavior. Psychological Bulletin, 124, 54–74.

Patterson, L. W. (1963). In-store traffic flow. New York: Point-of-Purchase Advertising Institute.

Plutchik, R., & van Praag, H. M. (1995). The nature of impulsivity: definitions, ontology, genetics and relations to aggression. In E. Hollander & D. Stein (Eds.), Impulsivity and aggression (pp. 7–24). New York: John Wiley & Sons.

Puri, R. (1996). Measuring and modifying consumer impulsiveness: A cost-benefit accessibility framework. Journal of Consumer Psychology, 5, 87–113.

Rook, D. W. (1987). The buying impulse. Journal of Consumer Research, 14, 189–198.

Rook, D. W., & Fisher, R. J. (1995). Normative influences on impulsive buying behaviors. Journal of Consumer Research, 22, 305–313.

Rook, D. W., & Hoch, S. H. (1985). Consuming impulses. In E. Hirschman & M. Holbrook (Eds.), Advances in consumer research (Vol. 12, pp. 23–27). Chicago, IL: Association for Consumer Research.

Salovey, P., & Mayer, J. D. (1990). Emotional intelligence. Imagination, Cognition and Personality, 9, 185–211.

Schwarz, N., & Bohner, G. (1996). Feelings and their motivational implications: Moods and the action sequence. In P. Gollwitzer & J. Bargh (Eds.), The psychology of action: Linking cognition and motivation to behavior (pp. 119–145). New York: Guilford Press.

Thaler, R. H., & Shefrin, H. M. (1981). An economic theory of self-control. Journal of Political Economy, 89, 392–406.

Vallacher, R. R. (1993). Mental calibration: Forging a working relationship between mind and action. In D. Wegner & J. Pennebaker (Eds.), Handbook of mental control (pp. 442–472). Englewood Cliffs, NJ: Prentice Hall.

Watson, D., & Clark, L. A. (1993). Behavioral disinhibition versus constraint: A dispositional perspective. In D. Wegner & J. Pennebaker (Eds.), Handbook of mental control (pp. 506–527). Englewood Cliffs, NJ: Prentice Hall.

Wegner, D. M., & Erber, R. (1993). Social foundations of mental control. In D. Wegner & J. Pennebaker (Eds.), Handbook of mental control (pp. 36–56). Englewood Cliffs, NJ: Prentice Hall.

Weinberg, P., & Gottwald, W. (1982). Impulsive consumer buying as a result of emotions. Journal of Business Research, 10, 43–57.

The author would like to thank Kalpesh Desai, Dennis Rook, and Rajan Nataraajan for insightful comments on earlier drafts of this article.

Correspondence regarding this article should be sent to: Dr. Utpal M. Dholakia, Marketing Department, School of Management, Jacobs Management Center, SUNY at Buffalo, Buffalo, NY 14260 (utpal@adelphia.net).