UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY RIFLE AND PISTOL LLC, et al., | No. 2:14-cv-02626-TLN-DB |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| KAMALA D. HARRIS, in her official capacity as Attorney General of California; and STEPHEN J. LINDLEY, in his official capacity as Chief of the California Department of Justice Bureau of Firearms, | |
| Defendants. | |

This matter is before the Court pursuant to Plaintiffs' and Defendants' Cross-Motions for Summary Judgment. (ECF Nos. 51 and 52.) Plaintiffs Tracy Rifle and Pistol LLC ("Tracy Rifle"), Michael Baryla ("Baryla"), Ten Percent Firearms ("Ten Percent"), Wesley Morris ("Morris"), Sacramento Black Rifle, Inc., Robert Adams, PRK Arms, Inc., Jeffrey Mullen, Imbert & Smithers, Inc. ("Imbert & Smithers"), and Alex Rolsky ("Rolsky") (collectively, "Plaintiffs") oppose Defendants' Motion. (ECF No. 55.) Defendants Kamala D. Harris, in her official capacity as Attorney General, and Stephen J. Lindley, in his official capacity of Chief of California Department of Justice Bureau of Firearms ("DOJ"), (collectively, the "Government") oppose Plaintiffs' Motion. (ECF No. 56.) For the reasons set forth below, the Court GRANTS

1

Plaintiffs' Motion for Summary Judgment, (ECF No. 51), and DENIES Defendants' Motion for Summary Judgment, (ECF No. 52).

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, retail firearms dealerships and their owners, argue that California Penal Code § 26820 is unconstitutional under the First Amendment of the United States Constitution and therefore seek declaratory and injunctive relief.  (ECF No. 22.)  Section 26820 provides: "No handgun or imitation handgun, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside."  Cal. Penal Code § 26820.  Several Plaintiffs have been cited for violations of § 26820, and several more would engage in speech prohibited by the statute but for the enforcement of it.  (ECF No. 55-2 at 2–3.)  The parties do not dispute the following facts.

On or about February 23, 2010, the DOJ inspected Ten Percent and discovered a metal sign shaped like a revolver in its parking lot.  (ECF No. 55-2 at 2.)  The DOJ inspector informed Morris, Ten Percent's owner, that the sign violated the handgun restriction, and Ten Percent removed the sign.  (ECF No. 55-2 at 2–3; ECF No. 51-4 at 16.)  The DOJ then issued a citation to Ten Percent and Morris for violating the handgun advertising ban.  (ECF No. 55-2 at 3.)  On September 12, 2014, the DOJ inspected Tracy Rifle.  (ECF No. 55-2 at 2.)  At the time of the inspection, Tracy Rifle's exterior windows were covered with large vinyl decals depicting four firearms—three handguns and a rifle.  (ECF No. 55-2 at 2.)  The DOJ cited Tracy Rifle and Baryla, Tracy Rifle's owner, for violating § 26820 and required them to take corrective action by February 11, 2015.  (ECF No. 55-2 at 2; ECF No. 51-4 at 6.)  On January 28, 2015, the DOJ inspected Imbert & Smithers and found a logo depicting an outline of a single-action revolver displayed on the building's exterior.  (ECF No. 55-2 at 3.)  The DOJ cited Imbert & Smithers and Rolsky, Imbert & Smithers's owner, for violating § 26820 and required them to take corrective action by July 28, 2015.  (ECF No. 55-2 at 3; ECF No. 51-4 at 37.)  All Plaintiffs wish to display truthful, nonmisleading on-site handgun advertising that is visible from the outside of their dealerships, and would do so, but for § 26820 and the threat of losing their dealer's licenses.  (ECF No. 56-1 at 2.)

2

Plaintiffs request this Court enter a declaratory judgment stating § 26820 violates the First Amendment and enter an injunction enjoining the enforcement of § 26820. (ECF No. 22 at 8–9.) Plaintiffs and the Government each move for summary judgment. (ECF Nos. 51 and 52).

## II.  STANDARD OF LAW

Summary judgment is appropriate when the moving party demonstrates no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

### III.   ANALYSIS

Plaintiffs challenge § 26820 as unconstitutional under the First Amendment, both on its face and as applied. (ECF No. 22 ¶ 37.) To succeed in a facial challenge, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Government, conversely, argues the law survives intermediate scrutiny and therefore is not unconstitutional. (ECF No. 52 at 16–17.) The Supreme Court has set out a four-part test to guide the constitutional analysis of commercial speech.

> At the outset, we must determine whether the expression is protected

> by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). If the Court finds that the affected speech is not misleading or related to unlawful activity, "the government bears the burden of showing that it has a substantial interest, that the restriction directly advances that interest and that the restriction is not more extensive than necessary to serve the interest." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013).

A.     <u>Whether the Speech Concerns Lawful Activity and Is Nonmisleading</u>

To qualify for First Amendment protection, the Court must first determine whether the commercial speech concerns lawful activity and is not misleading. *Cent. Hudson*, 447 U.S. at 566. The parties agree that on-site handgun advertisements concern lawful activity—purchasing a handgun from a licensed dealer—and are not misleading. (ECF No. 51-1 at 13; ECF No. 52 at 14.) Indeed, not only is purchasing a handgun from a licensed dealer lawful, it is constitutionally protected. *Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Therefore, the first prong of the *Central Hudson* test is satisfied.

B.     <u>Whether the Government's Interests Are Substantial</u>

Next, the Government must demonstrate that "the asserted governmental interest is substantial." *Cent. Hudson*, 447 U.S. at 566. Here, the Government advances two interests in support of its argument that § 26820 withstands First Amendment scrutiny. First, the Government asserts it has a substantial interest in reducing handgun suicide. (ECF No. 52 at 18.) Second, the Government asserts it has a substantial interest in reducing handgun crime. (ECF No. 52 at 23.) Plaintiffs do not dispute these are substantial governmental interests. (*See* ECF No. 51-1 at 13; ECF No. 55 at 5–6.) Therefore, the Court assumes that the Government's stated interests are substantial.

///

///

C. Whether § 26820 Directly and Materially Advances the Governmental Interests Asserted

The third prong of the *Central Hudson* test requires the Government to show that "the speech restriction directly and materially advances the asserted governmental interest[s]." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999). This prong is "critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)). "It is well established that 'the party seeking to uphold a restriction on commercial speech carries the burden of justifying it.'" *Edenfield*, 507 U.S. at 770 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983)). This burden requires more than "mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 770–71. Courts will not sustain a regulation if it "'provides only ineffective or remote support for the government's purpose' or if there is 'little chance' that the restriction will advance the State's goal." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566 (2001) (citation omitted) (quoting *Greater New Orleans Broad.*, 527 U.S. at 193; *Edenfield*, 507 U.S. at 770). However, the Government need not produce empirical data to support its conclusion that a speech restriction is necessary. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995). Instead, it may rely on "history, consensus, and 'simple common sense.'" *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)).

The Government argues that § 26820 directly advances its "interest in decreasing handgun suicides because the law inhibits handgun purchases by people with impulsive personality traits, who, as a group, are at a higher risk for suicide than the population in general." (ECF No. 52 at 18.) The Government argues its objective of preventing handgun suicides is achieved in two steps. "First, the advertisements restricted by section 26820 inhibit purchases by people with impulsive personality traits, a conclusion supported by Professor Gundlach's expert report." (ECF No. 52 at 18.) "[S]econd, people with impulsive personality traits are at a higher risk for

6

committing suicide, a conclusion supported by Professor Mann's expert report." (ECF No. 52 at 18.) The Government argues suicide is the leading cause of death for purchasers in the year after a handgun purchase, thus California's ten-day waiting period, Cal. Penal Code §§ 26815(a), 27540(a), is not entirely effective. (ECF No. 52 at 21.) In fact, according to the Government's expert, "[g]uns used for suicide are bought a mean of *11 years* before the suicide." (ECF No. 43-2 ¶ 30 (emphasis added).) The Government's argument that § 26820 directly advances its interest in handgun crime follows a similar vein—advertisements restricted by § 26820 tend to induce purchase by people with impulsive personality traits, and impulsive people are more likely to engage in crime. (ECF No. 52 at 23–24.) Thus, the Government's theory is essentially that an impulsive person will see a handgun sign outside a store, will impulsively buy the gun (although the Government does not identify a specific purpose for the purchase), and then, at some unspecified future time likely years later, the person's impulsive temperament will lead him to impulsively misuse the handgun that he bought in response to seeing the sign.

The Government claims § 26820 directly advances both its interests because it inhibits people with "impulsive personality traits" from purchasing a handgun in the first place. (ECF No. 52 at 18; ECF No. 56 at 8.) However, the Supreme Court has rejected this highly paternalistic approach to limiting speech, holding that the Government may not "achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011). The Supreme Court has reiterated that the Government cannot justify content-burdens on speech based on the "fear that people would make bad decisions if given truthful information." *Id.* (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002)). "Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth." *44 Liquormart v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion). For this reason, "[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Id.* The Government "may not seek to remove a popular but disfavored product from the marketplace by prohibiting truthful,

7

nonmisleading advertisements that contain impressive endorsements or catchy jingles." *Sorrell*, 564 U.S. at 577–78. That the Government "finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id.* at 578.

Yet, this is exactly what the Government seeks to do. The Government aims to stop a group of law-abiding adults with the shared personality trait of "impulsiveness" from making what it sees the bad decision of purchasing a handgun. The Government believes if it can inhibit such persons from making the initial decision to purchase a handgun, it will save them from harming themselves or others with the handgun at some later date, likely years from the initial purchase. However, the Government may not restrict speech that persuades adults, who are neither criminals nor suffer from mental illness, from purchasing a legal and constitutionally-protected product, merely because it distrusts their personality trait and the decisions that personality trait may lead them to make later down the road. Moreover, in the effort to restrict impulsive individuals from purchasing handguns, the Government has restricted speech to all adults, irrespective of whether they have this personality trait.[1] Therefore, the Government impermissibly seeks to achieve its goals through the indirect means of restricting certain speech by certain speakers based on the fear that a certain subset of the population with a particular personality trait could potentially make what the Government contends is a bad decision.

In addition to the Supreme Court's rejection of this type of approach, § 26820 is fatally underinclusive. "[U]nderinclusivity is relevant to *Central Hudson's* direct advancement prong because it 'may diminish the credibility of the government's rationale for restricting speech in the first place.'" *Valle Del Sol*, 709 F.3d at 824 (quoting *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009)). For example, in *Pitt News v. Pappert*, 379 F.3d 96 (3d Cir. 2004), the Third Circuit struck down a law restricting alcohol advertising in publications directly targeted to college students. The Court held that the law "applie[d] only to advertising in a very narrow sector of the media," and the state failed to show that "eliminating ads in [a] narrow sector [of the media] will do any good" because students "will still be exposed to a torrent of beer ads on

---

[1] The Government may not restrict commercial speech to shield a segment of the population when there are less restrictive alternatives. *See Lorillard Tobacco*, 533 U.S. at 581 ("[T]he governmental interest in protecting children from harmful materials does not justify an unnecessarily broad suppression of speech addressed to adults.").

1   television and the radio, and they will still see alcoholic beverage ads in other publications,"
2   including other publications displayed on campus. *Id.* at 107. The Ninth Circuit recently
3   addressed a similar issue in *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 851 (9th Cir.
4   2017), holding that restricting only a "small portion" of alcohol advertising visible to consumers
5   could not directly and materially advance the government's purported interest in promoting
6   temperance. The Government offers no meaningful distinction between this case and *Pitt News*.
7   Plaintiffs could display a large neon sign reading "GUNS GUNS GUNS" or a 15-foot depiction
8   of a modern sporting rifle, and this would be permissible. Moreover, Plaintiffs are free to
9   advertise through any other channels of communication. This includes a print advertisement with
10  a map to the store, a billboard with directions to the store (which could be blocks away), or a
11  radio jingle that makes it easy to find the store. The underinclusivity of this law gravely
12  diminishes the credibility of the Government's rationale.
13         More fundamentally, however, the Government has not demonstrated that § 26820 would
14  have any effect on handgun suicide or violence. The Government's first expert, Professor
15  Gregory T. Gundlach, opines that "it is reasonable to conclude that the display of a handgun or
16  imitation handgun or placard advertising the sale or other transfer thereof, in any part of the
17  premises of a California licensed handgun seller, that can be readily seen from the outside,
18  contributes in a positive way to the impulsive purchase of handguns." (ECF No. 43-1 ¶ 10.)
19  Professor Gundlach defines an "impulsive purchase" as "an unplanned and sudden buying act, in
20  response to subjective or external stimuli, accompanied by a powerful and persistent urge." (ECF
21  No. 43-1 ¶ 31.) According to Professor Gundlach, "[i]mpulse buying is distinguished from other
22  forms of buying based on the fact that it is primarily driven by strong hedonic temptations of
23  immediate satisfaction and improved mood with little or no regard for consequences." (ECF No.
24  43-1 ¶ 34.)
25         In reaching his conclusion, Professor Gundlach relies on studies of impulsive purchases
26  generally. (ECF No. 43-1 ¶¶ 32, 50–52.) The question, however, is not whether advertising
27  restrictions can generally reduce impulsive purchases, but rather whether § 26820 directly and
28  materially advances the Government's interest in reducing handgun purchases among impulsive

people and in turn the risk of handgun suicide or crime. The little evidence Professor Gundlach relies on to tie impulsive purchases to handguns includes a remark by a firearm manufacturer's executive during an earnings call, a passing mention in an industry publication, and two commenters on firearms blogs. (ECF No. 43-1 ¶ 33.) This evidence is trivial. Notably, it is unclear whether the use of the word "impulse" in any of these scenarios refers to the same "impulse" referred to by Professor Gundlach. Further, a study Professor Gundlach relies on explains that firearms fall into a product category least likely to involve impulse purchasing. *See* Clinton Amos et al., *A Meta-Analysis of Consumer Impulse Buying*, 31 J. Retailing & Consumer Servs. 86 (2014) ("An examination of product type did produce substantial difference as impulse buying was greater for fashion merchandise than supermarket purchases and general merchandise."). Handguns are substantially different from most purchases, both in terms of product type and cost. However, none of the studies Professor Gundlach relies on specifically address the impact of advertising on impulse purchases of handguns, let alone the impact specifically caused by the signage prohibited by § 26820. Nor does Professor Gundlach explain why the impulse purchases of handguns would be similar to other products. He similarly fails to address whether California handgun purchase regulations, such as the ten-day waiting period or required firearms law and safety test, would have an impact on impulsive handgun purchases. Thus, Professor Gundlach's data simply does not reveal that § 26820 reduces impulsive handgun purchases, let alone to a material degree.

      The Government does not satisfy its burden of materiality on a content-based commercial speech restriction by procuring an expert who, after citing some statistics and studies not directly related to the issue at hand, merely finds it "reasonable to conclude" that a statute does what the Government says it does and fails to express any opinion regarding the magnitude of this conclusion. *See 44 Liquormart*, 517 U.S. at 506 (plurality opinion) (holding the government failed to meet the direct advancement prong when it "presented no evidence to suggest that its speech prohibition [would] *significantly* reduce marketwide consumption" of alcohol). At best, Professor Gundlach's opinion provides "only ineffective or remote support for the government's purpose," which, of course, is not enough under *Central Hudson*. *Cent. Hudson*, 447 U.S. at 564.

1   Rather, the Government "must demonstrate that the harms it recites are real and that its restriction
2   will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 771.[2]  Thus, the
3   Government fails to demonstrate § 26820 affects impulsive handgun purchases to a material
4   degree.
5         The Government next relies on the opinion of Professor J. John Mann to demonstrate that
6   "people with impulsive personality traits are at a higher risk for committing suicide." (ECF No.
7   52 at 18.) Particularly, "Professor Mann offers the opinion that people with impulsive personality
8   traits are more likely to make a suicide attempt and that having a handgun in the home further
9   increases the risk that they will." (ECF No. 52 at 20.) Professor Mann goes on to explain that
10  "[s]uicidal behavior is generally impulsive and 70% of suicide attempters act less than one hour
11  after deciding to kill themselves." (ECF No. 43-2 ¶ 24.) Professor Mann did not study the effect
12  of § 26820 on impulsive handgun purchases, but rather assumes that if the invalidation of § 26820
13  would result in an increase in handgun purchases by people with impulsive personality traits, if
14  § 26820 were invalidated, "it would result in more handgun suicides in direct proportion to the
15  increase in handgun purchases by a vulnerable subgroup of the general population characterized
16  by more pronounced impulsive personality traits." (ECF No. 43-2 ¶ 15.) The Government also
17  cites several studies that found handgun purchases are associated with an increased risk of suicide
18  for the purchaser and members of the purchaser's household. (ECF No. 52 at 21.)
19        Both Professor Mann's report and the studies the Government cite conclude that
20  impulsive personality traits increase the risk of suicide or are associated with suicide. Plaintiffs
21  do not challenge the accuracy of these conclusions, (ECF No. 55-2 at 24–25), but instead,
22  challenge what they mean. (ECF No. 55 at 20.) Even if these conclusions are valid, they both
23  fail to demonstrate to any degree whether people who impulsively purchase handguns, as opposed
24  to those who non-impulsively purchase handguns or obtain a handgun through means other than
25  store purchase, commit suicide with that handgun. In other words, the Government fails to make

---

[2] Of course, this is not to say handgun signs visible from the outside of a store do not serve an important interest to stores. It is possible these signs could channel a handgun purchaser into one store rather than another. *See Greater New Orleans Broad.*, 527 U.S. at 188–89 ("While it is no doubt fair to assume that more advertising would have some impact on overall demand for gambling, it is also reasonable to assume that much of that advertising would merely channel gamblers to one casino rather than another.").

the link that impulsive handgun purchases result in impulsive handgun suicides. In fact, according to Professor Mann, the most relevant factor in handgun suicide is not whether the person who commits suicide purchases the handgun (let alone whether they impulsively purchase the handgun), but rather is whether a firearm is available in the home. (ECF No. 55-1 at 28 ("The gun in the house is what places people at risk. It's not necessarily whether they bought the gun or another family member bought the gun.").) Professor Mann's opinion thus focuses on the general notion that fewer handguns means less handgun suicide, rather than whether restricting impulsive handgun purchases would reduce handgun suicides. (*See* ECF No. 43-2 ¶ 33 ("The more handguns that are purchased the more handgun suicides will happen.").) But, the Court already held that the Government may not advance its asserted interests by demonstrating that as a general matter fewer handguns results in less handgun crime and violence. (ECF No. 32 at 10.) Ultimately, the Government fails to show that § 26820 has any direct or material effect on reducing handgun suicides because it fails to bridge the gap between those who impulsively purchase handguns and those who impulsively commit suicide with a handgun. Instead, the Government relies on mere speculation and conjecture. Accordingly, the Government fails to demonstrate that an impulsive handgun purchase results in an impulsive handgun suicide, i.e., that an impulsive handgun purchase is actually a "bad decision."

Although the bulk of the Government's argument focuses on suicide, the Government still maintains, as it did in the preliminary injunction stage, that § 26820 also directly advances California's interest in reducing handgun crimes. (ECF No. 52 at 23–24.) The Government still, however, has not produced evidence that § 26820 reduces impulsive handgun purchases and that this reduction in turn leads to less impulsive handgun crime, beyond what California's ten-day waiting period already provides. In the absence of evidence and with no common-sense relation, the Government has not met its burden of demonstrating that § 26820 directly and materially advances that interest. In sum, the Government fails to show that § 26820 has any effect on handgun suicide or crime.

///

///

D. <u>Whether § 26820 Is More Extensive Than Necessary</u>

Finally, the last prong of the *Central Hudson* test requires the Government to demonstrate that the challenged statute "is no more extensive than necessary to further" the Government's interests. *Cent. Hudson*, 447 U.S. at 569–70. "The fourth part of the test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans Broad.*, 527 U.S. at 188. In other words, "it should not be overinclusive." *Valle Del Sol*, 709 F.3d at 825 (emphasis omitted). The Government's fit need not be the least restrictive means, and it need not be perfect, but it must be reasonable. *Greater New Orleans Broad.*, 527 U.S. at 188.

However, "[i]f the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson*, 535 U.S. at 373. "[I]f the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Id.* at 371. A statute is more extensive than necessary if the government has other options that could advance its asserted interest in a manner less intrusive on First Amendment rights. *Rubin*, 514 U.S. at 491. The Government can achieve its interests not only through the creation of new laws, but also through the enforcement of existing laws. *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1178 (9th Cir. 2018) (holding California had "other, more narrowly tailored means of preventing consumer deception" such as banning deceptive or misleading surcharges, requiring retailers to disclose their surcharges both before and at the point of sale, or enforcing its existing laws banning unfair business practices and misleading advertising in pricing"); *Valle Del Sol*, 709 F.3d at 826–27 (holding Arizona could further its interest in traffic safety by enforcing existing traffic regulations rather than restricting speech).

The Government argues that § 26820 targets no more speech than necessary to further its asserted interests. (ECF No. 52 at 24.) However, the Government has "various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *Valle Del Sol*, 709 F.3d at 826 (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011)). For example, California has several laws that, if enforced, further its substantial interest in reducing handgun suicide and crime without

1  restricting speech.  The most notable of these laws imposes a ten-day waiting period before a
2  purchaser can receive a gun.  Cal. Penal Code §§ 26815(a), 27540(a).  This law, unlike § 26820,
3  is precisely related to the Government's interests in preventing handgun suicide and violence as it
4  "provides time not only for background checks, but for the purchaser to reflect on what he or she
5  is doing, and, perhaps, for second thoughts that might prevent gun violence."  *Silvester v. Harris*,
6  843 F.3d 816, 829 (9th Cir. 2016).  Additionally, California limits purchasers to one handgun
7  purchase within a thirty-day period, § 27535, and requires the purchaser complete a firearm safety
8  certificate program, §§ 31610–31670.  Unlike § 26820, which purportedly serves only to deter the
9  impulsive purchase of a handgun (ECF No. 58 at 11), these laws act directly to deter the potential
10 harmful consequences of handgun purchases without restricting speech.  They allow purchasers
11 not only the time to reflect on their purchases, but also provide an opportunity for purchasers to
12 learn about gun safety.  Further, to deter handgun crime, the Government has an arsenal of
13 criminal laws it may enforce.  Thus, the Government could further its asserted interests simply by
14 enforcing these existing laws.

15         If the Government considers its existing safeguards inadequate to combat handgun suicide
16 and crime, it may pass additional direct regulations within constitutionally permissible
17 boundaries.  The Government may also counteract what it views as dangerous messages with
18 "more speech, not enforced silence."  *Lorillard Tobacco*, 533 U.S. at 586 (quoting *Whitney v.*
19 *California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).  For example, the Government
20 could run an educational campaign focused on the dangers of handguns or the consequences of
21 impulsive decision making.  Although it appears the Government has rejected this idea, it has not
22 demonstrated why this alternative would not be more effective than § 26820.  Indeed, the
23 Supreme Court has recognized that "educational campaigns focused on the problems [at issue]
24 might prove to be more effective" than advertising regulations designed to decrease demand of a
25 product.  *44 Liquormart*, 517 U.S. at 507 (plurality opinion).  As the Government has provided no
26 evidence directly linking § 26820 to reduced handgun suicide or crime, it is surprising the
27 Government is so quick to dismiss other viable alternatives that may have greater impact.  The
28 Government has restricted disfavored speech without acknowledging the efficacy of policy

choices that do not burden speech.  Accordingly, § 26820 is more extensive than necessary.

The Government has an array of policies at its disposal to combat handgun suicide and crime.  "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table."  *Heller*, 554 U.S. at 636.  California may not accomplish its goals by violating the First Amendment.  The Government fails to satisfy the third and fourth prongs of the *Central Hudson* test.  Accordingly, § 26820 is unconstitutional on its face.

### IV.  CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Plaintiffs' Motion for Summary Judgment, (ECF No. 51), and DENIES Defendants' Motion for Summary Judgment, (ECF No. 52).  Further, the Court hereby orders that Defendants, and all persons and entities acting on their behalf, are enjoined from enforcing California Penal Code § 26820.

IT IS SO ORDERED.

Dated: September 10, 2018

_____
Troy L. Nunley
United States District Judge